IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDMUNDS HOLDING COMPANY, <br> A Delaware Corporation, and <br><br> EDMUNDS.COM, INC., <br> A New York Corporation, <br><br>       Plaintiffs, <br><br> v. <br><br> AUTOBYTEL INC., <br> A Delaware Corporation, <br><br>       Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | C.A. No. 08-149 (SLR) |

## DECLARATION OF ANDREW A. LUNDGREN, ESQ.

I, Andrew A. Lundgren, Esq. state:

1.  I am an attorney with the law firm of Young Conaway Stargatt & Taylor, LLP, counsel for Edmunds Holding Company and Edmunds.com, Inc. (collectively "Edmunds").

2.  I make this declaration in support of Edmunds' Answering Brief in Opposition to Defendant Autobytel's Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1).

3.  Attached hereto as Exhibit 1 is a true and correct copy of a December 11, 2004 article from Business Wire entitled "Autobytel Inc. Files Suit Against Dealix Corporation for Patent Infringement; U.S. Patent No. 6,282,517 Protects Real Time Communication of Purchase Requests."

4.  Attached hereto as Exhibit 2 is a true and correct copy of Autobytel's 2007 Form 10-K.

5.      Attached hereto as Exhibit 3 is a true and correct copy of the Complaint in

<u>Autobytel Inc. v. Dealix Corp.</u>, Civil No. 2:2004-cv-00338 (Sept. 24, 2004).

6.      Attached hereto as Exhibit 4 is a true and correct copy of the Complaint in

<u>Autobytel Inc. v. InsWeb Corp., et al.</u>, Civil No. 2:2007-cv-00524 (Nov. 30, 2007).


I declare under the penalty of perjury that the foregoing is true and accurate and that this

Declaration was executed on July 14, 2008.

_____
Andrew A. Lundgren (No. 4429)

*Attorney for Plaintiffs Edmunds Holding Company
and Edmunds.com, Inc.*

DB02:6978386.1

067243.1001

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on July 14, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Thomas C. Grimm, Esquire
> James W. Parrett, Jr., Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> PO Box 1347
> Wilmington, DE 19899-1347

I further certify that on July 14, 2008, I caused a true and correct copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### BY E-MAIL

> Timothy J. Haller, Esquire (haller@nshn.com)
> Gregory P. Casimer, Esquire (casimer@nshn.com)
> Niro, Scavone, Haller & Niro, Ltd.
> 181 West Madison Street, Suite 4600
> Chicago, IL  60602-4515

> YOUNG CONAWAY STARGATT
> & TAYLOR, LLP
>
> Melanie K. Sharp (No. 2501)
> msharp@ycst.com
> Andrew A. Lundgren(No. 4429)
> alundgren@ycst.com
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19899
> (302) 571-6600

# Exhibit 1

POWERED BY
BNET.com

FindArticles > Business Wire > Dec 11, 2004 > Article > Print friendly

**Autobytel Inc. Files Suit Against Dealix Corporation for Patent Infringement; U.S. Patent No. 6,282,517 Protects Real Time Communication of Purchase Requests**

IRVINE, Calif. -- Autobytel Inc. (Nasdaq:ABTLE), a leading Internet automotive marketing services company, has filed a lawsuit against Dealix Corporation in order to protect the Company's intellectual property. The lawsuit, filed in the United States District Court for the Eastern District of Texas, alleges infringement of U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests," which was issued in August 2001 by the U.S. Patent and Trademark Office. The Patent is directed toward an innovative method and system for matching customers and sellers in connection with the purchase of goods and services over the Internet and other computer networks.

"The U.S. Patent Office recognized the unique nature of the Autobytel technology which has helped to revolutionize sales and marketing in the automotive and other industries," said Autobytel Inc. President and CEO Jeffrey Schwartz. "Autobytel views its intellectual property as a significant asset and is determined to protect and enforce its rights with respect to its intellectual property."

The Patent can be found at http://www.uspto.gov/.

About Autobytel Inc.

Autobytel Inc. (Nasdaq:ABTLE), a leading Internet automotive marketing services company, helps retailers sell cars and manufacturers build brands through marketing, advertising, data and CRM (customer relationship management) products and programs. The Company owns and operates the automotive websites Autobytel.com, Autoweb.com, Carsmart.com, Car.com and AutoSite.com, as well as AIC (Automotive Information Center), a trusted industry source of automotive marketing data and technology for over 20 years. Autobytel is also a leader in dealership lead management and CRM solutions and owns and operates AVV, Inc., a top provider of dealership CRM and sales management products, and Retention Performance Marketing, Inc., (RPM(R)), which powers dealerships with cutting-edge customer loyalty and retention marketing programs. As the Internet's largest new car buying service, Autobytel generates over a billion dollars a month in car sales for dealers through its services and was the most visited new car buying and research destination in 2003, reaching millions of car shoppers as they made their vehicle buying decisions. Autobytel's car-selling sites and lead management products are used by more of the nation's top-100 e-dealers than any other program.

FORWARD-LOOKING STATEMENT DISCLAIMER

The statements contained in this press release that are not historical facts are forward-looking statements under the federal securities laws. These forward-looking statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Actual outcomes and results may differ materially from what is expressed in, or implied by, such forward-looking statements. Autobytel undertakes no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise. Among the important factors that could cause actual results to differ materially from those expressed in, or implied by, the forward-looking statements are changes in general economic conditions, the economic impact of terrorist attacks or military actions, increased dealer attrition, pressure on dealer fees, increased or unexpected competition, the failure to realize anticipated synergies from acquired entities, costs related to acquisitions, failure to retain key employees at acquired entities, difficulties in successfully integrating the businesses and technologies of acquired entities and Autobytel, that actual costs and expenses exceed the charges taken by Autobytel, changes in laws and regulations, costs of defending lawsuits and undertaking investigations and related matters and other matters disclosed in Autobytel's filings with the Securities and Exchange Commission. Investors are strongly encouraged to review our annual report on Form 10-K for the year ended December 31, 2003, and other filings with the Securities and Exchange Commission for a discussion of risks and uncertainties that could affect operating results and the

market price of our stock.

COPYRIGHT 2004 Business Wire
COPYRIGHT 2008 Gale, Cengage Learning

# Exhibit 2

# AUTOBYTEL  INC

## FORM 10-K
### (Annual Report)

## Filed 03/17/08 for the Period Ending 12/31/07

| | |
|---|---|
| Address | 18872 MACARTHUR BLVD |
| | SUITE 200 |
| | IRVINE, CA 92612-1400 |
| Telephone | 9492254500 |
| CIK | 0001023364 |
| Symbol | ABTL |
| SIC Code | 7370 - Computer Programming, Data Processing, And |
| Industry | Computer Services |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

---

(Mark One)

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 0-22239

---

# Autobytel Inc.
### (Exact Name of Registrant as Specified in Its Charter)

---

| **Delaware** | **33-0711569** |
|:---:|:---:|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**18872 MacArthur Boulevard
Irvine, California 92612-1400**
(Address of principal executive offices) (Zip Code)

**Registrant's telephone number, including area code (949) 225-4500**

Securities registered pursuant to Section 12(b) of the Act:

| **Common Stock, par value $0.001 per share** | **The NASDAQ Global Market** |
|:---:|:---:|
| Title of Class | Name of exchange on which registered |

---

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐       Accelerated filer ☒       Non-accelerated filer ☐       Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐    No ☒

Based on the closing sale price of $4.25 for our common stock on The NASDAQ Global Market on June 29, 2007, the aggregate market value of outstanding shares of common stock held by non-affiliates was approximately $179.6 million.

As of February 29, 2008, 43,831,903 shares of our common stock were outstanding.

**Documents Incorporated by Reference**

Portions of our Definitive Proxy Statement for the 2008 Annual Meeting, expected to be filed within 120 days of our fiscal year end, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

## EXPLANATORY NOTE

This Annual Report on Form 10-K restates our unaudited condensed consolidated financial statements for the fiscal quarters ended March 31, June 30, and September 30, 2007, as discussed in Note 13 to our consolidated financial statements contained in this Annual Report on Form 10-K. The restatement relates to our accounting treatment of the $20.0 million patent litigation settlement we entered into with Dealix Corporation ("Dealix") relating to a patent infringement lawsuit. Our previously issued financial statements for each of these periods should not be relied upon.

Our previously issued financial statements for the quarters ended March 31, June 30 and September 30, 2007 have been restated in this Annual Report on Form 10-K to correct errors relating to (i) the timing of recognition, (ii) classification of amounts and components recorded, and (iii) incomplete liquidity disclosure.

Specifically, the restatement involves three issues:

1. A receivable was recognized for which there was no reasonable assurance of collectability;

2. Deferred liability was recognized for future performance, for which there was none; and

3. Liquidity – prior disclosures described the receivable as a future source of liquidity, when there was no reasonable assurance of collectability

Appropriate accounting treatment or liquidity disclosure for the Dealix patent litigation settlement is summarized as follows:

1. Because the collectability of the remaining $8.0 million of the settlement amount that, as of December 31, 2007, was scheduled to be paid in three equal annual installments through 2010 cannot reasonably be assured, we will not record a receivable for this amount.

2. No portion of the initial $12.0 million settlement proceeds received on March 13, 2007 should be deferred but rather the entire amount should be recognized immediately in the consolidated statement of operations.

3. We have been unable to assess with reasonable assurance the collectability of the remaining payments under the settlement agreement as we do not have financial information to support the credit worthiness of the debtor or guarantor. Therefore, we do not have reasonable assurance that we will receive any remaining payments on their respective due dates or at all. In addition, prospectively, financial statement recognition of such remaining payments will only occur when either we can determine reasonable assurance of collectability or when proceeds are actually received. As of December 31, 2007, $8.0 million in settlement payments remained to be paid under the settlement agreement. However, we received our first annual payment under the settlement agreement in March 2008. Accordingly, as of the date of this Annual Report on Form 10-K, approximately $5.3 million remains to be paid under the settlement agreement.

Table of Contents

**Autobytel Inc.**

**ANNUAL REPORT ON FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007**

|  |  | Page Number |
|---|---|---|
| **Part I** | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 10 |
| Item 1B | Unresolved Staff Comments | 22 |
| Item 2 | Properties | 22 |
| Item 3 | Legal Proceedings | 22 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 24 |
| **Part II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 25 |
| Item 6 | Selected Consolidated Financial Data | 26 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 43 |
| Item 8 | Financial Statements and Supplementary Data | 43 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 43 |
| Item 9A | Controls and Procedures | 43 |
| Item 9B | Other Information | 45 |
| **Part III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 46 |
| Item 11 | Executive Compensation | 46 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 46 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 46 |
| Item 14 | Principal Accountant Fees and Services | 46 |
| **Part IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 47 |
|  | Signatures | 48 |

Table of Contents

## PART I

**Item 1.**    *Business*

The Securities and Exchange Commission ("SEC") encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This Annual Report and our proxy statement, parts of which are incorporated herein by reference, contain such forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate," "estimate," "expects," "projects," "intends," "plans," "believes" and words of similar substance used in connection with any discussion of future operations or financial performance identify forward-looking statements. In particular, statements regarding expectations and opportunities, new product expectations and capabilities, and our outlook regarding our performance and growth are forward-looking statements. This Annual Report also contains statements regarding plans, goals and objectives. There is no assurance that we will be able to carry out such plans or achieve such goals and objectives or that we will be able to successfully do so on a profitable basis. These forward-looking statements are just predictions and involve risks and uncertainties such that actual results may differ materially from these statements. Important factors that could cause actual results to differ materially from those reflected in forward-looking statements made in this Annual Report are set forth under "Item 1A. Risk Factors." Investors are urged not to place undue reliance on forward-looking statements, which speak only as of the date hereof. We are under no obligation, and expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise. All forward-looking statements contained herein are qualified in their entirety by the foregoing cautionary statements. Unless specified otherwise, as used herein, the terms "we," "us" or "our" refer to Autobytel Inc. and its subsidiaries.

## Overview

We are an automotive media and marketing services company focused on helping dealers sell cars and services, and manufacturers build brands through efficient marketing and advertising primarily through the Internet. We own and operate automotive Web sites, including MyRide.com ™, Autobytel.com ®, Autoweb.com ®, Car.com ℠, CarSmart.com ®, AutoSite.com ® and CarTV.com ®. We are a large automotive shopping content network and reach millions of Internet visitors as they shop for vehicles and make their vehicle buying decisions.

In 2006, we began to implement a series of strategic initiatives, including programs to transition our business toward a more media-centric advertising-driven business model, increasing the focus on providing best-of-class marketing and media services for our dealer and manufacturer customers, and better capturing integration opportunities between our businesses. Toward that end, in October 2007, we launched our next generation consumer Web site, MyRide.com. We believe MyRide.com is the first fully-integrated automotive vertical search web experience that is designed to provide consumers with a single comprehensive gateway to broad and relevant automotive information available on the Internet oriented toward the entire consumer automotive lifecycle—from finding and purchasing a new or used vehicle, enhancing a vehicle with parts and accessories, finding local in-market vehicle services, and accessing extensive multimedia and user-generated automotive content. MyRide.com has one of the Internet's most comprehensive used vehicle products, utilizing search-based technology to incorporate listings of millions of vehicles.

We provide tools and programs to automotive dealers and manufacturers to help them generate sales, enhance customer loyalty and reduce customer acquisition costs. We connect automotive marketers with the millions of vehicle shoppers visiting our branded Web sites (MyRide.com, Autobytel.com, Autoweb.com, Car.com, CarSmart.com, AutoSite.com and CarTV.com) and third party Web sites (primarily search engines, automotive information providers and other auto related venues) each month. We provide dynamic marketing and advertising programs that allow manufacturers and other automotive vendors to interact with Internet vehicle shoppers as they shop for vehicles and make their vehicle buying decisions. Our intent is to garner an increasing share of the approximately $31 billion spent annually by dealers, dealer associations, aftermarket automotive suppliers and manufacturers on marketing and advertising services.

Dealers participate in our branded automotive lead generation networks by entering into contracts with us directly or through a major dealer group or an automotive manufacturer or its automotive buying service affiliate. In turn, we direct consumers to dealers in their local area based on the consumers' vehicle preference. We expect our dealers to promptly provide consumers a haggle-free, competitive offer within 24 hours of being contacted by the consumer. We recommend that each dealer have at least one employee whose principal responsibility is supervising the dealer's Internet business, similar to the way in which most dealers have a new vehicle sales manager, a used vehicle sales manager and a service and parts department manager who are each responsible for those respective dealership functions. We believe that dealers who immediately respond to consumer inquiries, have readily available inventory and provide up-front competitive pricing benefit the most from our marketing services. We form our dealer relationships after analysis of automotive sales, historic lead activity and demographic data in each region. We seek to maintain in our dealer networks the highest quality dealers within defined territories and may terminate dealers that do not comply with the standards we set.

**Table of Contents**

Consumers come to our Web sites to research, compare and configure vehicles and to request a price quote on a vehicle from one of our network dealers. Once they are ready to buy a vehicle, consumers can submit a purchase request through any of our automotive Web sites and thereby connect to one or more of our participating dealers. Consumers can also shop for used vehicles at our branded Web sites by searching for a used vehicle according to the price, make, model, color, year and location of the vehicle. Consumers can submit credit questionnaires on our Car.com automotive Web site to be connected to a participating dealer or an automotive finance institution. The finance leads provide dealers with another direct channel of consumers, many of whom may not be able to secure loans from conventional lending sources.

We are a Delaware corporation. Our principal corporate offices are located in Irvine, California. Our common stock is listed on The NASDAQ Global Market under the symbol ABTL. Our corporate Web site is located at *www.autobytel.com* . Information on our Web site is not incorporated by reference in this Annual Report. At or through the Investor Relations section of our Web site we make available free of charge our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to these reports as soon as practicable after such material is electronically filed with or furnished to the SEC. Our Code of Conduct and Ethics for Employees, Officers and Directors is available at the Corporate Governance link of the Investor Relations section of our Web site.

## Significant Business Developments

As described above, in 2006 we began to implement a series of strategic initiatives. As part of these initiatives, we launched the MyRide.com Web site in October 2007.

In 2006, we began to explore strategic alternatives for our Retention Performance Marketing ® ("RPM ®") business and our Automotive Information Center ("AIC") data business. In February 2007, we announced that we sold the AIC data business to R. L. Polk & Co. and in July 2007, we announced that we sold the RPM business to Call Command, Inc. In 2007, we began to explore strategic alternatives for the customer relationship management (CRM) business of AVV, Inc. ("AVV") that includes lead management software applications. In January 2008, we announced that we sold such business to Dominion Enterprises for approximately $22.75 million in cash, plus a working capital payment of approximately $1.1 million, which remains subject to adjustment. The parties agreed to a $1.9 million escrow in connection with the transaction.

## Industry Background

*Online Commerce Opportunities* . Consumers have rapidly adopted the Internet as part of their car shopping and purchasing process and are expected to continue to do so in the future. According to Jupitermedia Corporation, the percentage of consumers who use the Internet to contact dealers for additional information about cars that results in a car sale is expected to increase by approximately 51% from 2007 to 2012. Additionally, according to J.D. Power and Associates, in 2007 nearly 90% of new car buyers used a search engine during the car shopping process.

*The Automotive Vehicle Market.* Automotive dealers operate in local markets and face significant state regulations and increasing business pressures. These fragmented markets are characterized by:

- competitive sales within regional markets,

- increasing advertising and marketing costs that continue to reduce dealer profits, and

- large investments by dealers in inventory, real estate, construction, personnel and other overhead expenses.

The ongoing rapid adoption of the Internet by consumers during their vehicle purchasing process has resulted, in part, from the fact that consumers have traditionally entered into the highly negotiated sales process with relatively little information regarding manufacturer's costs, leasing costs, financing costs, relative specifications and other important information. In addition, the ongoing growth of new vehicle sales generated online is, in part, an outgrowth of the high pressure sales tactics consumers associate with the traditional vehicle buying experience. Buying a vehicle is considered to be one of the most significant purchases a United States consumer makes.

## The Autobytel Solution

We believe that our marketing services improve the vehicle purchasing process for dealers, automotive manufacturers and consumers. The Internet's wide reach to consumers allows us to leverage our investment in branding and marketing across a very large audience to create qualified purchase requests for vehicles. For these reasons, we believe that the Internet represents the most efficient method of directing purchase requests to dealers. We believe our services enable dealers to reach consumers from an attractive demographic base, reduce marketing costs, increase consumer satisfaction and increase vehicle sales and car sale margins. We offer automotive manufacturers qualified car buyers to target during the consumer's research and consideration phase. We offer consumers Web sites with quality automotive information, tools to configure and compare this information, and a convenient and efficient car purchasing process.

Table of Contents

We believe that the benefits for dealers, automotive manufacturers and consumers described below will be enhanced as more consumers adopt and begin to use the MyRide.com Web site.

*Benefits to Dealers.*  We believe our services benefit dealers by reducing the dealers' incremental marketing costs and increasing sales volume. We believe dealers' personnel productivity could increase as a result of our services because we provide dealers access to potential purchasers who may be ready to buy or lease a vehicle. As a result, reaching these consumers and selling or leasing them vehicles costs the dealer little or no additional overhead expense, other than the fees paid to us and the personnel costs of a dedicated manager. We believe franchised new car retail dealers spend considerably less in marketing costs on each vehicle sold by using our new car marketing services than through traditional forms of marketing.

We direct consumers to dealers in their local area based on the consumers' vehicle preference. We believe this provides dealers access to a large number of well informed, ready-to-buy consumers, which allows dealers to compete more effectively.

A majority of all dealers that participated in the Autobytel or CarSmart ® network were assigned an exclusive geographic territory in such network based upon a specific vehicle make. In 2006, we began signing dealers to the Autobytel and CarSmart networks on a non-exclusive territorial basis. In 2007, we began to migrate our CarSmart dealers to Autobytel or Autoweb dealers and to remove geographic exclusivity from existing exclusive dealers. Autoweb retail dealers are not assigned exclusive territories to participate in the Autoweb network. Generally, Car.com retail dealers are not assigned exclusive territories to participate in the Car.com network. In 2007, we migrated our Car.com and Carsmart dealers to Autobytel or Autoweb dealers. In 2008, we plan to migrate Autoweb dealers to Autobytel with the goal of consolidating all of our dealers under one corporate brand, Autobytel Inc., with no geographic exclusivity.

*Benefits to Manufacturers* . Manufacturers can influence car buyers' decisions by targeting them during their research, consideration and decision process, in particular, by using our dynamic marketing programs. In addition, manufacturers can obtain purchase requests from us.

*Benefits to Consumers.*  Because our Web sites are continually updated and provide a large quantity of quality information, and because consumers have shown a preference for third-party Web sites and a preference for using the Internet during their car shopping experience, we believe our Web sites offer an efficient medium for consumers to learn about and shop for vehicles. Our Web sites provide consumers free of charge, up-to-date specifications and pricing information on vehicles and ready-to-print vehicle information summaries of each new make and model on the market. We also provide informative vehicle video reviews. In addition, our consumers gain easy access to valuable automotive information, such as dealer invoice pricing and tools consisting of a loan calculator to determine monthly payments, and helpful information to make a lease or buy decision. Our database of articles allows consumers to perform online library research by accessing documents, such as consumer and professional reviews. Various automotive information service providers, such as Kelley Blue Book, are also available on our Web sites to assist consumers with specific vehicle and related automotive decisions. Armed with such information, the consumer should be more confident and capable of making an informed and intelligent vehicle buying decision. We believe we offer consumers a significantly different vehicle purchasing experience from that of traditional methods. Consumers using our Web sites are able to shop for a vehicle and make decisions from the convenience of their own home or office. We expect dealers to provide consumers a haggle-free price quote within 24 hours after being contacted by the consumer and a high level of customer service.

3

Table of Contents

## Strategy

We intend to garner an increasing share of the approximately $31 billion spent annually by dealers, dealer associations, aftermarket automotive suppliers and manufacturers on marketing and advertising services. We intend to achieve this objective through the following principal strategies:

*Develop a Media-Centric Business Model.* We believe that one of the key strengths of the Internet is its efficiency in delivering information to consumers. We further believe that those who can deliver information to consumers in the most effective and organized manner that addresses the consumer automotive lifecycle, which we define as purchase, ownership, enhancement and enthusiasm, will be able to enhance their business. MyRide.com is designed as the next generation automotive consumer experience to meet these objectives and to provide consumers with a fully integrated automotive vertical search experience. MyRide.com is designed to provide a single comprehensive gateway to broad and relevant proprietary, licensed and Internet information related to the automotive lifecycle — from finding and purchasing a new or used vehicle, enhancing a vehicle with parts and accessories, finding local in-market vehicle services, and accessing extensive multimedia and user-generated automotive content. We expect that the MyRide.com product will enable us to attract and serve consumers throughout the automotive lifecycle and monetize their behavior by providing dealers, dealer associations, manufacturers and service and parts providers with marketing and advertising opportunities in each part of the automotive lifecycle.

*Increase the Quality and Quantity of Purchase Requests that Can Be Monetized.* We believe that increasing the quality and quantity of purchase requests that can be monetized is crucial to the long-term growth and success of our business. As part of our strategy to improve the quality of purchase requests, we continue to expand the breadth and depth of information and services available through our Web sites so that well-informed, ready-to-buy consumers can be directed to participating dealers. We are also investing in new initiatives to help drive an increasing number of qualified buyers to dealerships. By augmenting the volume of quality purchase requests, we are attempting to attract additional dealers to our networks, increase services provided to dealers, and solidify our relationships with existing dealers. Our strategy for increasing traffic to our Web sites and the number of purchase requests that can be monetized includes MyRide.com, forming and maintaining online sponsorships and alliances with Internet portals and search sites and with Internet automotive information providers and applying technologies to help optimize the placement of purchase requests.

*Increase the Number of Profitable Relationships with Retail Dealers Using Our Marketing Services.* Since our inception we have invested heavily to build our dealer networks. We consider our dealer networks to be significant strategic assets where new services and products can be deployed. We believe that strengthening the size and quality of our retail dealer networks is important to the success and growth of our business. Our strategy is to increase the size of our retail dealer networks by attracting new dealers and strengthening relationships with existing dealers by:

- increasing the monetizable volume and quality of purchase requests for new and used vehicles,

- consolidating all of our dealers under the Autobytel Inc. corporate brand on a geographic non-exclusive basis,

- providing new and enhanced marketing, advertising and media services and support that help dealers more effectively utilize the Internet to sell vehicles and services, and

- maintaining our training and support programs to participating dealers.

*Increase Enterprise Sales to Major Dealer Groups and Automotive Manufacturers.* We believe that strengthening the size and quality of our relationships with major dealer groups and automotive manufacturers is important to the success and growth of our business. Our strategy is to provide major dealer groups, such as AutoNation, and automotive manufacturers, such as General Motors and Ford, with access to a large number of purchase-minded consumers. We have existing relationships with most automotive manufacturers and have an opportunity to expand these relationships into our other marketing services.

*Strengthen the Advertising Component of our Business Model.* Our advertising sales effort is primarily targeted to vehicle manufacturers and automotive-related mass market consumer vendors. Using the targeted nature of Internet advertising, manufacturers can advertise their brands effectively to specific subsets of our consumers. Vehicle manufacturers can target advertisements to consumers who are researching vehicles, thereby increasing the likelihood of influencing their purchase decisions. We provide dynamic marketing programs that allow manufacturers to interact with Internet car shoppers as they make their car buying decisions. With MyRide.com, we offer our advertising customers enhanced marketing and media services, and a series of advertising opportunities for local dealers, dealer groups and other local automotive-related vendors. In addition, we recently launched the AutoReach [SM] Ad Network, an automotive ad network of third party web publishers. The network offers on-target high-value advertising and monetization opportunities for web publishers while providing additional ad inventory to automotive advertisers for targeting in-market consumers. We also recently launched our

4

Table of Contents

Local Connect <sup>SM</sup> program for dealers. The program offers dealers the timeliness of newspaper classifieds combined with the content and targeting specificity of the Internet. The program automatically generates relevant local dealer advertising to consumers who are researching a dealer's specific vehicle brand.

*Enter into Acquisitions and Strategic Alliances.*  We intend to grow and advance our business and may do so, in part, through acquisitions and strategic alliances. We will continue to review strategic acquisitions and partnership opportunities. We believe that acquisitions and strategic alliances can allow us to increase market share, benefit from advancements in technology and strengthen our business operations by enhancing our offering of products and services. We may acquire businesses that increase our market share in the lead referral and other automotive marketing services businesses. In addition, to complement our core business and extend our product solutions, we may also acquire businesses primarily focused on automotive related Web sites, content and/or technologies.

*Invest in Other Core Product Initiatives Designed to Improve Lead Quality and Dealer Margins.*  We believe that expanding our products and services offered to both manufacturers and dealers is critical to establishing ourselves as the premier provider of online automotive marketing services. In 2006, we launched our new Rapid Response program, the first initiative of our "Keep in Touch" (KIT) services designed to make it easier for member dealers to manage and communicate with their online customer leads. Rapid Response automatically places phone calls to member dealers, immediately notifying them—generally within seconds—each time a customer requests a price quote from their dealership during normal business hours. This service generated significant improvements to customer response rates and sales among dealers who participated in the program's beta testing. Participating dealers receive an online report that provides detailed reporting on their call activity, including all incoming numbers, which numbers they actually tried to connect with, and call results and duration. In 2007, we launched an Email Manager program, the second phase of KIT. The program is designed to automate long-term dealership follow up for consumer leads generated through our online Web services. When a customer submits an online request to purchase a vehicle at a member dealership, the program allows us to automatically follow up with a series of up to five fully customized, dealership-exclusive branded emails broadcast periodically over a 90-day period. We regularly refine our multi-level program to further qualify consumers we send to the dealers using our services. The Autobytel Quality Verification System <sup>SM</sup> uses filters and validation processes to identify consumers with strong purchase intent and is designed to improve purchase request quality. High quality purchase requests are those that result in high closing ratios. Closing ratio is the ratio of the number of vehicles purchased at a dealer generated from purchase requests to the total number of purchase requests sent to that dealer. We also developed a customized program for training dealers. The program teaches dealers to incorporate Internet sales, marketing, management and customer service techniques throughout the dealership. The program is designed to help the overall organization to sell more effectively to automotive consumers.

*Continue to Build Brand Equity.*  In the future we intend to focus the majority of our consumer branding efforts on MyRide.com. While we intend to maintain our network of branded Web sites for the foreseeable future, and users will have access to much of MyRide.com's functionality on those branded Web sites, our long term goal is to make the MyRide.com property our flagship consumer property. As part of our branding, we plan to reposition the Autobytel.com brand as an industry-focused brand geared towards dealers and manufacturers, and will invest in building more awareness and equity for the brand among those groups. In the future, we intend to market and invest primarily in creating brand equity, awareness and recognition for MyRide.com with consumers through a variety of media with a focus on Internet-based marketing. In addition, we also may advertise through traditional media, such as television, radio and print publications.

*Provide the Highest Quality Consumer Experience On Our Web Sites.*  We believe that consumer satisfaction and loyalty is heavily influenced by the consumer's experience with our Web sites and with our dealers. In order to enhance our appeal to consumers, we intend to continue developing our Web sites by enhancing vehicle information usability and personalization. We also plan to continue compiling high quality content from third-party sources on our Web sites. We believe that consumer satisfaction with the vehicle purchasing experience is also essential to our success and the differentiation of our services from those of our competitors. We intend to continue to invest in our retail dealer training and support services to provide a consistent, high-quality alternative to the traditional vehicle buying process. We actively monitor participating retail dealers through ongoing consumer surveys and research conducted by our internal dealer support group. Retail dealers that fail to abide by our program guidelines or who generate repeated consumer complaints are reviewed and, if appropriate, terminated. We expect that MyRide.com will enhance the experience of our consumers and differentiate our services from those of our competitors.

*Enforce and Strengthen our Intellectual Property Rights.*  We intend to grow and advance our business, in part, through enforcing and strengthening our intellectual property rights. In 2004 we brought a claim for patent infringement against Dealix Corporation ("Dealix"). We have entered into a settlement agreement with Dealix which provides that Dealix will pay us a total of $20.0 million in settlement payments over four years, $12 million of which has been paid in 2007. The agreement also provides for a non-exclusive license from us to Dealix and The Cobalt Group of patents and patent applications and mutual releases of claims. In November 2007, we filed a lawsuit in the United States District Court for the Eastern District of

5

Table of Contents

Texas against Insweb Corporation, Leadpoint, Inc., Internet Brands, Inc. and Auto Internet Marketing, Inc. In the lawsuit, we asserted infringement of U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests," against such parties, and sought damages and a permanent injunction. We cannot assure that our patents will be enforceable if subjected to litigation. We regard our trademarks, service marks, brand names and patents as important to our business and intend to protect and enforce our rights with respect to such intellectual property.

## Programs, Products and Services

*New Vehicle Purchasing Service.* Our new vehicle purchasing service enables consumers to shop for and select a new vehicle through our Web sites, MyRide.com, Autobytel.com, Autoweb.com, Car.com, CarSmart.com, AutoSite.com and CarTV.com, by providing to consumers information about vehicles and the ability to connect with local dealers. In order to assist the consumer in shopping for a new vehicle, we provide a broad range of easy to use research tools, including the ability to research information such as pricing, features, specifications and colors. When consumers indicate they are ready to buy a vehicle, consumers can complete a purchase request online, which specifies the type of vehicle and accessories the consumers desire, along with the consumers' contact information. We validate the consumer contact information using our proprietary Quality Verification System. We then route such information to one or more local participating dealers, if available, that sell the type of vehicle requested. We promptly return an e-mail message to the consumer with the dealership's name and phone number and the name of the dedicated manager, if any, at the dealership. We expect retail dealers to contact the consumer within 24 hours of receiving the purchase request with a firm, haggle-free price quote for the requested vehicle. When consumers complete their purchase, they usually take delivery of their vehicle at the dealership showroom. Generally, within 10 days of the submission of a consumer's purchase request, we contact the consumer again by e-mail to conduct a quality assurance survey that allows us to evaluate the sales process at participating retail dealers and improve the quality of dealer service. Revenue from new car purchase requests accounted for 40%, 43%, and 48% of total revenue in 2007, 2006, and 2005, respectively.

Dealers participate in our networks by entering into contracts with us or through major dealer groups or automotive manufacturers or their automotive buying service affiliates with whom we have agreements. Generally, our retail dealer contracts are terminable on 30 days' notice by either party. The majority of our retail fees consist of monthly subscription and transactional fees paid by dealers in our networks. We reserve the right to adjust our fees to retail dealers upon 30 days notice at any time during the term of the contract. We do not prevent dealers from entering into agreements with our competitors.

*Used Car Program.* The used car program allows consumers to search for a certified or non-certified used vehicle according to specific search parameters, such as the price, make, model, mileage, year and location of the vehicle. The used car program locates and displays the description, location and, if available, actual digital photograph of vehicles that satisfy the search parameters. The consumer can then submit a purchase request for a specific vehicle and is contacted by the dealer to conclude the sale. We charge each dealer that participates in the used car program monthly subscription or transactional fees. The used car program provides participating dealers online purchase requests shortly after submission by consumers, as well as the ability to track their inventory on a real-time basis.

Autobytel's Premium Pre-Owned program offers dealers additional advertising opportunities which gives dealers the ability to have more direct impact on consumers. Thumbnail photos of each vehicle listing, with multiple photo view options, are available along with links to the dealership's Web site and online inventory. AutobytelConnect ® is designed to help generate sales for dealers by listing a toll-free number next to each pre-owned vehicle. This allows consumers who prefer to speak with a representative of the dealership to call the representative directly. The "800" number can be routed to any land or mobile line, including a direct connection to the Internet department. All call activity is automatically recorded, enabling dealers to review every call, even if the call is busy, abandoned or after hours.

MyRide.com has one of the Internet's most comprehensive used vehicle products, utilizing search-based technology to incorporate listings of millions of vehicles. We believe MyRide.com features one of the Internet's most advanced used car search tools, enabling MyRide.com shoppers to conduct precise searches across millions of pre-owned vehicle listings. The program offers marketing advantages for dealers, including integrated pay-per-call pricing for eligible dealers, dealer specific inventory display, and sophisticated ad display and placement tools.

*Finance Requests.* In addition to providing new and used car vehicle purchasing services, Car.com enables consumers to submit a credit questionnaire or request for financing. The finance requests are forwarded to the nearest participating dealer that offers financing or, if a dealer is not available, to an automotive finance institution. This program is designed to enable consumers, who may not be able to secure loans through conventional lending sources, to obtain financing and purchase their desired vehicle.

6

Table of Contents

*Training.*  We believe that dealers and their employees require specialized training to learn the skills necessary to serve the Internet user and take full advantage of our proprietary systems. Therefore, we have developed an extensive training program for dealers. We believe this training is critical to enhancing our brands and reputation. We encourage retail dealers to have their representatives trained on our system. Training is conducted at regional training locations and at dealerships' premises. In training our retail dealers, we de-emphasize traditional vehicle selling techniques and emphasize our approach of immediately responding to consumer inquiries and providing up-front competitive no-haggle pricing. Our customized program for training dealers teaches dealers to incorporate Internet sales, marketing, management and customer service techniques throughout the dealership. The program is designed to help the overall organization to sell more effectively to automotive consumers who have visited the Internet.

*Advertising Services.*  We now have multiple Web site properties on which we offer media products to automotive manufacturers and related businesses. The Web sites attract an audience of car-shopping and car-buying consumers that advertisers can target during the vehicle purchasing decision. A primary way advertisers use our Web sites to reach these consumers is through vehicle content targeting . This allows automotive marketers to reach users while they are researching one of several site segments, including specific vehicles during the shopping and buying process on our network. Many advertisers use this capability to match their own brand advertising against the same vehicle pages that users are browsing during the research process. This form of placement is also referred to as retention marketing in the online automotive industry. It enables the advertiser to communicate highly relevant messaging to users while they are researching the vehicle of interest to them. If available, some advertisers will seek to buy inventory of competing automotive brand pages in order to achieve their objectives in capturing new market share. In supporting more brand driven objectives, we sell advertising that consists of fixed ad placement and anchor tenant opportunities. An example is the Featured Model Showcase that runs on our home page and includes an integrated module that showcases a specific vehicle. Unlike typical banner ads, the consumer is linked to a mini-site or showroom or to a specific product page on the advertiser's site where he or she can receive more specific information on the vehicle from the advertiser. We offer other packages with similar combinations of integrated ad units targeted to key areas of our Web sites, including new, used and certified pre-owned sections. Additionally, we offer advertising products designed to further and better engage in-market automotive consumers. We have a direct marketing platform that helps manufacturers target in-market consumers during the often-extended car shopping process. Designed to keep the brand in consideration, Autobytel Direct allows automotive marketers to deliver specific communications through either email or postal formats to in-market consumers during their purchase cycle. If the advertiser goal is to reach out to new potential customers or retain existing interested consumers, Autobytel Direct provides an effective way to access ready to buy consumers who are still in the decision making process. Advertising revenue accounted for 20%, 21%, and 20% of total revenue in 2007, 2006, and 2005, respectively.

*Service and Maintenance.*  We believe our Web sites empower consumers with access to information and research for dealing with common service and maintenance issues.

*Consumer Products and Other Services.*  We offer automotive related products and services, including insurance and finance, that we market to consumers through our Web sites on behalf of participating third-party providers.

*International.*  We do not expect to devote substantial resources to international operations, but may continue to explore additional licensing business as opportunities arise.

**Seasonality**

Traditionally, our purchase request volume fluctuates with automotive industry sales volume that has some measure of seasonality. Typically volume is highest in the spring and summer, with lower volume in the fall and winter months.

7

Table of Contents

## Intellectual Property

We have registered service marks, including Auto-By-Tel, Autobytel.com, MyRide, Autoweb, CarSmart and the Autobytel.com and MyRide.com logos. We have been issued a patent directed toward an innovative method and system for forming and submitting purchase requests over the Internet and other computer networks from consumers to suppliers of goods and services. The method permits suppliers of goods or services to provide enhanced customer service by making the purchasing process convenient for consumers as well as suppliers. The patent is also directed toward the communication system used to bring consumers and suppliers closer together. The patent expires on January 14, 2019. We have also been issued patents relating to online aftermarket accessory shopping and online auctions. We cannot assure that the patents will be enforceable if subjected to litigation. We have applied for additional service marks and patents. We regard our trademarks, service marks, brand names and patents as important to our business and intend to protect and enforce our rights with respect to such intellectual property.

## Competition

Our vehicle purchasing services compete against a variety of Internet and traditional vehicle purchasing services, automotive brokers and classified advertisement providers. Therefore, we are affected by the competitive factors faced by both Internet commerce companies as well as traditional offline companies within the automotive and automotive-related industries. The market for Internet-based commercial services is relatively new. Competition continued to intensify in 2007 as key competitors pursued the best quality consumer leads through strategic relationships, pricing, search marketing programs, and other tactics. Our business is characterized by minimal barriers to entry, and new competitors can launch a competitive service at relatively low cost. To compete successfully, we must significantly increase awareness of our services and brand names and deliver satisfactory value to our customers. Failure to compete successfully will cause our revenues to decline and would have a material adverse effect on our business, results of operations and financial condition.

We compete with other entities that maintain similar consumer and/or business to business Web sites, including AutoNation's AutoUSA, Microsoft Corporation's MSN Autos, CarsDirect.com, Cars.com, eBayMotors.com, Dealix.com, and AutoTrader.com. We also compete to a degree with vehicle dealers. Such competitors, including vehicle dealers, may already maintain or may introduce Web sites that compete with ours. We also compete indirectly against vehicle brokerage firms and affinity programs offered by several companies, including Costco Wholesale Corporation and Wal-Mart Stores, Inc. In addition, all major automotive manufacturers have their own Web sites and many have launched online buying services, such as General Motors Corporation and Ford Motor Company in its partnership with its dealers through FordDirect.com. On advertising, we compete with offerings from, among others, the major portals (e.g., Yahoo!, MSN, AOL), transaction based sites (e.g., Ebay Motors, Cars.com, Autotrader) automotive verticals (e.g., KBB, Edmunds) and numerous lifestyle sites (e.g., HIN City).

We believe that the principal competitive factors in the online market are:

- brand recognition,
- dealer return on investment,
- lead quality,
- prices of products and services,
- speed and quality of fulfillment,
- strength of intellectual property,
- field sales and customer support,
- dealer territorial coverage,
- relationships with automotive manufacturers,
- variety of integrated products and services,
- consumer experience and ease of use,
- customer satisfaction,
- quality of Web site content,
- quality of service, and
- technical expertise.

8

Table of Contents

We cannot assure that we can compete successfully against current or future competitors, many of which have substantially more technical and financial resources as well as existing brand recognition. In addition, competitive pressures may result in increased marketing costs, decreased Web site traffic or loss of market share or otherwise may materially and adversely affect our business, results of operations and financial condition.

## Operations and Technology

We believe that our future success is significantly dependent upon our ability to continue to deliver high-performance, reliable and comprehensive Web sites, enhance consumer/dealer communications, maintain the highest levels of information privacy and ensure transactional security. We currently host all our Web sites at secure data center third-party hosting facilities. The data centers include redundant power infrastructure, redundant network connectivity, fire detection and suppression systems and security systems to prevent unauthorized access. Our network and computer systems are built on industry standard technology. Network security utilizes industry standard products and practices.

System enhancements are primarily intended to accommodate increased traffic across our Web sites, improve the speed in which purchase requests are processed and introduce new and enhanced products and services. System enhancements entail the implementation of sophisticated new technology and system processes. We intend to make investments in technology as we believe appropriate.

## Government Regulation

Currently few laws or regulations have been adopted that apply directly to Internet business activities. The adoption of additional local, state or national laws or regulations may decrease the growth of Internet usage or the acceptance of Internet commerce.

We believe that our dealer marketing services do not constitute franchising or vehicle brokerage activity in a way that makes franchise, motor vehicle dealer, or vehicle broker licensing laws applicable to us. However, if individual state regulatory requirements are deemed applicable to us or change, or additional requirements are imposed on us, we may be required to modify our service programs in that state in a manner that may undermine our program's attractiveness to consumers or dealers, not offer such service, or terminate our operations in that state, any of which may negatively affect our financial condition and growth. As we introduce new services, we may need to comply with additional licensing regulations and regulatory requirements.

Our services may result in changes in the way vehicles are currently sold or may be viewed as threatening by new and used vehicle dealers that do not subscribe to our programs. Such businesses are often represented by influential lobbying organizations, and such organizations or other persons may propose legislation that, if adopted, could impact our evolving marketing and distribution model.

To date, we have not expended significant resources on lobbying or related government affairs issues, but may do so in the future.

*Franchise Classification.* If our relationships or written agreements with our dealers were found to be franchises under federal or state franchise laws, we could be subjected to additional regulations, including, but not limited to, licensing and increased reporting and disclosure requirements. Compliance with varied laws, regulations, and enforcement characteristics found in each state may require us to allocate both staff time and monetary resources, each of which may adversely affect our results of operations. As an additional risk, if our dealer relationships or subscription agreements are determined to establish franchises, we may be subject to limitations on our ability to quickly and efficiently effect changes in our dealer relationships in response to changing market trends, which may negatively impact our ability to compete in the marketplace.

We believe that neither our relationship with our participating dealers nor our dealer agreements themselves constitute franchises under federal or state franchise laws. This belief has been upheld by a Federal Appeals Court in Michigan that ruled our business relationship and our dealer subscription agreement do not rise to the level of a franchise under Michigan law.

*Vehicle Brokerage Activities.* We believe that our dealer marketing referral service model does not qualify as an automobile brokerage activity. Accordingly, we believe that state motor vehicles dealer or broker licensing laws generally do not apply to us. In the event such laws are deemed applicable to us, we may be required to cease business in any such state, and pay administrative fees, fines, and penalties for failure to comply with such licensing requirements.

9

Table of Contents

In response to concerns about our marketing referral program raised by the Texas Department of Transportation, we modified our program in that state to achieve compliance. These modifications included implementing a pricing model under which all participating dealerships (regardless of brand) in a given zip code in Texas are charged uniform fees for leads and opening our program to all dealerships that wish to apply.

In the event any other state's regulatory requirements impose state specific requirements on us or include us within an industry-specific regulatory scheme, we may be required to modify our marketing programs in such state in a manner that may undermine the program's attractiveness to consumers or dealers. In the alternative, if we determine that the licensing and related requirements are overly burdensome, we may elect to terminate operations in such state. In each case, our business, results of operations and financial condition could be materially and adversely affected.

*Financing Related Activities.* We provide a connection through our Web sites that allows a consumer to obtain finance information and submit requests for loans to third parties. We receive marketing fees from financial institutions or dealers in connection with this advertising activity. We do not demand nor do we receive any fees from consumers for this service. In the event states require us to be licensed as a financial broker, we intend to obtain such licenses. We may be unable to comply with a state's regulations affecting our current operations or newly introduced services, or we could be required to incur significant fees and expenses to obtain any required license or be compelled to discontinue such operations in such state.

*Insurance Related Activities.* We provide links on our Web sites to various third parties so that consumers can receive quotes for insurance coverage and extended warranty coverage from third parties and submit quote applications online through such parties' Web sites. We receive marketing fees from such participants in connection with this advertising activity. We receive no premiums from consumers nor do we charge consumers fees for our services. All applications are completed on the respective insurance carriers' or other third parties' Web sites.

We do not believe that our activity requires us to be licensed under state insurance laws. The use of the Internet in the marketing of insurance products, however, is a relatively new practice. It is not clear whether or to what extent state insurance licensing laws apply to activities similar to ours.

## Employees

As of February 29, 2008, we had 269 employees. We also utilize independent contractors as required. None of our employees are represented by a labor union. We have not experienced any work stoppages and consider our employee relations to be good.

## Item 1A.    *Risk Factors*

In addition to the factors discussed in the "Overview" and "Liquidity and Capital Resources" sections of Part II "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" in this Annual Report on Form 10-K, the following additional factors may affect our future results. The risks described below are not the only risks facing us. Additional risks and uncertainties not currently know to us or that we currently deem to be immaterial may also materially and adversely affect our business.

***Except for fiscal years 2003 and 2004, we have had a history of net annual losses. We cannot assure that we will be profitable in the future. If we are unable to achieve profitability in the future and we continue to lose money, our operations will not be financially viable.***

Most of our senior executives do not have long-term experience in the Internet based vehicle information and shopping industry. This limited operating history contributes to our difficulty in predicting future operating results.

Except for fiscal years 2003 and 2004, we have had a history of net annual losses. We cannot assure that we will be profitable in the future. We had an accumulated deficit of $191.4 million and $186.1 million as of December 31, 2007 and December 31, 2006, respectively.

Our potential for future profitability must be considered in light of the risks, uncertainties, expenses and difficulties frequently encountered by companies in emerging and rapidly evolving markets, such as the market for Internet commerce. We believe that to achieve and sustain profitability, we must, among other things:

- generate increased vehicle shopper and buyer traffic to our Web sites,

- successfully introduce new products and services,

Table of Contents

- continue to send new and used vehicle purchase requests to dealers that result in sufficient dealer transactions to justify our fees,

- expand the number of dealers in our networks and enhance the quality of dealers,

- sustain and expand our relationships with automotive manufacturers,

- assure continued access to a high volume of leads at acceptable prices from third party sources,

- respond to competitive developments,

- maintain a high degree of customer satisfaction,

- provide secure and easy to use Web sites for customers,

- increase visibility of our brand names,

- defend and enforce our intellectual property rights,

- identify and successfully consummate and integrate acquisitions,

- design and implement effective internal control systems,

- continue to attract, retain and motivate qualified personnel, and

- continue to upgrade and enhance our technologies to accommodate expanded service offerings and increased consumer traffic.

We cannot be certain that we will be successful in achieving these goals or that if we are successful in achieving these goals, that we will be profitable in the future.

*If our internal controls and procedures fail, our financial condition, results of operations and cash flow could be materially adversely affected .*

Management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. In making its assessment of the effectiveness of our internal control over financial reporting as of December 31, 2007, management used the criteria described in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). A material weakness is a control deficiency, or combination of control deficiencies, that results in a more than remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

Management determined that we had no material weakness in our internal control over financial reporting as of December 31, 2007. Our internal controls may not prevent all potential errors and fraud, because any control system, no matter how well designed, can only provide reasonable and not absolute assurance that the objectives of the control system will be achieved. We have had material weaknesses in our internal control over financial reporting in the past and there is no assurance that we will not have a material weakness in the future resulting from failure of our internal controls and procedures.

Our ability to report our financial results on a timely and accurate basis could be adversely affected by a failure in our internal control over financial reporting. If our financial statements are not fairly presented, investors may not have a complete understanding of our operating results and financial condition. If our financial statements are not timely filed with the SEC, we could be delisted from The NASDAQ Global Market. If either or both of these events occur, it could have a material adverse affect on our ability to operate our business. In addition, a failure in our internal control over financial reporting could materially and adversely affect our financial condition, results of operations and cash flow.

*If we lose our key personnel or are unable to attract, train and retain additional highly qualified sales, marketing, managerial and technical personnel, our business may suffer.*

Our future success depends on our ability to identify, hire, train and retain highly qualified sales, marketing, managerial and technical personnel. In addition, as we introduce new services we may need to hire additional personnel. We may not be able to attract, assimilate or retain such personnel in the future. The inability to attract and retain the necessary managerial, technical, sales and marketing personnel could have a material adverse effect on our business, results of operations and financial condition.

11

**Table of Contents**

Our business and operations are substantially dependent on the performance of our executive officers and key employees. The loss of the services of one or more of our executive officers or key employees could have a material adverse effect on our business, results of operations and financial condition. We replaced certain of our executive officers during 2006 and 2007. If we are unable to effectively integrate new executive officers, our business, results of operations and financial condition may be materially adversely affected.

***If a more media-centric advertising-driven business model, including the MyRide.com Web site, is not successful, we may not be able to be profitable in the future.***

In 2006, we began to implement a series of strategic initiatives, including programs to transition our business toward a more media-centric advertising-driven business model. Towards that end, we launched the MyRide.com Web site in October 2007 and expect to launch other products and services this year. Demand and market acceptance for newly introduced services and products over the Internet are subject to uncertainty and we have no assurance that consumers and other automotive participants will accept and use our new products and services. If consumers and other automotive participants fail to accept and use our new products and services or acceptance is at a lower level than anticipated, our strategy of focusing on a more media-centric advertising-driven business model will not be successful. Accordingly, we cannot assure that we will be profitable in the future.

***If our dealer attrition increases, our dealer networks and revenues derived from these networks may decrease.***

The majority of our revenues is derived from fees paid by retail and enterprise dealers participating in our dealer networks. A few agreements account for substantially all of our enterprise dealers. From time to time, a major dealer group or automotive manufacturer may significantly increase or decrease the number of enterprise dealers participating in our dealer networks or the number of purchase requests accepted from us. If dealer attrition increases or the number of purchase requests accepted from us decreases and we are unable to add new dealers to mitigate the attrition or decrease in number of accepted requests, our revenues will decrease. A material factor affecting dealer attrition is our ability to provide dealers with high quality purchase requests at prices acceptable to dealers. High quality purchase requests are those that result in high closing ratios. Closing ratio is the ratio of the number of vehicles purchased at a dealer generated from purchase requests to the total number of purchase requests sent to that dealer. If the number of dealers in our networks declines or dealers reduce the services they receive from us, our revenues will decrease and our business, results of operations and financial condition will be materially and adversely affected. In addition, if automotive manufacturers or major dealer groups force us to decrease the fees we charge for our services, our revenues will decline which could have a material adverse effect on our business, results of operations and financial condition.

Generally, our retail dealer agreements are cancelable by either party upon 30 days notice. Participating retail dealers may terminate their relationship with us for any reason, including an unwillingness to accept our subscription terms or as a result of joining alternative marketing programs. We cannot assure that retail dealers will not terminate their agreements with us. Our business is dependent upon our ability to attract and retain qualified new and used vehicle retail dealers, major dealer groups and automotive manufacturers. In order for us to grow or maintain our dealer networks, we need to reduce our dealer attrition. We cannot assure that we will be able to reduce the level of dealer attrition, and our failure to do so could materially and adversely affect our business, results of operations and financial condition.

***We may lose participating retail dealers because of the reconfiguration or elimination of exclusive dealer territories. We will lose the revenues associated with any reductions in participating retail dealers resulting from such changes.***

We are reducing or reconfiguring dealer territories or eliminating exclusive dealer territories currently assigned to some retail dealers. We are taking such action and may take others in connection with consolidating our corporate brands into one brand under Autobytel Inc. If a retail dealer is unwilling to accept a reduction or reconfiguration of its territory or elimination of its exclusive territory or other action by us, it may terminate its relationship with us. A retail dealer also could sue to prevent such reduction, reconfiguration or elimination or other action, or collect damages from us. A material decrease in the number of retail dealers participating in our networks or litigation with retail dealers could have a material adverse effect on our business, results of operations and financial condition.

***We send a substantial amount of individual purchase requests to multiple retail dealers. As a result, we may lose participating retail dealers and may be subject to pressure on the fees we charge such dealers for such purchase requests. We will lose the revenues associated with any reductions in participating retail dealers or fees.***

We send a substantial amount of individual purchase requests to multiple retail dealers to enhance consumer satisfaction and experience. If a retail dealer perceives such requests as having less value, it may request that fees be reduced or may terminate its relationship with us. A material decrease in the number of retail dealers participating in our networks or the fees such dealers pay us could have a material adverse effect on our business, results of operations and financial condition.

12

Table of Contents

***We rely heavily on our participating dealers to promote our brand value by providing high quality services to our consumers. If dealers do not provide our consumers high quality services, our brand value will diminish and the number of consumers who use our services may decline causing a decrease in our revenues.***

Promotion of our brand value depends on our ability to provide consumers a high quality experience. If our dealers do not provide consumers with high quality service, the value of our brands could be damaged and the number of consumers using our services may decrease. We devote significant efforts to train participating retail dealers in practices that are intended to increase consumer satisfaction. Our inability to train retail dealers effectively, or the failure by participating dealers to adopt recommended practices, respond rapidly and professionally to vehicle inquiries, or sell and lease vehicles in accordance with our marketing strategies, could result in low consumer satisfaction, damage our brand names and materially and adversely affect our business, results of operations and financial condition.

***Competition could reduce our market share and harm our financial performance. Our market is competitive not only because the Internet has minimal barriers to entry, but also because we compete directly with other companies in the offline environment.***

Our vehicle marketing services compete against a variety of Internet and traditional vehicle purchasing services, automotive brokers and classified advertisement providers. Therefore, we are affected by the competitive factors faced by both Internet commerce companies as well as traditional, offline companies within the automotive and automotive-related industries. The market for Internet-based commercial services is relatively new. Competition continued to intensify in 2007 as key competitors pursued the best quality consumer leads through strategic relationships, pricing, search marketing programs, and other tactics. Our business is characterized by minimal barriers to entry, and new competitors can launch a competitive service at relatively low cost. To compete successfully, we must significantly increase awareness of our services and brand names and deliver satisfactory value to our customers. Failure to compete successfully will cause our revenues to decline and would have a material adverse effect on our business, results of operations and financial condition.

We compete with other entities which maintain similar consumer and/or business to business Web sites including AutoNation's AutoUSA, Microsoft Corporation's MSN Autos, CarsDirect.com, Cars.com, eBayMotors.com, Dealix.com, and AutoTrader.com. We also compete to a degree with vehicle dealers. Such competitors, including vehicle dealers, may already maintain or may introduce Web sites which compete with ours. We also compete indirectly against vehicle brokerage firms and affinity programs offered by several companies, including Costco Wholesale Corporation and Wal-Mart Stores, Inc. In addition, all major automotive manufacturers have their own Web sites and many have launched online buying services, such as General Motors Corporation and Ford Motor Company in its partnership with its dealers through FordDirect.com. On advertising, we compete with offerings from, among others, the major portals (e.g., Yahoo!, MSN, AOL), transaction based sites (e.g., Ebay Motors, Cars.com, Autotrader), automotive verticals (e.g., KBB, Edmunds) and numerous lifestyle sites (e.g., HIN City).

We believe that the principal competitive factors in the online market are:

- brand recognition,

- dealer return on investment,

- lead quality,

- prices of products and services,

- speed and quality of fulfillment,

- strength of intellectual property,

- field sales and customer support,

- dealer territorial coverage,

- relationships with automotive manufacturers,

- variety of integrated products and services,

- consumer experience and ease of use,

- customer satisfaction,

13

Table of Contents

- quality of Web site content,

- quality of service, and

- technical expertise.

We cannot assure that we can compete successfully against current or future competitors, many of which have substantially more technical and financial resources as well as existing brand recognition. In addition, competitive pressures may result in increased marketing costs, decreased Web site traffic or loss of market share or otherwise may materially and adversely affect our business, results of operations and financial condition.

***Our quarterly financial results are subject to significant fluctuations which may make it difficult for investors to predict our future performance.***

Our quarterly operating results have fluctuated in the past and may fluctuate in the future due to many factors. Our expense levels are based in part on our expectations of future revenues which may vary significantly. If revenues do not increase faster than expenses, our business, results of operations and financial condition will be materially and adversely affected. Other factors that may adversely affect our quarterly operating results include:

- our ability to retain existing dealers, attract new dealers and maintain dealer and customer satisfaction,

- the announcement or introduction of new or enhanced sites such as MyRide.com, services and products by us or our competitors,

- general economic conditions and economic conditions specific to the Internet, online commerce or the automotive industry,

- a decline in the usage levels of online services and consumer acceptance of the Internet and commercial online services for the purchase of consumer products and services such as those marketed or advertised by us,

- our ability to upgrade and develop our systems and infrastructure and to attract new personnel in a timely and effective manner,

- the level of traffic on our Web sites and other sites that refer traffic to our Web sites,

- technical difficulties, system downtime, Internet brownouts or electricity blackouts,

- the amount and timing of operating costs and capital expenditures relating to expansion of our business, operations and infrastructure,

- costs of ongoing litigation and any adverse judgments resulting from such litigation,

- costs of defending and enforcing our intellectual property rights,

- governmental regulation, and

- unforeseen events affecting the industry.

***Seasonality is likely to cause fluctuations in our operating results. Investors may not be able to predict our annual operating results based on a quarter to quarter comparison of our operating results.***

Traditionally, our purchase request volume fluctuates with automotive industry sales volume that has some measure of seasonality. Typically, volume is highest in the spring and summer, with lower volume in the fall and winter months. As seasonality occurs, investors may not be able to predict our annual operating results based on a quarter to quarter comparison of our operating results. Seasonality in the automotive industry, Internet and commercial online service usage and advertising expenditures is likely to cause fluctuations in our operating results and could have a material adverse effect on our business, results of operations and financial condition.

***Employee pricing and other actions by manufacturers that promote transparent pricing may decrease the perceived value of our services to consumers and dealers. If the number of consumers and dealers who use our services declines, our revenues will decrease.***

In the past, some manufacturers introduced programs allowing all consumers to purchase new vehicles at prices offered to employees. Employee pricing and future actions by manufacturers that promote transparent pricing may negatively affect the perceived value of our services to consumers and dealers. A decline in the perceived value of our services to consumers and dealers may result in a decline in demand for our services, which could adversely affect our business, financial condition and results of operations.

14

**Table of Contents**

***We may be particularly affected by general economic conditions due to the nature of the automotive industry.***

The economic strength of the automotive industry significantly impacts the revenues we derive from dealers, automotive manufacturers and other customers and consumer traffic to our Web sites. The automotive industry is cyclical, with vehicle sales fluctuating due to changes in national and global economic forces. Purchases of vehicles are typically discretionary for consumers and may be particularly affected by negative trends in the general economy. The success of our operations depends to a significant extent upon a number of factors relating to discretionary consumer spending, including economic conditions (and perceptions of such conditions by consumers) affecting disposable consumer income (such as employment, wages and salaries, business conditions, energy prices and interest rates in regional and local markets). Because the purchase of a vehicle is a significant investment and is relatively discretionary, any reduction in disposable income in general or a general increase in interest rates, energy prices or a general tightening of lending may affect us more significantly than companies in other industries. Given the economic outlook for 2008, we expect total new vehicle sales to decrease from 2007 levels. In addition, if any of our larger customers were to become insolvent because of economic conditions in the automotive industry, our business, results of operations and financial condition may be materially and adversely affected.

At some point in the future, manufacturers may decrease current levels of incentive spending on new vehicles, which has served to drive sales volume in the past. Such a reduction in incentives could lead to a decline in demand for new vehicles. A decline in vehicle purchases may result in a decline in demand for our services which could adversely affect our business, financial condition and results of operations.

Threatened terrorist acts and the ongoing military action have created uncertainties in the automotive industry and domestic and international economies in general. These events may have an adverse impact on general economic conditions, which may reduce demand for vehicles and consequently our services and products which could have an adverse effect on our business, financial condition and results of operations. At this time, however, we are not able to predict the nature, extent and duration of these effects on overall economic conditions on our business, financial condition and results of operations.

We cannot assure that our business will not be materially adversely affected as a result of an industry or general economic downturn.

***If any of our relationships with Internet search engines or online automotive information providers terminates, our purchase request volume or quality could decline. If our purchase request volume or quality declines, our participating dealers may not be satisfied with our services and may terminate their relationships with us or force us to decrease the fees we charge for our services. If this occurs, our revenues would decrease.***

We depend on a number of strategic relationships to direct a substantial amount of purchase requests and traffic to us or our Web sites. The termination of any of these relationships or any significant reduction in traffic to Web sites on which our services are advertised or offered, or the failure to develop additional referral sources, could cause our purchase request volume or quality to decline. If this occurs, dealers may no longer be satisfied with our services and may terminate their relationships with us or force us to decrease the fees we charge for our services. If dealers terminate their relationships with us or force us to decrease the fees we charge for our services, our revenues will decline which could have a material adverse effect on our business, results of operations and financial condition. We receive a significant number of purchase requests through a limited number of Internet search engines, online automotive information providers, and other auto related Internet sites. We periodically negotiate revisions to existing agreements and these revisions could increase our costs in future periods. A number of our agreements with online service providers may be terminated without cause. We may not be able to maintain our relationship with our online service providers or find alternative, comparable marketing sponsorships and alliances capable of originating significant numbers of purchase requests on terms satisfactory to us. If we cannot maintain or replace our relationships with online service providers, our revenues may decline which could have a material adverse effect on our business, results of operations and financial condition.

***If any of our advertising relationships with manufacturers terminates or declines or our advertising rates decline, our revenues would decrease.***

We depend on a number of manufacturer relationships for substantially all of our advertising revenues. Automotive manufacturers increasingly make advertising decisions based on certain performance criteria. Due to acquiring advertising impressions from low quality third party sources that we no longer use, our 2007 performance as measured by such advertisers was lower than desired. As a result, we are experiencing a decline in advertising rates charged to such

15

Table of Contents

manufacturers for advertising and may experience lower demand for advertising from such manufacturers or termination of our advertising relationships with them. The termination of any of these relationships or decline in the level of advertising with us or reduction in advertising rates or any significant failure to develop additional sources of advertising would cause our revenues to decline which could have a material adverse effect on our business, results of operations and financial condition. We periodically negotiate revisions to existing agreements and these revisions could decrease our advertising revenues in future periods. A number of our agreements with such manufacturers may be terminated without cause. We may not be able to maintain our relationship with such manufacturers on favorable terms or find alternative comparable relationships capable of replacing advertising revenues on terms satisfactory to us. If we cannot do so, our revenues would decline which could have a material adverse effect on our business, results of operations and financial condition.

*If we cannot build and maintain strong brand loyalty, our business may suffer.*

We believe that the importance of brand recognition will increase as more companies engage in commerce over the Internet. Development and awareness of the MyRide.com, Autobytel.com, Autoweb.com, Car.com, CarSmart.com and other brands will depend largely on our ability to obtain a leadership position in Internet commerce. If dealers and manufacturers do not perceive us as an effective channel for increasing vehicle sales, or consumers do not perceive us as offering reliable information concerning new and used vehicles, as well as referrals to high quality dealers, in a user-friendly manner that reduces the time spent for vehicle purchases and services, we will be unsuccessful in promoting and maintaining our brands. Our brands may not be able to gain widespread acceptance among consumers or dealers. Our failure to develop our brands sufficiently would have a material adverse effect on our business, results of operations and financial condition.

*We are a relatively new business in an emerging industry and need to manage the introduction of new products and services in order to avoid increased expenses without corresponding revenues.*

We have been introducing new services to consumers and dealers in order to establish ourselves as a leader in the evolving market for automotive marketing services. Introducing new or enhanced products and services, such as MyRide.com, requires us to increase expenditures before we generate revenues. For example, we may need to hire personnel to oversee the introduction of new services before we generate revenues from these services. Our inability to generate satisfactory revenues from such expanded services to offset costs could have a material adverse effect on our business, results of operations and financial condition.

We must also:

- test, introduce and develop new services and products, including enhancing our Web sites,

- expand the breadth of products and services offered,

- expand our market presence through relationships with third parties, and

- acquire new or complementary businesses, products or technologies.

We cannot assure that we can successfully achieve these objectives.

*If federal or state franchise laws or state automotive dealer and/or broker laws apply to us we may be required to modify or eliminate our marketing programs. If we are unable to market our services in the manner we currently do, our revenues may decrease and our business may suffer.*

We believe that neither our relationship with our dealers nor our dealer subscription agreements constitute "franchises" under federal or state franchise laws. A federal court of appeals in Michigan has ruled that our dealer subscription agreement was not a "franchise" under Michigan law. However, if any state's regulatory requirements relating to franchises or our method of business impose additional requirements on us or include us within an industry-specific regulatory scheme, we may be required to modify our marketing programs in such state in a manner which undermines the program's attractiveness to consumers or dealers. If our relationship or written agreement with our dealers were found to be a "franchise" under federal or state franchise laws, we could be subject to other regulations, such as franchise disclosure and registration requirements and limitations on our ability to effect changes in our relationships with our dealers, which may negatively impact our ability to compete and cause our revenues to decrease and our business to suffer. If we become subject to fines or other penalties or if we determine that the franchise and related requirements are overly burdensome, we may elect to terminate operations in such state. In each case, our revenues may decline and our business, results of operations and financial condition could be materially and adversely affected.

16

Table of Contents

We also believe that our dealer marketing service generally does not qualify as an automobile brokerage activity and, therefore, state motor vehicle dealer or broker licensing requirements generally do not apply to us. In response to Texas Department of Transportation concerns, we modified our marketing program in that state to make our program open to all dealers who wish to apply. In addition, we modified the program to include a pricing model under which all participating dealers, regardless of brand, in a given zip code in Texas are charged uniform fees for referral of purchase requests. If other states' regulatory requirements relating to motor vehicle dealers or brokers are deemed applicable to us, we may become subject to fines, penalties or other requirements and may be required to modify our marketing programs in such states in a manner that undermines the attractiveness of the program to consumers or dealers. If we determine that the licensing or other requirements, in a given state are overly burdensome, we may elect to terminate operations in such state. In each case, our revenues may decline and our business, results of operations and financial condition could be materially and adversely affected.

***If financial broker and insurance licensing requirements apply to us in states where we are not currently licensed, we will be required to obtain additional licenses and our business may suffer.***

If we are required to be licensed as a financial broker, it may result in an expensive and time-consuming process that could divert the effort of management away from day-to-day operations. In the event states require us to be licensed and we are unable to do so, or are otherwise unable to comply with regulations required by changes in current operations or the introduction of new services, we could be subject to fines or other penalties or be compelled to discontinue operations in such states, and our business, results of operations and financial condition could be materially and adversely affected.

We provide links on our Web sites so consumers can receive quotes for insurance coverage from third parties and submit quote applications online through such parties' Web sites. We receive fees from such participants in connection with this advertising activity. We do not believe that such activities require us to be licensed under state insurance laws. The use of the Internet in the marketing of insurance products, however, is a relatively new practice. It is not clear whether or to what extent state insurance licensing laws apply to activities similar to ours.

If we are unable to be licensed to comply with additional regulations, or are otherwise unable to comply with regulations required by changes in current operations or the introduction of new services, we could be subject to fines or other penalties or be compelled to discontinue operations in such states, and our business, results of operations and financial condition could be materially and adversely affected.

***There are many risks associated with consummated and potential acquisitions.***

We may evaluate potential acquisitions which we believe will complement or enhance our existing business. If we acquire other companies in the future, it may dilute the value of existing stockholders' ownership. The impact of dilution may restrict our ability or otherwise not allow us to consummate acquisitions. Issuance of equity securities may restrict utilization of net operating loss carry forwards because of an annual limitation due to ownership change limitations under the Internal Revenue Code. We may also incur debt and losses related to the impairment of goodwill and acquired intangible assets if we acquire another company or business, and this could negatively impact our results of operations. We currently do not have any definitive agreements to acquire any company or business, and we may not be able to identify or complete any acquisition in the future.

Acquisitions involve numerous risks. For example:

- It may be difficult to assimilate the operations and personnel of an acquired business into our own business,

- Management information and accounting systems of an acquired business must be integrated into our current systems,

- We may lose dealers participating in both our network as well as that of the acquired business, if any,

- Our management must devote its attention to assimilating the acquired business which diverts attention from other business concerns,

- We may enter markets in which we have limited prior experience, and

- We may lose key employees of an acquired business.

***Changes in government regulations of Internet commerce may result in increased costs that may reduce our future earnings.***

Because our business is dependent on the Internet, the adoption of new local, state or national laws or regulations may decrease the growth of Internet usage or the acceptance of Internet commerce which could, in turn, decrease the demand for our services and increase our costs or otherwise have a material adverse effect on our business, results of operations and financial condition.

Table of Contents

Tax authorities in a number of states are currently reviewing the appropriate tax treatment of companies engaged in Internet commerce. New state tax regulations may subject us to additional state sales, use and income taxes.

***Evolving government regulations may require future licensing which could increase administrative costs or adversely affect our revenues.***

In a regulatory climate that is uncertain, our operations may be subject to direct and indirect adoption, expansion or reinterpretation of various laws and regulations. Compliance with these future laws and regulations may require us to obtain appropriate licenses at an undeterminable and possibly significant initial monetary and annual expense. These additional monetary expenditures may increase future overhead, thereby potentially reducing our future results of operations.

We have identified what we believe are the areas of domestic government regulation, which if changed, would be costly to us. These laws and regulations include franchise laws, motor vehicle brokerage licensing laws, motor vehicle dealer licensing laws, insurance licensing laws, financial services laws and data security and privacy laws, which are or may be applicable to aspects of our business. There could be laws and regulations applicable to our business which we have not identified or which, if changed, may be costly to us.

***Our success is dependent on keeping pace with advances in technology. If we are unable to keep pace with advances in technology, consumers may stop using our services and our revenues will decrease. If we are required to invest substantial amounts in technology, our results of operations will suffer.***

The Internet and electronic commerce markets are characterized by rapid technological change, changes in user and customer requirements, frequent new service and product introductions embodying new technologies and the emergence of new industry standards and practices that could render our existing Web sites and technology obsolete. These market characteristics are exacerbated by the emerging nature of the market and the fact that many companies are expected to introduce new Internet products and services in the near future. If we are unable to adapt to changing technologies, our business, results of operations and financial condition could be materially and adversely affected. Our performance will depend, in part, on our ability to continue to enhance our existing services, develop new technology that addresses the increasingly sophisticated and varied needs of our prospective customers, license leading technologies and respond to technological advances and emerging industry standards and practices on a timely and cost-effective basis. The development of our Web sites and other proprietary technology entails significant technical and business risks. We may not be successful in using new technologies effectively or adapting our Web sites, or other proprietary technology to customer requirements or to emerging industry standards. In addition, if we are required to invest substantial amounts in technology in order to keep pace with technological advances, our results of operations will suffer.

***We are vulnerable to electricity and communications system interruptions. The majority of our primary servers are located in a few locations. If electricity or communications to such locations or to our headquarters were interrupted, our operations would be adversely affected.***

Our production Web sites and certain systems, including MyRide.com, Autobytel.com, Autoweb.com, CarSmart.com, AutoSite.com, Car.com and Finance.Car.com, are currently hosted at secure third-party hosting facilities.

Although backup servers are available, our primary servers are vulnerable to interruption by damage from fire, earthquake, flood, power loss, telecommunications failure, break-ins and other events beyond our control. In the event that we experience significant system disruptions, our business, results of operations and financial condition would be materially and adversely affected. We have, from time to time, experienced periodic systems interruptions and anticipate that such interruptions will occur in the future.

Our main production systems and our accounting, finance and contract management systems are hosted in secure facilities with generators and other alternate power supplies in case of a power outage. However, our corporate offices, where we have the users and additional applications for our accounting, finance and contract management systems, are vulnerable to wide-scale power outages. To date, we have not been significantly affected by blackouts or other interruptions in service. In the event we are affected by interruptions in service, our business, results of operations and financial condition could be materially and adversely affected.

We maintain business interruption insurance which pays up to $9.0 million for the actual loss of business income sustained due to the suspension of operations as a result of direct physical loss of or damage to property at our offices. However, in the event of a prolonged interruption, this business interruption insurance may not be sufficient to fully compensate us for the resulting losses.

18

Table of Contents

***Internet-related issues may reduce or slow the growth in the use of our services in the future.***

Critical issues concerning the commercial use of the Internet, such as ease of access, security, privacy, reliability, cost, and quality of service may impact the growth of Internet use. If periods of decreased performance, outages or delays on the Internet occur frequently or other critical issues concerning the Internet are not resolved, overall Internet usage or usage of our Web sites could increase more slowly or decline, which would cause our business, results of operations and financial condition to be materially and adversely affected.

***The public market for our common stock may be volatile, especially since market prices for Internet-related and technology stocks have often been unrelated to operating performance.***

Prior to the initial public offering of our common stock in March 1999, there was no public market for our common stock. We cannot assure that an active trading market will be sustained or that the market price of the common stock will not decline. The stock market in general and the shares of emerging companies in particular have experienced significant price fluctuations. The market price of our common stock is likely to be highly volatile and could be subject to wide fluctuations in response to factors such as:

- actual or anticipated variations in our quarterly operating results,

- historical and anticipated operating metrics such as the number of participating dealers, the visitors to our Web sites and the frequency with which they transact,

- announcements of new product or service offerings,

- technological innovations,

- competitive developments, including actions by automotive manufacturers,

- changes in financial estimates by securities analysts or our failure to meet such estimates,

- conditions and trends in the Internet, electronic commerce and automotive industries,

- our ability to comply with the conditions to continued listing of our stock on The NASDAQ Global Market,

- adoption of new accounting standards affecting the technology or automotive industry, and

- general market conditions and other factors.

Further, the stock markets, and in particular The NASDAQ Global Market, have experienced price and volume fluctuations that have particularly affected the market prices of equity securities of many technology companies and have often been unrelated or disproportionate to the operating performance of such companies. These broad market factors have affected and may adversely affect the market price of our common stock. In addition, general economic, political and market conditions, such as recessions, interest rates, energy prices, international currency fluctuations, terrorist acts, military actions or wars, may adversely affect the market price of the common stock. In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been instituted against companies with publicly traded securities. Such litigation could result in substantial costs and a diversion of management's attention and resources, which would have a material adverse effect on our business, results of operations and financial condition.

***Changing legislation affecting the automotive industry could require increased regulatory and lobbying costs and may harm our business.***

Our services may result in changing the way vehicles are marketed and sold which may be viewed as threatening by new and used vehicle dealers who do not subscribe to our programs. Such businesses are often represented by influential lobbying organizations, and such organizations or other persons may propose legislation which could impact the evolving marketing and distribution model which our services promote. Should current laws be changed or new laws passed, our business, results of operations and financial condition could be materially and adversely affected. As we introduce new services, we may need to comply with additional licensing regulations and regulatory requirements.

To date, we have not spent significant resources on lobbying or related government affairs issues but we may need to do so in the future. A significant increase in the amount we spend on lobbying or related activities would have a material adverse effect on our results of operations and financial condition.

19

**Table of Contents**

***Our computer infrastructure may be vulnerable to security breaches. Any such problems could jeopardize confidential information transmitted over the Internet, cause interruptions in our operations or cause us to have liability to third persons.***

Our computer infrastructure is potentially vulnerable to physical or electronic computer break-ins, viruses and similar disruptive problems and security breaches. Any such problems or security breaches could cause us to have liability to one or more third parties and disrupt all or part of our operations. A party able to circumvent our security measures could misappropriate proprietary information, customer information or consumer information, jeopardize the confidential nature of information transmitted over the Internet or cause interruptions in our operations. Concerns over the security of Internet transactions and the privacy of users could also inhibit the growth of the Internet in general, particularly as a means of conducting commercial transactions. To the extent that our activities or those of third-party contractors involve the storage and transmission of proprietary information such as personal financial information, security breaches could expose us to a risk of financial loss, litigation and other liabilities. Our current insurance program may protect us against some, but not all, of such losses. Any of these events could have a material adverse effect on our business, results of operations and financial condition.

***We depend on continued technological improvements in our systems and in the Internet overall. If we are unable to handle an unexpectedly large increase in volume of consumers using our Web sites, we cannot assure our consumers or dealers that purchase requests will be efficiently processed and our business may suffer.***

If the Internet continues to experience significant growth in the number of users and the level of use, then the Internet infrastructure may not be able to continue to support the demands placed on it by such potential growth.

An unexpectedly large increase in the volume or pace of traffic on our Web sites or the number of orders placed by customers may require us to expand and further upgrade our technology, transaction-processing systems and network infrastructure. We may not be able to accurately project the rate or timing of increases, if any, in the use of our Web sites or expand and upgrade our systems and infrastructure to accommodate such increases. In addition, we cannot assure that our dealers will efficiently process purchase requests.

Any of such failures regarding the Internet in general or our Web sites, technology systems and infrastructure in particular, or with respect to our dealers, would have a material and adverse affect on our business, results of operations and financial condition.

***Misappropriation or infringement of our intellectual property and proprietary rights could impair our competitive position. Enforcement actions to protect our intellectual property could materially and adversely affect our business, results of operations and financial condition.***

Our ability to compete depends upon our proprietary systems and technology. While we rely on trademark, trade secret, patent and copyright law, confidentiality agreements and technical measures to protect our proprietary rights, we believe that the technical and creative skills of our personnel, continued development of our proprietary systems and technology, brand name recognition and reliable Web site maintenance are more essential in establishing and maintaining a leadership position and strengthening our brands. As part of our confidentiality procedures, we generally enter into confidentiality agreements with our employees and consultants and limit access to our trade secrets and technology. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our services or to obtain and use information that we regard as proprietary. Policing unauthorized use of our proprietary rights is difficult. We cannot assure that the steps taken by us will prevent misappropriation of technology or that the agreements entered into for that purpose will be enforceable. Effective trademark, service mark, patent, copyright and trade secret protection may not be available where our products and services are made available online. In addition, litigation may be necessary to enforce or protect our intellectual property rights or to defend against claims of infringement or invalidity. We recently filed a lawsuit against multiple defendants to protect one of our patents, and are defendants in two other patent litigation matters, one of which is a declaratory judgment action regarding one of our patents. Future litigation, even if successful, could result in substantial costs and diversion of resources and management attention and could materially adversely affect our business, results of operations and financial condition. Misappropriation of our intellectual property or potential litigation could also have a material adverse effect on our business, results of operations and financial condition.

20

Table of Contents

***We face risk of claims from third parties relating to intellectual property. In addition, we may incur liability for retrieving and transmitting information over the Internet. Such claims and liabilities could harm our business.***

As part of our business, we make Internet services and content available to our customers. This creates the potential for claims to be made against us, either directly or through contractual indemnification provisions with third parties. We are involved in one such matter which is described in "Item 3. Legal Proceedings" herein. We could face liability for information retrieved from or transmitted over the Internet and liability for products sold over the Internet. We could be exposed to liability with respect to third-party information that may be accessible through our Web sites, links or car review services. Such claims might, for example, be made for defamation, negligence, patent, copyright or trademark infringement, personal injury, breach of contract, unfair competition, false advertising, invasion of privacy or other legal theories based on the nature, content or copying of these materials. Such claims might assert, among other things that, by directly or indirectly providing links to Web sites operated by third parties we should be liable for copyright or trademark infringement or other wrongful actions by such third parties through such Web sites. It is also possible that, if any third-party content provided on our Web sites contains errors, consumers could make claims against us for losses incurred in reliance on such information. Any claims could result in costly litigation, divert management's attention and resources, cause delays in releasing new or upgrading existing services or require us to enter into royalty or licensing agreements.

We also enter into agreements with other companies under which any revenue that results from the purchase or use of services through direct links to or from our Web sites or on our Web sites is shared. Such arrangements may expose us to additional legal risks and uncertainties, including disputes with such parties regarding revenue sharing, local, state and federal government regulation and potential liabilities to consumers of these services, even if we do not provide the services ourselves. We cannot assure that any indemnification provided to us in our agreements with these parties, if available, will be adequate.

Even to the extent such claims do not result in liability to us, we could incur significant costs in investigating and defending against such claims. The imposition upon us of potential liability for information carried on or disseminated through our system could require us to implement measures to reduce our exposure to such liability, which might require the expenditure of substantial resources or limit the attractiveness of our services to consumers, dealers and others.

Litigation regarding intellectual property rights is common in the Internet and software industries. We expect that Internet technologies and software products and services may be increasingly subject to third-party infringement claims as the number of competitors in our industry segment grows and the functionality of products in different industry segments overlaps. We are involved in patent litigation, both as plaintiff and defendant, which are described in "Item 3. Legal Proceedings" herein. There can be no assurance that our services do not infringe on the intellectual property rights of third parties.

From time to time, plaintiffs have brought these types of claims and sometimes successfully litigated them against online services. Our liability insurance may not cover all potential claims to which we are exposed and may not be adequate to indemnify us for all liability that may be imposed. Any imposition of liability that is not covered by insurance or is in excess of our insurance coverage could have a material adverse effect on our business, results of operations and financial condition.

***We could be adversely affected by litigation. If we were subject to a significant adverse litigation outcome, our financial condition could be materially adversely affected.***

We are a defendant in certain proceedings or are involved in legal matters which are described in "Item 3. Legal Proceedings" herein.

From time to time, we are involved in other litigation or other legal matters arising from the normal course of our business activities. The actions filed against us and other litigation or legal matters, even if not meritorious, could result in substantial costs and diversion of resources and management attention and an adverse outcome in litigation could materially adversely affect our business, results of operations and financial condition.

***We are uncertain of our ability to obtain additional financing for our future capital needs. If we are unable to obtain additional financing we may not be able to continue to operate our business.***

We currently anticipate that our cash and cash equivalents and short-term investments will be sufficient to meet our anticipated needs for working capital and other cash requirements at least for the next 12 months. We may need to raise additional funds sooner, however, in order to develop new or enhance existing services or products or to respond to competitive pressures. There can be no assurance that additional financing will be available on terms favorable to us, or at all. If adequate funds are not available or are not available on acceptable terms, our ability to develop or enhance services or

Table of Contents

products or respond to competitive pressures would be significantly limited. In addition, our ability to continue to operate our business may also be materially adversely affected in the event additional financing is not available when required. Such limitation could have a material adverse effect on our business, results of operations, financial condition and prospects.

***Our certificate of incorporation and bylaws, stockholder rights plan and Delaware law contain provisions that could discourage a third party from acquiring us or limit the price third parties are willing to pay for our stock.***

Provisions of our amended and restated certificate of incorporation and bylaws relating to our corporate governance and provisions in our stockholder rights plan could make it difficult for a third party to acquire us, and could discourage a third party from attempting to acquire control of us. These provisions allow us to issue preferred stock with rights senior to those of the common stock without any further vote or action by the stockholders. These provisions provide that the board of directors is divided into three classes, which may have the effect of delaying or preventing changes in control or change in our management because less than a majority of the board of directors are up for election at each annual meeting. In addition, these provisions impose various procedural and other requirements which could make it more difficult for stockholders to effect corporate actions such as a merger, asset sale or other change of control of us. Under the stockholder rights plan, if a person or group acquires 15% or more of our common stock, all rights holders, except the acquirer, will be entitled to acquire at the then exercise price of a right that number of shares of our common stock which, at the time, has a market value of two times the exercise price of the right. In addition, under certain circumstances, all right holders, other than the acquirer, will be entitled to receive at the then exercise price of a right that number of shares of common stock of the acquiring company which, at the time, has a market value of two times the exercise price of the right. The initial exercise price of a right is $65. Such charter and rights provisions could limit the price that certain investors might be willing to pay in the future for shares of our common stock and may have the effect of delaying or preventing a change in control. The issuance of preferred stock also could decrease the amount of earnings and assets available for distribution to the holders of common stock or could adversely affect the rights and powers, including voting rights, of the holders of the common stock.

We are also subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law. In general, the statute prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner. For purposes of Section 203, a "business combination" includes a merger, asset sale or other transaction resulting in a financial benefit to the interested stockholder, and an "interested stockholder" is a person who, together with affiliates and associates, owns or did own 15% or more of the corporation's voting stock.

## Item 1B.     *Unresolved Staff Comments*

None.

## Item 2.     *Properties*

Our headquarters are located in a single office complex in Irvine, California. We lease a total of approximately 60,000 square feet. The lease expires in September 2010. Car.com is located in a single suite in an office building in Troy, Michigan and occupies approximately 4,700 square feet. The lease expires in January 2011. CarTV is located in an industrial building in Santa Ana, California and occupies approximately 3,600 square feet. The lease expires in February 2009.

We believe that our existing facilities are adequate to meet our needs and that existing needs and future growth can be accommodated by leasing alternative or additional space.

## Item 3.     *Legal Proceedings*

In August 2001, a purported class action lawsuit was filed in the United States District Court for the Southern District of New York against Autobytel and certain of the Company's current and former directors and officers (the "Autobytel Individual Defendants") and underwriters involved in the Company's initial public offering. A Consolidated Amended Complaint, which is now the operative complaint, was filed on April 19, 2002. This action purports to allege violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Plaintiffs allege that the underwriter defendants agreed to allocate stock in the Company's initial public offering to certain investors in exchange for excessive and undisclosed commissions and agreements by those investors to make additional purchases of stock in the aftermarket at pre-determined prices. Plaintiffs allege that the prospectus for the Company's initial public offering was false and misleading in violation of

22

Table of Contents

the securities laws because it did not disclose these arrangements. The action seeks damages in an unspecified amount. The action is being coordinated with approximately 300 other nearly identical actions filed against other companies. On October 9, 2002, the District Court dismissed the Autobytel Individual Defendants from the case without prejudice. On February 19, 2003, the District Court denied the Company's motion to dismiss the complaint. On December 5, 2006, the Second Circuit vacated a decision by the District Court granting class certification in six of the coordinated cases, which are intended to serve as test, or "focus" cases. The plaintiffs selected these six cases, which do not include the Company. On April 6, 2007, the Second Circuit denied the petition for rehearing filed by the plaintiffs, but noted that the plaintiffs could ask the District Court to certify more narrow classes than those that were rejected.

Prior to the Second Circuit's December 5, 2006 ruling, the majority of issuers, including the Company, and their insurers had submitted a settlement agreement to the District Court for approval. In light of the Second Circuit opinion, the parties agreed that the settlement could not be approved. On September 25, 2007, the District Court approved a stipulation filed by the plaintiffs and the issuers which terminated the proposed settlement. On August 14, 2007, the plaintiffs filed amended complaints in the six focus cases. The amended complaints include a number of changes, such as changes to the definition of the purported class of investors, and the elimination of the individual defendants as defendants. The six focus case issuers and the underwriters named as defendants in the focus cases filed motions to dismiss the amended complaints against them on November 14, 2007. On September 27, 2007, the plaintiffs filed a motion for class certification in the six focus cases. On December 21, 2007, the issuers and the underwriters filed papers opposing plaintiffs' class certification motion and plaintiffs filed an opposition to defendants' motions to dismiss. On January 28, 2008, the issuers and the underwriters filed reply briefs in further support of their motions to dismiss the amended complaints. Due to the inherent uncertainties of litigation, the Company cannot accurately predict the ultimate outcome of the matter. The Company cannot predict whether it will be able to renegotiate a settlement that complies with the Second Circuit's mandate. If the Company is found liable, the Company is unable to estimate or predict the potential damages that might be awarded, whether such damages would be greater than its insurance coverage, or whether such damages would have a material impact on its results of operations, financial condition or cash flows in any future period.

Between April and September 2001, eight separate purported class actions virtually identical to the one filed against Autobytel were filed against Autoweb.com, Inc. ("Autoweb"), certain of Autoweb's former directors and officers (the "Autoweb Individual Defendants") and underwriters involved in Autoweb's initial public offering. A Consolidated Amended Complaint, which is now the operative complaint, was filed on April 19, 2002. It purports to allege violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Plaintiffs allege that the underwriter defendants agreed to allocate stock in Autoweb's initial public offering to certain investors in exchange for excessive and undisclosed commissions and agreements by those investors to make additional purchases of stock in the aftermarket at pre-determined prices. Plaintiffs allege that the prospectus for Autoweb's initial public offering was false and misleading in violation of the securities laws because it did not disclose these arrangements. The action seeks damages in an unspecified amount. The action is being coordinated with approximately 300 other nearly identical actions filed against other companies. On October 9, 2002, the District Court dismissed the Autoweb Individual Defendants from the case without prejudice. On February 19, 2003, the District Court dismissed Autoweb's motion to dismiss the complaint. On December 5, 2006, the Second Circuit vacated a decision by the District Court granting class certification in six of the coordinated cases, which are intended to serve as test, or "focus" cases. The plaintiffs selected these six cases, which do not include Autoweb. On April 6, 2007, the Second Circuit denied a petition for rehearing filed by the plaintiffs, but noted that the plaintiffs could ask the District Court to certify more narrow classes than those that were rejected.

Prior to the Second Circuit's December 5, 2006 ruling, the majority of issuers, including Autoweb, and their insurers had submitted a settlement agreement to the District Court for approval. In light of the Second Circuit opinion, the parties agreed that the settlement could not be approved. On September 25, 2007, the District Court approved a stipulation filed by the plaintiffs and the issuers which terminated the proposed settlement. On August 14, 2007, the plaintiffs filed amended complaints in the six focus cases. The amended complaints include a number of changes, such as changes to the definition of the purported class of investors, and the elimination of the individual defendants as defendants. The six focus case issuers and the underwriters named as defendants in the focus cases filed motions to dismiss the amended complaints against them on November 14, 2007. On September 27, 2007, the plaintiffs filed a motion for class certification in the six focus cases. On December 21, 2007, the issuers and the underwriters filed papers opposing plaintiffs' class certification motion and plaintiffs filed an opposition to defendants' motions to dismiss. On January 28, 2008, the issuers and the underwriters filed reply briefs in further support of their motions to dismiss the amended complaints. Due to the inherent uncertainties of litigation, the Company cannot accurately predict the ultimate outcome of the matter. The Company cannot predict whether Autoweb will be able to renegotiate a settlement that complies with the Second Circuit's mandate. If Autoweb is found liable, the Company is unable to estimate or predict the potential damages that might be awarded, whether such damages would be greater than Autoweb's insurance coverage, or whether such damages would have a material impact on the Company's results of operations, financial condition or cash flows in any future period.

23

**Table of Contents**

We reviewed the above class action matters and do not believe that it is probable that a loss contingency has occurred; therefore, we have not recorded a liability against these claims as of December 31, 2007.

On October 21, 2005, Autobytel received a complaint as well as a demand for arbitration/statement of claim filed by certain former shareholders of Stoneage Corporation ("Stoneage"). The complaint was filed in the Central District of California and names us as well as certain current and former officers and directors as defendants. The demand for arbitration was filed with the American Arbitration Association and names the same group of defendants. The allegations and claims in both of these matters are virtually identical and stem from the acquisition of Stoneage by us on April 15, 2004. Both the complaint and demand for arbitration contain causes of action for: breach of the acquisition agreement, breach of the registration rights agreement, violations of California Corporations Code Sections 25401 and 25501, violations of California Corporations Code Sections 25400 and 25500, fraud, negligent misrepresentation, fraudulent concealment, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The demand for arbitration also contains a cause of action for violation of Section 17(a) of the Securities Act of 1933. The complaint and demand for arbitration seek unspecified damages and attorneys' fees and costs, as well as rescission and punitive awards. The defendants have not responded to either the complaint or demand for arbitration. On November 29, 2005, the parties requested that the arbitration be stayed, and on February 8, 2006, the plaintiffs dismissed the complaint without prejudice. On May 2, 2007, the parties tentatively agreed to a settlement in principle, and a settlement agreement was negotiated and fully executed in September 2007. We recorded a liability of $1.0 million against this claim as of March 31, 2007. Payments in accordance with the settlement agreement were made by us and our insurer in October 2007.

In August 2007, AVV received a letter from a customer claiming indemnification regarding an action brought against such customer for alleged patent infringement. The customer later made a similar claim against Autobytel. We are in discussions with such customer regarding such claim. We cannot currently predict the outcome of this matter, which, depending on the outcome, may have a material impact on our results of operations, financial condition or cash flows.

On November 30, 2007, we filed a lawsuit in the United States District Court for the Eastern District of Texas against Insweb Corporation, Leadpoint, Inc., Internet Brands, Inc. and Auto Internet Marketing, Inc. In the lawsuit, we asserted infringement of U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests," against such parties, and sought damages and a permanent injunction. We cannot assure that the patent will be enforceable or that the above action will be successful.

On March 11, 2008, Insweb Corporation filed a lawsuit in the United States District Court for the Southern District of California against us, one of our subsidiaries and Dominion Enterprises, the purchaser of the AVV business. In the lawsuit, Insweb asserted infringement of U.S. Patent No. 6,898,597, entitled "Event Log," by marketing and selling the WebControl product of the AVV business and is seeking damages and a permanent injunction. We intend to vigorously defend the lawsuit. Dominion has asserted an indemnity claim under the purchase agreement relating to the sale of the AVV business. We are obligated to indemnify Dominion for this claim subject to and in accordance with the terms of the purchase agreement. We cannot currently predict the outcome of this matter, which, depending on the outcome, may have a material impact on our results of operations, financial condition or cash flows.

On March 13, 2008, Edmunds Holding Company et. al filed a lawsuit in the United States District Court for the District of Delaware against us. In the lawsuit, Edmunds is seeking a declaration that its business activities, some of which include generating automotive leads, do not infringe our U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests" and that such patent is invalid. We intend to vigorously defend the lawsuit. We cannot currently predict the outcome of this matter, which, depending on the outcome, may have a material impact on our results of operations, financial condition or cash flows.

From time to time, we are involved in other litigation matters arising from the normal course of our business activities. The actions filed against us and other litigation, even if not meritorious, could result in substantial costs and diversion of resources and management attention, and an adverse outcome in litigation could materially adversely affect our business, results of operations, financial condition and cash flows.

**Item 4.**     *Submission of Matters to a Vote of Security Holders*

No matters were submitted to a vote of security holders during the fourth quarter of 2007.

Table of Contents

## PART II

**Item 5.**    *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

Our common stock, par value $0.001 per share, has been quoted on The NASDAQ Global Market or its predecessor since March 26, 1999, and currently trades under the symbol "ABTL". Prior to such time, there was no public market for our common stock. The following table sets forth, for the calendar quarters indicated, the range of high and low sales prices of our common stock as reported on The NASDAQ Global Market.

| Year | High | Low |
|------|------|-----|
| **2006** | | |
| First Quarter | $5.16 | $4.01 |
| Second Quarter | $4.83 | $2.81 |
| Third Quarter | $3.48 | $2.55 |
| Fourth Quarter | $3.74 | $2.83 |
| 2007 | | |
| First Quarter | $4.21 | $2.87 |
| Second Quarter | $4.64 | $3.18 |
| Third Quarter | $4.48 | $2.48 |
| Fourth Quarter | $3.45 | $2.10 |

As of February 29, 2008, there were 475 holders of record of our common stock. We have never declared or paid any cash dividends on our common stock. We intend to retain all of our future earnings, if any, for use in our business, and therefore we do not expect to pay any cash dividends on our common stock in the foreseeable future.

**Performance Graph**

The following graph shows a comparison of cumulative total stockholder returns for our common stock, the NASDAQ Composite, the Russell 2000 Index and the Russell 3000 Index. In 2003, our common stock was included for the first time in the Russell 3000 Index. The graph assumes the investment of $100 on December 31, 2002. The data regarding us assumes an investment at the closing price of $2.80 per share of our common stock on December 31, 2002. The performance shown is not necessarily indicative of future performance.



Table of Contents

| | | | Cumulative Total Return | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 |
| Autobytel | $100.00 | $325.36 | $215.71 | $176.43 | $125.00 | $ 98.21 |
| NASDAQ Composite | 100.00 | 149.75 | 164.64 | 168.60 | 187.83 | 205.22 |
| Russell 2000 | 100.00 | 147.25 | 174.24 | 182.18 | 215.64 | 212.26 |
| Russell 3000 | 100.00 | 131.06 | 146.71 | 155.69 | 180.16 | 189.42 |

## Item 6.    *Selected Consolidated Financial Data*

The following selected consolidated financial data should be read in conjunction with our consolidated financial statements and related notes and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing elsewhere in this Annual Report on Form 10-K. Our consolidated financial statements and related notes and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" provide detailed information regarding discontinued operations, and other charges which have impacted our results of operations and financial condition and affect the comparability of the financial data provided below. The Statement of Operations Data for the years ended December 31, 2007, 2006, 2005, 2004 and 2003 and the Balance Sheet Data as of December 31, 2007, 2006, 2005, 2004 and 2003 are derived from our audited consolidated financial statements. In the Statements of Operations Data, the revenues and expenses of our AIC operations and the RPM and AVV businesses have been aggregated as discontinued operations and stated separately from the respective captions of continuing operations for all periods presented. Expenses included in discontinued operations represent direct costs of our AIC operations and the RPM and AVV businesses that will be eliminated from future operations as a result of the sale of these businesses. The Balance Sheet Data for 2007 excludes the assets and liabilities of our AIC operations and the RPM business which were sold in 2007 and our AVV business which was classified as held for sale at December 31, 2007. The Balance Sheet Data for 2006 excludes the assets and liabilities of our AIC operations which were classified as held for sale at December 31, 2006. Certain reclassifications have been made to prior years' information to conform to the current year presentation. These reclassifications primarily relate to the discontinued operations of the RPM and AVV businesses and the reclassification of licensing fees from revenue to other income.

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| | (Amounts in thousands, except per share data) | | | | |
| **Statements of Operations Data:** | | | | | |
| Revenues | $ 84,385 | $ 85,102 | $ 97,002 | $99,336 | $77,089 |
| Costs and expenses: | | | | | |
| Cost of revenues | 52,448 | 47,653 | 45,271 | 45,351 | 36,507 |
| Sales and marketing | 21,474 | 20,128 | 19,880 | 18,242 | 14,168 |
| Technology support | 18,119 | 17,476 | 16,274 | 13,214 | 7,936 |
| General and administrative | 27,065 | 38,416 | 29,329 | 17,852 | 9,526 |
| Amortization of acquired intangible assets | 464 | 1,209 | 1,308 | 924 | 62 |
| Patent litigation settlement | (12,000) | — | — | — | — |
| Domestic restructuring and other charges, net | — | — | — | — | (27) |
| Total costs and expenses | 107,570 | 124,882 | 112,062 | 95,583 | 68,172 |
| Operating (loss) income | (23,185) | (39,780) | (15,060) | 3,753 | 8,917 |
| Interest and other income, net | 5,906 | 2,367 | 3,821 | 1,339 | 1,378 |
| Foreign currency exchange loss | (7) | — | — | — | — |
| (Loss) income from continuing operations before income taxes and minority interests | (17,286) | (37,413) | (11,239) | 5,092 | 10,295 |
| Benefit (Provision) for income taxes | — | 107 | 37 | (117) | (7) |
| Minority interest | — | (21) | (249) | (124) | — |
| (Loss) income from continuing operations | (17,286) | (37,327) | (11,451) | 4,851 | 10,288 |
| Income (loss) from discontinued operations | 11,931 | 5,859 | 5,193 | 986 | (3,961) |
| Net (loss) income | $ (5,355) | $(31,468) | $ (6,258) | $ 5,837 | $ 6,327 |
| Basic (loss) income per share from continuing operations | $ (0.40) | $ (0.88) | $ (0.27) | $ 0.12 | $ 0.30 |
| Diluted (loss) income per share from continuing operations | $ (0.40) | $ (0.88) | $ (0.27) | $ 0.12 | $ 0.27 |
| Basic net (loss) income per share | $ (0.12) | $ (0.74) | $ (0.15) | $ 0.14 | $ 0.18 |
| Diluted net (loss) income per share | $ (0.12) | $ (0.74) | $ (0.15) | $ 0.13 | $ 0.17 |

26

Table of Contents

|  | As of December 31, | | | | |
|  | 2007 | 2006 | 2005 | 2004 | 2003 |
|  | | | ( in thousands) | | |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 27,601 | $ 22,743 | $ 33,353 | $ 24,287 | $ 45,643 |
| Restricted cash | — | 360 | 241 | 9,053 | — |
| Short-term investments | 686 | 3,000 | 12,000 | 16,500 | 9,991 |
| Working capital (1) | 26,448 | 25,066 | 48,426 | 49,983 | 53,782 |
| Long-term investments | — | — | 3,000 | 12,000 | 6,000 |
| Total assets (2) | 104,996 | 124,694 | 147,328 | 160,717 | 98,509 |
| Non-current liabilities | 436 | 195 | 152 | 8 | 178 |
| Accumulated deficit | (191,442) | (186,087) | (154,619) | (148,361) | (154,198) |
| Stockholders' equity | $ 106,252 | $ 103,818 | $ 128,347 | $ 136,067 | $ 84,004 |

(1) Excludes net assets and (liabilities) held for sale of approximately $17.0 million and ($.4) million as of December 31, 2007 and 2006, respectively.

(2) Excludes assets held for sale of approximately $17.2 million and $2 thousand as of December 31, 2007 and 2006, respectively.

**Item 7.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

You should read the following discussion of our results of operations and financial condition in conjunction with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. This discussion contains forward-looking statements based on current expectations that involve risks and uncertainties. Actual results and the timing of certain events may differ significantly from those projected in such forward-looking statements due to a number of factors, including those discussed in Part I "Item 1A. Risk Factors" in this Annual Report on Form 10-K.

**Company Overview**

We are an automotive media and marketing services company focused on helping dealers sell cars and services, and manufacturers build brands through efficient marketing and advertising primarily through the Internet. We own and operate automotive Web sites, including MyRide.com™, Autobytel.com ®, Autoweb.com ®, Car.com ®, CarSmart.com ®, AutoSite.com ® and CarTV.com ®. We are among the largest automotive shopping content networks and reach millions of Internet visitors as they shop for vehicles and make their vehicle buying decisions.

**Executive Summary**

In 2006, we began to implement a series of strategic initiatives, including programs to transition our business toward a more media-centric advertising-driven business model, increasing the focus on providing best-of-class marketing and media services for our dealer and manufacturer customers, and better capturing integration opportunities between our businesses. In October 2007, we officially launched MyRide.com, the first fully-integrated automotive vertical search web experience, which is designed to provide consumers with a single comprehensive gateway to broad and relevant automotive information available on the Internet and oriented toward the entire consumer automotive lifecycle—from finding and purchasing a new or used vehicle, enhancing a vehicle with parts and accessories, finding local vehicle services, and accessing extensive multimedia and user-generated automotive content. We believe MyRide.com is one of the Internet's most comprehensive used vehicle Web sites, utilizing search-based technology to incorporate listings of millions of vehicles.

As part of the implementation of our strategic initiatives, we disposed of non-core operations and businesses. In January 2007, we sold certain assets and liabilities of the AIC operations to R. L. Polk & Co for $3.0 million. In June 2007, we sold substantially all the assets and certain liabilities of the RPM business to Call Command, Inc. pursuant to a Stock Purchase Agreement for an aggregate purchase price of $7.6 million, subject to a working capital adjustment. In January

27

**Table of Contents**

2008, we sold substantially all the assets and certain liabilities of AVV to Dominion Enterprises for $23.8 million, subject to a working capital adjustment. In connection with the sale of our AIC operations and RPM business, we recognized an aggregate gain on sale of approximately $6.3 million in our Consolidated Statement of Operations for the year ended December 31, 2007.

In December 2005, we received $3.9 million as part of an agreement to dissolve Autobytel.Europe and recognized a foreign currency exchange gain of $1.5 million. The dissolution of Autobytel.Europe was completed in February 2007 and we received an additional $0.2 million in connection therewith.

In October 2007, we sold our 9.41% investment in Autobytel Japan to SBI Holdings Inc. for approximately $4.0 million in cash. In connection with the sale, we entered into the 2 nd Amended and Restated License Agreement with Autobytel Japan pursuant to which we will provide it a perpetual, royalty-free, non-exclusive, non-transferable license for certain intellectual property. We do not have any continuing performance obligations under the license agreement.

In 2004, we filed a lawsuit in the United States District Court for the Eastern District of Texas against Dealix Corporation, a wholly-owned subsidiary of The Cobalt Group. In that lawsuit, we asserted infringement of U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests," against Dealix. In December 2006, we entered into a settlement agreement (the "Settlement Agreement") with Dealix relating to the lawsuit. With court approval on March 25, 2007, the lawsuit against Dealix was dismissed. The Settlement Agreement provides that Dealix will pay us a total of $20.0 million in settlement payments for a mutual release of claims and a non-exclusive license from us to Dealix and The Cobalt Group of certain of our patent and patent applications. On March 13, 2007, we received the initial $12.0 million settlement payment with the remainder to be paid out in installments of approximately $2.7 million on the next three annual anniversary dates of the initial payment. We received the first annual installment of approximately $2.7 million in March 2008. The remaining payments are guaranteed by WP Equity Partners, Inc., a Warburg Pincus affiliate. We have been unable to assess with reasonable assurance the collectability of the remaining payments under the Settlement Agreement as we do not have financial information to support the credit worthiness of the debtor or guarantor. Therefore, we do not have reasonable assurance that we will receive any remaining payments on their respective due dates or at all. See Note 13 of the "Notes to Consolidated Financial Statements" in Part IV "Item 15. Exhibits and Financial Statement Schedules" of this Annual Report on Form 10-K.

On January 1, 2006, we adopted the provisions of Statement of Financial Accounting Standards ("SFAS") No. 123(R) using the modified prospective application method. Under this transition method, share-based compensation cost from continuing operations of $4.6 million and $5.1 million was recognized in 2007 and 2006, respectively, which includes the applicable amounts of: (a) compensation cost of all share-based payments granted prior to, but not yet vested as of December 31, 2005 (based on the grant-date fair value estimated in accordance with the original provisions of SFAS No. 123 and previously presented in the pro forma footnote disclosures), and (b) compensation cost for all share-based payments granted subsequent to December 31, 2005 (based on the grant-date fair value estimated in accordance with the new provisions of SFAS No. 123(R)). See Note 2. of the "Notes to Consolidated Financial Statements" in Part IV "Item 15. Exhibits and Financial Statement Schedules" of this Annual Report on Form 10-K.

In the fourth quarter of 2007, as part of our strategic initiatives, we implemented a workforce reduction of approximately 14% of our workforce. The affected employees were mostly in the areas of accounting and finance, information technology, and other general and administrative related areas. The reduction was effected in order to reduce our overall cost structure and generate operational efficiencies across our product lines. The reduction in workforce will continue into the first quarter of 2008. We expect that the charges associated with the reduction in workforce will range between $0.9 million and $1.0 million, $0.9 million of which was incurred in the fourth quarter of 2007 with the remainder to be incurred in the first quarter of 2008. The charges consist mainly of severance costs and other benefits.

Our results of operations have been affected in 2007 by various factors, including, but not limited to, the following:

- General economic and market conditions in the automotive industry;

- The effects of competition (e.g., the availability and pricing of competing services and products and the resulting effects on sales and pricing of our services and products);

- Variability in the volume of purchase requests delivered to our retail and enterprise dealers;

- Variations in spending by automotive manufacturers on our advertising services;

- Variations in the number of users visiting our Web sites;

- The implementation of certain strategic initiatives, including those described above;

28

Table of Contents

- The recognition of deferred revenue related to a multiple-element arrangement upon delivery of all services in 2007;

- The recognition of a gain on the amendment of a license agreement for certain of our intellectual property with a Japanese licensee and the sale of all our ownership interest in such licensee;

- The recognition of a gain related to the settlement of a lawsuit for patent infringement against Dealix Corporation;

- Costs associated with the settlement of the Stoneage matter;

- Costs associated with relocating certain employees to our corporate office; and

- Costs associated with the separation of certain employees and the realignment and reduction of our workforce.

In the future, our results of operations may continue to be affected by various factors, including, but not limited to, some of those mentioned above.

## How we generate revenues

Lead fees consist of purchase request fees for new and used cars and finance request fees, which in the aggregate made up 80% of our revenues in 2007 and 2005 and 79% of our revenues in 2006. We derive the balance of our revenues from advertising and other services.

Fees for purchase requests are paid by retail dealers, enterprise dealers and automotive manufacturers or their automotive buying service affiliates who participate in our online car buying referral networks. Enterprise dealers consist of (i) dealers that are part of major dealer groups with more than 25 dealerships with whom we have a single agreement and (ii) dealers that are eligible to receive purchase requests from us as part of a single agreement with an automotive manufacturer or its automotive buying service affiliate. Major dealer groups include AutoNation and automotive manufacturers include General Motors and Ford. Fees paid by customers participating in our car buying referral networks are comprised of monthly subscription and/or transaction fees for consumer leads, or purchase requests, which are directed to participating dealers. These monthly subscription and transaction fees are recognized in the period service is provided. Ongoing fixed monthly subscription fees are based, among other things, on the size of the territory, demographics and, indirectly, the transmittal of purchase requests to customers participating in our car buying referral networks. Transaction fees are based on the number of purchase requests provided to retail and enterprise dealers and automotive manufacturers each month.

Generally, our dealer contracts are terminable on 30 days' notice by either party. From time to time, a major dealer group or automotive manufacturer may significantly increase or decrease the number of purchase requests accepted from us.

To enhance the quality of purchase requests, each purchase request is passed through our Quality Verification System [SM] which uses filters and validation processes to identify consumers with valid purchase intent before delivering the purchase request to our retail and enterprise dealers. We believe the implementation of these quality enhancing processes allows us to deliver high quality purchase requests to our retail and enterprise dealers. High quality purchase requests are those that result in high closing ratios. Closing ratio is the ratio of the number of vehicles purchased at a dealer generated from purchase requests to the total number of purchase requests sent to that dealer.

During 2007, we broadly applied our new proprietary technology that allows multiple lead placements to leverage our dealer base. Historically, our main sources of automotive leads have been third party Internet consumer request providers rather than our Web sites. Our strategic goal is to generate more automotive leads through our newly launched MyRide.com Web site.

We delivered approximately 3.0 million purchase requests through our online systems to retail and enterprise dealers in each of 2007 and 2006. Of these, approximately 1.8 million and 1.9 million were delivered to retail dealers in 2007 and 2006, respectively, and approximately 1.2 million and 1.1 million were delivered to enterprise dealers in 2007 and 2006, respectively. This change in mix of purchase requests, whereby the proportion of purchase requests delivered to enterprise dealers with lower average selling price have increased compared to the proportion delivered to retail dealers, may continue in 2008.

Additionally, we delivered approximately 0.7 million and 0.8 million finance requests in 2007 and 2006, respectively, to retail dealers, finance request intermediaries, and automotive finance companies.

Table of Contents

Advertising revenues represent fees from automotive manufacturers and other advertisers who target car shoppers during the research, consideration and decision making process on our Web sites, as well as through direct marketing offerings. Using the targeted nature of Internet advertising, manufacturers can advertise their brands effectively on any of our Web sites by targeting advertisements to consumers who are researching vehicles, thereby increasing the likelihood of influencing their purchase decisions. Due to the poor quality of traffic provided by certain traffic acquisition sources, the advertising performance across our network has been declining. This generated increase in pressure from advertisers to reduce advertising rates and improve performance. As a result, we made the decision to completely eliminate these low quality traffic sources. Since then, advertising performance has improved substantially. While we have received positive feedback from our advertisers, our advertising rates and total advertising page views have declined and may remain so in the short-term.

Other revenues include fees from internet sales training and other programs and services. To enhance our retail dealers' ability to sell cars using our programs, we developed and implemented various products and processes that allow us to provide high quality dealer support. We contact all retail dealers new to our programs to confirm their initiation in our programs and train their designated personnel on the use of our programs and products. We also contact our retail dealers on a regular basis to identify retail dealers who are not using our programs effectively, develop relationships with retail dealer principals and their personnel responsible for calling consumers and to inform our retail dealers about their effectiveness using surveys completed by purchase-intending consumers.

Our relationship with retail dealers may terminate for various reasons including:

- Termination by the dealer due to issues with purchase request volume, purchase request quality, fee increases or lack of dedicated personnel to manage the program effectively,

- Termination by us due to the dealer providing poor customer service to consumers or for nonpayment of fees to us by the dealer,

- Termination by us of dealers that cannot provide us with a reasonable profit,

- Elimination of the manufacturer brand, or

- Sale or termination of the dealer franchise.

Because our primary revenue source is from lead fees, our business model is different from many other Internet commerce sites. The automobiles requested through our Web sites are sold by dealers; therefore, we derive no direct revenues from the sale of a vehicle and have no procurement, carrying or shipping costs and no inventory risk.

**Trends in Our Business**

We pioneered the Internet automotive category by harnessing the power of the Web to connect car shoppers with automotive retailers and manufacturers. Over the years, both the Internet and the automotive category have changed substantially. As more consumers spend more time online, advertisers are migrating large portions of their budgets from declining media such as print, radio, and television to the Internet. This trend is expected to continue for years to come, as a significant imbalance remains between media consumption and advertising expenditures online. This is particularly true in the automotive category. Manufacturers, regional dealer associations and individual retail dealers are all moving more advertising spending online. We believe there are significant unmet consumer needs in this category that we can capitalize on with features on the MyRide.com Web site. However, competitive offerings from the major portals (e.g., Yahoo!, MSN, AOL), transaction based sites (e.g., Ebay Motors, Cars.com, Autotrader), automotive verticals (e.g., KBB, Edmunds) and lifestyle sites (e.g., HIN City) are abundant. Additionally, low barriers allow for new competitive entries into the space.

Our traditional email lead referral business has matured. In addition, new car vehicle sales are expected to be down in 2008, perhaps to their lowest levels in a decade. This is expected to put continued pressure on the availability of consumer leads.

30

Table of Contents

**Results of Continuing Operations**

*Basis of Presentation* Our AIC operations and RPM and AVV businesses are presented in the consolidated financial statements as discontinued operations. As discontinued operations, revenues and expenses of our AIC operations and RPM and AVV businesses have been aggregated and stated separately from the respective captions in continuing operations in the Condensed Consolidated Statements of Operations. Expenses included in discontinued operations are direct costs of our AIC operations and RPM and AVV businesses that will be eliminated from future operations as a result of the sale of our AIC operations and RPM and AVV businesses. Assets and liabilities that were included in the sale of our AIC operations have been aggregated and classified as held for sale under current assets and current liabilities, respectively, in our Condensed Consolidated Balance Sheet as of December 31, 2006. Similarly, assets and liabilities that were included in the sale of our AVV business have been aggregated and classified as held for sale under current assets, long-term assets and current liabilities, respectively, in our Condensed Consolidated Balance Sheet as of December 31, 2007.

All other references to operating results reflect our ongoing operations, excluding our AIC operations, our RPM and our AVV businesses.

The following table sets forth our results of continuing operations as a percentage of revenues:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2007** | **2006** | **2005** |
| Revenues | 100% | 100% | 100% |
| Costs and expenses: |  |  |  |
| Cost of revenues | 62 | 56 | 47 |
| Sales and marketing | 25 | 24 | 20 |
| Technology support | 21 | 21 | 17 |
| General and administrative | 32 | 45 | 30 |
| Amortization of acquired intangible assets | 1 | 1 | 1 |
| Patent litigation settlement | (14) | — | — |
| Total costs and expenses | 127 | 147 | 115 |
| Operating loss | (27) | (47) | (15) |
| Interest and other income | 7 | 3 | 4 |
| Loss from continuing operations before income taxes and minority interest | (20) | (44) | (11) |
| Provision for income taxes | — | — | — |
| Minority interest | — | — | — |
| Loss from continuing operations | (20) | (44) | (11) |
| Income from discontinued operations | 14 | 7 | 5 |
| Net loss | (6)% | (37)% | (6)% |

Revenues from continuing operations by groups of similar services are as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2007** | **2006** | **2005** |
|  | | (in thousands) | |
| Revenues: |  |  |  |
| Lead fees | $67,386 | $67,496 | $77,513 |
| Advertising | 16,885 | 17,505 | 19,207 |
| Other | 114 | 101 | 282 |
| Total revenues | $84,385 | $85,102 | $97,002 |

31

Table of Contents

*2007 Compared to 2006*

*Total Revenues.* Our total revenues from continuing operations decreased by $0.7 million, or 1%, to $84.4 million in 2007 compared to $85.1 million in 2006.

*Lead Fees.* Lead fees decreased by $0.1 million to $67.4 million in 2007 compared to $67.5 million in 2006. Our lead fees are influenced by numerous factors, including but not limited to, purchase request volume, mix between purchase requests delivered to retail dealers and enterprise dealers, pricing and general market conditions. The decrease was primarily due to a change in the mix of purchase requests delivered, with an increase of approximately 9% in the proportion of purchase requests delivered to enterprise dealers that generally have a lower average sales price per purchase request. This decline was partially offset by deferred revenue of $1.4 million that was recognized under a multiple-element arrangement upon delivery of all services in 2007 and an increase of approximately 12% in the average sales price per finance request delivered.

*Advertising.* Advertising revenue decreased by $0.6 million or 4%, to $16.9 million in 2007 compared to $17.5 million in 2006. The decrease was primarily due to a reduction in total advertising page views resulting from our recently implemented initiative to eliminate lower quality traffic sources and a decline in spending by automotive manufacturers in our direct marketing program, partially offset by higher display advertising rates on our web site properties.

*Other Revenue.* Other revenue remained flat in 2007 compared to 2006.

Costs and expenses from continuing operations were as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| | | **(in thousands)** | |
| Costs and expenses: | | | |
| Cost of revenues | $ 52,448 | $ 47,653 | $ 45,271 |
| Sales and marketing | 21,474 | 20,128 | 19,880 |
| Technology support | 18,119 | 17,476 | 16,274 |
| General and administrative | 27,065 | 38,416 | 29,329 |
| Amortization of acquired intangible assets | 464 | 1,209 | 1,308 |
| Patent litigation settlement | (12,000) | — | — |
| Total costs and expenses | $107,570 | $124,882 | $112,062 |

*Cost of Revenues.* Cost of revenues consists of lead and traffic acquisition costs and other cost of revenues. Lead and traffic acquisition costs consist of payments made to our Internet consumer request providers, including Internet portals and online automotive information providers. Other cost of revenues consists of fees paid to third parties for data and content included on our properties, connectivity costs, technology license fees, development and maintenance costs related to MyRide.com Web site, server equipment depreciation and technology amortization and compensation related expense.

Cost of revenues increased by $4.8 million or 10% to $52.5 million in 2007 compared to $47.7 million in 2006. This represents 62% and 56% of total revenues from continuing operations for 2007 and 2006, respectively. The increase was primarily due to a $2.2 million increase in lead and traffic acquisition costs, $1.6 million in maintenance, depreciation and amortization of computer equipment and software, a $0.7 million increase in data and content and hosting services fees and a $0.3 million increase in personnel related expenses.

The increase in lead and traffic acquisition costs was primarily due to an increase in the number of purchase requests acquired from our internet consumer request providers, partially offset by a decrease in the average price per purchase requests acquired and a decline in spending with third parties who direct search queries to our Web sites. The increase in maintenance, depreciation and amortization of computer equipment and software was primarily related to the equipment and software associated with the full launch of MyRide.com. The increase in data and content and hosting services fees resulted from short-term increase in costs to migrate to a new data center in order to accommodate increased capacity requirements in connection with the launch of MyRide.com. The increase in personnel cost is primarily related to increased headcount.

Table of Contents

*Sales and Marketing.*  Sales and marketing expense includes costs for developing our brand equity and personnel and other costs associated with dealer sales, Web site advertising sales, and dealer training and support. Sales and marketing expense increased by $1.4 million or 7% to $21.5 million in 2007 compared to $20.1 million in 2006. This represents 25% and 24% of total revenues from continuing operations for 2007 and 2006, respectively. The increase in sales and marketing expense was primarily due to a $0.4 million increase in advertising and promotional expenses, a $0.5 million increase in moving and relocation costs, and $0.3 million increase in research and professional fees and a $0.2 million increase in various other costs. The increases in advertising, research and professional fees were associated with the full launch of MyRide.com. The increase in moving and relocation costs is primarily due to the completion of relocation of certain new employees to our corporate headquarters .

*Technology Support.* Technology support cost includes compensation and related costs for personnel responsible for significantly enhancing the features, content and functionality of our Web site, and our Internet-based communications platform, costs associated with our telecommunications and computer infrastructure, and costs related to data and technology maintenance. Technology support costs increased by $0.6 million or 4% to $18.1 million in 2007 compared to $17.5 million in 2006. This represents 21% of total revenues from continuing operations for 2007 and 2006. The increase was primarily due to an increase of $1.0 million in computer equipment and software maintenance, depreciation and amortization costs and a $0.3 million increase in personnel related expenses. These increases were partially offset by a $0.2 million decrease in professional fees and a $0.5 million decrease in various other costs. The increase in computer equipment and software maintenance, depreciation and amortization costs is primarily related to costs incurred to maintain our existing technology and purchases of new computer equipment and capitalized software in 2007 required for our new data center. The increase in personnel related expenses is primarily due to severance costs and other benefits to employees affected by the reduction in workforce. The decrease in professional fees is primarily related to replacement of consultants with permanent employees following the launch of MyRide.com .

*General and Administrative.* General and administrative expense consists of executive, financial and legal personnel expenses, and costs related to being a public company. General and administrative expense decreased by $11.3 million or 30% to $27.1 million in 2007 compared to $38.4 million in 2006. This represents 32% and 45% of total revenues from continuing operations for 2007 and 2006, respectively. The decrease was primarily due to:

- • a decrease in legal fees of $11.1 million, of which $9.2 million was associated with enforcing our intellectual property rights and $1.9 million related to other legal matters, and

- • a decrease in professional fees to consultants and temporary personnel of $2.8 million due to replacement with full time employees.

These decreases were partially offset by an increase of:

- • $1.0 million in costs associated with the settlement of the Stoneage litigation,

- • $0.6 million in personnel related costs primarily due to severance payments to employees affected by the reduction in workforce,

- • $0.2 million in professional fees paid to third party research and survey companies,

- • $0.2 million in utilities,

- • $0.1 million in bad debt expense, and

- • $0.5 million in various other costs,

*Amortization of Acquired Intangible Assets.*  Amortization of intangibles decreased by $0.7 million or 62% to $0.5 million in 2007 compared to $1.2 million in 2006. The decrease was associated with certain intangible assets being fully amortized.

*Patent Litigation Settlement.* Patent litigation settlement relates to the deferred liability from the Dealix litigation settlement and represents initial cash payment of $12.0 million received in 2007. (See "Executive Summary" for further details).

*Interest and Other Income.*  Interest and other income increased by $3.5 million or 150% to $5.9 million in 2007 compared to $2.4 million in 2006. The increase in interest and other income was primarily due to an increase of $4.0 million in international licensing fees representing cash received from a Japanese licensee as consideration for the sale of our remaining shares in such licensee. The carrying amount of our investment in the Japanese licensee was zero on the date of sale. In connection with the sale, we also amended the license agreement for certain intellectual property with such licensee from a term license to a perpetual royalty free license. This increase was partially offset by a $0.5 million decrease in interest income primarily due to a decrease in average invested cash and cash equivalents in 2007 compared to 2006.

Table of Contents

*Income Taxes.*  We had no provision for state income taxes for 2007 compared to a benefit for state income taxes of $0.1 million for 2006. No provision for federal income taxes has been recorded as we generated taxable losses through December 31, 2007.

*Income from discontinued operations.*  Income from discontinued operations relates to our AIC operations and RPM business which we sold in January and June 2007, respectively. It also includes the operations of our AVV business which met the criteria for classification as held for sale as of December 31, 2007. We subsequently sold AVV in January 2008. We will not have any significant continuing involvement in the AIC operations or RPM and AVV businesses.

### 2006 Compared to 2005

*Total Revenues.*  Our total revenues from continuing operations decreased by $11.9 million or 12%, to $85.1 million in 2006 compared to $97.0 million in 2005.

*Lead Fees.*  Lead fees decreased by $10.0 million or 13%, to $67.5 million in 2006 compared to $77.5 million in 2005. The decrease was primarily due to a decline in the purchase requests delivered to our retail and enterprise dealers coupled with a lower average selling price per retail purchase request. This decline was partially offset by an increase in the average sales price per finance request delivered. The decline in retail purchase requests was primarily due to a lower average monthly delivery of purchase requests per dealer.

*Advertising.*  Advertising revenue decreased by $1.7 million or 9%, to $17.5 million in 2006 compared to $19.2 million in 2005. The decrease was primarily due to lower spending by automotive manufacturers with our Web site properties.

*Other Revenues.*  Other revenues decreased by $0.2 million or 64% to $0.1 million in 2006 compared to $0.3 million in 2005. The decrease was primarily due to a $0.1 million decrease in fees from classified advertising that was discontinued in the second quarter of 2005 and a $0.1 million decline in fees from training.

*Cost of Revenues* . Cost of revenues increased by $2.4 million or 5% to $47.7 million in 2006 compared to $45.3 million in 2005. This represents 56% and 47% of total revenues from continuing operations for 2006 and 2005, respectively. The increase was primarily due to a $3.0 million increase in lead and traffic acquisition costs, partially offset by a $0.3 million decrease in amortization of capitalized internal use software and acquired intangible assets, a $0.2 million decrease in personnel and related costs and a $0.1 million decrease in hosting costs. The increase in lead and traffic acquisition costs was primarily due to our increased spending with third parties who direct search queries to our Web sites and an increase in the costs of finance requests acquired from third parties, partially offset by a decrease in the number of purchase requests acquired directly from third parties. The decrease in amortization of capitalized internal use software and acquired intangible assets was due to certain costs that were fully amortized in 2005. The decrease in personnel and related costs was primarily due to a decline in headcount.

*Sales and Marketing.*  Sales and marketing expenses increased by $0.2 million or 1% to $20.1 million in 2006 compared to $19.9 million in 2005. This represents 24% and 20% of total revenues from continuing operations for 2006 and 2005, respectively. The increase was primarily due to a $1.1 million increase in stock compensation expense as a result of adopting the provisions of SFAS No. 123(R) on January 1, 2006, partially offset by a $0.7 million decline in advertising spending and a $0.2 million decrease in various other costs.

*Technology Support.*  Technology support costs increased by $1.2 million or 7% to $17.5 million in 2006 compared to $16.3 million in 2005. This represents 21% and 17% of total revenues from continuing operations for 2006 and 2005 respectively.

The increase was primarily due to:

- increased stock compensation expense of $1.0 million as a result of adopting the provisions of SFAS No. 123(R) on January 1, 2006,

- increased professional fees of $0.6 million, which was primarily due to spending with third parties to assist us with the implementation of certain strategic initiatives,

- an increase in depreciation and amortization expense of $0.6 million, which was primarily due to an increase in purchases of equipment and capitalized software, and

34

**Table of Contents**

- an increase in relocation costs of $0.3 million associated with the relocation of certain newly hired employees to our corporate office.

These increases were offset by lower personnel and related costs of $0.9 million, a $0.2 million decrease in telephone costs and a $0.2 million decrease in various other costs. The decrease in personnel and related costs was due to reduced headcount.

*General and Administrative.* General and administrative expense increased by $9.1 million, or 31%, to $38.4 million in 2006 compared to $29.3 million in 2005. This represents 45% and 30% of total revenues from continuing operations for 2006 and 2005, respectively. The increase was primarily due to an:

- increase in legal fees of $8.6 million associated with enforcing our intellectual property rights,

- increase in stock compensation expense of $2.8 million as a result of adopting the provisions of SFAS No. 123(R) on January 1, 2006,

- increase in compensation costs of $0.9 million primarily due to costs associated with the separation of certain employees and the realignment and reduction of our workforce,

- increased professional fees of $0.6 million primarily due to spending with third parties to assist us with the implementation of certain strategic initiatives,

- increase in temporary personnel costs of $0.3 million,

- increase in relocation costs of $0.5 million associated with the relocation of certain newly hired employees to our corporate office, and

- increase of $0.4 million in various other costs.

These increases were offset by a:

- decrease in costs associated with the preparation and audits of our consolidated financial statements of $3.4 million, which were primarily due to professional fees incurred during the first six months of 2005 associated with the internal review and restatements of our consolidated financial statements,

- decrease in bad debt expense of $0.5 million,

- decrease in other legal fees of $0.7 million associated with defending purported class action and derivative lawsuits filed against us and other legal matters, and

- reimbursement of $0.4 million by our insurance carrier for specific legal costs incurred associated with defending purported class and derivative action lawsuits and other claims.

*Amortization of Acquired Intangible Assets.* Amortization of acquired intangible assets decreased by $0.1 million to $1.2 million in 2006 compared to $1.3 million in 2005.

*Interest and Other Income.* Interest and Other Income decreased by $1.4 million or 37% to $2.4 million in 2006 compared to $3.8 million in 2005. This decrease was primarily due to foreign exchange gain of $1.5 million recognized in 2005 on dissolution of Autobytel.Europe. Autobytel.Europe did not generate any revenue in 2006 as a result of its substantial liquidation. Its dissolution was completed in February 2007. The decrease in interest and other income was partially offset by an increase of $0.1 million in interest income due to the investment of our cash and cash equivalents in accounts yielding higher interest rates in 2006 compared to 2005.

*Minority Interest.* Minority interest represents the portion of Autobytel.Europe's net income allocable to Autobytel.Europe's other shareholder. In February 2007, Autobytel.Europe was dissolved.

*Income Taxes.* In 2006, benefit for state income taxes of $0.1 million was recorded compared to a nominal amount for 2005. No provision for federal income taxes was recorded as we generated taxable losses in both years.

*Income (loss) from discontinued operations.* Income from discontinued operations relates to our AIC operations and RPM business which we sold in January and June 2007, respectively. It also includes the operations of our AVV business which met the criteria for classification as held for sale as of December 31, 2007. We subsequently sold AVV in January 2008. We will not have any significant continuing involvement in the AIC operations or RPM and AVV businesses.

Table of Contents

**Stock Options Granted in 2007**

During 2007, we granted stock options to purchase 955,167 shares of common stock under our 1999 Stock Option Plan, 1999 Employee and Acquisition Related Stock Option Plan, 2000 Stock Option Plan, 2004 Restricted Stock and Option Plan, and 2006 Inducement Stock Option Plan, including performance based-options to purchase 16,667 shares of common stock granted to Monty A. Houdeshell. In addition, during 2007, performance based-options to purchase 200,000 shares of common stock were deemed to be granted to James E. Riesenbach under SFAS No. 123(R). The stock options were granted at our common stock closing price on the grant dates. We also granted 130,817 shares of common stock under our 1996 Employee Stock Purchase Plan.

To induce Mr. Riesenbach to join us as Chief Executive Officer and President, on March 20, 2006, we entered into an agreement with Mr. Riesenbach whereby we granted 1,000,000 options to him at an exercise price of $4.68 per share. Of the 1,000,000 options granted, 600,000 were service-based awards and met the criteria for granted options in accordance with SFAS No. 123(R), "Share-Based Payment", as of March 20, 2006. The remaining 400,000 options are performance-based awards where the performance criteria were to be defined at a future date. As such, in accordance with SFAS No. 123(R), the awards were not considered granted until such time that the performance criteria have been defined.

To induce Mr. Houdeshell to join us as Chief Financial Officer, on January 30, 2007, we entered into an agreement with Mr. Houdeshell whereby we granted 300,000 options to him at an exercise price of $3.74 per share. Of the 300,000 options granted, 250,000 were service-based awards and met the criteria for granted options in accordance with SFAS No. 123(R) as of January 30, 2007. The remaining 50,000 options are performance-based awards where the performance criteria were to be defined at a future date. As such, in accordance with SFAS No. 123(R), the awards are not considered granted until such time that the performance criteria have been defined.

On July 17, 2007, the Compensation Committee of the Board of Directors established performance criteria for the vesting of 200,000 performance-based options held by Mr. Riesenbach and 16,667 performance-based options held by Mr. Houdeshell. The performance criteria are based upon the attainment by us of certain revenue, earnings before income taxes, depreciation and amortization (EBITDA) and strategic goals. Therefore, the total awards of 216,667 met the criteria for granted options in accordance with SFAS No. 123(R), "Share-Based Payments", as of July 17, 2007 and are included in the outstanding options for 2007. We also began recognizing compensation expense for these awards on that date.

As of December 31, 2007, excluding the remaining 233,333 performance-based options, we had outstanding stock options to purchase 8,986,636 shares of common stock and 66,741 outstanding employee stock purchase plan awards to purchase shares of common stock.

**Segment Information**

We conduct our business within one business segment, which is defined as providing automotive marketing services.

36

Table of Contents

**Quarterly Results of Operations**

The following tables presenting our unaudited quarterly results from continuing operations for the eight quarters ended December 31, 2007 should be read in conjunction with our consolidated financial statements and related notes contained elsewhere in this Annual Report on Form 10-K. We have prepared the unaudited information on the same basis as our audited consolidated financial statements. Our operating results for any quarter are not necessarily indicative of results for any future quarters or for a full year.

| | Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec 31, 2007 | Sep 30, 2007 (as restated) | Jun 30, 2007 (as restated) | Mar 31, 2007 (as restated) | Dec 31, 2006 | Sep 30, 2006 | Jun 30, 2006 | Mar 31, 2006 |
| | (in thousands, except per share amounts) (unaudited) | | | | | | | |
| **Consolidated Statements of Operations Data:** | | | | | | | | |
| Revenues | $ 18,886 | $ 21,911 | $ 21,642 | $ 21,946 | $20,439 | $ 20,792 | $22,083 | $ 21,788 |
| Costs and expenses: | | | | | | | | |
| Cost of revenues | 13,077 | 14,934 | 12,762 | 11,675 | 10,720 | 11,786 | 12,379 | 12,768 |
| Sales and marketing | 5,293 | 5,260 | 5,222 | 5,699 | 4,204 | 4,513 | 5,587 | 5,824 |
| Technology support | 4,730 | 4,577 | 4,608 | 4,204 | 4,728 | 4,877 | 4,003 | 3,868 |
| General and administrative | 6,558 | 5,599 | 6,306 | 8,602 | 10,201 | 9,374 | 9,231 | 9,610 |
| Amortization of acquired intangible assets | 42 | 42 | 79 | 301 | 303 | 302 | 302 | 302 |
| Patent litigation settlement | — | — | — | (12,000) | — | — | — | — |
| Total costs and expenses | 29,700 | 30,412 | 28,977 | 18,481 | 30,156 | 30,852 | 31,502 | 32,372 |
| Operating (loss) income | (10,814) | (8,501) | (7,335) | 3,465 | (9,717) | (10,060) | (9,419) | (10,584) |
| Interest and other income | 4,481 | 486 | 462 | 477 | 545 | 598 | 612 | 612 |
| Foreign currency exchange (loss) | — | — | — | (7) | — | — | — | — |
| (Loss) income from continuing operations before income taxes and minority interest | (6,333) | (8,015) | (6,873) | 3,935 | (9,172) | (9,462) | (8,807) | (9,972) |
| Provision for income taxes | — | — | — | — | 81 | 26 | — | — |
| Minority Interest | — | — | — | — | (21) | (5) | 8 | (3) |
| Income from discontinued operations | 1,951 | 1,427 | 4,838 | 3,715 | 1,854 | 1,562 | 931 | 1,512 |
| Net (loss) income | $ (4,382) | $ (6,588) | $ (2,035) | $ 7,650 | $(7,258) | $ (7,879) | $(7,868) | $ (8,463) |
| (Loss) income from continuing operations per share | | | | | | | | |
| Basic | $ (0.14) | $ (0.18) | $ (0.16) | $ 0.09 | $ (0.21) | $ (0.22) | $ (0.21) | $ (0.24) |
| Diluted | $ (0.14) | $ (0.18) | $ (0.16) | $ 0.09 | $ (0.21) | $ (0.22) | $ (0.21) | $ (0.24) |
| Net (loss) income per share | | | | | | | | |
| Basic | $ (0.10) | $ (0.15) | $ (0.05) | $ 0.18 | $ (0.17) | $ (0.19) | $ (0.19) | $ (0.20) |
| Diluted | $ (0.10) | $ (0.15) | $ (0.05) | $ 0.17 | $ (0.17) | $ (0.19) | $ (0.19) | $ (0.20) |

**Liquidity and Capital Resources**

The table below sets forth a summary of our cash flows for the years ended December 31, 2007, 2006, and 2005:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in thousands) | | |
| Net cash used by operating activities | $(6,908) | $(18,783) | $ (6,125) |
| Net cash provided by investing activities | 9,610 | 6,636 | 18,606 |
| Net cash provided by (used in) financing activities | 2,156 | 1,537 | (3,415) |

Our principal sources of liquidity are from proceeds from dispositions of non-core businesses and operating cash flows and we continue to have no debt. Our domestic cash, cash equivalents and short-term investments totaled $28.3 million as of December 31, 2007 compared to domestic cash, cash equivalents, and short-term investments of $25.7 million as of December 31, 2006.

Our working capital, excluding assets and liabilities held for sale, increased by $1.3 million, to $26.4 million at December 31, 2007 compared to $25.1 million at December 31, 2006. The increase was primarily related to proceeds from the settlement of the Dealix patent infringement lawsuit, proceeds from the sale of certain assets and liabilities of our AIC operations and substantially all the assets and certain liabilities of our RPM business, issuances of common stock in connection with the exercise of employee stock options and pursuant to our employee stock purchase plan and maturity of long-term investments. This increase was offset in part by cash used by operations and cash paid for purchases of property and equipment, including capitalized software costs of $6.3 million associated with the development of MyRide.com. We believe we will have enough cash to fund our operations for the next 12 months.

In December 2006, we entered into the Settlement Agreement with Dealix relating to a patent infringement lawsuit. The Settlement Agreement provides that Dealix will pay us a total of $20.0 million in settlement payments, $12.0 million of which was paid to us on March 13, 2007, with the remainder to be paid out in installments of approximately $2.7 million on the next three annual anniversary dates of the initial payment. We received the first installment of approximately $2.7 million

37

Table of Contents

in March 2008. The remaining payments are guaranteed by WP Equity Partners, Inc., a Warburg Pincus affiliate. We have been unable to assess with reasonable assurance the collectability of the remaining payments under the Settlement Agreement as we do not have financial information to support the credit worthiness of the debtor or guarantor. Therefore, we do not have reasonable assurance that we will receive any remaining payments on their respective due dates or at all and cannot rely on such payments as a source of future liquidity.

In addition to the disposition of our AIC operations and RPM business in 2007, we also disposed of our AVV business in January 2008. These dispositions are part of our strategic initiatives to focus on our core business. We do not expect the dispositions of our AIC operations and RPM and AVV businesses to materially impact our future cash flow.

*Net Cash Used in Operating Activities*

The main source of our operating cash flows is cash collections from customers who have purchased our services. Our primary uses of cash in operating activities are for lead and traffic acquisition costs paid to our Internet consumer request providers and personnel related expenditures. Net cash used in operating activities was $6.9 million in 2007 compared to $18.8 million in 2006 and $6.1 million in 2005. Net cash used in operating activities in 2007 resulted primarily from an operating loss and an increase in working capital, partially offset by gains from the dispositions of the AIC operations and RPM business. The increase in working capital was primarily the result of a decrease in accounts payable and accrued expenses, a decrease in deferred revenues, a decrease in accounts receivable and an increase in other liabilities. The decrease in accounts payable and accrued expenses was primarily due to timing of vendor payments, including professional fees related to enforcing our intellectual property rights. Our standard payment terms for our invoices usually average 30 days net. The decrease in deferred revenues and the increase in other liabilities relate to a decline in delivery of advertising, which resulted from our recently implemented initiative to eliminate lower quality traffic sources. The decrease in accounts receivable is primarily due to collection efforts, timing of payments and clean-up of various outstanding amounts. Our 2007 net cash used in operations was better than 2006 due to the reduced operating loss and the impact of gains from discontinued operations in 2007.

Net cash used in operating activities in 2006 resulted primarily from an operating loss and a decrease in working capital. The decrease in working capital was primarily the result of a decrease in deferred revenue and an increase in accounts payable. The decrease in deferred revenue was primarily due to the change in billing monthly subscription fees for customers participating in our car buying referral networks from advance to arrears, offset by the deferral of revenue related to a multiple-element arrangement (see Note 2. of the "Notes to Consolidated Financial Statements" in Part IV "Item 15. Exhibits and Financial Statement Schedules" of this Annual Report on Form 10-K). The increase in accounts payable was primarily due to the timing of when payments are made and an increase in professional fees incurred associated with the enforcement of our intellectual property rights and implementation of certain strategic initiatives.

Net cash used in operating activities was $6.1 million in 2005, and resulted from an operating loss and a decrease in working capital. The decrease in working capital was primarily the result of an increase in accounts receivable, a decrease in accounts payable and accrued expenses, a decrease in other current liabilities and an increase in prepaid expenses and other current assets. The increase in accounts receivable was primarily due to the increase in days sales outstanding from 57 days during the year ended December 31, 2004 to 59 days for the year ended December 31, 2005. The decrease in accounts payable and accrued expenses was primarily due to estimated income tax payments in 2005. The decrease in other current liabilities was due to refund payments made to retail dealers. The increase in prepaid expenses and other current assets was primarily due to the payment of higher insurance premiums.

*Net Cash Provided by Investing Activities*

Our primary uses of cash in investing activities have typically been for the purchases of property and equipment (mostly information technology related equipment). In the past, our primary sources of cash provided by investing activities have been through maturities of short-term investments and sale of money market and commercial paper marketable securities. Net cash provided by investing activities was $9.6 million, $6.6 million and $18.6 million in 2007, 2006 and 2005, respectively. Net cash provided by investing activities in 2007 was primarily due to proceeds received from the sale of certain assets and liabilities of the AIC operations, and sale of our interest in Autobytel Japan, and substantially all of the assets and certain liabilities of our RPM business, maturity of a short-term investment, and a cash distribution from Autobytel.Europe, partially offset by the purchases of property and equipment and capitalized internal use software in connection with the development of MyRide.com. We anticipate an overall decrease in spending related to property and equipment in fiscal 2008 compared to fiscal 2007.

We expect that a significant source of cash from investing activities in 2008 will be proceeds from the sale of our AVV business.

Table of Contents

Net cash provided by investing activities in 2006 was related to the maturity of investments in government sponsored agency bonds, offset by purchases of short-term investment in commercial paper and purchases of property and equipment.

Net cash provided by investing activities in 2005 was related to the sale and maturities of short-term investment in government sponsored agency bonds and auction rate securities and a cash distribution from Autobytel.Europe, offset by purchases of short-term and long-term investments in government sponsored agency bonds and auction rate securities, purchases of property and equipment and expenditures for capitalized software.

*Net Cash Provided by (Used in) Financing Activities*

Our primary source of cash from financing activities has typically been proceeds from sale of common stock under our employee stock option and stock purchase plans. Net cash provided by financing activities was $2.2 million and $1.5 million in 2007 and 2006, respectively. Net cash used in financing activities was $3.4 million in 2005. Net cash provided by financing activities in 2007 was primarily due to proceeds received from the issuance of common stock in connection with the exercise of stock options and pursuant to our employee stock purchase plan. Our future liquidity and capital resources could be impacted by the exercise of outstanding common stock options and the cash proceeds we receive upon exercise of these securities. Fluctuations in our future stock price, the timing of the issuance of additional stock options, the duration of their vesting provision and the grant price will all impact the timing of any proceeds. Accordingly, we cannot estimate the amount of such proceeds at this time.

Net cash provided by financing activities in 2006 was due to proceeds received from the issuances of common stock in connection with the exercise of employee stock options and pursuant to our employee stock purchase plan.

Net cash used in financing activities in 2005 was due to cash distribution to the minority interest shareholder offset by proceeds received from the sale of common stock through our employee stock purchase plan and the exercise of stock options.

## Contractual Obligations

Our contractual commitments include operating leases related to our facilities in Irvine, California, Santa Ana, California, and Troy, Michigan and our technology and communications infrastructure. We also entered into a web search agreement with a vendor that guaranteed monthly minimum payments over a two-year period from June 15, 2007. The following are our contractual commitments associated with our lease obligations and vendor obligations as of December 31, 2007:

| | Years Ending December 31, | | | | | |
| | (in thousands) | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 and thereafter | Total |
|---|---|---|---|---|---|---|
| Building Rent | $1,454 | $1,419 | $1,094 | $ 9 | $ — | $3,976 |
| Operating leases | 15 | 15 | 14 | 13 | — | 57 |
| Hosting and communication | 75 | 44 | — | — | — | 119 |
| Guaranteed minimum payment | 828 | 293 | — | — | — | 1,121 |
| Total | $2,372 | $1,771 | $1,108 | $ 22 | $ — | $5,273 |

*Prospective Capital Needs.* We believe that our current and expected levels of working capital are adequate to support our present operations and to fund future growth and business opportunities.

## Off-Balance Sheet Arrangements

In conjunction with the dispositions of the RPM and AVV businesses, we agreed to indemnify the purchasers for pre-closing tax obligations and other pre-closing obligations and liabilities. The term of the indemnification for the pre-closing tax obligations is based on the statute of limitation as set forth by the taxing authority. The term of the indemnification for other obligations and liabilities generally range from 1 year to 3 years, with the indemnification obligation for certain specified liabilities surviving indefinitely. The maximum indemnification obligation is the purchase price of each transaction, subject to certain exceptions which have no indemnification limitation. Since it is not possible to determine whether there will be any indemnification obligations in the future or the amounts thereof, we cannot estimate the potential amount of future payments, if any, under these indemnification obligations. Therefore, no liability for these indemnification obligations has been recorded.

Table of Contents

From time to time, we enter into agreements in the ordinary course of business pursuant to which we agree to indemnify, hold harmless and reimburse the indemnified party for losses suffered or incurred by it, which may include losses relating to intellectual property infringement claims. The term of these indemnifications may vary depending on the agreement. Other than the claims against AVV and us discussed in Part I "Item 3. Legal Proceedings" herein, we currently have no knowledge of any intellectual property infringement claim that may be subject to indemnification by us, nor can we estimate the maximum potential amount of future payments under any such indemnification. Therefore, no liability has been recorded.

## Critical Accounting Policies and Estimates

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the United States of America. By doing so, we make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, as well as related disclosure of contingent assets and liabilities. We believe the following critical accounting policies, among others, require significant judgment in determining estimates and assumptions used in the preparation of our consolidated financial statements. Accordingly, actual results could differ materially from our estimates. To the extent that there are material differences between these estimates and our actual results, our financial condition or results of operations may be affected. For a detailed discussion of the application of these and other accounting policies, see Note 2. of the "Notes to Consolidated Financial Statements" in Part IV "Item 15. Exhibits and Financial Statement Schedules" of this Annual Report on Form 10-K.

*Revenue Recognition.* We recognize revenues when earned as defined by Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition," and Emerging Issues Task Force ("EITF") Issue 00-21, "Revenue Arrangements with Multiple Deliverables." SAB No. 104 considers revenue realized after all four of the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the seller's price to the buyer is fixed or determinable and (iv) collectibility is reasonably assured.

In accounting for multiple-element arrangements, one of the key judgments to be made is the accounting value that is attributable to the different contractual elements. The appropriate allocation of value not only impacts which revenue stream is credited with the revenue, it also impacts the amount and timing of revenue recorded in the consolidated statement of operations during a given period due to the differing methods of recognizing revenue. Revenue is allocated to each element based on the accounting determination of the relative fair value of that element to the aggregate fair value of all elements. The fair values must be reliable, verifiable and objectively determinable. When available, such determination is based principally on the pricing of similar cash arrangements with unrelated parties that are not part of a multiple-element arrangement. When sufficient evidence of the fair values of the individual elements does not exist, revenue is not allocated among them until that evidence exists. Instead, the revenue is recognized as earned using revenue recognition principles applicable to the entire arrangement as if it were a single element arrangement.

*Capitalized Internal Use Software and Web site Development Costs.* We capitalize costs, including share-based compensation costs, to develop internal use software under the provisions of Statement of Position ("SOP") 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." We capitalize Web site development costs under EITF Issue 00-2, "Accounting for Web Site Development Costs" and SOP 98-1. SOP 98-1 and EITF Issue 00-2 require the capitalization of external and internal computer software costs and Web site development costs, respectively, incurred during the application development stage. The application development stage is characterized by software design and configuration activities, coding, testing and installation. Training and maintenance costs are expensed as incurred while upgrades and enhancements are capitalized if it is probable that such expenditures will result in additional functionality. Capitalized internal use software development costs are amortized using the straight-line method over an estimated useful life of three years. Capitalized Web site development costs, once placed in service, will be amortized using the straight-line method over the estimated useful life. These costs are subject to periodic impairment reviews and evaluations for indications that the software may no longer be expected to provide any service potential or placed in service for its intended use.

Changes in strategy and/or market conditions could significantly impact the carrying value of our capitalized software and Web site development costs. We use estimates and make assumptions to determine the related estimated useful lives and assess the carrying value of capitalized software and Web site development costs. In future periods, if the carrying value of capitalized software or Web site development costs is determined not to be recoverable, we will recognize a non-cash charge for the impairment of capitalized software or Web site development costs.

*Goodwill.* In accordance with SFAS No. 142, Goodwill and Other Intangible Assets, we test goodwill for impairment on a "reporting unit" level as defined by reference to SFAS No. 131, Disclosures about Segments of an Enterprise and Related Information. We utilize a two-step test to identify the potential impairment and to measure the amount of goodwill

40

Table of Contents

impairment, if any. The first step requires us to compare the enterprise's carrying value to its fair value. If the fair value is less than the carrying value, enterprise goodwill is potentially impaired and we then complete the second step to measure the impairment loss, if any. The second step requires the calculation of the implied fair value of enterprise goodwill by deducting the fair value of all tangible and intangible net assets from the fair value of the reporting unit. If the implied fair value of enterprise goodwill is less than the carrying amount of enterprise goodwill, an impairment loss is recognized equal to the difference.

No impairment charge of goodwill was recognized in 2007, 2006 and 2005. The decrease in the carrying amount of goodwill of $18.6 million represents the allocation of goodwill associated with the dispositions of the RPM business and AVV business (see Note 4 of the "Notes to Consolidated Financial Statements" in Part IV "Item 15. Exhibits and Financial Schedules" of this Annual Report on Form 10-K).

*Income Taxes.* We account for income taxes under the liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. We record a valuation allowance, if necessary, to reduce deferred tax assets to an amount we believe is more likely than not to be realized.

In the preparation of our consolidated financial statements, we are required to estimate our income taxes in each of the jurisdictions in which we operate, including estimating both our actual current tax expense and assessing temporary differences resulting from differing treatment of items for tax and accounting purposes. To the extent that we have deferred tax assets, we must assess the likelihood that our deferred tax assets will be recovered from taxable temporary differences, tax planning strategies or future taxable income and to the extent that we believe that recovery is not likely, we must establish a valuation allowance. At the end of each reporting period, we evaluate whether it is more likely than not that our deferred tax assets are not realizable. At December 31, 2007 and 2006, we were unable to assert that more likely than not our deferred tax assets will be realized. However, our assessment may change in future periods if we generate positive operating results. A change in our assessment and the corresponding reduction of valuation allowance would generally impact our provision for income taxes in the period of such change.

*Share-Based Compensation Expense.* We account for share-based compensation in accordance with SFAS No. 123R. Under the provisions of SFAS No. 123R, share-based compensation cost is estimated at the grant date based on the award's fair value as calculated by the Black-Scholes ("BS") option-pricing model and is recognized as expense over the requisite service period. The BS model requires various highly judgmental assumptions including volatility, forfeiture rates and expected option life. If any of the assumptions used in the BS model change significantly, stock-based compensation expense may differ materially in the future from that recorded in the current period.

## Recent Accounting Pronouncements

In June 2006, the Financial Accounting Standards Board ("FASB") issued FIN 48 (As Amended) "Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109" which prescribes a recognition threshold and measurement process for recording in the financial statements uncertain tax positions taken or expected to be taken in a tax return. FIN 48 requires that a company recognize the financial statement effects of a tax position when there is a likelihood of more than 50 percent, based on the technical merits, that the position will be sustained upon examination. It also provides guidance on the derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition requirements for uncertain tax positions. We adopted the provisions of FIN 48 on January 1, 2007. The following table shows the reconciliation of the total amounts of unrecognized tax benefits for 2007 (in thousands):

| | |
|---|---:|
| Unrecognized tax benefit – opening balance | $ 500 |
| Gross increases or decreases – current period | — |
| Settlements | — |
| Lapse of statue of limitations | — |
| Unrecognized tax benefit | $ 500 |

Upon adoption of FIN No. 48, we analyzed our filing positions for all open tax years in all U.S. federal and state jurisdictions where we are required to file. At the adoption date of January 1, 2007, we had $0.5 million of unrecognized tax benefits. Of the total unrecognized tax benefits at the adoption date, the entire amount of $0.5 million was recorded as a

**Table of Contents**

reduction to deferred tax assets, which caused a corresponding reduction in our valuation allowance of $0.5 million. To the extent such portion of unrecognized tax benefits is recognized at a time such valuation allowance no longer exists, the recognition would impact our effective tax rate.

We file income tax returns in the U.S. federal jurisdiction and various state jurisdictions. In general, we are no longer subject to U.S. federal and state tax examinations for years prior to 2003. We do not believe there will be any material changes in our unrecognized tax positions over the next 12 months. Therefore, no reserves for uncertain income tax positions have been recorded pursuant to FIN No. 48. In addition, we did not record a cumulative effect adjustment related to the adoption of FIN No. 48 and the adoption of FIN No. 48 did not have a material effect on our consolidated financial position or results of operations.

Our policy is to recognize interest and penalties accrued on any unrecognized tax benefits as a component of income tax expense. As of the date of adoption and December 31, 2007, we did not have any accrued interest or penalties associated with any unrecognized tax benefits, nor was any interest expense recognized in the year ended December 31, 2007.

In September 2006, the FASB's Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 06-1, "Accounting for Consideration Given by a Service Provider to a Manufacturer or Reseller of Equipment Necessary for an End-Customer to Receive Service from the Service Provider". EITF 06-1 provides guidance on the accounting for consideration given to third party manufacturers or resellers of equipment which is required by the end-customer in order to utilize the service from the service provider. EITF Issue No. 06-1 is effective for fiscal years beginning after June 15, 2007 and its adoption is not expected to have a material effect on our consolidated financial position or results of operations.

In September 2006, FASB issued SFAS No. 157, "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a frame work for measuring fair value and expands disclosure about fair value measurements. SFAS 157 does not require new fair value measurements but provides guidance on how to measure fair value by providing a fair value hierarchy used to classify the source of information. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007. However, on February 12, 2008, the FASB issued FASB Staff ("FSP") FAS 157-2 which delays the effective date for all non-financial assets and liabilities except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). FSP 157-2 defers the effective date of SFAS 157 to fiscal years beginning after November 15, 2008, and interim periods within the fiscal years for items within the scope of this FSP. Therefore, effective for 2008, we will adopt SFAS 157, except as it applies to those non-financial assets and non-financial liabilities as noted in FSP FAS 157-2. We do not expect it to have a material effect on our consolidated financial position, results of operations or cash flows.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities—Including an amendment of FASB Statement No. 115." SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. Subsequent measurements for the financial instruments and liabilities an entity elects to fair values will be recognized in earnings. SFAS 159 also establishes additional disclosure requirements. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted provided the entity also elects to apply the provisions of SFAS No. 157. We do not expect its adoption to have a material effect on our consolidated financial position or results of operations.

The FASB issued SFAS No. 141R (revised 2007), "Business Combinations." which significantly changes the financial accounting and reporting of business combination transactions. SFAS No. 141R requires the acquiring entity in a business combination to recognize all (and only) the assets acquired and liabilities assumed in the transaction and establishes the acquisition-date fair value as the measurement objective for all assets acquired and liabilities assumed in a business combination. Certain provisions of this standard will, among other things, impact the determination of acquisition-date fair value of consideration paid in a business combination (including contingent consideration); exclude transaction costs from acquisition accounting; and change accounting practices for acquired contingencies, acquisition-related restructuring costs, in-process research and development, indemnification assets, and tax benefits. For us, SFAS No. 141R is effective for business combinations occurring after December 31, 2008. We are currently evaluating the future impacts and disclosures of this standard.

In December 2007, the FASB issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements." SFAS No. 160 amends Accounting Research Bulletin ("ARB") No. 51, "Consolidated Financial Statements" and establishes accounting and reporting standards for the noncontrolling interest (minority interest) in a subsidiary. This statement requires the reporting of all noncontrolling interests as a separate component of stockholders' equity, the reporting of consolidated net income (loss) as the amount attributable to both the parent and the noncontrolling interests and the separate disclosure of net income (loss) attributable to the parent and to the noncontrolling interests. In addition, this statement provides accounting and reporting guidance related to changes in noncontrolling ownership interests. Other than the reporting requirements described

42

above which require retrospective application, the provisions of SFAS No. 160 are to be applied prospectively in the first annual reporting period beginning on or after December 15, 2008. As of December 31, 2007 and 2006, we had no noncontrolling interests on our consolidated financial statements. We are currently evaluating the impact of this standard, but would not expect it to have a material impact on our consolidated financial statements.

In December 2007, the FASB ratified the EITF consensus on EITF Issue No. 07-1, "Accounting for Collaborative Arrangements" that discusses how parties to a collaborative arrangement (which does not establish a legal entity within such arrangement) should account for various activities. The consensus indicates that costs incurred and revenues generated from transactions with third parties (i.e. parties outside of the collaborative arrangement) should be reported by the collaborators on the respective line items in their income statements pursuant to EITF Issue No. 99-19, "Reporting Revenue Gross as a Principal Versus Net as an Agent." Additionally, the consensus provides that income statement characterization of payments between the participants in a collaborative arrangement should be based upon existing authoritative pronouncements; analogy to such pronouncements if not within their scope; or a reasonable, rational, and consistently applied accounting policy election. For us, EITF Issue No. 07-1 is effective beginning January 1, 2009 and is to be applied retrospectively to all periods presented for collaborative arrangements existing as of the date of adoption. We are currently evaluating the impact of this standard on our consolidated financial statements.

## Item 7A.    *Quantitative and Qualitative Disclosures about Market Risk*

We are exposed to the impact of changes in the market values of our investments.

## Investment Risk

The primary objective of our investment activities is to preserve principal while at the same time maximizing yields without significantly increasing risk. To achieve this objective, we maintain our portfolio of cash equivalents in a variety of securities, including both government and corporate obligations and money market funds. Our financial instruments include cash, cash equivalents, short-term investment, accounts and notes receivable, minority investments, accounts payable and accrued liabilities and deferred revenues. As of December 31, 2007, the carrying values of these financial instruments approximated their fair values.

In 2007, we owned minority shares in a publicly held company, which we have classified as available-for-sale. Investments in both fixed-rate and floating-rate interest-earning instruments carry varying degrees of interest rate risk. The fair market value of our fixed-rate securities may be adversely impacted due to a rise in interest rates. In general, securities with longer maturities are subject to greater interest-rate risk than those with shorter maturities. While floating rate securities generally are subject to less interest-rate risk than fixed-rate securities, floating-rate securities may produce less income than expected if interest rates decrease. Due in part to these factors, our investment income may fall short of expectations. If interest rates were to increase (decrease) by 1% (100 basis points), the fair market value of our total investment portfolio could decrease (increase) on an annual basis by approximately $0.3 million at December 31, 2007 and December 31, 2006.

## Item 8.    *Financial Statements and Supplementary Data*

Our Consolidated Balance Sheets as of December 31, 2007 and 2006 and our Consolidated Statements of Operations and Comprehensive Income (Loss), Stockholders' Equity and Cash Flows for each of the years in the three-year period ended December 31, 2007, together with the reports of our independent registered public accounting firms, begin on page F-1 of this Annual Report on Form 10-K and are incorporated herein by reference.

## Item 9.    *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

None.

## Item 9A.    *Controls and Procedures*

### Management's Report On Internal Control Over Financial Reporting

The management of Autobytel Inc. is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, management conducted an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007. In making this assessment, management used the criteria set forth in the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) entitled *Internal Control—Integrated Framework* . Management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2007.

43

Table of Contents

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of
Autobytel Inc. and Subsidiaries
Irvine, California

We have audited Autobytel Inc. and subsidiaries (the Company) internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of the Company as of December 31, 2007 and 2006, and the related consolidated statements of operations and comprehensive loss, stockholders' equity and cash flows for the years then ended, of Autobytel Inc. and Subsidiaries and our report dated March 17, 2008 expressed an unqualified opinion.

/s/ McGladrey & Pullen LLP
Irvine, California
March 17, 2008

### Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended, as of December 31, 2007. Our

44

Table of Contents

management concluded that the financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with generally accepted accounting principles in the United States ("US GAAP").

**Remediation of Prior Year Material Weakness**

As previously disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, our management concluded that our internal control over financial reporting was not effective as of December 31, 2006.

To address and remediate this material weakness, during 2007 management performed an assessment of the appropriate supervisory and staffing levels, skill sets and experience of the financial staff and then implemented a complete reorganization of the accounting department, including changing personnel were necessary, adding financial analysis disciplines, addressing process improvements and systems. The result has enhanced the design and operating effectiveness of our internal controls over financial reporting. Management has concluded that the above measures have effectively remediated the material weakness that was identified as of December 31, 2006.

In addition, based on management's evaluation as of December 31, 2007, our disclosure controls and procedures are designed of a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time period specified in the SEC rules and forms, and that such information is accumulated and communicated to our management, as appropriate, to allow timely decisions regarding required disclosure. The effectiveness of our internal controls over financial reporting as of December 31, 2007 has been audited by McGladrey and Pullen, LLP, an independent registered public accounting firm, as stated in their report which is included in Item 8 of this Annual Report on Form 10-K.

**Changes in Internal Control Over Financial Reporting**

Except for the changes related to remediation of the prior year material weakness described above, there have been no changes in internal controls over financial reporting identified in connection with the evaluation required by paragraph (d) of Rules 13a-15 or 15d-15 of the Securities Exchange Act of 1934 that have occurred during the fourth quarter of fiscal year 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**    *Other Information*

None .

Table of Contents

## PART III

### Item 10.    *Directors, Executive Officers and Corporate Governance*

We will file the information called for in this item not later than 120 days after our fiscal year end (December 31, 2007) in our definitive Proxy Statement in connection with our 2008 Annual Meeting of Stockholders pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, which information is incorporated herein by reference, or in an amendment to this Annual Report on Form 10-K.

### Item 11.    *Executive Compensation*

We will file the information called for in this item not later than 120 days after our fiscal year end (December 31, 2007) in our definitive Proxy Statement in connection with our 2008 Annual Meeting of Stockholders pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, which information is incorporated herein by reference, or in an amendment to this Annual Report on Form 10-K.

### Item 12.    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

We will file the information called for in this item not later than 120 days after our fiscal year end (December 31, 2007) in our definitive Proxy Statement in connection with our 2008 Annual Meeting of Stockholders pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, which information is incorporated herein by reference, or in an amendment to this Annual Report on Form 10-K.

### Item 13.    *Certain Relationships and Related Transactions, and Director Independence*

We will file the information called for in this item not later than 120 days after our fiscal year end (December 31, 2007) in our definitive Proxy Statement in connection with our 2008 Annual Meeting of Stockholders pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, which information is incorporated herein by reference, or in an amendment to this Annual Report on Form 10-K.

### Item 14.    *Principal Accountant Fees and Services*

We will file the information called for in this item not later than 120 days after our fiscal year end (December 31, 2007) in our definitive Proxy Statement in connection with our 2008 Annual Meeting of Stockholders pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, which information is incorporated herein by reference, or in an amendment to this Annual Report on Form 10-K.

Table of Contents

**PART IV**

**Item 15.**    *Exhibits and Financial Statement Schedules*

(a) The following documents are filed as a part of this Annual Report on Form 10-K:

    (1)   *Financial Statements:*

| | Page |
|---|---|
| Index | F-1 |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | F-5 |
| Consolidated Statements of Stockholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

    (2)   *Financial Statement Schedules:*

| | |
|---|---|
| Schedule II—Valuation and Qualifying Accounts | F-50 |

    All other schedules have been omitted since the required information is presented in the financial statements and the related notes or is not applicable.

    (3)   *Exhibits:*

    The exhibits filed or furnished as part of this Annual Report on Form 10-K are listed in the Index to Exhibits immediately preceding such exhibits, which Index to Exhibits is incorporated herein by reference.

Table of Contents

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 17th day of March, 2008.

AUTOBYTEL INC.

By:    /s/ JAMES E. RIESENBACH
James E. Riesenbach
*Chief Executive Officer, President and Director*

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each of Autobytel Inc., a Delaware corporation, and the undersigned Directors and Officers of Autobytel Inc. hereby constitute and appoint James E. Riesenbach, Monty A. Houdeshell or Ariel Amir as its or his true and lawful attorneys-in-fact and agents, for it or him and in its or his name, place and stead, in any and all capacities, with full power to act alone, to sign any and all amendments to this report, and to file each such amendment to this report, with all exhibits thereto, and any and all documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in connection therewith, as fully to all intents and purposes as it or he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ MICHAEL J. FUCHS<br>Michael J. Fuchs | Chairman of the Board and Director | March 17, 2008 |
| /s/ JAMES E. RIESENBACH<br>James E. Riesenbach | Chief Executive Officer, President and Director (Principal Executive Officer) | March 17, 2008 |
| /s/ MONTY A. HOUDESHELL<br>Monty A. Houdeshell | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | March 17, 2008 |
| /s/ CURTIS E. DEWALT<br>Curtis E. DeWalt | Vice President and Controller (Principal Accounting Officer) | March 17, 2008 |
| /s/ MARK R. ROSS<br>Mark R. Ross | Vice Chairman and Director | March 17, 2008 |
| /s/ JEFFREY H. COATS<br>Jeffrey H. Coats | Director | March 17, 2008 |
| /s/ ROBERT S. GRIMES<br>Robert S. Grimes | Director | March 17, 2008 |
| /s/ MARK N. KAPLAN<br>Mark N. Kaplan | Director | March 17, 2008 |
| /s/ JEFFREY M. STIBEL<br>Jeffrey M. Stibel | Director | March 17, 2008 |

**Table of Contents**

**AUTOBYTEL INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | F-5 |
| Consolidated Statements of Stockholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

F-1

Table of Contents

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders
Autobytel Inc. and Subsidiaries
Irvine, California

We have audited the consolidated balance sheets of Autobytel Inc. and subsidiaries (the Company) as of December 31, 2007 and 2006, and the related consolidated statements of operations and comprehensive loss, stockholders' equity and cash flows for each of the two years then ended. Our audits also include the consolidated financial statement schedule listed in item 15(a). These consolidated financial statements and financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2007 and 2006, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We have also audited the reclassifications to the 2005 statement of operations and stockholders' equity to retrospectively apply the accounting for discontinued operations with no effect on the net income or stockholders' equity, as discussed in Note 4 to the consolidated financial statements. In our opinion, such reclassifications are appropriate and have been properly applied. We were not engaged to audit, review or apply any procedures to the 2005 consolidated financial statements of the Company other than with respect to the reclassifications and, accordingly, we do not express an opinion or any other form of assurance on the 2005 consolidated financial statements taken as a whole.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated March 17, 2008 expressed an unqualified opinion on the Company's internal control over financial reporting.

/s/ M c G ladrey & P ullen , LLP

Irvine, California
March 17, 2008

F-2

Table of Contents

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Autobytel Inc.:

In our opinion, the consolidated balance sheet as of December 31, 2005 and the related consolidated statements of operations and comprehensive income (loss), statements of stockholders' equity and statements of cash flows for each of two years in the period ended December 31, 2005, before the effects of the adjustments to retrospectively reflect the discontinued operations described in Note 4, present fairly, in all material respects, the financial position of Autobytel Inc. and its subsidiaries at December 31, 2005, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America (the 2005 financial statements before the effects of the adjustments discussed in Note 4 are not presented herein). In addition, in our opinion, the financial statement schedule, for each of the two years in the period ended December 31, 2005 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements before the effects of the adjustments described above. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits, before the effects of the adjustments described above, of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We were not engaged to audit, review, or apply any procedures to the adjustments to retrospectively reflect the discontinued operations described in Note 4 and accordingly, we do not express an opinion or any other form of assurance about whether such adjustments are appropriate and have been properly applied. Those adjustments were audited by other auditors.

/s/ PricewaterhouseCoopers LLP

Irvine, California
March 16, 2006

F-3

Table of Contents

## AUTOBYTEL INC.

### CONSOLIDATED BALANCE SHEETS
**(Amounts in thousands, except share and per share data)**

| | December 31, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 27,601 | $ 22,743 |
| Restricted cash and cash equivalents | — | 360 |
| Short-term investments | 686 | 3,000 |
| Accounts receivable, net of allowances for bad debts and customer credits of $534 and $798, respectively | 11,692 | 17,250 |
| Prepaid expenses and other current assets | 1,739 | 1,819 |
| Assets held for sale | 17,160 | 2 |
| Total current assets | 58,878 | 45,174 |
| Property and equipment, net | 10,757 | 7,954 |
| Goodwill | 52,074 | 70,697 |
| Acquired intangible assets, net | 303 | 674 |
| Other assets | 144 | 197 |
| Total assets | $ 122,156 | $ 124,696 |
| **LIABILITIES, MINORITY INTEREST AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 5,852 | $ 9,271 |
| Accrued expenses | 6,470 | 7,607 |
| Deferred revenues | 1,749 | 2,138 |
| Other current liabilities | 1,199 | 1,090 |
| Current liabilities held for sale | 198 | 393 |
| Total current liabilities | 15,468 | 20,499 |
| Deferred rent—non-current | 241 | 195 |
| Deferred revenue—non-current | 195 | — |
| Total liabilities | 15,904 | 20,694 |
| Minority interest | — | 184 |
| Commitments and contingencies (Note 6) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value; 11,445,187 shares authorized; none outstanding | — | — |
| Common stock, $0.001 par value; 200,000,000 shares authorized; 43,788,633 and 42,665,840 shares issued and outstanding, respectively | 44 | 43 |
| Additional paid-in capital | 296,964 | 289,862 |
| Accumulated other comprehensive income – securities available-for-sale | 686 | — |
| Accumulated deficit | (191,442) | (186,087) |
| Total stockholders' equity | 106,252 | 103,818 |
| Total liabilities, minority interest and stockholders' equity | $ 122,156 | $ 124,696 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**AUTOBYTEL INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(Amounts in thousands, except share and per share data)**

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2007** | **2006** | **2005** |
| Revenues | $ 84,385 | $ 85,102 | $ 97,002 |
| Costs and expenses: | | | |
|    Cost of revenues | 52,448 | 47,653 | 45,271 |
|    Sales and marketing | 21,474 | 20,128 | 19,880 |
|    Technology support | 18,119 | 17,476 | 16,274 |
|    General and administrative | 27,065 | 38,416 | 29,329 |
|    Amortization of acquired intangible assets | 464 | 1,209 | 1,308 |
|    Patent litigation settlement | (12,000) | — | — |
|      Total costs and expenses | 107,570 | 124,882 | 112,062 |
|    Operating loss | (23,185) | (39,780) | (15,060) |
| Interest and other income | 5,906 | 2,367 | 3,821 |
| Foreign currency exchange loss | (7) | — | — |
|    Loss from continuing operations before income taxes and minority interest | (17,286) | (37,413) | (11,239) |
| Income taxes benefit | — | 107 | 37 |
| Minority interest | — | (21) | (249) |
|    Loss from continuing operations | (17,286) | (37,327) | (11,451) |
| Income from discontinued operations | 11,931 | 5,859 | 5,193 |
|    Net loss | $ (5,355) | $(31,468) | $ (6,258) |
| Loss per share from continuing operations: Basic and Diluted | $ (0.40) | $ (0.88) | $ (0.27) |
| Net loss per share: Basic and Diluted | $ (0.12) | $ (0.74) | $ (0.15) |
| Comprehensive loss: | | | |
|    Net loss | $ (5,355) | $(31,468) | $ (6,258) |
|    Foreign currency translation adjustment | — | — | (566) |
|    Reclassification of foreign cumulative translation adjustment for liquidation of Autobytel.Europe recognized in net loss | — | — | (1,533) |
|    Unrealized gain from available for sale securities | 686 | — | — |
|      Comprehensive loss | $ (4,669) | $(31,468) | $ (8,357) |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**Table of Contents**

**AUTOBYTEL INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Amounts in thousands, except share and per share data)**

| | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | |
| Balance, December 31, 2004 | 41,905,848 | $  42 | $282,287 | $  2,099 | $ (148,361) | $136,067 |
| Issuance of common stock upon exercise of stock options | 193,304 | — | 499 | — | — | 499 |
| Issuance of common stock under employee stock purchase plan | 34,297 | — | 138 | — | — | 138 |
| Adjustment for fractional shares on exchange of Autoweb shares for Autobytel shares | (39) | — | — | — | — | — |
| Foreign currency translation adjustment | — | — | — | (566) | — | (566) |
| Realization of foreign cumulative translation adjustment for liquidation of Autobytel.Europe | — | — | — | (1,533) | — | (1,533) |
| Net loss | — | — | — | — | (6,258) | (6,258) |
| Balance, December 31, 2005 | 42,133,410 | 42 | 282,924 | — | (154,619) | 128,347 |
| Issuance of common stock upon exercise of stock options | 413,167 | 1 | 1,132 | — | — | 1,133 |
| Issuance of common stock under employee stock purchase plan | 119,264 | — | 404 | — | — | 404 |
| Share-based compensation | — | — | 5,402 | — | — | 5,402 |
| Adjustment for fractional shares on exchange of Autoweb shares for Autobytel shares | (1) | — | — | — | — | — |
| Net loss | — | — | — | — | (31,468) | (31,468) |
| Balance, December 31, 2006 | 42,665,840 | 43 | 289,862 | — | (186,087) | 103,818 |
| Issuance of common stock upon exercise of stock options | 1,014,412 | 1 | 2,032 | — | — | 2,033 |
| Issuance of common stock under employee stock purchase plan | 108,381 | — | 307 | — | — | 307 |
| Share-based compensation | — | — | 4,763 | — | — | 4,763 |
| Securities available for sale | — | — | — | 686 | — | 686 |
| Net loss | — | — | — | — | (5,355) | (5,355) |
| Balance, December 31, 2007 | 43,788,633 | $  44 | $296,964 | $  686 | $ (191,442) | $106,252 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

Table of Contents

### AUTOBYTEL INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS
**(Amounts in thousands, except share data)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| Cash flows from operating activities: | | | |
| Net loss | $ (5,355) | $(31,468) | $ (6,258) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 3,648 | 2,171 | 1,999 |
| Amortization of acquired intangible assets | 507 | 1,515 | 1,998 |
| Provision for bad debt | 401 | 391 | 906 |
| Provision for customer credits | 1,321 | 1,645 | 2,816 |
| Write-off of capitalized internal use software | — | 264 | — |
| (Gain) loss on disposal of property and equipment | (1) | 111 | 103 |
| Gain on sale of investment in Autobytel Japan | (3,985) | — | — |
| Gain on sale of AIC | (2,762) | — | — |
| Gain on sale of RPM business | (3,576) | — | — |
| Share-based compensation | 4,753 | 5,397 | — |
| Minority interest | — | 21 | 249 |
| Foreign currency exchange loss (gain) | 7 | (22) | (1,533) |
| Changes in assets and liabilities, net of the effects of discontinued operations: | | | |
| Accounts receivable | 1,457 | (244) | (4,790) |
| Prepaid expenses and other current assets | 141 | 635 | (92) |
| Other assets | 52 | (73) | (9) |
| Accounts payable | (2,535) | 2,754 | (175) |
| Accrued expenses | (757) | (4) | (713) |
| Deferred revenues | (391) | (1,364) | (142) |
| Accrued domestic restructuring | — | — | (74) |
| Other current liabilities | 167 | (512) | (410) |
| Net cash used in operating activities | (6,908) | (18,783) | (6,125) |
| Cash flows from investing activities: | | | |
| Maturities of short-term investments | 3,000 | 14,998 | 21,600 |
| Purchases of short-term and long-term investments | — | (2,998) | (8,100) |
| Distribution of foreign investment | 354 | — | 7,941 |
| Change in restricted cash and cash equivalents | — | (97) | (121) |
| Purchases of property and equipment | (7,647) | (5,282) | (2,809) |
| Proceeds from sale of property and equipment | 2 | 15 | 95 |
| Proceeds from sale of investment in Autobytel Japan | 3,985 | — | — |
| Proceeds from sale of AIC | 2,573 | — | — |
| Proceeds from sale of RPM business | 7,343 | — | — |
| Net cash provided by investing activities | 9,610 | 6,636 | 18,606 |
| Cash flows from financing activities: | | | |
| Distribution to minority interest shareholder | (184) | — | (4,052) |
| Net proceeds from exercise of stock options and awards issued under the employee stock purchase plan | 2,340 | 1,537 | 637 |
| Net cash provided by (used in) financing activities | 2,156 | 1,537 | (3,415) |
| Net increase (decrease) in cash and cash equivalents | 4,858 | (10,610) | 9,066 |
| Cash and cash equivalents, beginning of period | 22,743 | 33,353 | 24,287 |
| Cash and cash equivalents, end of period | $27,601 | $ 22,743 | $33,353 |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid during the period for income taxes | $    85 | $    465 | $    588 |

**Supplemental disclosure of non-cash investing and financing activities:**

- Non-cash investing activities in 2007 included $0.7 million of short-term investment in available for sale securities.

The accompanying notes are an integral part of these consolidated financial statements.

F-7

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.    Organization and Operations of Autobytel

Autobytel Inc. (the "Company" or "Autobytel") is an automotive media and marketing services company that helps dealers sell cars and services, and manufacturers build brands through efficient marketing and advertising, primarily through the Internet. The Company owns and operates automotive Web sites, including MyRide.com ™, Autobytel.com ®, Autoweb.com ®, Car.com ®, CarSmart.com ®, AutoSite.com ®, and CarTV.com ®. The Company is among the largest automotive shopping content networks and reaches millions of Internet visitors as they shop for vehicles and make their vehicle buying decisions.

The Company is a Delaware corporation incorporated on May 17, 1996. Its principal corporate offices are located in Irvine, California. The Company's common stock is listed on The NASDAQ Global Market under the symbol ABTL.

From its inception through December 31, 2002 and for the years ended December 31, 2007, 2006 and 2005, the Company has experienced annual operating losses and has an accumulated deficit of $191.4 million as of December 31, 2007. The Company believes current cash and cash equivalents are sufficient to meet anticipated cash needs for working capital and capital expenditures for at least the next 12 months. The Company's results of operations and financial condition may be affected by its dependence on, and the general economic conditions of, the automotive industry.

### 2.    Summary of Significant Accounting Policies

*Basis of Presentation*

The accompanying consolidated financial statements include the accounts of the Company and its wholly and majority owned subsidiaries.

Investments in entities in which the Company has the ability to exercise significant influence, but not control, are accounted for using the equity method. Prior to March 31, 2004, the Company accounted for its investment in Autobytel.Europe under the equity method. On March 31, 2004, the Company adopted FASB Interpretation ("FIN") 46(R), "Consolidation of Variable Interest Entities," and determined it was the primary beneficiary of Autobytel.Europe. As a result of this adoption, the Company consolidated Autobytel.Europe's balance sheet and its results of operations starting on April 1, 2004. The Company owned 49% of Autobytel.Europe. In December 2005, the owners of Autobytel.Europe agreed to dissolve the company, which was completed in February 2007 (see Note 5).

All intercompany transactions and balances have been eliminated in consolidation.

The Company sold certain assets and liabilities of its Automotive Information Center ("AIC") data operations, its former vehicle price and specification business, on January 31, 2007. The Company also sold its wholly-owned subsidiary, Retention Performance Marketing, Inc., which was in the business of providing customer loyalty and retention marketing programs ("RPM"), on June 30, 2007. In January 2008, the Company sold certain assets and liabilities of its AVV Inc. ("AVV") business, its former software applications and services and data extraction business. Accordingly, the AIC operations, RPM and AVV businesses are presented in the consolidated financial statements as discontinued operations. As discontinued operations, revenues and expenses of the AIC operations, RPM and AVV businesses have been aggregated and stated separately from the respective captions in continuing operations in the Condensed Consolidated Statements of Operations. Expenses included in discontinued operations are direct costs of the AIC operations, RPM and AVV businesses that will be eliminated from future operations as a result of the sale of the AIC operations, RPM and AVV businesses. Assets and liabilities that were included in the sale of the AVV business and AIC operations have been aggregated and classified as held for sale under current assets and current liabilities, in the Company's Condensed Consolidated Balance Sheets as of December 31, 2007 and 2006, respectively.

*Use of Estimates in the Preparation of Financial Statements*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates include, but are not limited to, allowances for bad debts and customer credits, useful lives of depreciable assets, accrued liabilities and valuation allowance for deferred tax assets. Actual results could differ from those estimates.

F-8

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Cash and Cash Equivalents*

For purposes of the consolidated balance sheets and the consolidated statements of cash flows, the Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents. Domestic cash and cash equivalents represent amounts held by the Company for use by the Company.

*Restricted Cash and Cash Equivalents*

Restricted cash and cash equivalents represent amounts held for use in Autobytel.Europe's current operations as directed by Autobytel.Europe and are not available to the Company.

*Short-Term Investments*

The Company categorized its equity securities as Available-for-Sale and its debt securities as held-to-maturity investments in accordance with Statement of Financial Accounting Standards ("SFAS") No. 115, "Accounting for Certain Investments in Debt and Equity Securities." All held-to-maturity securities with remaining maturities of less than one year are classified as short-term investments. The Company had no long-term investments as of December 31, 2007 and 2006.

The Company reviews its investments in equity and debt securities for potential impairment on a regular basis. As part of the evaluation process of individual securities classified as available-for-sale or held-to-maturity, the Company reviews factors such as the length of time and extent to which fair value has been below cost basis, the financial condition of the issuer and the Company's intent and ability to hold the investment for a period of time which may be sufficient for anticipated recovery in market value. The Company will record an impairment loss on investments for any other-than-temporary decline in fair value of these investments below their cost basis. For the years ended December 31, 2007, 2006 and 2005, the Company did not record any impairment losses that were related to other-than-temporary decline in fair value of its debt or equity securities.

*Accounts Receivable*

Credit is extended to customers based on an evaluation of the customer's financial condition, and when credit is extended, collateral is generally not required. Interest is not normally charged on receivables.

*Allowances for Bad Debts and Customer Credits*

The allowance for bad debts is an estimate of bad debt expense that could result from the inability or refusal of customers to pay for services. Additions to the estimated allowance for bad debts are recorded to general and administrative expenses and are based on factors such as historical write-off percentages and the current aging of accounts receivable. Reductions in the estimated allowance for bad debts are recorded as a decrease in general and administrative expenses. As specific bad debts are identified, they are written-off against the previously established estimated allowance for bad debts and have no impact on operating expenses.

The allowance for customer credits is an estimate of adjustments for services that do not meet the requirements of customers of the Company. Additions to the estimated allowance for customer credits are recorded as a reduction in revenue and are based on the Company's historical experience of: (i) the amount of credits issued; (ii) the length of time after services are rendered that the credits are issued; and (iii) other factors known at the time. Reductions in the estimated allowance for customer credits are recorded as an increase in revenues. As specific customer credits are identified, they are written-off against the previously established estimated allowance for customer credits and have no impact on revenues.

*Fair Value of Financial Instruments*

The Company's financial instruments, including cash, cash equivalents, accounts receivable and accounts payable are carried at cost, which approximates their fair value because of the short-term maturity of these instruments.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash, cash equivalents, short-term investments and accounts receivable. Cash, cash equivalents and short-term investments are primarily maintained with three financial institutions in the United States. Deposits held by banks may exceed the amount of insurance provided for such deposits. Generally these deposits may be redeemed upon demand. Accounts receivable are primarily derived from fees billed to automotive dealers and automotive manufacturers. The Company generally requires no collateral to support customer receivables and maintains an allowance for bad debts for potential credit losses.

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Property and Equipment*

Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets, generally three years. Amortization of leasehold improvements is provided using the straight-line method over the shorter of the remaining lease term or the estimated useful lives of the improvements. Repair and maintenance costs are charged to operating expenses as incurred. Gains or losses resulting from the retirement or sale of property and equipment are recorded as operating income or expenses, respectively.

The Company evaluates the carrying value of property and equipment for impairment in accordance with SFAS No. 144, "Accounting for Impairment or Disposal of Long-Lived Assets." The Company records impairment losses on long-lived assets used in operations when events and circumstances indicate that long-lived assets might be impaired and the undiscounted cash flows estimated to be generated by those assets are less than the carrying amounts of those assets. The impairment recognized is the difference between the fair value of the asset and its carrying amount. The Company did not record any impairment losses on its property and equipment in 2007, 2006 and 2005.

*Operating Leases*

The Company leases office space, certain office equipment and a domain name under operating lease agreements which expire on various dates through 2011, with options to renew on expiration of the original lease terms. Certain of the lease agreements contain rent holiday provisions. Rent holidays are considered in determining straight-line rent expense from the date the Company takes possession of the property to the end of the initial lease term, with differences between rent expense and rent paid recorded as deferred rent liabilities on the Consolidated Balance Sheets. The lease term begins on the date of initial possession of the leased property for purposes of recognizing rent expense on a straight-line basis over the term of the lease. Lease renewal periods are considered on a lease-by-lease basis and are generally not included in the initial lease term.

*Capitalized Internal Use Software and Web site Development Costs*

The Company capitalizes costs, including share-based compensation costs, to develop internal use software under the provisions of Statement of Position ("SOP") 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." The Company capitalizes Web site Development Costs under Emerging Issues Task Force (EITF) Issue No. 00-2, "Accounting for Web Site Development Costs" and SOP 98-1. SOP 98-1 and EITF Issue 00-2 require the capitalization of external and internal computer software costs and Web site development costs, respectively, incurred during the application development stage. The application development stage is characterized by software design and configuration activities, coding, testing and installation. Training and maintenance costs are expensed as incurred while upgrades and enhancements are capitalized if it is probable that such expenditures will result in additional functionality. Capitalized internal use software development costs are amortized using the straight-line method over an estimated useful life of three years. Capitalized Web site development costs, once placed in service, will be amortized using the straight-line method over the estimated useful life. These costs are subject to periodic reviews and evaluations for indications that the software may no longer be expected to provide any service potential or placed in service for its intended use.

*Goodwill and Intangible Assets*

Goodwill represents the excess of the purchase price for business acquisitions over the fair value of identifiable assets and liabilities acquired. The Company uses estimates and makes assumptions to determine the fair value of acquired assets and liabilities.

The Company evaluates the carrying value of enterprise goodwill for impairment in accordance with SFAS No. 142, "Goodwill and Other Intangible Assets." Under SFAS No. 142, goodwill is tested for impairment by comparing its fair value to its carrying value. Testing for impairment of goodwill is a two-step process. The first step requires the Company to compare the enterprise's carrying value to its fair value. If the fair value is less than the carrying value, enterprise goodwill is potentially impaired and the Company then completes the second step to measure the impairment loss, if any. The second step requires the calculation of the implied fair value of goodwill by deducting the fair value of all tangible and intangible net assets from the fair value of the reporting unit. If the implied fair value of goodwill is less than the carrying amount of

F-10

**Table of Contents**

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

enterprise goodwill, an impairment loss is recognized equal to the difference. The Company evaluates enterprise goodwill, at a minimum, on an annual basis and whenever events and changes in circumstances suggest that the carrying amount may not be recoverable. In June 2007, Autobytel performed an annual impairment test of enterprise goodwill and concluded that enterprise goodwill was not impaired.

Intangible assets with identifiable lives are amortized on a straight-line basis over their estimated useful life. Amortization is charged to operating expenses. The Company evaluates the carrying value of these intangible assets for impairment in accordance with SFAS No. 144.

The decrease in the carrying amount of goodwill of $18.6 million represents the allocation of goodwill associated with the dispositions of the RPM and AVV businesses (see Note 4).

### *Loss Contingencies*

In conformity with accounting principles generally accepted in the United States of America, the Company establishes an accrual for an estimated loss contingency when it is both probable that an asset has been impaired or that a liability has been incurred and the amount of the loss can be reasonably estimated. Any legal fees expected to be incurred in connection with a contingency are expensed as incurred.

### *Revenue Recognition*

The Company classifies revenues as lead fees, advertising, and other.

Revenues from continuing operations by groups of similar services are as follows:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2007** | **2006** | **2005** |
|  |  | **(in thousands)** |  |
| **Revenues:** |  |  |  |
| Lead fees | $67,386 | $67,496 | $77,513 |
| Advertising | 16,885 | 17,505 | 19,207 |
| Other | 114 | 101 | 282 |
| Total revenues | $84,385 | $85,102 | $97,002 |

The Company recognizes revenues earned as defined by Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition," and EITF Issue 00-21, "Revenue Arrangements with Multiple Deliverables." SAB No. 104 considers revenue realized after all four of the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the seller's price to the buyer is fixed or determinable and (iv) collectability is reasonably assured.

Lead fees consist of car buying purchase request fees for new and used cars, and finance request fees. Fees for car buying purchase requests are paid by retail dealers, enterprise dealers and automotive manufacturers or their automotive buying service affiliates who participate in the Company's online car buying referral networks. Enterprise dealers consist of (i) dealers that are part of major dealer groups with more than 25 dealerships with whom the Company has a single agreement and (ii) dealers that are eligible to receive purchase requests from the Company as part of a single agreement with an automotive manufacturer or its automotive buying service affiliate. Fees paid by customers participating in the Company's car buying referral networks are comprised of monthly subscription and/or transaction fees for consumer leads, or purchase requests, which are directed to participating dealers. These monthly subscription and transaction fees are recognized in the period service is provided.

Lead fees also include fees paid by retail dealers, finance request intermediaries, and automotive finance companies who participate in the Company's Car.com finance referral network. Customers participating in the Company's Car.com finance referral network pay ongoing monthly subscription fees or transaction fees based on the number of finance requests provided to them each month. The fees are recognized in the period service is provided.

Advertising revenues represent fees from automotive manufacturers and other advertisers who target car buyers during the research, consideration and decision making process on the Company's Web sites, as well as through direct marketing offerings. Advertising revenues are recognized in the period the advertisements are displayed on the Web sites.

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Other revenues include fees from classified listings for used cars, internet sales training and other products and services. Fees from other products and services are recognized as products are delivered or services are provided.

Fees billed prior to providing services are deferred, as they do not satisfy all of the revenue recognition criteria in SAB No. 104. Deferred revenues are recognized as revenue over the periods services are provided or purchase requests are delivered.

In accounting for multiple-element arrangements, one of the key judgments to be made is the accounting value that is attributable to the different contractual elements. The appropriate allocation of value not only impacts which revenue stream mentioned above is credited with the revenue, it also impacts the amount and timing of revenue recorded in the consolidated statement of operations during a given period due to the differing methods of recognizing revenue. Revenue is allocated to each element based on the accounting determination of the relative fair value of that element to the aggregate fair value of all elements or alternatively deferred revenue maybe computed based on the fair value of the undelivered elements. The fair values must be reliable, verifiable and objectively determinable. When available, such determination is based principally on the pricing of the same elements with unrelated parties that are not part of a multiple-element arrangement. When sufficient evidence of the fair values of the individual elements does not exist, revenue is not allocated among them until that evidence exists. Instead, the revenue is recognized as earned using revenue recognition principles applicable to the entire arrangement as if it were a single element arrangement.

The Company deferred revenue of $1.1 million at December 31, 2006, in accordance with EITF Issue 00-21 under a multiple-element arrangement. The Company did not have deferred revenue under a multiple-element arrangement at December 31, 2007. Revenue recognized under these types of arrangements totaled $1.4 million and $0.9 million for the years ended December 31, 2007 and 2006, respectively. No revenue was recognized under these arrangements for the year ended December 31, 2005.

*Risks Due to Concentration of Significant Customers*

In 2007, the Company had one automotive manufacturer which accounted for greater than 10% of total revenues. In 2006 and 2005, no dealer, major dealer group, manufacturer, or other customer accounted for greater than 10% of total revenues. The Company had no balances owed from any single automotive manufacturer that accounted for more than 10% of total accounts receivable as of December 31, 2007 and 2006.

*Cost of Revenues*

Cost of revenues consists of lead and traffic acquisition costs and other cost of revenues. Lead and traffic acquisition cost consists of payments made to the Company's Internet consumer request providers, including Internet portals and online automotive information providers. Other cost of revenues consists of fees paid to third parties for data and content included on the Company's properties, connectivity costs, technology license fees, development and maintenance costs, server equipment depreciation and technology amortization and compensation related expense.

*Sales and Marketing*

Sales and marketing expense primarily consists of personnel and other costs associated with sales, marketing, training and support of the Company's dealer networks as well as advertising expenses to develop brand equity and encourage potential customers to visit the Company's Web sites. Sales and marketing costs are recorded as expenses are incurred.

*Technology Support*

Technology support includes compensation and related costs for personnel responsible for significantly enhancing the features, content and functionality of the Company's Web sites, and its Internet-based communications platform, costs associated with its telecommunications and computer infrastructure, and costs related to data and technology maintenance. Development expenditures are expensed as incurred or capitalized in accordance with SOP 98-1.

F-12

Table of Contents

# AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*General and Administrative*

General and administrative expense primarily consists of executive, financial, human resources and legal personnel expenses, and costs related to being a public company. General and administrative expenditures are expensed as incurred. Certain expenses such as rent, certain employee benefits, facility maintenance, and insurance are allocated from general and administrative expenses to other cost categories based on employee count.

*Foreign Currency Translation*

Prior to December 15, 2005, Autobytel.Europe operated in a functional currency other than the U.S. Dollar. At December 15, 2005, the owners of Autobytel.Europe agreed to dissolve the company. As a part of the liquidation, the assets and liabilities were translated at the current exchange rate at December 15, 2005, while the revenue and expenses were translated at the average exchange rate prevailing for the period between January 1, 2005 and December 15, 2005. Subsequent to December 15, 2005, Autobytel.Europe accounted for any remaining assets, liabilities, revenue and expenses using the U.S. Dollar. In February 2007, Autobytel.Europe was dissolved.

*Income Taxes*

The Company accounts for income taxes in accordance with SFAS No. 109, "Accounting for Income Taxes." Under SFAS No. 109, deferred income tax assets and liabilities are determined based on the differences between the book and tax basis of assets and liabilities and are measured using the currently enacted tax rates and laws. A valuation allowance is recorded against deferred tax assets when it is more likely than not that such deferred tax assets will not be realized.

*Computation of Basic and Diluted Net (Loss) Income per share*

Net (loss) income per share has been calculated under SFAS No. 128, "Earnings per Share." SFAS No. 128 requires companies to compute earnings per share under two different methods, basic and diluted. Basic net (loss) income per share is calculated by dividing the net (loss) income by the weighted average shares of common stock outstanding during the period. Diluted net (loss) income per share is calculated by dividing the net (loss) income by the weighted average shares of common stock outstanding during the period and dilutive potential shares of common stock. Dilutive potential shares of common stock, as determined under the treasury stock method, consist of shares of common stock issuable upon exercise of stock options net of shares of common stock assumed to be repurchased by the company from the exercise proceeds.

The following table sets forth the computation of basic and diluted net (loss) income per share from continuing operations and discontinued operations:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in thousands, except share and per share data) | | |
| Continuing operations: | | | |
| Numerator: | | | |
| Net loss from continuing operations | $ (17,286) | $ (37,327) | $ (11,451) |
| Denominator: | | | |
| Weighted average common shares and denominator for basic calculation | 43,413,908 | 42,389,050 | 41,956,799 |
| Weighted average effect of dilutive securities | — | — | — |
| Denominator for diluted calculation | 43,413,908 | 42,389,050 | 41,956,799 |
| Net loss per share from continuing operations—basic and diluted | $ (0.40) | $ (0.88) | $ (0.27) |
| Discontinued operations: | | | |
| Numerator: | | | |
| Net income from discontinued operations | $ 11,931 | $ 5,859 | $ 5,193 |
| Denominator: | | | |
| Weighted average common shares and denominator for basic calculation | 43,413,908 | 42,389,050 | 41,956,799 |
| Weighted average effect of dilutive securities | — | — | — |
| Denominator for diluted calculation | 43,413,908 | 42,389,050 | 41,956,799 |
| Net income per share from discontinued operations—basic and diluted | $ 0.27 | $ 0.14 | $ 0.12 |
| Net loss: | | | |
| Numerator: | | | |
| Net loss | $ (5,355) | $ (31,468) | $ (6,258) |
| Denominator: | | | |
| Weighted average common shares and denominator for basic calculation | 43,413,908 | 42,389,050 | 41,956,799 |
| Weighted average effect of dilutive securities | — | — | — |
| Denominator for diluted calculation | 43,413,908 | 42,389,050 | 41,956,799 |
| Net loss per share—basic and diluted | $ (0.12) | $ (0.74) | $ (0.15) |

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

For the years ended December 31, 2007, 2006 and 2005, 7,897,805, 6,892,552 and 4,305,210, respectively, antidilutive potential shares of common stock, consisting of shares issuable under employee and director stock options and employee stock purchase plan awards, have been excluded from the calculation of diluted net loss per share, as they represent stock options with an exercise price greater than the average market price for the period. In addition, for the years ended December 31, 2007, 2006 and 2005, 591,045, 1,080,048 and 1,739,470, respectively, antidilutive potential shares of common stock have been excluded from the calculation of diluted net loss per share, as the Company incurred a net loss from continuing operations for the period.

*Share-Based Compensation*

Prior to 2006, the Company accounted for share-based compensation plans under the recognition and measurement principles of Accounting Principles Board (APB) Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations. No compensation cost was reflected in the net loss for 2005 related to stock options as all options granted under share-based compensation plans had an exercise price equal to the market closing price of the underlying common stock on the date of grant.

Effective January 1, 2006, the Company adopted SFAS No. 123(R), "Share-Based Payment," which is a revision to SFAS No. 123, "Accounting for Stock-Based Compensation" issued in 1995, using the modified prospective method and therefore has not restated prior periods' results. Under the fair value recognition provisions of SFAS No. 123(R), the Company recognizes share-based compensation net of an estimated forfeiture rate and therefore only recognizes compensation cost for those shares expected to vest over the service period of the award. The fair value of each stock option award is estimated on the date of grant using the Black-Scholes option pricing model based on the underlying common stock closing price as of the date of grant, the expected term, expected stock price volatility, and expected risk-free interest rates. Prior to SFAS No. 123(R) adoption, the Company accounted for share-based payments under APB Opinion No. 25 "Accounting for Stock Issued to Employees," and, accordingly, generally recognized no compensation expense related to share-based awards as awards were generally granted at fair value at the date of grant and accounted for forfeitures as they occurred.

Calculating share-based compensation expense requires the input of highly subjective assumptions, including the expected term of the share-based awards, expected stock price volatility, risk-free interest rate and expected pre-vesting option forfeitures. The assumptions used in calculating the fair value of share-based awards represent the Company's best estimates, but these estimates involve inherent uncertainties and the application of management judgment. As a result, if factors change and the Company uses different assumptions, share-based compensation expense could be materially different in the future. In addition, the Company is required to estimate the expected forfeiture rate and only recognize expense for those options expected to vest. The Company estimates the forfeiture rate based on historical experience of its share-based awards that are granted, exercised and cancelled. If its actual forfeiture rate is materially different from its estimate, the share-based compensation expense could be significantly different from what was recorded in the current period.

F-14

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company utilizes the straight-line attribution method for recognizing share-based compensation expense under SFAS No. 123(R). For the years ended December 31, 2007 and 2006, the Company recorded share-based compensation expense of $4.8 million or $0.11 per share, and $5.4 million or $0.13 per share, respectively. Share-based compensation expense is included in costs and expenses in the Consolidated Statements of Operations as follows:

| | Years Ended December 31, | |
| | 2007 | 2006 |
| | (in thousands) | |
|---|---|---|
| Share-based compensation expense: | | |
| Cost of revenues | $    157 | $    215 |
| Sales and marketing | 970 | 1,116 |
| Product and technology development | 785 | 1,018 |
| General and administrative | 2,669 | 2,762 |
| Share-based compensation expense included in continuing operations | 4,581 | 5,111 |
| Share-based compensation expense included in discontinued operations | 172 | 286 |
| Total share-based compensation expense | 4,753 | 5,397 |
| Amount capitalized to internal use software | 10 | 5 |
| Total share-based compensation costs | $    4,763 | $    5,402 |

The following table illustrates the pro forma effect on net (loss) income and net (loss) income per share as if the Company had applied the fair value recognition provisions of SFAS No. 123 to share-based employee compensation for the year ended December 31, 2005. (All amounts in thousands, except for per share data):

| | |
|---|---|
| Net (loss): | |
| As reported | $  (6,258) |
| Add: Share-based employee compensation included in reported net (loss) | — |
| Less: Share-based employee compensation determined under the fair value based method | (6,703) |
| Pro forma | $(12,961) |
| Net (loss) per share—basic and diluted: | |
| As reported | $   (0.15) |
| Pro forma | $   (0.31) |

Prior to the adoption of SFAS No. 123(R), the Company did not record any tax benefits resulting from the exercise of options due to uncertainty surrounding the timing of realizing the benefits of its deferred tax assets in future periods. SFAS No. 123(R) requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than an operating cash flow as required under APB No. 25. Had the Company recognized an excess tax benefit from deductions resulting from the exercise of stock options, it would have classified the benefit as a financing cash inflow in the consolidated statement of cash flows.

Awards granted under the Company's stock option plans were estimated to have a weighted average grant date fair value per share of $1.97, $2.26, and $2.52 for the years ended December 31, 2007, 2006 and 2005, respectively, based on the Black-Scholes option-pricing model on the date of grant using the following assumptions:

| | Years Ended December 31, | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Expected dividend yield | 0% | 0% | 0% |
| Expected volatility | 61.0% - 64.89% | 73.28% - 81.04% | 68.70% - 73.94% |
| Expected risk-free interest rate | 3.57% - 5.02% | 4.35% - 5.07% | 3.65% - 4.36% |
| Expected life | 4.36 years | 4.99 years | 3.50-4.99 years |

F-15

Table of Contents

## AUTOBYTEL INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The expected risk-free interest rate is based on United States treasury yield for a term consistent with the expected life of the stock option in effect at the time of grant. Expected volatility is based on the Company's historical experience for a period equal to the expected life. The Company has used historical volatility because it has a limited number of options traded on its common stock to support the use of an implied volatility or a combination of both historical and implied volatility. Expected life is calculated using a lattice expected term model for 2007 and 2006, which utilizes historical data to calculate future behavior. Expected life for 2005 is based on historical exercise patterns. A dividend yield was not considered in the option-pricing formula since the Company has not paid dividends in the past and has no current plans to do so in the future. The estimated forfeiture rate used was based on historical experience. As required by SFAS No. 123(R), the Company adjusts the estimated forfeiture rate based on actual experience.

As of December 31, 2007, there was $3.2 million of total unrecognized compensation cost, net of estimated forfeitures, related to non-vested share-based compensation arrangements granted under share-based compensation plans. The cost is expected to be recognized over a weighted-average period of 1.6 years using the straight-line attribution method.

Awards issued under the employee stock purchase plan were estimated to have a weighted average fair value per award of $0.79, $0.93, and $1.09 for the years ended December 31, 2007, 2006, and 2005, respectively, based on the Black-Scholes option-pricing model and the following assumptions:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Expected dividend yield | 0% | 0% | 0% |
| Expected volatility | 47.00% - 48.93% | 53.42% - 53.51% | 44.95% - 77.97% |
| Expected risk-free interest rate | 4.96% - 5.15% | 4.60% - 5.18% | 2.99% - 3.69% |
| Expected life | 6 months | 6 months | 1.4 - 6 months |

The expected risk-free interest rate is based on United States treasury yield for a term consistent with the expected life of the award in effect at the time of grant. Expected volatility is based on the Company's historical experience for a period equal to the expected life. Expected life is based on the term of the offering period. A dividend yield was not considered in the option-pricing formula since the Company has not paid dividends in the past and has no current plans to do so in the future. The estimated forfeiture rate used was based on historical experience. As required by SFAS No. 123(R), the Company adjusts the estimated forfeiture rate based on actual experience.

As of December 31, 2007, there was $7,000 of total unrecognized compensation cost related to options granted under the employee stock purchase plan. The cost is expected to be recognized over 1 month using the straight-line attribution method.

### Business Segment

The Company conducts its business within one business segment which is defined as providing automotive media and marketing services.

### Recently Adopted Accounting Pronouncements

In June 2006, FASB's EITF reached a consensus on Issue No. 06-3, "How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement". EITF Issue 06-3 provides accounting guidance regarding the presentation of taxes assessed by a governmental authority on a revenue producing transaction between a seller and a customer such as sales and use taxes. EITF Issue 06-3 was effective for fiscal years beginning after December 15, 2006. The adoption did not have a material effect on the Company's consolidated financial position or results of operations.

In July 2006, FASB issued FIN 48 "Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109" which prescribes a recognition threshold and measurement process for recording in the financial statements uncertain tax positions taken or expected to be taken in a tax return. FIN 48 requires that a company recognize the financial statement effects of a tax position when there is a likelihood of more than 50 percent, based on the technical merits, that the position will be sustained upon examination. It also provides guidance on the derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition requirements for uncertain tax positions. The accounting provisions of FIN 48 was effective for the Company beginning January 1, 2007. The adoption of FIN 48 did not have a material effect on the Company's consolidated financial position or results of operations.

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Accounting Pronouncements Not Yet Adopted*

In June 2006, FASB's EITF reached a consensus on Issue No. 06-1, "Accounting for Consideration Given by a Service Provider to Manufacturers or Resellers of Equipment Necessary for an End-Customer to Receive Service from the Service Provider". EITF Issue 06-1 provides guidance on the accounting for consideration given to third party manufacturers or resellers of equipment which is required by the end-customer in order to utilize the service from the service provider. EITF Issue 06-1 is effective for fiscal years beginning after June 15, 2007 and its adoption is not expected to have a material effect on the Company's consolidated financial position or results of operations.

In September 2006, FASB issued SFAS No. 157, "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a frame work for measuring fair value and expands disclosure about fair value measurements. SFAS No. 157 does not require new fair value measurements but provides guidance on how to measure fair value by providing a fair value hierarchy used to classify the source of information. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007. However, on February 12, 2008, the FASB issued FASB Staff ("FSP") FAS No. 157-2 which delays the effective date for all non-financial assets and liabilities except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). FSP 157-2 defers the effective date of SFAS No. 157 to fiscal years beginning after November 15, 2008, and interim periods within the fiscal years for items within the scope of this FSP. Effective for 2008, the Company will adopt SFAS No. 157, except as it applies to those non-financial assets and non-financial liabilities as noted in FSP FAS 157-2. The Company does not expect it to have a material effect on its consolidated financial position, results of operations or cash flows.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities—Including an amendment of FASB Statement No. 115." SFAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. Subsequent measurements for the financial instruments and liabilities an entity elects to fair value will be recognized in earnings. SFAS No. 159 also establishes additional disclosure requirements. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted provided the entity also elects to apply the provisions of SFAS No. 157. The Company does not expect its adoption to have a material effect on its consolidated financial position or results of operations

The FASB issued SFAS No. 141R (revised 2007), "Business Combinations." which significantly changes the financial accounting and reporting of business combination transactions. SFAS No. 141R requires the acquiring entity in a business combination to recognize all (and only) the assets acquired and liabilities assumed in the transaction and establishes the acquisition-date fair value as the measurement objective for all assets acquired and liabilities assumed in a business combination. Certain provisions of this standard will, among other things, impact the determination of acquisition-date fair value of consideration paid in a business combination (including contingent consideration); exclude transaction costs from acquisition accounting; and change accounting practices for acquired contingencies, acquisition-related restructuring costs, in-process research and development, indemnification assets, and tax benefits. For the Company, SFAS No. 141R is effective for business combinations occurring after December 31, 2008. The Company is currently evaluating the future impacts and disclosures of this standard.

In December 2007, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 160, "Noncontrolling Interests in Consolidated Financial Statements." SFAS No. 160 amends Accounting Research Bulletin ("ARB") No. 51, "Consolidated Financial Statements" and establishes accounting and reporting standards for the noncontrolling interest (minority interest) in a subsidiary. This statement requires the reporting of all noncontrolling interests as a separate component of stockholders' equity, the reporting of consolidated net income (loss) as the amount attributable to both the parent and the noncontrolling interests and the separate disclosure of net income (loss) attributable to the parent and to the noncontrolling interests. In addition, this statement provides accounting and reporting guidance related to changes in noncontrolling ownership interests. Other than the reporting requirements described above which require retrospective application, the provisions of SFAS No. 160 are to be applied prospectively in the first annual reporting period beginning on or after December 15, 2008. As of December 31, 2007 and 2006, the Company had no noncontrolling interests on its consolidated financial statements. The Company is currently evaluating the impact of this standard, but would not expect it to have a material impact on its consolidated financial statements.

F-17

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

In December 2007, the FASB ratified the EITF consensus on EITF Issue No. 07-1, "Accounting for Collaborative Arrangements" that discusses how parties to a collaborative arrangement (which does not establish a legal entity within such arrangement) should account for various activities. The consensus indicates that costs incurred and revenues generated from transactions with third parties (i.e. parties outside of the collaborative arrangement) should be reported by the collaborators on the respective line items in their income statements pursuant to EITF Issue No. 99-19, "Reporting Revenue Gross as a Principal Versus Net as an Agent." Additionally, the consensus provides that income statement characterization of payments between the participants in a collaborative arrangement should be based upon existing authoritative pronouncements; analogy to such pronouncements if not within their scope; or a reasonable, rational, and consistently applied accounting policy election. For the Company, EITF Issue No. 07-1 is effective beginning January 1, 2009 and is to be applied retrospectively to all periods presented for collaborative arrangements existing as of the date of adoption. The Company is currently evaluating the impact of this standard on its consolidated financial statements.

*Reclassifications*

Certain reclassifications have been made to prior years' information to conform to the current year presentation. These reclassifications primarily relate to the discontinued operations of the RPM and AVV businesses and the reclassification of licensing fees from revenue to other income.

## 3. Selected Balance Sheet Accounts

*Short-Term and Long-Term Investments*

As of December 31, 2007 and 2006, the amortized cost basis, aggregate fair value, unrealized gains and losses by security type were as follows:

Available-for-sale securities consist of the following:

| | Estimated Fair Value | Gains in Accumulated Other Comprehensive Income | Loss in Accumulated Other Comprehensive Income |
|---|---|---|---|
| | | (in thousands) | |
| December 31, 2007: | | | |
| Short-term investments, available for sale: | | | |
| Equity securities | $  686 | $  686 | $  — |
| Total as of December 31, 2007 | $  686 | $  686 | $  — |

Held-to-maturity securities consist of the following:

| | Amortized Cost Basis | Aggregate Fair Value | Unrealized Gains | Unrealized Losses |
|---|---|---|---|---|
| | | (in thousands) | | |
| December 31, 2006: | | | | |
| Short-term investments, held-to-maturity: | | | | |
| Government sponsored agency bonds | $ 3,000 | $ 2,993 | $  — | $  7 |
| Total as of December 31, 2006 | $ 3,000 | $ 2,993 | $  — | $  7 |

F-18

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Accounts Receivable, Net of Allowances for Bad Debts and Customer Credits*

As of December 31, 2007 and 2006, accounts receivable and allowances for bad debts and customer credits were as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (in thousands) | |
| Accounts receivable | $12,226 | $18,048 |
| Less: | | |
|     Allowance for bad debts | (329) | (529) |
|     Allowance for customer credits | (205) | (269) |
|  | (534) | (798) |
| Accounts receivable, net | $11,692 | $17,250 |

*Property and Equipment*

Property and equipment consists of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (in thousands) | |
| Computer software and hardware | $ 11,327 | $ 10,392 |
| Furniture and equipment | 1,615 | 1,682 |
| Leasehold improvements | 1,574 | 1,342 |
| Capitalized internal use software | 9,049 | 2,055 |
| Development in process | 93 | 2,680 |
|  | 23,658 | 18,151 |
| Less—Accumulated depreciation and amortization | (12,901) | (10,197) |
|  | $ 10,757 | $ 7,954 |

During 2006, the Company recorded a charge of $0.3 million associated with the write-off of a capitalized internal use software project no longer being developed or expected to be placed in service for its intended use. This charge was included in technology support expenses. As of December 31, 2007 and 2006, capitalized internal use software, net of amortization, and development in process were $6.0 million and $2.9 million, respectively.

Depreciation and amortization expense related to property and equipment was $3.5 million, $1.9 million and $1.8 million for the years ended December 31, 2007, 2006 and 2005, respectively.

*Goodwill*

In June 2007, the Company performed an annual impairment test of enterprise goodwill and concluded that enterprise goodwill was not impaired. The decrease in the carrying amount of goodwill of $18.6 million represents the allocation of goodwill associated with the dispositions of the RPM and AVV businesses (see Note 4).

F-19

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Intangible Assets*

Intangible assets recorded as a part of acquisitions are amortized over their estimated useful lives (weighted-average life is approximately 3 years) and consist of the following:

| | | As of December 31, 2007 | | |
|---|---|---|---|---|
| | Average Estimated Useful Lives | Gross Carrying Amount | Accumulated Amortization | Net Amount |
| | | (in thousands) | | |
| Customer relationships | 3 years | $ 3,775 | $ (3,775) | $ — |
| Domain name | 5 years | 836 | (533) | 303 |
| Total | | $ 4,611 | $ (4,308) | $ 303 |

| | | As of December 31, 2006 | | |
|---|---|---|---|---|
| | Average Estimated Useful Lives | Gross Carrying Amount | Accumulated Amortization | Net Amount |
| | | (in thousands) | | |
| Developed technology | 2 years | $ 820 | $ (820) | $ — |
| Customer relationships | 3 years | 4,375 | (4,022) | 353 |
| Domain name | 5 years | 700 | (379) | 321 |
| Total | | $ 5,895 | $ (5,221) | $ 674 |

During 2007, the Company added approximately $0.1 million in domain name due to the launch of MyRide.com.

Amortization expense for the years ended December 31, 2007, 2006 and 2005 was $0.5 million, $1.5 million and $2.0 million, respectively. Amortization expense related to acquired technology is classified as cost of revenues. Amortization expense for the remaining lives of the intangible assets is estimated to be as follows:

| | Amortization Expense |
|---|---|
| | (in thousands) |
| 2008 | $ 167 |
| 2009 | 68 |
| 2010 | 27 |
| 2011 | 27 |
| 2012 | 14 |
| | $ 303 |

*Accrued Expenses*

The Company accrues expenses that are incurred and reasonably estimable based on the facts and circumstances available. As of December 31, 2007 and 2006, accrued expenses consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in thousands) | |
| Compensation and related costs | $5,638 | $4,688 |
| Professional fees | 153 | 1,612 |
| Other accrued expenses | 679 | 1,307 |
| Total accrued expenses | $6,470 | $7,607 |

F-20

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Other Current Liabilities*

As of December 31, 2007 and 2006, other current liabilities consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (in thousands) | |
| Amounts due to customers | $ 431 | $ 253 |
| Outstanding checks | 272 | 224 |
| Employee benefits | 171 | 262 |
| State income tax payable | 87 | 99 |
| Other current liabilities | 238 | 252 |
| Total other current liabilities | $1,199 | $1,090 |

## 4.  Discontinued Operations

On January 31, 2007, the Company completed the sale of certain assets and liabilities of the AIC operations to R.L. Polk ("Polk") for $3.0 million. The Company received cash of $2.1 million, net of $0.4 million associated with AIC's deferred revenues and prepaid expenses at January 31, 2007. The balance of $0.5 million was deposited by Polk in an escrow account and was distributed to the Company in the second quarter of 2007. As part of the transaction, the Company received a license to use data supplied by Polk at no cost for a period of three years and the Company licensed to Polk certain data at no cost for a period of three years and certain software at no cost in perpetuity. The Company recognized a gain on the sale of the AIC operations of $2.8 million during the year ended December 31, 2007.

On June 30, 2007, the Company sold its RPM business to Call Command, Inc. ("Call Command") pursuant to a Stock Purchase Agreement (the "RPM Agreement") for an aggregate purchase price of $7.6 million, subject to a working capital adjustment. Substantially all the assets and certain liabilities of the RPM business were included in the sale and consisted primarily of accounts receivable, prepaid expenses, certain property and equipment, intangible assets, accounts payable and accrued expenses. The Company received cash of $7.1 million and the balance of $0.5 million, which was deposited by Call Command in an escrow account, was distributed to the Company upon determination of the working capital adjustment in accordance with the terms of the RPM Agreement. The Company recognized a gain on the sale of the RPM business of $3.6 million during the year ended December 31, 2007.

On January 24, 2008, the Company completed the sales of certain assets and liabilities of its AVV data extraction and customer relationship management software business to Dominion Enterprises ("Dominion") for $22.75 million in cash, plus a working capital payment of approximately $1.1 million which remains subject to adjustment. The Company expects to record a gain of approximately $6.0 million in connection with the transaction.

In conjunction with the dispositions of the Company's RPM and AVV businesses, the Company entered into Transition Services and Arrangements Agreements ("TSAAs") whereby the Company agreed to provide certain transition services for the RPM and AVV businesses for a period not to exceed six months and eight months, respectively. The expected cash flows under the TSAAs do not represent a significant continuation of the direct cash flows of the disposed RPM or AVV businesses. The Company also agreed to indemnify each of the purchasers for pre-closing tax obligations and other pre-closing obligations and liabilities. The term of the indemnification for the pre-closing tax obligations is based on the statute of limitation as set forth by the taxing authority. The term of the indemnification for other obligations and liabilities generally range from 1 year to 3 years, with the indemnification obligation for certain specified liabilities surviving indefinitely. The maximum indemnification obligation is the purchase price of each transaction, subject to certain exceptions which have no indemnification limitation. Since it is not possible to determine whether there will be any indemnification obligations in the future or the amounts thereof, the Company cannot estimate the potential amount of future payments, if any, under these indemnification obligations. Therefore, no liability for these indemnification obligations has been recorded.

The assets and liabilities that are included in the sale of the AVV business and AIC operations met the criteria defined in SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," as of December 31, 2007 and 2006, respectively, and are classified as held for sale at December 31, 2007 and 2006, respectively. Pursuant to SFAS No. 144 and EITF Issue 03-13, "Applying the Conditions in Paragraph 42 of FASB Statement No. 144 in Determining Whether to Report Discontinued Operations," the results of operations presented in the Consolidated Financial Statements reflect the AIC operations and the RPM and AVV businesses as discontinued operations for all periods presented. As discontinued operations, revenues and expenses of the AIC operations and the RPM and AVV businesses have been aggregated and stated separately from the respective captions of continuing operations in the Consolidated Statements of Operations. Expenses

F-21

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

include direct costs of the business that will be eliminated from future operations as a result of the sale of the AIC operations and the RPM and AVV businesses. Assets and liabilities that are included in the sale of the AIC operations and AVV business have been aggregated and classified as held for sale under current assets, long-term assets and current liabilities. Current assets are comprised of accounts receivable and prepaid expenses. Current liabilities are comprised of deferred revenues, commissions payable and other liabilities. All other references to operating results reflect the ongoing operations of the Company, excluding the AIC operations and the RPM and AVV businesses.

The assets and liabilities attributable to the AIC operations held for sale at December 31, 2006 consist of the following:

|  | Year Ended December 31, 2006 |
| --- | --- |
|  | (in thousands) |
| Prepaid expenses and other current assets | 2 |
| Deferred revenue | (393) |
|  | $     (391) |

The results of operations of the AIC operations reported as discontinued operations are summarized as follows:

### AIC STATEMENTS OF OPERATIONS
### (Amounts in thousands)

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
| Revenues | $  210 | $3,087 | $3,215 |
| Costs and expenses: |  |  |  |
| Cost of revenues | 10 | 154 | 59 |
| Sales and marketing | 68 | 478 | 386 |
| Technology support | 193 | 1,584 | 2,224 |
| General and administrative | 32 | 41 | 1 |
| Total costs and expenses | 303 | 2,257 | 2,670 |
| Gain on sale | 2,762 | — | — |
| Income from discontinued operations | $2,669 | $  830 | $  545 |

The results of operations of the RPM business reported as discontinued operations are summarized as follows:

### RPM STATEMENTS OF OPERATIONS
### (Amounts in thousands)

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
| Revenues | $7,145 | $14,303 | $14,157 |
| Costs and expenses: |  |  |  |
| Cost of revenues | 3,346 | 7,825 | 7,145 |
| Sales and marketing | 3,303 | 5,230 | 4,673 |
| Technology support | 287 | 1,919 | 2,632 |
| General and administrative | 53 | 59 | 93 |
| Amortization of intangible assets | 43 | 180 | 193 |
| Total costs and expenses | 7,032 | 15,213 | 14,736 |
| Gain on sale | 3,576 | — | — |
| Provision for income taxes | (9) | — | (65) |
| Income (loss) from discontinued operations | $3,680 | $  (910) | $  (644) |

Table of Contents

AUTOBYTEL INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The assets and liabilities attributable to the AVV business held for sale consist of the following:

|  | Year Ended December 31, 2007 |
|---|---|
|  | (in thousands) |
| Accounts receivable, net | $ 1,328 |
| Prepaid expenses and other current assets | 27 |
| Property and equipment, net | 141 |
| Goodwill | 15,664 |
| Accounts payable | (50) |
| Accrued expenses | (17) |
| Deferred revenue | (119) |
| Other current liabilities | (12) |
|  | $ 16,962 |

The results of operations of the AVV business reported as discontinued operations are summarized as follows:

### AVV STATEMENTS OF OPERATIONS
#### (Amounts in thousands)

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Revenues | $10,559 | $11,554 | $10,723 |
| Costs and expenses: | | | |
| Cost of revenues | 88 | 206 | 291 |
| Sales and marketing | 2,007 | 2,267 | 2,319 |
| Technology support | 2,137 | 1,941 | 2,000 |
| General and administrative | 745 | 1,043 | 581 |
| Amortization of intangible assets | — | 17 | 40 |
| Total costs and expenses | 4,977 | 5,474 | 5,231 |
| Provision for income taxes | — | (141) | (200) |
| Income from discontinued operations | $ 5,582 | $ 5,939 | $ 5,292 |

5.  **International Operations**

Autobytel.Europe was organized and formed in 1997 to expand the Company's business model and operations throughout Europe.

In December 2005, the Company received $3.9 million from Autobytel.Europe as part of an agreement to dissolve Autobytel.Europe and recognized a foreign currency exchange gain of $1.5 million.

Autobytel.Europe's total revenue for the year ended December 31, 2005 was $0.3 million. Autobytel.Europe did not generate any revenue for the years ended December 31, 2007 and 2006 as a result of the substantial liquidation. The dissolution of Autobytel.Europe was completed in February 2007.

F-23

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

On October 25, 2007, the Company sold its 9.41% investment in Autobytel Japan to SBI Holdings Inc. for approximately $4.0 million in cash. In connection with the sale, the Company entered into the 2 nd Amended and Restated License Agreement with Autobytel Japan pursuant to which the Company will provide it a perpetual, royalty-free, non-exclusive, non-transferable license for certain intellectual property. The Company does not have any continuing performance obligations under the license agreement. The Company's investment in Autobytel Japan at the date of the sale was zero as the investment amount had been previously written down. The $4.0 million in cash was received in November 2007 and was reported as other income in the fourth quarter of 2007.

**6.    Commitments and Contingencies**

*Operating Leases*

The Company leases its facilities, certain office equipment and a domain name under operating leases which expire on various dates through 2011. As of December 31, 2007, future minimum lease payments on leases with non-cancelable terms in excess of one year were as follows (in thousands):

| Years Ending December 31, | |
| --- | --- |
| 2008 | $1,545 |
| 2009 | 1,477 |
| 2010 | 1,108 |
| 2011 | 22 |
| Thereafter | — |
| | $4,152 |

Rent expense included in costs and expenses from continuing operations was $1.6 million, $1.6 million and $1.5 million for the years ended December 31, 2007, 2006 and 2005, respectively.

*Guarantees*

The Company guarantees operating lease commitments related to the facility in Troy, Michigan for some of its wholly-owned subsidiaries. The maximum guarantee amount is approximately $0.3 million which represents the remaining commitment, through January 2012, on such operating lease arrangements as of December 31, 2007.

*Employment Agreements*

As of December 31, 2007, Autobytel had agreements with James E. Riesenbach, Chief Executive Officer and President, Monty A. Houdeshell, Executive Vice President and Chief Financial Officer, Ariel Amir, Executive Vice President and Chief Legal and Administrative Officer, Russell Bartlett, Senior Vice President, CRM and Data Services, Mark Garms, Senior Vice President, Dealer Operations and Strategy, Jonathan Rosen, Senior Vice President, Web Business Operations, and Mark Canon, Senior Vice President and Chief Product Officer. In the event of termination, non-renewal or change of control, Mr. Riesenbach is entitled to payments of two times the sum of his annual base salary and a bonus of 100% of base salary and benefits for twenty four months. In the event of termination or non-renewal, Mr. Houdeshell is entitled to payments of one year base salary plus bonus of 60% of base salary and benefits for twelve months. In the event of termination or non-renewal, Mr. Amir is entitled to payments of one year base salary plus bonus of 50% of base salary and benefits for twelve months. Messrs. Houdeshell and Amir are also entitled to additional severance payments in the event of a change of control. The agreements for Messrs. Riesenbach, Amir and Houdeshell also provide that if compensation in the event of a change of control is deemed to be parachute payments under the Internal Revenue Code, then the Company will make additional payments to compensate for their additional tax obligations. The agreement for Mr. Riesenbach expires on March 20, 2009 and provides for a one year extension. If the agreement with Mr. Riesenbach expires by its terms upon the expiration of the additional one year period, Mr. Riesenbach is entitled to receive a severance payment equal to two times his highest annual base salary as well as benefits for twelve months following such expiration. The agreements of Messrs. Amir and Houdeshell expire on July 19, 2009 and January 30, 2010, respectively, and automatically renew for additional one year periods unless either Autobytel or the applicable officer notifies the other of its or his intent not to renew no later than one hundred twenty days prior to the expiration of the then current term. In addition, the agreements provide for vesting of options upon a change of control. In addition, certain other officers, including Messrs. Rosen and Garms, are entitled to six months' base salary in the event of a termination without cause or for good reason and six months of benefits following

Table of Contents

## AUTOBYTEL INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

termination. Mr. Canon is entitled to twelve months' base salary in the event of a termination without cause or for good reason and twelve months of benefits following termination. In February 2008, Mr. Bartlett received twelve months' base salary upon his termination of employment. Mr. Bartlett is also entitled to twelve months of benefits. Mr. Garms holds certain options that vest upon a change of control. The agreements with such officers are 'at will'.

*Litigation*

In August 2001, a purported class action lawsuit was filed in the United States District Court for the Southern District of New York against Autobytel and certain of the Company's current and former directors and officers (the "Autobytel Individual Defendants") and underwriters involved in the Company's initial public offering. A Consolidated Amended Complaint, which is now the operative complaint, was filed on April 19, 2002. This action purports to allege violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Plaintiffs allege that the underwriter defendants agreed to allocate stock in the Company's initial public offering to certain investors in exchange for excessive and undisclosed commissions and agreements by those investors to make additional purchases of stock in the aftermarket at pre-determined prices. Plaintiffs allege that the prospectus for the Company's initial public offering was false and misleading in violation of the securities laws because it did not disclose these arrangements. The action seeks damages in an unspecified amount. The action is being coordinated with approximately 300 other nearly identical actions filed against other companies. On October 9, 2002, the District Court dismissed the Autobytel Individual Defendants from the case without prejudice. On February 19, 2003, the District Court denied the Company's motion to dismiss the complaint. On December 5, 2006, the Second Circuit vacated a decision by the District Court granting class certification in six of the coordinated cases, which are intended to serve as test, or "focus" cases. The plaintiffs selected these six cases, which do not include the Company. On April 6, 2007, the Second Circuit denied the petition for rehearing filed by the plaintiffs, but noted that the plaintiffs could ask the District Court to certify more narrow classes than those that were rejected.

Prior to the Second Circuit's December 5, 2006 ruling, the majority of issuers, including the Company, and their insurers had submitted a settlement agreement to the District Court for approval. In light of the Second Circuit opinion, the parties agreed that the settlement could not be approved. On September 25, 2007, the District Court approved a stipulation filed by the plaintiffs and the issuers which terminated the proposed settlement. On August 14, 2007, the plaintiffs filed amended complaints in the six focus cases. The amended complaints include a number of changes, such as changes to the definition of the purported class of investors, and the elimination of the individual defendants as defendants. The six focus case issuers and the underwriters named as defendants in the focus cases filed motions to dismiss the amended complaints against them on November 14, 2007. On September 27, 2007, the plaintiffs filed a motion for class certification in the six focus cases. On December 21, 2007, the issuers and the underwriters filed papers opposing plaintiffs' class certification motion and plaintiffs filed an opposition to defendants' motions to dismiss. On January 28, 2008, the issuers and the underwriters filed reply briefs in further support of their motions to dismiss the amended complaints. Due to the inherent uncertainties of litigation, the Company cannot accurately predict the ultimate outcome of the matter. The Company cannot predict whether it will be able to renegotiate a settlement that complies with the Second Circuit's mandate. If the Company is found liable, the Company is unable to estimate or predict the potential damages that might be awarded, whether such damages would be greater than its insurance coverage, or whether such damages would have a material impact on its results of operations, financial condition or cash flows in any future period.

Between April and September 2001, eight separate purported class actions virtually identical to the one filed against Autobytel were filed against Autoweb.com, Inc. ("Autoweb"), certain of Autoweb's former directors and officers (the "Autoweb Individual Defendants") and underwriters involved in Autoweb's initial public offering. A Consolidated Amended Complaint, which is now the operative complaint, was filed on April 19, 2002. It purports to allege violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Plaintiffs allege that the underwriter defendants agreed to allocate stock in Autoweb's initial public offering to certain investors in exchange for excessive and undisclosed commissions and agreements by those investors to make additional purchases of stock in the aftermarket at pre-determined prices. Plaintiffs allege that the prospectus for Autoweb's initial public offering was false and misleading in violation of the securities laws because it did not disclose these arrangements. The action seeks damages in an unspecified amount. The action is being coordinated with approximately 300 other nearly identical actions filed against other companies. On October 9, 2002, the District Court dismissed the Autoweb Individual Defendants from the case without prejudice. On February 19, 2003, the District Court dismissed Autoweb's motion to dismiss the complaint. On December 5, 2006, the Second Circuit vacated a decision by the District Court granting class certification in six of the coordinated cases, which are intended to serve as test, or "focus" cases. The plaintiffs selected these six cases, which do not include Autoweb. On April 6, 2007, the Second Circuit denied a petition for rehearing filed by the plaintiffs, but noted that the plaintiffs could ask the District Court to certify more narrow classes than those that were rejected.

F-25

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Prior to the Second Circuit's December 5, 2006 ruling, the majority of issuers, including Autoweb, and their insurers had submitted a settlement agreement to the District Court for approval. In light of the Second Circuit opinion, the parties agreed that the settlement could not be approved. On September 25, 2007, the District Court approved a stipulation filed by the plaintiffs and the issuers which terminated the proposed settlement. On August 14, 2007, the plaintiffs filed amended complaints in the six focus cases. The amended complaints include a number of changes, such as changes to the definition of the purported class of investors, and the elimination of the individual defendants as defendants. The six focus case issuers and the underwriters named as defendants in the focus cases filed motions to dismiss the amended complaints against them on November 14, 2007. On September 27, 2007, the plaintiffs filed a motion for class certification in the six focus cases. On December 21, 2007, the issuers and the underwriters filed papers opposing plaintiffs' class certification motion and plaintiffs filed an opposition to defendants' motions to dismiss. On January 28, 2008, the issuers and the underwriters filed reply briefs in further support of their motions to dismiss the amended complaints. Due to the inherent uncertainties of litigation, the Company cannot accurately predict the ultimate outcome of the matter. The Company cannot predict whether Autoweb will be able to renegotiate a settlement that complies with the Second Circuit's mandate. If Autoweb is found liable, the Company is unable to estimate or predict the potential damages that might be awarded, whether such damages would be greater than Autoweb's insurance coverage, or whether such damages would have a material impact on the Company's results of operations, financial condition or cash flows in any future period.

The Company reviewed the above class action matters and does not believe that it is probable that a loss contingency has occurred; therefore, the Company has not recorded a liability against these claims as of December 31, 2007.

On October 21, 2005, Autobytel received a complaint as well as a demand for arbitration/statement of claim filed by certain former shareholders of Stoneage Corporation ("Stoneage"). The complaint was filed in the Central District of California and names the Company as well as certain current and former officers and directors as defendants. The demand for arbitration was filed with the American Arbitration Association and names the same group of defendants. The allegations and claims in both of these matters are virtually identical and stem from the acquisition of Stoneage by the Company on April 15, 2004. Both the complaint and demand for arbitration contain causes of action for: breach of the acquisition agreement, breach of the registration rights agreement, violations of California Corporations Code Sections 25401 and 25501, violations of California Corporations Code Sections 25400 and 25500, fraud, negligent misrepresentation, fraudulent concealment, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The demand for arbitration also contains a cause of action for violation of Section 17(a) of the Securities Act of 1933. The complaint and demand for arbitration seek unspecified damages and attorneys' fees and costs, as well as rescission and punitive awards. The defendants have not responded to either the complaint or demand for arbitration. On November 29, 2005, the parties requested that the arbitration be stayed, and on February 8, 2006, the plaintiffs dismissed the complaint without prejudice. On May 2, 2007, the parties tentatively agreed to a settlement in principle, and a settlement agreement was negotiated and fully executed in September 2007. The Company recorded a liability of $1.0 million against this claim as of March 31, 2007. Payments in accordance with the settlement agreement were made by the Company and its insurer in October 2007.

In August 2007, AVV, Inc. received a letter from a customer claiming indemnification regarding an action brought against such customer for alleged patent infringement. The customer later made a similar claim against the Company. The Company and AVV are in discussions with such customer regarding such claim. The Company cannot currently predict the outcome of this matter, which, depending on the outcome, may have a material impact on its results of operations, financial condition or cash flows.

On November 30, 2007, the Company filed a lawsuit in the United States District Court for the Eastern District of Texas against Insweb Corporation, Leadpoint, Inc., Internet Brands, Inc. and Auto Internet Marketing, Inc. In the lawsuit, the Company asserted infringement of U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests," against such parties, and sought damages and a permanent injunction. The Company cannot assure that the patent will be enforceable or that the above action will be successful.

On March 11, 2008, Insweb Corporation filed a lawsuit in the United States District Court for the Southern District of California against the Company, one of its subsidiaries and Dominion Enterprises, the purchaser of the AVV business. In the lawsuit, Insweb asserted infringement of U.S. Patent No. 6,898,597, entitled "Event Log", by marketing and selling the WebControl product of the AVV business and is seeking damages and a permanent injunction. The Company intends to vigorously defend the lawsuit. Dominion has asserted an indemnity claim under the purchase agreement relating to the sale of the AVV business. The Company is obligated to indemnify Dominion for this claim subject to and in accordance with the terms of the purchase agreement. The Company cannot currently predict the outcome of this matter, which, depending on the outcome, may have a material impact on its results of operations, financial condition or cash flows.

F-26

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

On March 13, 2008, Edmunds Holding Company et. al filed a lawsuit in the United States District Court for the District of Delaware against the Company. In the lawsuit, Edmunds is seeking a declaration that its business activities, some of which include generating automotive leads, do not infringe the Company's U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests" and that such patent is invalid. The Company intends to vigorously defend the lawsuit. The Company cannot currently predict the outcome of this matter, which, depending on the outcome, may have a material impact on its results of operations, financial condition or cash flows.

From time to time, the Company is involved in other litigation matters arising from the normal course of its business activities. The actions filed against the Company and other litigation, even if not meritorious, could result in substantial costs and diversion of resources and management attention, and an adverse outcome in litigation could materially adversely affect its business, results of operations, financial condition and cash flows.

## 7.  Retirement Savings Plan

The Company has a retirement savings plan which qualifies as a deferred salary arrangement under Section 401(k) of the Internal Revenue Code (IRC or Code) (the 401(k) Plan.) The 401(k) Plan covers all employees of the Company who are over 21 years of age and is effective on the first day of the month following date of hire. Under the 401(k) Plan, participating employees are allowed to defer up to 50% of their pretax salaries not to exceed the maximum IRC deferral amount. The Company contributions to the 401(k) Plan are discretionary. During 2007, 2006 and 2005, the Company contributed $0.5 million, $0.6 million and $0.6 million, respectively, related to continuing operations and $0.1 million, $0.1 million and $0.2 million, respectively, related to discontinued operations.

## 8.  Stockholders' Equity

*Preferred Stock*

As of December 31, 2007, 11,445,187 shares of preferred stock with a $0.001 par value were authorized and undesignated. There were no shares of preferred stock issued or outstanding as of December 31, 2007.

*1996 Stock Incentive Plan*

The Company's 1996 Stock Incentive Plan (the Incentive Plan) was approved by the Board of Directors in October 1996. The Incentive Plan provides for the granting to employees of incentive stock options within the meaning of Section 422 of the Code, and for the granting to employees, directors and consultants of nonstatutory stock options and stock purchase rights. The Company has reserved a total of 833,333 shares of common stock for issuance under the Incentive Plan. The exercise price of stock options granted under the Incentive Plan cannot be lower than the fair market value of the common stock, as determined by the Board of Directors, on the date of grant. With respect to any participants who, at the time of grant, own stock possessing more than 10% of the voting power of all classes of stock of the Company, the exercise price of stock options granted to such person must be at least 110% of the fair market value on the grant date, and the maximum term of such options is five years. The term of all other options granted under the Incentive Plan may be up to 10 years. Stock options granted under the Incentive Plan vest according to vesting schedules determined by the Board of Directors.

*1998 Stock Option Plan*

The Company's 1998 Stock Option Plan (the 1998 Option Plan) was adopted in December 1998. The Company has reserved 1,500,000 shares under the 1998 Option Plan. The 1998 Option Plan provides for the granting to employees of incentive stock options within the meaning of the Code and nonstatutory stock options.

The exercise price of non-statutory options granted under the 1998 Option Plan cannot be lower than 85% of the fair market value of the common stock on the date of grant. The exercise price of all incentive stock options granted cannot be lower than the fair market value on the grant date. With respect to any participants who beneficially own more than 10% of the voting power of all classes of stock of the Company, the exercise price of any stock option granted to such person must be at least 110% of the fair market value on the grant date, and the maximum term of such option is five years. The term of all other options granted under the 1998 Option Plan may be up to 10 years. Under the 1998 Option Plan, certain stock options (Performance Options) vest over a time period determined by the Board of Directors, however, the vesting could be accelerated based on the performance of the Company's common stock. At December 31, 2007, there were no non-vested performance options outstanding under the 1998 Option Plan.

Table of Contents

# AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The 1998 Option Plan provides that, unless otherwise provided in the stock option agreement, in the event of any merger, consolidation, or sale or transfer of all or any part of the Company's business or assets, all rights of the optionee with respect to the unexercised portion of any option will become immediately vested and may be exercised immediately, except to the extent that any agreement or undertaking of any party to any such merger, consolidation, or sale or transfer of assets makes specific provisions for the assumption of the obligations of the Company with respect to the 1998 Option Plan. All stock options granted under the 1998 Option Plan vest according to vesting schedules determined by the Board of Directors.

### 1999 Stock Option Plan

The Company's 1999 Stock Option Plan (the 1999 Option Plan) was adopted in January 1999. The Company has reserved 1,800,000 shares under the 1999 Option Plan. The 1999 Option Plan provides for the granting of stock options to employees of the Company. Under the 1999 Option Plan, not more than 1,000,000 shares may be issued pursuant to options granted after March 31, 1999.

The 1999 Option Plan provides for an automatic grant of an option to purchase 20,000 shares of common stock to each non-employee director on the date on which the person first becomes a non-employee director. In each successive year the non-employee director will automatically be granted an option to purchase 5,000 shares on November 1 each subsequent year provided the non-employee director has served on the Board of Directors for at least six months. Each option will have a term of 10 years and will be granted at the fair market value of the Company's common stock on the date of grant. The options vest in their entirety and become exercisable on the first anniversary of the grant date, provided that the optionee continues to serve as a director on such date.

The 1999 Option Plan is similar in all other material respects to the 1998 Option Plan.

### 1999 Employee and Acquisition Related Stock Option Plan

The Company's 1999 Employee and Acquisition Related Stock Option Plan (the Employee and Acquisition Option Plan) was approved by the Board of Directors in September 1999. The Company has reserved a total of 1,500,000 shares of common stock for issuance under the Employee and Acquisition Option Plan. The Employee and Acquisition Option Plan provides for the granting to employees and acquired employees of stock options, and for the granting to employees, acquired employees and service providers of nonstatutory stock options. The exercise price of incentive stock options granted can not be lower than the fair market value on the date of grant and the exercise price of nonstatutory stock options can not be less than 85% of the fair market value of the common stock on the date of grant. The exercise price of stock options granted to individuals beneficially owning more than 10% of the voting power of all classes of the Company stock must be at least 110% of the fair market value on the grant date and have a maximum term of five years. The term of all other options granted under the Employee and Acquisition Option Plan may be up to 10 years. Stock options granted under the Employee and Acquisition Option Plan vest according to vesting schedules determined by the Board of Directors.

### 2000 Stock Option Plan

The Company's 2000 Stock Option Plan (the 2000 Option Plan) was approved by the Board of Directors in April 2000. The 2000 Option Plan provides for the granting of both incentive stock options and nonqualified stock options to eligible employees, consultants and outside directors of the Company. The Company has reserved 3,000,000 shares under the 2000 Option Plan. Stock options granted under the 2000 Option Plan vest according to vesting schedules determined by the Board of Directors.

The 2000 Option Plan is similar in all other material respects to the 1999 Option Plan.

### Amended and Restated 2001 Restricted Stock and Option Plan

On February 25, 2003, the Board of Directors approved the Amended and Restated 2001 Restricted Stock and Option Plan, which was approved by stockholders on June 25, 2003 (the Restricted Plan). The Restricted Plan allows for the granting of restricted stock, deferred share awards, stock options and stock appreciation rights to selected directors, officers, employees, consultants or other service providers of the Company. The Company has reserved 1,500,000 shares under the Restricted Plan. The Restricted Plan prohibits anyone from receiving awards for more than 400,000 shares per year. The Board of Directors may grant awards that vest immediately or based on future conditions. The Board of Directors has the discretionary authority to impose, in agreements, such restrictions on shares of common stock issued pursuant to restricted stock awards under the Restricted Plan as it may deem appropriate or desirable, including but not limited to the authority to impose a right of first refusal or to establish repurchase rights or both of these restrictions. Any repurchase right of the Company lapses on consummation of a change of control. Options may be either incentive stock options or nonqualified stock options. The per share exercise price of an incentive stock option shall not be less than 100% of the fair market value of a share on the date the option is granted (110% in the case of a grant to a ten-percent stockholder). The per share exercise price of a nonqualified stock option shall not be less than 85% of the fair market value of a share on the date the option is granted. No option shall be exercisable after the expiration of ten years from its

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

grant date (five years in the case of an incentive stock option granted to a ten-percent stockholder). Options granted to optionees who are not directors, officers, or consultants must become exercisable at a rate no longer than 20% per year for five years from the grant date. Except as described below and as provided in the Restricted Plan, participants will not have any rights in the event that the Company is sold, merged, or otherwise reorganized. Unless the award agreement provides differently or unless any party to the merger, consolidation, or sale or transfer of the Company assets assumes the Company's obligations with respect to awards under the Restricted Plan, the unvested portion of awards will become immediately vested upon any merger (other than a merger in which the Company is the surviving entity and the terms and number of outstanding shares remain unchanged as compared to the terms and number of outstanding shares prior to the merger), consolidation, or sale or transfer of the Company assets.

*2004 Restricted Stock and Option Plan*

The Company's 2004 Restricted Stock and Option Plan (the 2004 Plan) was adopted by the Board of Directors on March 2, 2004, and approved by the stockholders on June 24, 2004. The 2004 Plan provides that an aggregate of 2,700,000 shares of the Company's common stock are available to be awarded to the Company's directors, officers, employees, consultants, or other service providers in the form of restricted shares, restricted units, deferred shares, options, SARs, and performance units; provided, that the maximum number of shares that can be awarded in the form of restricted shares, restricted units, deferred shares, or performance awards cannot exceed 200,000 shares. The 2004 Plan prohibits anyone from receiving an award of more than 500,000 shares of the Company's common stock during any one calendar year, or 1,000,000 shares of the Company's common stock during the term of the 2004 Plan. In addition, the 2004 Plan prohibits anyone from receiving performance units in any performance period (which shall not be less than one fiscal year) in excess of $2,500 in cash. The Board of Directors may grant awards that vest immediately or based on future conditions. The Board of Directors has the discretionary authority to impose certain restrictions on awards, including repurchase rights in favor of the Company. The per share exercise price of both incentive and nonstatutory stock options shall not be less than 100% of the fair market value of a share on the date the option is granted (110% in the case of a grant to a ten-percent stockholder). No option shall be exercisable after the expiration of ten years from its grant date (five years in the case of an incentive stock option granted to a ten-percent stockholder). Options granted to optionees who are not directors, officers, or consultants must become exercisable at a rate no longer than 20% per year for five years from the grant date. Unless the award agreement provides differently or unless any party to the merger, consolidation, or sale or transfer of the Company assets assumes the Company's obligations with respect to awards under the 2004 Plan, the unvested portion of awards will become immediately vested upon any merger (other than a merger in which the Company is the surviving entity and the terms and number of outstanding shares remain unchanged as compared to the terms and number of outstanding shares prior to the merger), consolidation, or sale or transfer of the Company assets. Unless the award agreement provides differently, upon any liquidation or dissolution of the Company as provided in the 2004 Plan, all of the rights to any portion of unvested awards will end, and the awards will be canceled at the time of the liquidation or dissolution unless the relevant dissolution or liquidation plan provides otherwise.

*2006 Inducement Stock Option Plan*

In June 2006, the 2006 Inducement Stock Option Plan (the 2006 Plan) was approved by the Board of Directors. The 2006 Plan provides that an aggregate of 2,000,000 shares of the Company's common stock are available to be awarded to the Company's newly hired employees or appointed directors, solely in connection with the hiring of the employee or appointing of the director, in the form of nonqualified stock options. The per share exercise price of the stock options shall not be less than 100% of the fair market value of a share on the date of grant. No option shall be exercisable after the expiration of ten years from its grant date. An optionee who is not an officer or a director must have the right to exercise at least 20% of the options granted per year over five years from the date of grant. Unless the award agreement provides differently, the unvested portion of the awards will immediately become vested upon any merger (other than a merger in which the Company is the surviving entity and the terms remain unchanged as compared to the terms prior to the merger), consolidation, or sale or transfer of the Company's assets, except if the options are assumed by the acquiring party. Unless the award agreement provides differently, upon any liquidation or dissolution of the Company, all the rights to any portion of unvested awards will end, and the awards will be canceled at the time of the liquidation or dissolution unless the relevant dissolution or liquidation plan provides otherwise.

To induce Monty A. Houdeshell to join the Company as Chief Financial Officer, on January 30, 2007, the Company entered into an agreement with Mr. Houdeshell whereby the Company granted 300,000 options to him at an exercise price of $3.74 per share. Of the 300,000 options granted, 250,000 were service-based awards and met the criteria for granted options in accordance with SFAS No. 123(R) as of January 30, 2007. The remaining 50,000 options are performance-based awards where the future performance criteria were to be defined at a future date. As such, in accordance with SFAS No. 123(R), the awards are not considered granted until such time that the performance criteria have been defined. On July 17, 2007, the Compensation Committee of the Board of Directors established performance criteria for the vesting of 16,667 performance-based options held by Mr. Houdeshell. The performance criteria are based upon the attainment by the Company of certain

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

revenue, earnings before income taxes, depreciation and amortization (EBITDA) and strategic goals. Therefore, under SFAS No. 123(R), the total performance-based awards of 16,667 were deemed granted as of July 17, 2007 and are included in the outstanding options at December 31, 2007, and the Company began recognizing compensation expense for these awards as of July 17, 2007. As of December 31, 2007, there remain 33,333 performance-based options for which the performance criteria are not yet defined. These options are not included in outstanding options at December 31, 2007 and the Company will begin recognizing share-based compensation expense based on the fair value of the remaining 33,333 performance-based options on the date the performance criteria have been defined.

The 16,667 performance-based options granted to Mr. Houdelshell in 2007 had a fair value of $2.42 per award based on the Black-Scholes option-pricing model and the following assumptions: expected dividend yield of 0%, expected volatility of 62.01%, expected risk-free interest rate of 5.02% and an expected term of 4.36 years. Total expense recorded for these performance-based options was $28,000 in 2007.

### 2006 Riesenbach Options

In connection with hiring Mr. Riesenbach as President and Chief Executive Officer on March 20, 2006, Mr. Riesenbach was granted stock options to purchase 1,000,000 shares of common stock, which vest, as to 333,333 of the options, on March 20, 2007, and thereafter (i) 11,111 of the options vest on each monthly anniversary of the grant date over the period beginning on the 13th monthly anniversary and ending on the 35th monthly anniversary of the grant date, (ii) 11,114 of the options vest on the day immediately preceding the 36th monthly anniversary of the grant date, provided that the vesting of such options will accelerate upon a change of control, or termination due to death or disability, by the Company without cause or by Mr. Riesenbach for good reason, and (iii) 200,000 of the options will vest upon each filing by the Company of its Annual Report on Form 10-K for each of the fiscal years ending on December 31, 2007 and December 31, 2008 provided Mr. Riesenbach is actively employed by the Company on the respective vesting dates and Mr. Riesenbach and the Company have satisfied reasonable performance criteria established by the Board of Directors or a committee thereof in its sole discretion after consulting with Mr. Riesenbach, provided that the vesting of such options will accelerate upon a change of control. Most vested options held by Mr. Riesenbach may be exercised for two years after termination other than in the event of termination for cause.

To induce Mr. Riesenbach to join the Company as Chief Executive Officer and President, on March 20, 2006, the Company entered into an agreement with Mr. Riesenbach whereby the Company granted 1,000,000 options to him at an exercise price of $4.68. Of the 1,000,000 options granted, 600,000 were service-based awards and met the criteria for granted options in accordance with SFAS No. 123(R) as of March 20, 2006. The remaining 400,000 options are performance-based awards where the future performance criteria will be defined at a future date. As such, in accordance with SFAS No. 123(R), the awards are not considered granted and are not included in outstanding options until such time that the performance criteria have been defined. On July 17, 2007, the Compensation Committee of the Board of Directors established performance criteria for the vesting of 200,000 performance-based options held by Mr. Riesenbach. The performance criteria are based upon the attainment by the Company of certain revenue, earnings before income taxes, depreciation and amortization (EBITDA) and strategic goals. Therefore, under SFAS No. 123(R), the total performance-based awards of 200,000 were deemed granted as of July 17, 2007 and are included in the outstanding options at December 31, 2007, and the Company began recognizing compensation expense for these awards as of July 17, 2007. As of December 31, 2007, there remain 200,000 performance-based options for which the performance criteria are not yet defined. These options are not included in outstanding options at December 31, 2007 and the Company will begin recognizing share-based compensation expense based on the fair value of the remaining 200,000 performance-based options on the date the performance criteria have been defined.

The 200,000 performance-based options granted to Mr. Riesenbach in 2007 had a fair value of $2.18 per award based on the Black-Scholes option-pricing model and the following assumptions: expected dividend yield of 0%, expected volatility of 62.01%, expected risk-free interest rate of 5.02% and an expected term of 4.36 years. Total expense recorded for these performance-based options was $0.3 million in 2007.

### Outstanding Stock Options and Stock Option Activity

The Company grants incentive and non-qualified stock options at an exercise price equal to the market closing price at the date of grant and that vest according to vesting schedules determined by the Board of Directors or a committee thereof. Shares of common stock issued upon exercise of stock options or awards under the employee stock purchase plan are from previously unissued shares.

F-30

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

A summary of the Company's outstanding stock options as of December 31, 2007, and changes during the year then ended is presented below:

| | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| Outstanding at December 31, 2006 | 10,661,551 | $ 5.08 | | |
| Granted | 1,155,167 | 3.73 | | |
| Exercised | (1,014,412) | 2.01 | | |
| Forfeited and expired | (1,815,670) | 7.20 | | |
| Outstanding at December 31, 2007 | 8,986,636 | $ 4.82 | 6.57 | $ 708,101 |
| Vested and expected to vest at December 31, 2007 | 8,194,461 | $ 4.96 | 6.36 | $ 698,655 |
| Exercisable at December 31, 2007 | 6,288,188 | $ 5.37 | 5.58 | $ 669,361 |

The total intrinsic value of options exercised during 2007, 2006 and 2005, was $1.6 million, $0.4 million and $0.4 million, respectively.

As of December 31, 2007, 2,393,657 stock options were available for grant under the Company's stock option plans.

*1996 Employee Stock Purchase Plan*

The Company's 1996 Employee Stock Purchase Plan (Purchase Plan) was adopted by the Board of Directors in November 1996. On February 25, 2003, the Board of Directors approved an amendment providing for an additional 300,000 shares of common stock issuable over a ten-year period ending on February 24, 2013. The amendment was approved by stockholders on June 25, 2003. On April 17, 2007, the Board of Directors approved an amendment providing for an additional 350,000 shares of common stock issuable over a ten-year period ending on April 17, 2017. The amendment was approved by stockholders on June 22, 2007. The Purchase Plan, which is intended to qualify under Section 423 of the Code, permits eligible employees of the Company to purchase shares of common stock through payroll deductions of up to ten percent of their compensation, up to a certain maximum amount for all purchase periods ending within any calendar year. The Company has reserved a total of 1,094,444 shares of common stock for issuance under the Purchase Plan. The price of common stock purchased under the Purchase Plan will be 85% of the lower of the fair market value of the common stock on the first or last day of each six month purchase period. Employees may end their participation in the Purchase Plan at any time during an offering period, and they will be paid their payroll deductions to date. Participation ends automatically upon termination of employment with the Company.

A summary of the Company's outstanding awards under the employee stock purchase plan as of December 31, 2007, and changes during the period then ended is presented below:

| | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| Outstanding at December 31, 2006 | 83,827 | $ 2.69 | | |
| Granted | 130,817 | 2.88 | | |
| Exercised | (108,381) | 2.83 | | |
| Forfeited | (39,522) | 2.87 | | |
| Outstanding at December 31, 2007 | 66,741 | $ 2.73 | 1 month | $ 1 |
| Vested and expected to vest at December 31, 2007 | 60,934 | $ 2.73 | 1 month | $ 1 |

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Preferred Shares Purchase Rights Plan*

In July 2004, the Board of Directors approved the adoption of a stockholder rights plan under which all stockholders of record as of August 10, 2004 received rights to purchase shares of Series A Junior Participating Preferred Stock. The rights were distributed as a non-taxable dividend and will expire July 30, 2014.

The rights will be exercisable only if a person or group acquires 15% or more of the common stock of the Company or announces a tender offer for 15% or more of the common stock. If a person or group acquires 15% or more of the common stock, all rightholders, except the acquirer, will be entitled to acquire at the then exercise price of a right that number of shares of the Company's common stock which at the time will have a market value of two times the exercise price of the right. Under certain circumstances, all rightholders, other than the acquirer, will be entitled to receive at the then exercise price of a right that number of shares of common stock of the acquiring company which at the time will have a market value of two times the exercise price of the right. The initial exercise price of a right is $65.00.

The Board of Directors may terminate the rights plan at any time or redeem the rights prior to the time a person or group acquires more than 15% of the Company's common stock.

## 9. Accrued Liability for Work Force Reduction

As part of the Company's cost reduction efforts, in the fourth quarter of 2007, the Company initiated a workforce reduction of approximately 14% of its workforce. The affected employees were mostly in the areas of accounting and finance, information technology, and other general and administrative related areas. The reduction was effected in order to reduce the Company's overall cost structure and generate operational efficiencies across product lines. The Company estimates the charges associated with the reduction in workforce will range between $0.9 million and $1.0 million, $0.9 million of which was expensed in the fourth quarter of 2007 with the remainder to be incurred in the first quarter of 2008. The charges consist mainly of severance costs and other benefits.

## 10. Income Taxes

The benefit for income taxes from continuing operations consists of the following for the years ended December 31:

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
|  |  | (in thousands) |  |
| Current: |  |  |  |
| Federal | $— | $107 | $ 37 |
| State | — | — | — |
|  | — | 107 | 37 |
| Deferred: |  |  |  |
| Federal | — | — | — |
| State | — | — | — |
|  | — | — | — |
| Total income tax benefit | $— | $107 | $ 37 |

The reconciliation of the U.S. federal statutory rate to the effective income tax rate for the years ended December 31, 2007, 2006 and 2005, is as follows:

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Tax provision at U.S. federal statutory rates | (35.0)% | (35.0)% | (35.0)% |
| State taxes | 0.1 | 0.1 | 1.3 |
| Non-deductible permanent items | 0.4 | 0.3 | 1.1 |
| Incentive stock options | 2.4 | 1.1 | — |
| Goodwill | 6.0 | — | — |
| Change in federal valuation allowance | 26.1 | 33.2 | 32.3 |
|  | 0.0% | (0.3)% | (0.3)% |

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred taxes as of December 31, 2007 and 2006 are as follows:

|  | 2007 | 2006 |
|---|---|---|
|  | (in thousands) | |
| Deferred tax assets: | | |
| Allowance for doubtful accounts | $ 255 | $ 327 |
| Accrued liabilities | 401 | 915 |
| Net operating loss carryforwards | 33,319 | 32,183 |
| Tax credits | — | 464 |
| Fixed assets | 830 | 720 |
| Intangible assets | 2,864 | 4,549 |
| Share-based compensation expense | 3,188 | 1,721 |
| Other | 115 | 59 |
| Total gross deferred tax assets | 40,972 | 40,938 |
| Deferred tax liabilities: | | |
| Intangible assets | (74) | (276) |
| Other | (281) | — |
| Federal benefit of state taxes | (1,434) | (1,482) |
| Total gross deferred tax liabilities | (1,789) | (1,758) |
| Valuation allowance | (39,183) | (39,180) |
| Net deferred income taxes | $ — | $ — |

At December 31, 2007, the Company had recorded a valuation allowance of $39.2 million on its net deferred tax assets. Based on the weight of available evidence, the Company believes that it is more likely than not that these deferred tax assets will not be realized.

At December 31, 2007, the Company had federal and state net operating loss carryforwards of approximately $88.1 million and $51.6 million, respectively. The federal net operating loss carryforwards expire through 2027 as follows (in millions):

|  | Amount |
|---|---|
| 2021 | $ 30.4 |
| 2022 | 4.2 |
| 2023 | 0.5 |
| 2024 | 4.4 |
| 2025 | 7.2 |
| 2026 | 25.9 |
| 2027 | 15.5 |
|  | $ 88.1 |

The state net operating loss carryforwards expire through 2017 as follows (in millions):

|  | Amount |
|---|---|
| 2009(1) | $ 1.3 |
| 2010(2) | — |
| 2011(2) | — |
| 2012(2) | — |
| 2013(2) | 17.3 |
| 2014(2) | 3.4 |
| 2015(2) | 5.4 |
| 2016(2) | 20.9 |
| 2017(2) | 3.3 |
|  | $ 51.6 |

(1)   Ohio tax will be phased out by 2009.

(2)   California net operating loss has a 10 year carryforward period.

F-33

Table of Contents

## AUTOBYTEL INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

A portion of these net operating losses is subject to an annual limitation of approximately $0.5 million per year. The federal and state net operating losses begin to expire in 2021 and 2013, respectively. Approximately $10.8 million and $5.0 million, respectively, of the federal and state net operating loss carryforwards were incurred by subsidiaries prior to the date of the Company's acquisition of such subsidiaries. The Company established a valuation allowance of $4.1 million at the date of acquisitions related to these subsidiaries. Accordingly, the tax benefits associated with the realization of such net operating losses will be credited to goodwill if realized. In addition, the federal and state net operating losses of approximately $13.5 million and $8.5 million, respectively, relate to stock option deductions. Therefore, to the extent that the valuation allowance is reduced in the future and such options are realized in accordance with SFAS No. 123(R), approximately $4.7 million and $0.5 million, respectively, will be credited to stockholder's equity rather than to income tax benefit.

At December 31, 2007, deferred tax assets exclude approximately $0.6 million and $0.1 million of tax-effected federal and state net operating losses pertaining to tax deductions from stock-based compensation. Upon future realization of these benefits, the Company expects to increase additional paid-in capital and reduce income taxes payable. For purposes of SFAS No. 123(R), the benefit of excess stock option deductions is not recorded until such time that the deductions reduce income taxes payable. For purposes of determining when the stock options reduce income taxes payable, the Company has adopted the "with and without" approach under SFAS No. 123(R) whereby the Company considers net operating losses arising from continuing operations prior to net operating losses attributable to excess stock option deductions.

At December 31, 2007 the Company had federal and state tax credit carryforwards of $0.3 million and $0.2 million, respectively, which begin to expire in 2021.

Upon adoption of FIN No. 48, the Company analyzed its filing positions for all open tax years in all U.S. federal and state jurisdictions where the Company is required to file. At the adoption date of January 1, 2007, the Company had $0.5 million of unrecognized tax benefits. Of the total unrecognized tax benefits at the adoption date, the entire amount of $0.5 million was recorded as a reduction to deferred tax assets, which caused a corresponding reduction in the Company's valuation allowance of $0.5 million. To the extent such portion of unrecognized tax benefits is recognized at a time such valuation allowance no longer exists, the recognition would impact the Company's effective tax rate. The Company adopted the provisions of FIN 48 on January 1, 2007. The following table shows the reconciliation of the total amounts of unrecognized tax benefits for 2007 (in thousands):

| | |
|---|---|
| Unrecognized tax benefit – opening balance | $ 500 |
| Gross increases or decreases – current period | — |
| Settlements | — |
| Lapse of statue of limitations | — |
| Unrecognized tax benefit | $ 500 |

The Company files income tax returns in the U.S. federal jurisdiction and various state jurisdictions. In general, the Company is no longer subject to U.S. federal and state tax examinations for years prior to 2003. The Company does not believe there will be any material changes in its unrecognized tax positions over the next 12 months. Therefore, no reserves for uncertain income tax positions have been recorded pursuant to FIN No. 48. In addition, the Company did not record a cumulative effect adjustment related to the adoption of FIN No. 48 and the adoption of FIN No. 48 did not have a material effect on the Company's consolidated financial position or results of operations.

The Company's policy is to recognize interest and penalties accrued on any unrecognized tax benefits as a component of income tax expense. As of the date of adoption and December 31, 2007, the Company did not have any accrued interest or penalties associated with any unrecognized tax benefits, nor were any interest expense recognized in the year ended December 31, 2007.

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**11.   Related Party Transactions**

The wife of Mark Garms, Senior Vice President, Dealer Operations and Strategy, joined the Company in February 2005 as Director, Project Management and was promoted to Senior Director, Project Management in June 2006. Her base salary is $145,000 and she is eligible for a bonus of up to 20% of her base salary. Her base salary and bonus payments for 2007 were $145,000 and $18,500, respectively. Mrs. Garms was granted 15,000 options on August 14, 2006 at $2.99 per share. The options vest as to 33 $1/3$ % on the first anniversary of the grant date and as to $1/36$ th at the end of each successive monthly anniversary thereafter for the following 24 months.

During the fourth quarter of 2007, the Company entered into a transaction with The Search Agency, a provider of search engine marketing and search engine optimization services. Jeffrey M. Stibel, a director of the Company, is an equity owner of The Search Agency. The Company incurred costs of approximately $0.1 million for services provided by The Search Agency in 2007, which were included in accounts payable in the Company's Consolidated Balance Sheet as of December 31, 2007. All such services were provided in the ordinary course of business at prices and on terms and conditions that the Company believes are the same as those that would result from arm's-length negotiations between unrelated parties.

**12.   Subsequent Events**

On January 24, 2008 the Company sold certain assets and liabilities of its AVV data extraction and customer relationship management software business to Dominion Enterprises for $22.75 million in cash, plus a working capital payment of approximately $1.1 million which remains subject to adjustment. The Company expects to record a gain of approximately $6.0 million in connection with the transaction.

On March 14, 2008, the Company received the first annual installment of $2.67 million pursuant to the settlement agreement with Dealix Corporation ("Dealix").

F-35

**Table of Contents**

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**13. Quarterly Financial Data (Unaudited)**

The Company is restating, within this Annual Report on Form 10-K, its unaudited condensed consolidated financial statements for the first, second, and third fiscal quarters of 2007 relating to the accounting of the $20.0 million patent litigation settlement the Company entered into with Dealix relating to a patent infringement lawsuit.

**Background**

In 2004, the Company filed a lawsuit in the United States District Court for the Eastern District of Texas against Dealix, a wholly-owned subsidiary of The Cobalt Group ("Cobalt"). In that lawsuit, the Company asserted infringement of U.S. Patent No. 6,282,517, entitled "Real Time Communication of Purchase Requests," against Dealix. In December 2006, the Company entered into a settlement agreement (the "Settlement Agreement") with Dealix relating to the lawsuit. With court approval on March 25, 2007, the lawsuit against Dealix was dismissed. Among other things, the Settlement Agreement provides:

- that Dealix pay the Company a total of $20.0 million in settlement payments, comprised of $12.0 million due on March 13, 2007 (the ("Initial Payment") and payments of approximately $2.7 million each year thereafter for three years (each a "Yearly Payment" and collectively the "Yearly Payments");

- subject to the Company's receipt of the full and timely payment of the Initial Payment and the Yearly Payments, for its release of Dealix and Cobalt and certain of their respective affiliates from all claims existing on the execution date of the Settlement Agreement;

- for Dealix and Cobalt's release of the Company and certain of its affiliates from all claims existing on the execution date of the Settlement Agreement;

- the grant by the Company of a non-exclusive license to Dealix and Cobalt and their subsidiaries under certain of the Company's patent and patent applications (the "License"); and

- that, to the extent that operating under the License infringes any other patent owned by the Company or which it has the right to license, the Company will not sue Dealix or Cobalt or their subsidiaries based on such other patent.

On March 13, 2007, the Company received the Initial Payment of $12.0 million. The Company received the first Yearly Payment in March 2008. While the Yearly Payments have been guaranteed by WP Equity Partners, Inc., a Warburg Pincus affiliate, there is no assurance that the Company will receive any remaining Yearly Payments on their respective due dates or at all.

Initially, the Company allocated the $20.0 million settlement as follows (in thousands):

| | |
|---|---|
| Mutual release of claims | $ 9,899 |
| Non-exclusive license | 9,192 |
| Discount on remaining outstanding payments | 909 |
| Total settlement amount | $20,000 |

The Company had previously recognized approximately $9.9 million of the Initial Payment as patent litigation settlement, a credit within costs and expenses, in its condensed consolidated statements of operations for the three, six and nine months ended March 31, June 30, and September 30, 2007, respectively. The Company had also recorded a receivable on its condensed consolidated balance sheet for the remaining three Yearly Payments, which were discounted to their net present value of approximately $7.1 million. As of March 31, 2007 and June 30, 2007, approximately $2.5 million and approximately $4.6 million was included in prepaid expenses and other current assets, and other assets, respectively, in the condensed consolidated balance sheets. In the condensed consolidated balance sheet as of September 30, 2007, these amounts had increased to approximately $2.6 million and approximately $4.7 million, in prepaid expenses and other current assets, and other assets, respectively. The calculated discount of approximately $0.9 million was reflected as a reduction to the gain from litigation settlement and was being amortized over a three-year period to interest and other income in the Company's condensed consolidated statements of operations.

F-36

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

To estimate the fair value of the License, an income approach was used, which included estimates of projected license revenue and related expenses, discounted utilizing a rate of 17%. The fair value of the License was estimated at $9.2 million. The Company recorded $0.8 million and $8.4 million in current and non-current deferred revenue, respectively, in the condensed consolidated balance sheet as of March 31, 2007. The deferred revenue was to be recognized to revenue on a straight-line basis through January 2019, the patent's remaining life.

On April 27, 2007, the Company received a comment letter from the staff of the Division of Corporation Finance of the Securities and Exchange Commission (the "Staff") relating to its accounting for the proceeds of the patent litigation settlement with Dealix. Additional comments were received from the Staff in comment letters dated June 4, 2007, June 22, 2007, July 25, 2007, September 19, 2007, January 28, 2008 and February 6, 2008 and the Company responded to each of the Staff's letters received.

In connection with this review, and subsequent to the issuance of its September 30, 2007 condensed consolidated unaudited quarterly financial statements filed on Form 10-Q, management concluded that the license had been delivered and the Company had no further performance obligation to deliver. As such, all the proceeds from the patent litigation settlement should be recognized within costs and expenses on the Consolidated Statement of Operations upon the first to occur of receipt of the payment and determination of reasonable assurance of collectibility of the Yearly Payments.

Management also reconsidered the potential realization of the $8.0 million in Yearly Payments due to the Company as of December 31, 2007. As the Company was unable to obtain financial information on Dealix or the guarantor, it was not able to assess with reasonable assurance the collectibility of the Yearly Payments to be received. Therefore, the $8.0 million in Yearly Payments to be received as of December 31, 2007 will only be recognized upon the first to occur of receipt of such Yearly Payments and determination of reasonable assurance of collectibility of such Yearly Payments.

The remaining Yearly Payments of $8.0 million, as of December 31, 2007, to be paid out in installments of approximately $2.7 million on the next three annual anniversary dates of the Initial Payment are guaranteed by WP Equity Partners, Inc., a Warburg Pincus affiliate. However, while the Company would pursue payment from the debtor and/or the guarantor, the Company does not have the ability to state with reasonable assurance that it will receive the remaining Yearly Payments from either Dealix or WP Equity Partners, Inc. on their respective due dates or at all. As such, the Company concluded that the booking of a receivable for such future payments is not appropriate and, as noted above, there will be financial statement recognition upon the first to occur of receipt of payment and determination of reasonable assurance of collectibility of such Yearly Payments.

As a result, in this Annual report on Form 10-K, the Company revised its accounting as follows:

- For the quarter ended March 31, 2007, it recognized a net increase in the recorded settlement of $2.1 million, which it had previously reported as deferred revenue resulting in all of the initial proceeds of $12.0 million received in 2007 being recognized, and reversing the previously recorded receivable and related deferred liability.

- For the quarters ended June 30, and September 30, 2007, it also revised its accounting by reversing the previously recorded amortization of deferred liability and discount on future payments of approximately $0.3 million in both periods, and reversing the remaining balances of the previously recorded receivable and related deferred liability.

The adjustments recorded in this restatement result in all proceeds from the patent litigation settlement being recognized in the period received, with no provision or recognition for future payments until reasonable assurance of collectibility is determined or cash is received. For the full year ended December 31, 2007, the Company recognized an additional $1.2 million of income as compared to the original accounting. The adjustments recorded in this restatement also remove any need to recognize either an asset or liability associated with the patent litigation settlement as of December 31, 2007.

F-37

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The net effects of the restatement adjustment on the corresponding balance sheet accounts, as of the quarters ended March 31, June 30 and September 30, 2007, indicated in the following table, are in thousands, except per share data:

BALANCE SHEET DATA: (Unaudited)

| | Consolidated Balance Sheets (Amounts in thousands, except share and per share data) (Unaudited) March 31, 2007 | | |
|---|---|---|---|
| | As Previously Reported | Correction of Error | As Restated |
| **Current assets:** | | | |
| Domestic cash and cash equivalents | $ 28,084 | | $ 28,084 |
| Restricted international cash and cash equivalents | — | | — |
| Short-term investments | — | | — |
| Accounts Receivable, net of allowances | 16,833 | | 16,833 |
| Prepaid expenses and other current assets | 4,081 | (2,514) | 1,567 |
| Total current assets | 48,998 | (2,514) | 46,484 |
| Long-term investments | — | | — |
| Property and equipment, net | 11,977 | | 11,977 |
| Goodwill | 70,697 | | 70,697 |
| Acquired intangible assets, net | 446 | | 446 |
| Other assets | 4,795 | (4,586) | 209 |
| Total assets | $ 136,913 | $ (7,100) | $ 129,813 |
| **Current liabilities:** | | | |
| Accounts payable | $ 6,930 | | 6,930 |
| Accrued expenses | 6,504 | | 6,504 |
| Deferred revenues | 1,981 | (779) | 1,202 |
| Other current liabilities | 1,109 | | 1,109 |
| Total current liabilities | 16,524 | (779) | 15,745 |
| Deferred Rent - non-current | 178 | | 178 |
| Deferred revenues - non-current | 8,658 | (8,399) | 259 |
| Other liabilities - non-current | — | | — |
| Total liabilities | 25,360 | (9,178) | 16,182 |
| **Stockholders' equity:** | | | |
| Preferred stock | — | | — |
| Common stock | 43 | | 43 |
| Additional paid-in capital | 292,025 | | 292,025 |
| Accumulated other comprehensive loss | | | |
| Accumulated deficit | (180,515) | 2,078 | (178,437) |
| Total stockholders' equity | 111,553 | 2,078 | 113,631 |
| Total liabilities and stockholders' equity | $ 136,913 | $ (7,100) | $ 129,813 |

F-38

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Consolidated Balance Sheets (Amounts in thousands, except share and per share data) (Unaudited) June 30, 2007 | | |
|---|---|---|---|
| | As Previously Reported | Correction of Error | As Restated |
| Current assets: | | | |
| Domestic cash and cash equivalents | $ 28,279 | | $ 28,279 |
| Restricted international cash and cash equivalents | — | — | — |
| Short-term investments | — | — | — |
| Accounts Receivable, net of allowances | 17,478 | | 17,478 |
| Prepaid expenses and other current assets | 5,640 | (2,555) | 3,085 |
| Total current assets | 51,397 | (2,555) | 48,842 |
| Long-term investments | — | | — |
| Property and equipment, net | 12,940 | | 12,940 |
| Goodwill | 67,738 | | 67,738 |
| Acquired intangible assets, net | 387 | | 387 |
| Other assets | 4,895 | (4,659) | 236 |
| Total assets | $ 137,357 | $ (7,214) | $ 130,143 |
| Current liabilities: | | | |
| Accounts payable | $ 6,130 | | $ 6,130 |
| Accrued expenses | 6,793 | | 6,793 |
| Deferred revenues | 2,056 | | 2,056 |
| Other current liabilities | 1,965 | (779) | 1,186 |
| Total current liabilities | 16,944 | (779) | 16,165 |
| Deferred Rent - non-current | 251 | — | 251 |
| Deferred revenues - non-current | 237 | | 237 |
| Other liabilities - non-current | 8,205 | (8,205) | — |
| Total liabilities | 25,637 | (8,984) | 16,653 |
| Stockholders' equity: | | | |
| Preferred stock | — | — | — |
| Common stock | 43 | | 43 |
| Additional paid-in capital | 293,919 | | 293,919 |
| Accumulated other comprehensive loss | | | |
| Accumulated deficit | (182,242) | 1,770 | (180,472) |
| Total stockholders' equity | 111,720 | 1,770 | 113,490 |
| Total liabilities and stockholders' equity | $ 137,357 | $ (7,214) | $ 130,143 |

F-39

Table of Contents

# AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Consolidated Balance Sheets (Amounts in thousands, except share and per share data) (Unaudited) September 30, 2007 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Correction of Error | As Restated |
| Current assets: | | | |
| Domestic cash and cash equivalents | $ 28,270 | | $ 28,270 |
| Restricted international cash and cash equivalents | — | | — |
| Short-term investments | — | | — |
| Accounts Receivable, net of allowances | 14,675 | | 14,675 |
| Prepaid expenses and other current assets | 4,661 | (2,595) | 2,066 |
| Total current assets | 47,606 | (2,595) | 45,011 |
| Long-term investments | — | | — |
| Property and equipment, net | 11,909 | | 11,909 |
| Goodwill | 67,738 | | 67,738 |
| Acquired intangible assets, net | 345 | | 345 |
| Other assets | 4,920 | (4,733) | 187 |
| Total assets | $ 132,518 | $ (7,328) | $ 125,190 |
| Current liabilities: | | | |
| Accounts payable | $ 7,190 | | $ 7,190 |
| Accrued expenses | 6,275 | | 6,275 |
| Deferred revenues | 1,659 | | 1,659 |
| Other current liabilities | 1,534 | (779) | 755 |
| Total current liabilities | 16,658 | (779) | 15,879 |
| Deferred Rent - non-current | 223 | — | 223 |
| Deferred revenues - non-current | 216 | | 216 |
| Other liabilities - non-current | 8,010 | (8,010) | — |
| Total liabilities | 25,107 | (8,789) | 16,318 |
| Stockholders' equity: | | | |
| Preferred stock | — | | — |
| Common stock | 44 | | 44 |
| Additional paid-in capital | 295,888 | | 295,888 |
| Accumulated other comprehensive loss | | | |
| Accumulated deficit | (188,521) | 1,461 | (187,060) |
| Total stockholders' equity | 107,411 | 1,461 | 108,872 |
| Total liabilities and stockholders' equity | $ 132,518 | $ (7,328) | $ 125,190 |

F-40

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

STATEMENTS OF OPERATIONS DATA: (Unaudited)

Retrospective changes – Discontinued operations. The Company sold certain assets and liabilities of its Automotive Information Center ("AIC") data operations, its former vehicle price and specification operations, on January 31, 2007. AIC was determined to be a discontinued operation during the fourth quarter of fiscal 2006. The Company also sold its wholly-owned subsidiary, Retention Performance Marketing, Inc., which was in the business of providing customer loyalty and retention marketing programs ("RPM"), on June 30, 2007. RPM was determined to be a discontinued operation in the second quarter of fiscal 2007. In January 2008, the Company sold certain assets and liabilities of its AVV, Inc. ("AVV") business, its former software applications and services and data extraction business. AVV was determined to be a discontinued operation in the fourth quarter of fiscal 2007. Accordingly, the AIC operations, and RPM and AVV businesses are presented in the consolidated financial statements as discontinued operations. As discontinued operations, revenues and expenses of the AIC operations, and RPM and AVV businesses have been aggregated and stated separately from the respective captions in continuing operations in the condensed consolidated statements of operations. Expenses included in discontinued operations are direct costs of the AIC operations, and RPM and AVV businesses that will be eliminated from future operations as a result of the sale of the AIC operations, and RPM and AVV businesses.

The following table sets forth selected consolidated statements of operations data for Autobytel, showing previously reported amounts and restated amounts for the quarters ended March 31, June 30 and September 30, 2007:

| | Consolidated Statements of Operations (Amounts in thousands, except share and per share data) (Unaudited) Three Months Ended March 31, 2007 | | | | | |
|---|---|---|---|---|---|---|
| | As Previously Reported | Correction of Error | As Restated for Error | Reclassifications | Discontinued Operations | As Restated |
| Revenues | $ 28,366 | $ (14) | $ 28,352 | $ (89)A | $ (6,317) | $ 21,946 |
| Costs and expenses: | | | | | | |
| Cost of revenues | 13,338 | — | 13,338 | 68 B | (1,731) | 11,675 |
| Sales and marketing | 7,709 | — | 7,709 | 37 C | (2,047) | 5,699 |
| Technology support | 4,977 | — | 4,977 | (37)C | (736) | 4,204 |
| General and administrative | 8,810 | — | 8,810 | — | (208) | 8,602 |
| Amortization of acquired intangible assets | 344 | — | 344 | — | (43) | 301 |
| Patent litigation settlement | (9,899) | (2,101) | (12,000) | — | — | (12,000) |
| Total costs and expenses | 25,279 | (2,101) | 23,178 | 68 | (4,765) | 18,481 |
| Operating income (loss) | 3,087 | 2,087 | 5,174 | (157) | (1,552) | 3,465 |
| Interest and other income | 329 | (9) | 320 | 157 D | — | 477 |
| Foreign currency exchange loss | (7) | — | (7) | — | — | (7) |
| Income (loss) from continuing operations before income taxes | 3,409 | 2,078 | 5,487 | — | (1,552) | 3,935 |
| Provision for income taxes | (7) | — | (7) | — | 7 | — |
| Income (loss) from continuing operations | 3,402 | 2,078 | 5,480 | — | (1,545) | 3,935 |
| Income from discontinued operations | 2,170 | — | 2,170 | — | 1,545 | 3,715 |
| Net income | $ 5,572 | $ 2,078 | $ 7,650 | $ — | $ — | $ 7,650 |
| Loss per share from continuing operations: | | | | | | |
| Basic | $ 0.08 | $ 0.05 | $ 0.13 | $ — | $ (0.04) | $ 0.09 |
| Diluted | $ 0.08 | $ 0.05 | $ 0.13 | $ — | $ (0.04) | $ 0.09 |
| Income per share from discontinued operations: | | | | | | |
| Basic | $ 0.05 | $ — | $ 0.05 | $ — | $ 0.04 | $ 0.09 |
| Diluted | $ 0.05 | $ (0.01) | $ 0.04 | $ — | $ 0.04 | $ 0.08 |
| Net income (loss) per share: | | | | | | |
| Basic | $ 0.13 | $ 0.05 | $ 0.18 | $ — | $ — | $ 0.18 |
| Diluted | $ 0.13 | $ 0.04 | $ 0.17 | $ — | $ — | $ 0.17 |

A    Reclassification of $(157) of licensing fees from other revenue to other income, and $68 of inter-company elimination associated with discontinued operations

B    Reclassification of $68 of inter-company elimination associated with discontinued operations

C    Reclassification of $37 of certain employee costs from sales and marketing to technology support to conform with current year presentation

D    Reclassification of $157 of licensing fees from other revenue to other income

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Consolidated Statements of Operations**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**
**Three Months Ended June 30, 2007**

| | As Previously Reported | Correction of Error | As Restated for Error | Reclassifications | Discontinued Operations | As Restated |
|---|---|---|---|---|---|---|
| Revenues | $ 24,331 | $ 14 | $ 24,345 | $ (96)A | $ (2,607) | $21,642 |
| Costs and expenses: | | | | | | |
| Cost of revenues | 12,718 | — | 12,718 | 62 B | (18) | 12,762 |
| Sales and marketing | 5,684 | — | 5,684 | 41 C | (503) | 5,222 |
| Technology support | 5,189 | — | 5,189 | (41)C | (540) | 4,608 |
| General and administrative | 6,464 | — | 6,464 | — | (158) | 6,306 |
| Amortization of acquired intangible assets | 79 | — | 79 | — | — | 79 |
| Patent litigation settlement | — | — | — | — | — | — |
| Total costs and expenses | 30,134 | — | 30,134 | 62 | (1,219) | 28,977 |
| Operating income (loss) | (5,803) | 14 | (5,789) | (158) | (1,388) | (7,335) |
| Interest and other income | 626 | (322) | 304 | 158 D | — | 462 |
| Foreign currency exchange loss | — | — | — | — | — | — |
| Income (loss) from continuing operations before income taxes | (5,177) | (308) | (5,485) | — | (1,388) | (6,873) |
| Provision for income taxes | — | — | — | — | — | — |
| Income (loss) from continuing operations | (5,177) | (308) | (5,485) | — | (1,388) | (6,873) |
| Income from discontinued operations | 3,450 | — | 3,450 | — | 1,388 | 4,838 |
| Net income (loss) | $ (1,727) | $ (308) | $ (2,035) | $ — | $ — | $(2,035) |
| Loss per share from continuing operations: | | | | | | |
| Basic | $ (0.12) | $ (0.01) | $ (0.13) | $ — | $ (0.03) | $ (0.16) |
| Diluted | $ (0.12) | $ (0.01) | $ (0.13) | $ — | $ (0.03) | $ (0.16) |
| Income per share from discontinued operations: | | | | | | |
| Basic | $ 0.08 | $ — | $ 0.08 | $ — | $ 0.03 | $ 0.11 |
| Diluted | $ 0.08 | $ — | $ 0.08 | $ — | $ 0.03 | $ 0.11 |
| Net income (loss) per share: | | | | | | |
| Basic | $ (0.04) | $ (0.01) | $ (0.05) | $ — | $ — | $ (0.05) |
| Diluted | $ (0.04) | $ (0.01) | $ (0.05) | $ — | $ — | $ (0.05) |

A    Reclassification of $(158) of licensing fees from other revenue to other income, and $62 of inter-company elimination associated with discontinued operations

B    Reclassification of $62 of inter-company elimination associated with discontinued operations

C    Reclassification of $41 of certain employee costs from sales and marketing to technology support to conform with current year presentation

D    Reclassification of $158 of licensing fees from other revenue to other income

F-42

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Consolidated Statements of Operations
(Amounts in thousands, except share and per share data)
(Unaudited)
Six Months Ended June 30, 2007

| | As Previously Reported | Correction of Error | As Restated for Error | Reclassifications | Discontinued Operations | As Restated |
|---|---|---|---|---|---|---|
| Revenues | $ 49,075 | $ — | $ 49,075 | $ (185) | $ (5,302) | $ 43,588 |
| Costs and expenses: | | | | | | |
| Cost of revenues | 24,352 | — | 24,352 | 130 | (45) | 24,437 |
| Sales and marketing | 11,859 | — | 11,859 | 78 | (1,016) | 10,921 |
| Technology support | 10,045 | — | 10,045 | (78) | (1,155) | 8,812 |
| General and administrative | 15,264 | — | 15,264 | — | (356) | 14,908 |
| Amortization of acquired intangible assets | 380 | — | 380 | — | — | 380 |
| Patent litigation settlement | (9,899) | (2,101) | (12,000) | — | — | (12,000) |
| Total costs and expenses | 52,001 | (2,101) | 49,900 | 130 | (2,572) | 47,458 |
| Operating income (loss) | (2,926) | 2,101 | (825) | (315) | (2,730) | (3,870) |
| Interest and other income | 955 | (331) | 624 | 315 | — | 939 |
| Foreign currency exchange loss | (7) | — | (7) | — | — | (7) |
| Income (loss) from continuing operations before income taxes | (1,978) | 1,770 | (208) | — | (2,730) | (2,938) |
| Provision for income taxes | (7) | — | (7) | — | 7 | — |
| Income (loss) from continuing operations | (1,985) | 1,770 | (215) | — | (2,723) | (2,938) |
| Income from discontinued operations | 5,830 | — | 5,830 | — | 2,723 | 8,553 |
| Net income (loss) | $ 3,845 | $ 1,770 | $ 5,615 | $ — | $ — | $ 5,615 |
| Loss per share from continuing operations: | | | | | | |
| Basic | $ (0.05) | $ 0.04 | $ (0.01) | $ — | $ (0.06) | $ (0.07) |
| Diluted | $ (0.05) | $ 0.04 | $ (0.01) | $ — | $ (0.06) | $ (0.07) |
| Income per share from discontinued operations: | | | | | | |
| Basic | $ 0.14 | $ — | $ 0.14 | $ — | $ 0.06 | $ 0.20 |
| Diluted | $ 0.14 | $ — | $ 0.14 | $ — | $ 0.06 | $ 0.20 |
| Net income (loss) per share: | | | | | | |
| Basic | $ 0.09 | $ 0.04 | $ 0.13 | $ — | $ — | $ 0.13 |
| Diluted | $ 0.09 | $ 0.04 | $ 0.13 | $ — | $ — | $ 0.13 |

F-43

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Consolidated Statements of Operations**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**
**Three Months Ended September 30, 2007**

| | As Previously Reported | Correction of Error | As Restated for Error | Reclassifications | Discontinued Operations | As Restated |
|---|---|---|---|---|---|---|
| Revenues | $ 24,763 | $ — | $ 24,763 | $ (156)A | $ (2,696) | $21,911 |
| Costs and expenses: | | | | | | |
| Cost of revenues | 14,959 | — | 14,959 | — | (25) | 14,934 |
| Sales and marketing | 5,742 | — | 5,742 | 19 B | (501) | 5,260 |
| Technology support | 5,107 | — | 5,107 | (19)B | (511) | 4,577 |
| General and administrative | 5,839 | — | 5,839 | — | (240) | 5,599 |
| Amortization of acquired intangible assets | 42 | — | 42 | — | — | 42 |
| Patent litigation settlement | — | | — | | — | — |
| Total costs and expenses | 31,689 | — | 31,689 | — | (1,277) | 30,412 |
| Operating income (loss) | (6,926) | — | (6,926) | (156) | (1,419) | (8,501) |
| Interest and other income | 639 | (309) | 330 | 156 C | — | 486 |
| Foreign currency exchange loss | — | | — | | — | — |
| Income (loss) from continuing operations before income taxes | (6,287) | (309) | (6,596) | — | (1,419) | (8,015) |
| Provision for income taxes | (16) | — | (16) | | 16 | — |
| Income (loss) from continuing operations | (6,303) | (309) | (6,612) | — | (1,403) | (8,015) |
| Income from discontinued operations | 24 | — | 24 | — | 1,403 | 1,427 |
| Net income (loss) | $ (6,279) | $ (309) | $ (6,588) | $ — | $ — | $(6,588) |
| Loss per share from continuing operations: | | | | | | |
| Basic | $ (0.14) | $ (0.01) | $ (0.15) | $ — | $ (0.03) | $ (0.18) |
| Diluted | $ (0.14) | $ (0.01) | $ (0.15) | — | $ (0.03) | $ (0.18) |
| Income per share from discontinued operations: | | | | | | |
| Basic | $ — | $ — | $ — | $ — | $ 0.03 | $ 0.03 |
| Diluted | $ — | $ — | $ — | $ — | $ 0.03 | $ 0.03 |
| Net income (loss) per share: | | | | | | |
| Basic | $ (0.14) | $ (0.01) | $ (0.15) | $ — | $ — | $ (0.15) |
| Diluted | (0.14) | (0.01) | (0.15) | — | — | (0.15) |

A   Reclassification of $(156) of licensing fees from other revenue to other income

B   Reclassification of $19 of certain employee costs from sales and marketing to technology support to conform with current year presentation

C   Reclassification of $156 of licensing fees from other revenue to other income

F-44

Table of Contents

**AUTOBYTEL INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Consolidated Statements of Operations**
(Amounts in thousands, except share and per share data)
(Unaudited)
Nine Months Ended September 30, 2007

| | As Previously Reported | Correction of Error | As Restated for Error | Reclassifications | Discontinued Operations | As Restated |
|---|---|---|---|---|---|---|
| Revenues | $ 73,838 | $ — | $ 73,838 | $ (341) | $ (7,998) | $ 65,499 |
| Costs and expenses: | | | | | | |
| Cost of revenues | 39,311 | — | 39,311 | 130 | (70) | 39,371 |
| Sales and marketing | 17,603 | — | 17,603 | 97 | (1,519) | 16,181 |
| Technology support | 15,152 | — | 15,152 | (97) | (1,666) | 13,389 |
| General and administrative | 21,102 | — | 21,102 | — | (595) | 20,507 |
| Amortization of acquired intangible assets | 422 | — | 422 | — | — | 422 |
| Patent litigation settlement | (9,899) | (2,101) | (12,000) | — | — | (12,000) |
| Total costs and expenses | 83,691 | (2,101) | 81,590 | 130 | (3,850) | 77,870 |
| Operating income (loss) | (9,853) | 2,101 | (7,752) | (471) | (4,148) | (12,371) |
| Interest and other income | 1,595 | (640) | 955 | 471 | (1) | 1,425 |
| Foreign currency exchange loss | (7) | — | (7) | — | — | (7) |
| Income (loss) from continuing operations before income taxes | (8,265) | 1,461 | (6,804) | — | (4,149) | (10,953) |
| Provision for income taxes | (23) | — | (23) | — | 23 | — |
| Income (loss) from continuing operations | (8,288) | 1,461 | (6,827) | — | (4,126) | (10,953) |
| Income from discontinued operations | 5,854 | — | 5,854 | | 4,126 | 9,980 |
| Net income (loss) | $ (2,434) | $ 1,461 | $ (973) | $ — | $ — | $ (973) |
| Loss per share from continuing operations: | | | | | | |
| Basic | $ (0.19) | $ 0.04 | $ (0.15) | $ — | $ (0.10) | $ (0.25) |
| Diluted | $ (0.19) | $ 0.04 | $ (0.15) | $ — | $ (0.10) | $ (0.25) |
| Income per share from discontinued operations: | | | | | | |
| Basic | $ 0.13 | $ — | $ 0.13 | $ — | $ 0.10 | $ 0.23 |
| Diluted | $ 0.13 | $ — | $ 0.13 | $ — | $ 0.10 | $ 0.23 |
| Net income (loss) per share: | | | | | | |
| Basic | $ (0.06) | $ 0.04 | $ (0.02) | $ — | $ — | $ (0.02) |
| Diluted | $ (0.06) | $ 0.04 | $ (0.02) | $ — | $ — | $ (0.02) |

F-45

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

STATEMENTS OF CASH FLOW DATA: (Unaudited)

The following table sets forth selected consolidated statements of cash flows data for Autobytel, showing previously reported amounts and restated amounts for the quarters ended March 31, June 30 and September 30, 2007:

| | Consolidated Statement of Cash Flows (Amounts in thousands, except share data) (Unaudited) Three Months Ended March 31, 2007 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Correction of Error | As Restated |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ 5,572 | $ 2,078 | $ 7,650 |
| Adjustments to reconcile net income (loss) to net cash provided (used in) operating activities: | | | |
| Non-cash charges: | | | |
| Depreciation and amortization | 545 | | 545 |
| Amortization of intangible assets | 344 | | 344 |
| Provision for bad debts | 21 | | 21 |
| Provision for customer credits | 410 | | 410 |
| (Gain) loss on disposal of property and equipment | (1) | | (1) |
| Gain on sale of AIC business | (2,262) | | (2,262) |
| Gain on sale of RPM business | — | | — |
| Stock-based compensation | 1,499 | | 1,499 |
| Foreign currency exchange loss | 6 | | 6 |
| Changes in assets and liabilities, excluding effect of acquisitions: | | | — |
| Accounts Receivable | (14) | | (14) |
| Prepaid expenses and other current assets | 366 | | 366 |
| Other assets | (134) | | (134) |
| Accounts payable | (1,660) | | (1,660) |
| Accrued expenses | (1,268) | | (1,268) |
| Deferred revenues | 1,091 | (2,078) | (987) |
| Other liabilities | 2 | | 2 |
| Net cash provided by operating activities | 4,517 | — | 4,517 |
| Cash flows from investing activities: | | | |
| Maturities of short-term investments | 3,000 | | 3,000 |
| Distribution of foreign investment | 354 | | 354 |
| Purchases of property and equipment | (5,078) | | (5,078) |
| Proceeds from sale of property and equipment | 1 | | 1 |
| Proceeds from the sale of AIC business | 2,073 | | 2,073 |
| Proceeds from the sale of RPM business | — | | — |
| Net cash provided by investing activities | 350 | — | 350 |
| Cash flows from financing activities: | | | |
| Distribution to minority interest shareholder | (184) | | (184) |
| Proceeds from exercise of stock options and awards | 658 | | 658 |
| Net cash provided by (used in) financing activities | 474 | — | 474 |
| Net increase in cash and cash equivalents | 5,341 | — | 5,341 |
| Cash and cash equivalents, beginning of period | 22,743 | | 22,743 |
| Cash and cash equivalents, end of period | $ 28,084 | $ — | $ 28,084 |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid during the period for income taxes | $ 60 | $ — | $ 60 |

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Consolidated Statement of Cash Flows (Amounts in thousands, except share data) (Unaudited) Six Months Ended June 30, 2007 | | |
| --- | --- | --- | --- |
| | As Previously Reported | Correction of Error | As Restated |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ 3,845 | $ 1,770 | $ 5,615 |
| Adjustments to reconcile net income (loss) to net cash provided (used in) operating activities: | | | |
| Non-cash charges: | | | |
| Depreciation and amortization | 1,094 | | 1,094 |
| Amortization of intangible assets | 423 | | 423 |
| Provision for bad debts | 183 | | 183 |
| Provision for customer credits | 822 | | 822 |
| (Gain) loss on disposal of property and equipment | (1) | | (1) |
| Gain on sale of AIC business | (2,762) | | (2,762) |
| Gain on sale of RPM business | (3,048) | | (3,048) |
| Stock-based compensation | 2,518 | | 2,518 |
| Foreign currency exchange loss | 6 | | 6 |
| Changes in assets and liabilities, excluding effect of acquisitions: | | | — |
| Accounts Receivable | (2,538) | | (2,538) |
| Prepaid expenses and other current assets | (1,222) | | (1,222) |
| Other assets | (254) | | (254) |
| Accounts payable | (2,300) | | (2,300) |
| Accrued expenses | (561) | | (561) |
| Deferred revenues | (162) | | (162) |
| Other liabilities | 2,045 | (1,770) | 275 |
| Net cash provided by operating activities | (1,912) | — | (1,912) |
| Cash flows from investing activities: | | | |
| Maturities of short-term investments | 3,000 | | 3,000 |
| Distribution of foreign investment | 354 | | 354 |
| Purchases of property and equipment | (6,918) | | (6,918) |
| Proceeds from sale of property and equipment | 1 | | 1 |
| Proceeds from the sale of AIC business | 2,573 | | 2,573 |
| Proceeds from the sale of RPM business | 7,093 | | 7,093 |
| Net cash provided by investing activities | 6,103 | — | 6,103 |
| Cash flows from financing activities: | | | |
| Distribution to minority interest shareholder | (184) | | (184) |
| Proceeds from exercise of stock options and awards | 1,529 | | 1,529 |
| Net cash provided by (used in) financing activities | 1,345 | — | 1,345 |
| Net increase in cash and cash equivalents | 5,536 | — | 5,536 |
| Cash and cash equivalents, beginning of period | 22,743 | | 22,743 |
| Cash and cash equivalents, end of period | $ 28,279 | $ — | $ 28,279 |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid during the period for income taxes | $ 66 | $ — | $ 66 |

F-47

Table of Contents

## AUTOBYTEL INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Consolidated Statement of Cash Flows (Amounts in thousands, except share data) (Unaudited) Nine Months Ended September 30, 2007 | | |
|---|---|---|---|
| | As Previously Reported | Correction of Error | As Restated |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ (2,434) | $ 1,461 | $ (973) |
| Adjustments to reconcile net income (loss) to net cash provided (used in) operating activities: | | | |
| Non-cash charges: | | | |
| Depreciation and amortization | 2,151 | | 2,151 |
| Amortization of intangible assets | 465 | | 465 |
| Provision for bad debts | 301 | | 301 |
| Provision for customer credits | 1,051 | | 1,051 |
| (Gain) loss on disposal of property and equipment | — | | — |
| Gain on sale of AIC business | (2,762) | | (2,762) |
| Gain on sale of RPM business | (3,072) | | (3,072) |
| Stock-based compensation | 3,758 | | 3,758 |
| Foreign currency exchange loss | 7 | | 7 |
| Changes in assets and liabilities, excluding effect of acquisitions: | | | — |
| Accounts Receivable | (82) | | (82) |
| Prepaid expenses and other current assets | (160) | | (160) |
| Other assets | (127) | | (127) |
| Accounts payable | (1,190) | | (1,190) |
| Accrued expenses | (969) | | (969) |
| Deferred revenues | (580) | | (580) |
| Other liabilities | 1,391 | (1,461) | (70) |
| Net cash provided by operating activities | (2,252) | — | (2,252) |
| **Cash flows from investing activities:** | | | |
| Maturities of short-term investments | 3,000 | | 3,000 |
| Distribution of foreign investment | 354 | | 354 |
| Purchases of property and equipment | (7,317) | | (7,317) |
| Proceeds from sale of property and equipment | 1 | | 1 |
| Proceeds from the sale of AIC business | 2,573 | | 2,573 |
| Proceeds from the sale of RPM business | 7,093 | | 7,093 |
| Net cash provided by investing activities | 5,704 | — | 5,704 |
| **Cash flows from financing activities:** | | | |
| Distribution to minority interest shareholder | (184) | | (184) |
| Proceeds from exercise of stock options and awards | 2,259 | | 2,259 |
| Net cash provided by (used in) financing activities | 2,075 | — | 2,075 |
| Net increase in cash and cash equivalents | 5,527 | — | 5,527 |
| Cash and cash equivalents, beginning of period | 22,743 | | 22,743 |
| Cash and cash equivalents, end of period | $ 28,270 | $ — | $ 28,270 |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid during the period for income taxes | $ 85 | $ — | $ 85 |

F-48

Table of Contents

Current year (restated as noted above for the first, second and third quarters of 2007) and prior year quarterly financial data for the Company is summarized in the table below:

| | Three Months Ended (Unaudited) | | | |
| | December 31, 2007 | September 30, 2007 (as restated) | June 30, 2007 (as restated) | March 31, 2007 (as restated) |
| --- | --- | --- | --- | --- |
| | | (in thousands, except per share data) | | |
| Revenue | $ 18,886 | $ 21,911 | $ 21,642 | $ 21,946 |
| Cost of revenue | 13,077 | 14,934 | 12,762 | 11,675 |
| Operating (loss) income | (10,814) | (8,501) | (7,335) | 3,465 |
| (Loss) income from continuing operations | (6,333) | (8,015) | (6,873) | 3,935 |
| Net (loss) income | (4,382) | (6,588) | (2,035) | 7,650 |
| Basic and diluted net loss (income) per share from continuing operations | $ (0.14) | $ (0.18) | $ (0.16) | $ 0.09 |
| Basic net loss (income) per share | $ (0.10) | $ (0.15) | $ (0.05) | $ 0.18 |
| Diluted net loss (income) per share | $ (0.10) | $ (0.15) | $ (0.05) | $ 0.17 |

| | Three Months Ended (Unaudited) | | | |
| | December 31, 2006 | September 30, 2006 | June 30, 2006 | March 31, 2006 |
| --- | --- | --- | --- | --- |
| | | (in thousands, except per share data) | | |
| Revenue | $ 20,439 | $ 20,792 | $ 22,083 | $ 21,788 |
| Cost of revenue | 10,720 | 11,786 | 12,379 | 12,768 |
| Operating loss | (9,717) | (10,060) | (9,419) | (10,584) |
| Loss from continuing operations | (9,172) | (9,462) | (8,807) | (9,972) |
| Net loss | (7,258) | (7,879) | (7,868) | (8,463) |
| Basic and diluted net loss per share from continuing operations | $ (0.21) | $ (0.22) | $ (0.21) | $ (0.24) |
| Basic and diluted net loss per share | $ (0.17) | $ (0.19) | $ (0.19) | $ (0.20) |

Table of Contents

**AUTOBYTEL INC.**

**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS**
**(Dollar amounts in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in thousands) | | |
| **Allowance for bad debts:** | | | |
| Beginning balance | $    529 | $    691 | $    682 |
| Additions | 300 | 391 | 906 |
| Write-offs | (500) | (553) | (897) |
| Ending balance | $    329 | $    529 | $    691 |
| **Allowance for customer credits:** | | | |
| Beginning balance | $    269 | $    433 | $    355 |
| Additions | 1,202 | 1,645 | 2,816 |
| Write-offs | (1,266) | (1,809) | (2,738) |
| Ending balance | $    205 | $    269 | $    433 |
| **Tax valuation allowance:** | | | |
| Beginning balance | $39,180 | $28,521 | $22,984 |
| (Credited) Charged to tax expense | 416 | 12,607 | 3,205 |
| Charged (credited) to other | (413) | (1,948) | 2,332 |
| Ending balance | $39,183 | $39,180 | $28,521 |

F-50

**Table of Contents**

**EXHIBIT INDEX**

| Number | Description |
|---|---|
| 3.1 | Fifth Amended and Restated Certificate of Incorporation of Autobytel Inc. (formerly autobytel.com inc. ("Autobytel" or the "Company")) certified by the Secretary of State of Delaware (filed December 14, 1998 and amended March 1, 1999) is incorporated herein by reference to Exhibit 3.1 of Amendment No. 2 (filed on March 5, 1999) to Autobytel's Registration Statement on Form S-1 (File No. 333-70621) originally filed with the Securities and Exchange Commission (the "SEC") on January 15, 1999 and declared effective (as amended) on March 25, 1999 (the "S-1 Registration Statement") |
| 3.2 | Second Certificate of Amendment of the Fifth Amended and Restated Certificate of Incorporation of Autobytel is incorporated herein by reference to Exhibit 3.1 of Form 10-Q for the Quarter Ended June 30, 1999 filed with the SEC on August 12, 1999 |
| 3.3 | Third Certificate of Amendment of the Fifth Amended and Restated Certificate of Incorporation of Autobytel is incorporated herein by reference to Exhibit 3.3 of Form 10-K for the Year Ended December 31, 2001 filed with the SEC on March 22, 2002 |
| 3.4 | Amended and Restated Bylaws of Autobytel is incorporated herein by reference to Exhibit 3.1 of Form 10-Q for the Quarter Ended September 30, 2000 filed with the SEC on November 13, 2000 |
| 3.5 | Amendment No. 1 to Amended and Restated Bylaws of Autobytel is incorporated herein by reference to Exhibit 3.1 of Form 10-Q for the Quarter Ended September 30, 2001 filed with the SEC on November 14, 2001 (the "September 2001 10-Q") |
| 3.6 | Amendment No. 2 to Amended and Restated Bylaws of Autobytel is incorporated herein by reference to Exhibit 3.1 of Form 10-Q for the Quarter Ended March 31, 2002 filed with the SEC on May 14, 2002 |
| 3.7 | Amendment No. 3 to Amended and Restated Bylaws of Autobytel is incorporated herein by reference to Exhibit 3.7 of Form 10-K for the Year Ended December 31, 2005 filed with the SEC on March 16, 2006 |
| 3.8 | Amendment No. 4 to Amended and Restated Bylaws of Autobytel is incorporated herein by reference to Exhibit 3.1 of the Current Report on Form 8-K filed with the SEC on December 10, 2007 |
| 4.1 | Form of Common Stock Certificate of Autobytel is incorporated herein by reference to Exhibit 4.1 of the September 2001 10-Q |
| 4.2 | Rights Agreement, dated as of July 30, 2004, between Autobytel and U.S. Stock Transfer Corporation is incorporated herein by reference to Exhibit 99.2 of the Current Report on Form 8-K filed with the SEC on August 2, 2004 (the "August 2004 8-K") |
| 4.3 | Form of Rights Certificate (included as Exhibit to Exhibit 4.3) incorporated herein by reference to Exhibit 99.3 of the August 2004 8-K |
| 10.1 | Form of Indemnification Agreement between Autobytel and its directors and officers is incorporated herein by reference to Exhibit 10.1 of the S-1 Registration Statement |
| 10.2 | Form of Outside Director Stock Option Agreement under the 2004 Restricted Stock and Option Plan is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on September 14, 2005 (the "September 2005 8-K") |
| 10.3 | Form of Letter Agreement (amending stock option agreement) is incorporated herein by reference to Exhibit 10.2 of the September 2005 8-K |
| 10.4 | 1996 Employee Stock Purchase Plan is incorporated herein by reference to Exhibit 10.7 of Amendment No. 1 to the S-1 Registration Statement filed with the SEC on February 9, 1999 (the "S-1 Amendment") |
| 10.5 | autobytel.com inc. 1998 Stock Option Plan is incorporated herein by reference to Exhibit 10.8 of the S-1 Amendment |
| 10.6 | autobytel.com inc. 1999 Stock Option Plan is incorporated herein by reference to Exhibit 10.30 of the S-1 Amendment |
| 10.7 | autobytel.com inc. 1999 Employee and Acquisition Related Stock Option Plan is incorporated herein by reference to Exhibit 10.1 of the Registration Statement filed on Form S-8 (File No. 333-90045) filed with the SEC on November 1, 1999 |
| 10.8 | Amendment No. 1 to the autobytel.com inc. 1998 Stock Option Plan dated September 22, 1999 is incorporated herein by reference to Exhibit 10.2 of Form 10-Q for the Quarter Ended September 30, 1999 filed with the SEC on November 12, 1999 |
| 10.9 | Amendment No. 1 to the autobytel.com inc. 1999 Stock Option Plan, dated September 22, 1999 is incorporated herein by reference to Exhibit 10.1 of Form 10-Q for the Quarter Ended September 30, 1999 filed with the SEC on November 12, 1999 |

**Table of Contents**

| Number | Description |
|--------|-------------|
| 10.10 | Employment Agreement, dated April 27, 2005, between Autobytel and Richard Post is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on May 3, 2005 (the "May 2005 8-K") |
| 10.11 | Employment Agreement, dated April 27, 2005, between Autobytel and Jeffrey Schwartz is incorporated herein by reference to Exhibit 10.2 of the May 2005 8-K |
| 10.12 | 1996 Stock Option Plan and related agreements are incorporated herein by reference to Exhibit 10.5 of the S-1 Amendment |
| 10.13 | 1996 Stock Incentive Plan and related agreements are incorporated herein by reference to Exhibit 10.6 of the S-1 Amendment |
| 10.14 | autobytel.com inc. Retirement Savings Plan is incorporated herein by reference to Exhibit 99.1 of the Registration Statement filed on Form S-8 (File No. 333-33038) with the SEC on June 15, 2000 |
| 10.15 | autobytel.com inc. 2000 Stock Option Plan is incorporated herein by reference to Exhibit 99.1 of the Registration Statement filed on Form S-8 (File No. 333-39396) with the SEC on June 15, 2000 |
| 10.16 | Employment Agreement, dated April 27, 2005, between Autobytel and Richard Walker is incorporated herein by reference to Exhibit 10.3 of the May 2005 8-K |
| 10.17 | autobytel.com inc. 2001 Restricted Stock Plan is incorporated herein by reference to Exhibit 4.3 to the Registration Statement filed on Form S-8 (File No. 333-67692) with the SEC on August 16, 2001 (the "August 2001 S-8") |
| 10.18 | Autoweb 1997 Stock Option Plan is incorporated herein by reference to Exhibit 4.4 of the August 2001 S-8 |
| 10.19 | Autoweb 1999 Equity Incentive Plan, as amended, is incorporated herein by reference to Exhibit 4.5 of the August 2001 S-8 |
| 10.20 | Autoweb 1999 Directors Stock Option Plan is incorporated herein by reference to Exhibit 4.6 of the August 2001 S-8 |
| 10.21 | Amendment No. 1 to the Auto-by-Tel Corporation 1996 Stock Incentive Plan is incorporated herein by reference to Exhibit (d)(2) of Schedule TO filed with the SEC on December 14, 2001 (the "Schedule TO") |
| 10.22 | Amendment No. 2 to the autobytel.com inc. 1998 Stock Option Plan is incorporated herein by reference to Exhibit (d)(5) of the Schedule TO |
| 10.23 | Amendment No. 2 to the autobytel.com inc. 1999 Stock Option Plan is incorporated herein by reference to Exhibit (d)(8) of the Schedule TO |
| 10.24 | Amendment No. 1 to the autobytel.com inc. 1999 Employee and Acquisition Related Stock Option Plan is incorporated herein by reference to Exhibit (d)(10) of the Schedule TO |
| 10.25 | Amendment No. 1 to the autobytel.com inc. 2000 Stock Option Plan is incorporated herein by reference to Exhibit (d)(12) of the Schedule TO |
| 10.26 | Amendment No. 2 to the autobytel.com inc. 2000 Stock Option Plan is incorporated herein by reference to Exhibit 10.46 of the Annual Report on Form 10-K for the Year Ended December 31, 2000 filed with the SEC on March 29, 2001 |
| 10.27 | Form of Stock Option Agreement pursuant to Auto-by-Tel Corporation 1996 Stock Incentive Plan is incorporated herein by reference to Exhibit (d)(13) of the Schedule TO |
| 10.28 | Form of Stock Option Agreement pursuant to autobytel.com inc. 1998 Stock Option Plan is incorporated herein by reference to Exhibit (d)(14) of the Schedule TO |
| 10.29 | Form of Stock Option Agreement pursuant to autobytel.com inc. 1999 Stock Option Plan is incorporated herein by reference to Exhibit (d)(15) of the Schedule TO |
| 10.30 | Form of Stock Option Agreement pursuant to autobytel.com inc. 1999 Employee and Acquisition Related Stock Option Plan is incorporated herein by reference to Exhibit (d)(16) of the Schedule TO |
| 10.31 | Form of Stock Option Agreement pursuant to autobytel.com inc. 2000 Stock Option Plan is incorporated herein by reference to Exhibit (d)(17) of the Schedule TO |
| 10.32 | Form of Performance Stock Option Agreement pursuant to autobytel.com inc. 1999 Stock Option Plan is incorporated herein by reference to Exhibit (d)(18) of the Schedule TO |
| 10.33 | Form of Non-employee Directors Stock Option Agreement pursuant to Auto-by-Tel Corporation 1996 Stock Incentive Plan is incorporated herein by reference to Exhibit (d)(19) of the Schedule TO |
| 10.34 | Employment Agreement, dated May 30, 2005, between Autobytel and Michael Schmidt is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on June 2, 2005 |

**Table of Contents**

| Number | Description |
|---|---|
| 10.35 | Employment Agreement, dated July 19, 2005, between Autobytel and Ariel Amir is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on July 22, 2005 |
| 10.36 | Letter Agreement, dated September 21, 2005, between Autobytel and Jill Richling is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on December 12, 2005 |
| 10.37 | 2003 Amendment to Auto-By-Tel Corporation 1996 Employee Stock Purchase Plan is incorporated herein by reference to Exhibit 4.8 of the Registration Statement filed on Form S-8 (File No. 333-107525) with the SEC on July 31, 2003 |
| 10.38 | Autobytel Inc. Amended and Restated 2001 Restricted Stock and Option Plan is incorporated herein by reference to Exhibit 4.7 of Post-Effective Amendment to Registration Statement filed on Form S-8 (File No. 333-67692) with the SEC on July 31, 2003 |
| 10.39 | Form of Outside Director Stock Option Agreement under the Autobytel 1999 Stock Option Plan is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on November 3, 2004 (the "November 2004 8-K") |
| 10.40 | Form of Outside Director Stock Option Agreement under the Autobytel 2004 Restricted Stock and Option Plan is incorporated herein by reference to Exhibit 10.2 of the November 2004 8-K |
| 10.41 | Autobytel Inc. 2004 Restricted Stock and Option Plan is incorporated herein by reference to Exhibit 4.8 of the Registration Statement filed on Form S-8 (File No. 333-116930) with the SEC on June 28, 2004 (the "2004 S-8") |
| 10.42 | Form of Employee Stock Option Agreement under the Autobytel 2004 Restricted Stock and Option Plan is incorporated herein by reference to Exhibit 4.9 of the 2004 S-8 |
| 10.43 | Stock Option Agreement, dated September 21, 2004, between Autobytel and Ariel Amir is incorporated herein by reference to Exhibit 10.61 of the Annual Report on Form 10-K for the Year Ended December 31, 2004 filed with the SEC on May 31, 2005 (the "2004 10-K") |
| 10.44 | Stock Option Agreement, dated September 21, 2004, between Autobytel and Richard Walker is incorporated herein by reference to Exhibit 10.62 of the 2004 10-K |
| 10.45 | Letter agreement, dated March 9, 2004 between Autobytel and Michael F. Schmidt is incorporated herein by reference to Exhibit 10.64 of the 2004 10-K |
| 10.46 | Form of Stock Option Agreement under the Autobytel 2004 Restricted Stock and Option Plan is incorporated herein by reference to Exhibit 10.65 of the 2004 10-K |
| 10.47 | Employment Agreement dated March 1, 2006 between Autobytel Inc. and James E. Riesenbach is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the Securities and Exchange Commission on March 7, 2006 |
| 10.48 | First Amendment to Employment Agreement dated March 7, 2006 between Autobytel Inc. and Richard Post is incorporated herein by reference to Exhibit 10.2 of the Current Report on Form 8-K filed with the Securities and Exchange Commission on March 7, 2006 |
| 10.49 | First Amendment to Employment Agreement dated March 7, 2006 between Autobytel Inc. and Richard Walker is incorporated herein by reference to Exhibit 10.3 of the Current Report on Form 8-K filed with the Securities and Exchange Commission on March 7, 2006 |
| 10.50 | Extension Letter dated February 27, 2006 from Autobytel Inc. to Richard A. Post is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the Securities and Exchange Commission on March 3, 2006 |
| 10.51 | First Amendment to Employment Agreement dated as of April 26, 2006 between Autobytel Inc. and Michael Schmidt is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the Securities and Exchange Commission on May 1, 2006 |
| 10.52 | 2006 Inducement Stock Option Plan is incorporated herein by reference to Exhibit 4.9 of the Registration Statement on Form S-8 (File No. 333-135076) filed with the Securities and Exchange Commission on June 16, 2006 (the "2006 S-8") |
| 10.53 | Form of Employee Inducement Stock Option Agreement is incorporated herein by reference to Exhibit 4.10 of the 2006 S-8 |
| 10.54 | Inducement Stock Option Agreement dated March 20, 2006 between James E. Riesenbach and Autobytel is incorporated herein by reference to Exhibit 4.11 of the 2006 S-8 |
| 10.55† | Settlement Agreement entered into as of December 19, 2006 among Autobytel Inc., The Cobalt Group, Inc., Dealix Corporation and for limited purposes WP Equity Partners, Inc. is incorporated herein by reference to Exhibit 10.76 of the Annual Report on Form 10-K for the Year Ended December 31, 2006 filed with the SEC on March 17, 2007 (the "2006 10-K") |

**Table of Contents**

| Number | Description |
|--------|-------------|
| 10.56 | Employment Agreement, made as of June 5, 2000, between Autobytel Inc. and Russell Bartlett. is incorporated herein by reference to Exhibit 10.77 of the 2006 10-K |
| 10.57 | Letter agreement, dated November 10, 2005, between Autobytel Inc. and Russell Bartlett is incorporated herein by reference to Exhibit 10.78 of the 2006 10-K |
| 10.58 | Employment Agreement, made as of February 8, 2002, between Autobytel Inc. and Mark Garms is incorporated herein by reference to Exhibit 10.79 of the 2006 10-K |
| 10.59 | Letter agreement, dated July 12, 2004, between Autobytel Inc. and Mark Garms is incorporated herein by reference to Exhibit 10.80 of the 2006 10-K |
| 10.60 | Employment Agreement, dated as of January 30, 2007 between the Company and Mr. Houdeshell is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on February 2, 2007 |
| 10.61 | Inducement Stock Option Agreement, dated January 30, 2007 between the Company and Mr. Houdeshell is incorporated herein by reference to Exhibit 10.2 of the Current Report on Form 8-K filed with the SEC on February 2, 2007 |
| 10.62 | Second Amendment to Employment Agreement, dated as of March 16, 2007 between the Company and Michael Schmidt is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on March 22, 2007 |
| 10.63 | Stock Purchase Agreement, dated as of June 29, 2007, between the Company, Retention Performance Marketing, Inc. and Call Command, Inc. is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on July 5, 2007 |
| 10.64 | 2007 Amendment to Auto-By-Tel Corporation 1996 Employee Stock Purchase Plan is incorporated herein by reference to Exhibit 10.2 of Form 10-Q for the Quarter Ended June 30, 2007 filed with the SEC on August 9, 2007 |
| 10.65 | First Amendment to Employment Agreement, dated as of July 19, 2007, between the Company and Ariel Amir is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on July 20, 2007 |
| 10.66 | Letter agreement, dated July 30, 2007, between the Company and Russell Bartlett is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on August 3, 2007 |
| 10.67 | Letter Agreement, dated October 30, 2007, between the Company and Jill Richling is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on November 5, 2007 |
| 10.68 | Letter Agreement dated October 4, 2007 between the Company and Curtis DeWalt is incorporated herein by reference to Exhibit 10.1 of the Current Report on Form 8-K filed with the SEC on November 15, 2007 |
| 10.69 | Letter Agreement dated October 30, 2007 between the Company and Curtis DeWalt is incorporated herein by reference to Exhibit 10.2 of the Current Report on Form 8-K filed with the SEC on November 15, 2007 |
| 10.70* | Letter Agreement dated June 19, 2006 between the Company and Jonathan Rosen |
| 10.71* | Letter Agreement dated August 9, 2006 between the Company and Jonathan Rosen |
| 10.72* | Letter Agreement dated July 19, 2007 between the Company and Jonathan Rosen |
| 10.73* | Letter Agreement between the Company and Mark Canon |
| 10.74* | Letter Agreement dated June 21, 2006 between the Company and Mark Canon |
| 21.1* | Subsidiaries of Autobytel |
| 23.1* | Consent of Independent Registered Public Accounting Firm |
| 23.2* | Consent of Independent Registered Public Accounting Firm |
| 24.1* | Power of Attorney (included in the signature page hereto) |
| 31.1* | Chief Executive Officer Section 302 Certification of Periodic Report, dated March 17, 2008 |
| 31.2* | Chief Financial Officer Section 302 Certification of Periodic Report, dated March 17, 2008 |
| 32.1* | Chief Executive Officer and Chief Financial Officer Section 906 Certification of Periodic Report, dated March 17, 2008 |

\* Filed herewith.

† Confidential treatment has been requested with regard to certain portions of this document. Such portions were filed separately with the Securities and Exchange Commission.

June 19, 2006

Jon Rosen
11711 Beall Mountain Road
Potomac, MD 20854

Dear Jon:

It is a pleasure to offer you the position of S.V.P., Web Business Operations at **Autobytel Inc.** Please be reminded that our offer of employment is contingent upon completion of our background check and your reviewing and accepting the terms of our various pre-hire and new-hire documents, including the employee handbook, the Confidentiality Agreement, the Arbitration Agreement, the Securities Trading Policy, and the Code of Conduct and Ethics for Employees, Officers and Directors. Following is a summary of our offer:

| | |
|---|---|
| Position: | S.V.P., Web Business Operations |
| Semi-Monthly Rate: | $10,000.00 ($240,000.00 Annualized) |
| Hire Date: | June 19, 2006 |
| Stock Options: | 250,000 subject to board approval and applicable securities laws. |
| Bonus Opportunity: | Target bonus opportunity is up to 45%, on an annual basis based on achievement of specified objectives. Specific objectives and plan details to be outlined in a separate document and incorporated herein by reference. Bonus will be prorated based upon actual time worked within the first year of employment. |
| Relocation: | Autobytel will pay (coach airfare and hotel) for one house hunting trip, up to five (5) days, for you and your spouse. |
| | Autobytel will cover shipment of your household goods, including up to two (2) automobiles; recreational vehicles are not eligible for shipment. |
| | Autobytel will cover the closing costs on the sale of your current primary residence and the purchase of a new primary residence in the Orange County area as described below. Taxes are not eligible for reimbursement. On the sale of your current home, we will cover customary real estate broker fees not to exceed 6%, reasonable legal fees, title costs and similar reasonable out of pocket expenses. For the purchase of a new primary residence, we will cover mortgage origination and financing fees not to exceed two points, reasonable legal fees, title costs and similar reasonable out of pocket expenses. You will have one year from your date of hire to submit for reimbursement of expenses relating to the purchase of a new primary residence. |
| | Autobytel will cover commuting costs (coach air/hotel/meals/rental car) not to exceed once weekly and with the best effort to minimize costs through August 31, 2006. Commuting costs will be covered in accordance with the Autobytel Travel and Expense Reimbursement policy. You agree to relocate to Orange County, California no later than August 31, 2006. |

|  | Autobytel will provide a one-time miscellaneous household expenses of $5,000 to cover expenses incurred in connection with your relocation and to put your new residence into move-in condition in an amount not to exceed five thousand dollars ($5,000.00). This one-time item will be paid within 10 days of notice that you purchased a new residence in Orange County, California. |
|---|---|
|  | The relocation and commuting costs paid by Autobytel will be grossed up for any income taxes levied thereon. |
| Severance: | You will be eligible for a six (6) month severance plan provided you do not resign or are terminated for cause in accordance with the terms approved by the board. Detailed plan will be outlined in a separate document. |

As a condition of employment, you will be required to sign the standard Employee Confidentiality Agreement and the Arbitration Agreement, which will apply during your employment with the Company and thereafter. Two originals of each of these agreements are enclosed for your review. Upon acceptance of this offer of employment, please sign and/or date in the designated areas, and return two signed originals of each directly to me. Jim Riesenbach, **Autobytel Inc.'s** President & CEO, will then sign and return one complete package to you for your records.

Enclosed you will also find information regarding our benefits package. Please review the information, fill out as much as possible, and bring it with you on your first day of employment. If you have any questions or concerns they will be addressed during your new hire orientation or you may contact Terry Brennan at (949) 862-3058.

This offer of employment is contingent on your ability to comply will all applicable State and Federal regulation, including without limitation requirements relating to the I-9 employment authorization verification process. A list of acceptable documents is enclosed. Please bring documents to verify employment eligibility on your first day of work.

The provisions of this letter are severable which means that if any part of the letter is legally unenforceable, the other provisions shall remain fully valid and enforceable. This letter sets forth our complete understanding regarding the matters addressed herein and supersedes all previous agreements or understandings between you and the Company, whether written or oral.

Jon, while we sincerely hope your employment relationship with Autobytel Inc., will be mutually rewarding, we want to be clear that by our policy, your employment is "at will" and there is no express or implied contract of employment for a specified period of time. This means that you may resign at any time without notice and that Autobytel Inc., may terminate your employment or change the terms of your employment, including but not limited to your duties, position, or compensation, at any time without cause and without notice. Our at-will employment policy may not be changed except by an explicit written agreement signed by both you and the President and CEO of Autobytel Inc. This policy supersedes any prior written or oral communications to the contrary.

In addition, Autobytel requires that you comply with all terms of any employment agreement that you may have with your current or former employer. Specifically, Autobytel expects that you will comply with any notification requirements of any agreement with your former employer, and Autobytel will adjust your start date accordingly to accommodate any required notice period.

Autobytel further expects that you will comply with any confidentiality provisions of any agreement with your former employer. Moreover, and regardless of whether you have a written agreement with such former employer, Autobytel does not want you to disclose to us or provide copies of any confidential, proprietary or trade secret information from such former employer.

This offer shall expire 7 days from date of issue. Please indicate acceptance of our offer by signing and returning the enclosed copy of this letter. By signing this offer letter you also will be acknowledging that you are not relying on any promises or representations other than those set forth above in deciding to accept this conditional offer of employment. You may fax a signed copy, if you wish, to our confidential fax at (949) 862-1324. Feel free to call if you have questions. We look forward to having you join the Autobytel Inc., team.

/s/ Jon Rosen
Jon Rosen

Best regards,

**Autobytel Inc.**

/s/ Mark Ernst
Mark Ernst
V.P., Human Resources

/s/ James E. Riesenbach
James E. Riesenbach
CEO and President

August 9, 2006

Jonathan Rosen
11711 Beall Mtn Rd
Potomac, MD 20854

Dear Mr. Rosen:

Autobytel Inc. (the "Company") and Jonathan Rosen, Senior Vice President, Web Business Operations ("Employee"), hereby agree as follows:

In the event of termination of the Employee by the Company without Cause (as defined in Schedule I attached hereto) or by the Employee for Good Reason (as defined in Schedule I attached hereto), the Employee shall be entitled to a severance payment equal to six months base salary at the highest rate paid to Employee while employed by the Company and Benefits (as defined in Schedule I hereto) for six months following termination.

The provisions of this letter are severable which means that if any part of this letter is legally unenforceable, the other provisions shall remain fully valid and enforceable. This letter sets forth our complete understanding regarding the matters addressed herein and supersedes all previous agreements or understandings between Employee and the Company, whether written or oral.

No modification, waiver, amendment, discharge or change of this letter, shall be valid unless the same is in writing and signed by the party against whom enforcement of such modification, waiver, amendment, discharge, or change is sought.

Any controversy or claim arising out of, or related to, this letter, or the breach thereof, shall be settled by binding arbitration in the City of Irvine, California, in accordance with the rules then in effect of the American Arbitration Association, and the arbitrator's decision shall be binding and final, and judgment upon the award rendered may be entered in any court having jurisdiction thereof. Each party hereto shall pay its or their own expenses incident to the negotiation, preparation and resolution of any controversy or claim arising out of, or related to, this letter, or the breach thereof.

Employee acknowledges and agrees that nothing in this letter shall confer upon Employee any right with respect to continuation of employment by the Company, nor shall it interfere in any way with Employee's right or the Company's right to terminate Employee's employment at any time, with or without Cause.

This letter shall be construed and enforced in accordance with the laws of the State of California.

Please execute a copy of this letter confirming your acceptance of and agreement with the foregoing.

Sincerely,

/s/ James E. Riesenbach

James E. Riesenbach
President and CEO

AGREED AND ACCEPTED:

as of the 9 day of August, 2006.

/s/ Jonathan Rosen

Jonathan Rosen

As used herein, the term "for Cause" shall refer to the termination of the Employee's employment as a result of any one or more of the following: (i) any conviction of, or pleading of nolo contendre by, the Employee for any crime or felony; (ii) any willful misconduct of the Employee which has a materially injurious effect on the business or reputation of the Company; (iii) the gross dishonesty of the Employee which has a materially injurious effect on the business or reputation of the Company; or (iv) failure to consistently discharge Employee's duties under this Agreement which failure continues for thirty (30) days following written notice from the Company detailing the area or areas of such failure. For purposes hereof, no act or failure to act, on the part of the Employee, shall be considered "willful" if it is done, or omitted to be done, by the Employee in good faith or with reasonable belief that Employee's action or omission was in the best interest of the Company. The Employee shall have the opportunity to cure any such acts or omissions (other than item (i) above) within fifteen (15) days of the Employee's receipt of notice from the Company finding that, in the good faith opinion of the Company, the Employee is guilty of acts or omissions constituting "Cause".

The term termination "without Cause" shall mean the termination of the Employee's employment for any reason other than (i) death, (ii) disability (as determined by the Company) or (iii) those reasons expressly set forth in the definition "for Cause" above, or no reason at all, and shall also mean the Employee's decision to terminate Employee's employment with the Company by reason of any act, decision or omission by the Company or the Board that materially reduces Employee's salary or the Employee's authority, functions or duties (each a "Good Reason").

"Benefits" shall mean participation, including eligible dependents, in any Company medical, dental or other health plans.

July 19, 2007

Jon Rosen
124 Lessay
Newport Coast, CA 92657

Dear Jon:

Reference is made to that certain letter agreement, dated June 19, 2006, between Jon Rosen ("Employee") and Autobytel Inc. ("Company"), pursuant to which Employee was offered and accepted the position of Senior Vice President, Web Business Operations of the Company (the "Letter").

Under such Letter, the Company agreed to cover the closing costs on the sale of Employee's then current primary residence as described in the Letter. In lieu of covering such costs, including, without limitation, customary real estate broker fees not to exceed 6%, reasonable legal fees, title costs and similar reasonable out of pocket expenses, the Company and Employee agree that the Company will pay Employee seventy five thousand dollars ($75,000).

This letter sets forth our complete understanding regarding the matters addressed herein and supersedes all previous agreements or understandings between Employee and the Company, whether written or oral, regarding the subject matter hereof. Except as modified by this letter, the other provisions of the Letter shall remain in full force and effect.

Please evidence your agreement with the foregoing by signing below and returning a signed copy of this letter to the undersigned.

Best regards,

**Autobytel Inc.**

/s/ James E. Riesenbach
James E. Riesenbach
CEO and President

ACCEPTED AND AGREED TO
this 19 day of July, 2007:

/s/ Jon Rosen
Jon Rosen

James M. Canon
3105 Legation St NW
Washington DC 20015

Dear Mark:

It is a pleasure to offer you the position of Senior Vice President, Chief Product Officer at **Autobytel Inc.** Please be reminded that our offer of employment is contingent upon completion of our background check and your reviewing and accepting the terms of our various pre-hire and new-hire documents, including the employee handbook, the Confidentiality Agreement, the Arbitration Agreement, the Securities Trading Policy, and the Code of Conduct and Ethics for Employees, Officers and Directors. Following is a summary of our offer:

| | |
|---|---|
| Position: | Senior Vice President, Chief Product Officer |
| Semi-Monthly Rate: | $11,041.67 ($265,000.00 Annualized) |
| Hire Date: | July 10, 2006 |
| Stock Options: | 300,000 subject to applicable securities laws. |
| Bonus Opportunity: | Target bonus opportunity is up to 45%, on an annual basis based on achievement of specified objectives. Specific objectives and plan details to be outlined in a separate document and incorporated herein by reference. Bonus will be prorated based upon actual time worked within the first year of employment. |
| Relocation: | Autobytel will pay (coach airfare and hotel) for one house hunting trip, up to five (5) days, for you and your spouse. |
| | Autobytel will cover shipment of your household goods, including up to two (2) automobiles; recreational vehicles are not eligible for shipment. |
| | Autobytel will cover the closing costs on the sale of your current primary residence and the purchase of a new primary residence in the Orange County area as described below. Taxes are not eligible for reimbursement. On the sale of your current home, we will cover customary reasonable real estate broker fees not to exceed 6%, reasonable legal fees, title costs and similar reasonable out of pocket expenses. For the purchase of a new primary residence, we will cover mortgage origination and financing fees not to exceed two points, reasonable legal fees, title costs and similar reasonable out of pocket expenses. You will have one year from your date of hire to submit for reimbursement of expenses relating to the purchase of a new primary residence. |
| | Autobytel will cover commuting costs (coach air/hotel/meals/rental car) not to exceed once weekly and with the best effort to minimize costs through August 31, 2006. Commuting costs will be covered in accordance with the Autobytel Travel and Expense Reimbursement policy. We expect that your relocation will take place no later than August 31, 2006. |

Autobytel will provide a one-time miscellaneous household expenses of $5,000 to cover expenses incurred in connection with your relocation and to put your new residence into move-in condition in an amount not to exceed five thousand dollars ($5,000.00). This one-time item will be paid within 10 days of notice that you purchased a new residence in Orange County, California.

The relocation and commuting costs paid by Autobytel will be grossed up for any income taxes levied thereon.

Severance:      You will be eligible for severance as provided in the attached letter which will be entered into by the parties on your date of hire.

As a condition of employment, you will be required to sign the standard Employee Confidentiality Agreement and the Arbitration Agreement, which will apply during your employment with the Company and thereafter. Two originals of each of these agreements are enclosed for your review. Upon acceptance of this offer of employment, please sign and/or date in the designated areas, and return two signed originals of each directly to me. Jim Riesenbach, **Autobytel Inc.'s** President & CEO, will then sign and return one complete package to you for your records.

Enclosed you will also find information regarding our benefits package. Please review the information, fill out as much as possible, and bring it with you on your first day of employment. If you have any questions or concerns they will be addressed during your new hire orientation or you may contact Terry Brennan at (949) 862-3058.

This offer of employment is contingent on your ability to comply will all applicable State and Federal regulation, including without limitation requirements relating to the I-9 employment authorization verification process. A list of acceptable documents is enclosed. Please bring documents to verify employment eligibility on your first day of work.

The provisions of this letter are severable which means that if any part of the letter is legally unenforceable, the other provisions shall remain fully valid and enforceable. This letter sets forth our complete understanding regarding the matters addressed herein and supersedes all previous agreements or understandings between you and the Company, whether written or oral.

Mark, while we sincerely hope your employment relationship with Autobytel Inc., will be mutually rewarding, we want to be clear that by our policy, your employment is "at will" and there is no express or implied contract of employment for a specified period of time. This means that you may resign at any time without notice and that Autobytel Inc., may terminate your employment or change the terms of your employment, including but not limited to your duties, position, or compensation, at any time without cause and without notice. Our at-will employment policy may not be changed except by an explicit written agreement signed by both you and the President and CEO of Autobytel Inc. This policy supersedes any prior written or oral communications to the contrary.

In addition, Autobytel requires that you comply with all terms of any employment agreement that you may have with your current or former employer. Specifically, Autobytel expects that you will comply with any notification requirements of any agreement with your former employer, and Autobytel will adjust your start date accordingly to accommodate any required notice period.

Autobytel further expects that you will comply with any confidentiality provisions of any agreement with your former employer. Moreover, and regardless of whether you have a written agreement with such former employer, Autobytel does not want you to disclose to us or provide copies of any confidential, proprietary or trade secret information from such former employer.

This offer shall expire 7 days from date of issue. Please indicate acceptance of our offer by signing and returning the enclosed copy of this letter. By signing this offer letter you also will be acknowledging that you are not relying on any promises or representations other than those set forth above in deciding to accept this conditional offer of employment. You may fax a signed copy, if you wish, to our confidential fax at (949) 862-1324. Feel free to call if you have questions. We look forward to having you join the Autobytel Inc., team.

/s/ Mark Canon
Mark Canon

Best regards,

**Autobytel Inc.**

/s/ Mark Ernst
Mark Ernst
V.P., Human Resources

/s/ James E. Riesenbach
James E. Riesenbach
CEO and President

June 21, 2006

James M. Canon
3105 Legation St NW
Washington DC 20015

Dear Mr. Canon:

Autobytel Inc. (the "Company") and Mark Canon, Senior Vice President and Chief Product Officer ("Employee"), hereby agree as follows:

In the event of termination of the Employee by the Company without Cause (as defined in Schedule I attached hereto) or by the Employee for Good Reason (as defined in Schedule I attached hereto), the Employee shall be entitled to a severance payment equal to twelve months base salary at the highest rate paid to Employee while employed by the Company and Benefits (as defined in Schedule I hereto) for twelve months following termination.

The provisions of this letter are severable which means that if any part of this letter is legally unenforceable, the other provisions shall remain fully valid and enforceable. This letter sets forth our complete understanding regarding the matters addressed herein and supersedes all previous agreements or understandings between Employee and the Company, whether written or oral.

No modification, waiver, amendment, discharge or change of this letter, shall be valid unless the same is in writing and signed by the party against whom enforcement of such modification, waiver, amendment, discharge, or change is sought.

Any controversy or claim arising out of, or related to, this letter, or the breach thereof, shall be settled by binding arbitration in the City of Irvine, California, in accordance with the rules then in effect of the American Arbitration Association, and the arbitrator's decision shall be binding and final, and judgment upon the award rendered may be entered in any court having jurisdiction thereof. Each party hereto shall pay its or their own expenses incident to the negotiation, preparation and resolution of any controversy or claim arising out of, or related to, this letter, or the breach thereof.

Employee acknowledges and agrees that nothing in this letter shall confer upon Employee any right with respect to continuation of employment by the Company, nor shall it interfere in any way with Employee's right or the Company's right to terminate Employee's employment at any time, with or without Cause.

This letter shall be construed and enforced in accordance with the laws of the State of California.

Please execute a copy of this letter confirming your acceptance of and agreement with the foregoing.

Sincerely,

/s/ James E. Riesenbach
James E. Riesenbach
President and CEO

AGREED AND ACCEPTED:

this 23 day of June, 2006.

/s/ Mark Canon
Mark Canon

As used herein, the term "for Cause" shall refer to the termination of the Employee's employment as a result of any one or more of the following: (i) any conviction of, or pleading of nolo contendre by, the Employee for any crime or felony; (ii) any willful misconduct of the Employee which has a materially injurious effect on the business or reputation of the Company; (iii) the gross dishonesty of the Employee which has a materially injurious effect on the business or reputation of the Company; or (iv) failure to consistently discharge Employee's duties under this Agreement which failure continues for thirty (30) days following written notice from the Company detailing the area or areas of such failure. For purposes hereof, no act or failure to act, on the part of the Employee, shall be considered "willful" if it is done, or omitted to be done, by the Employee in good faith or with reasonable belief that Employee's action or omission was in the best interest of the Company. The Employee shall have the opportunity to cure any such acts or omissions (other than item (i) above) within fifteen (15) days of the Employee's receipt of notice from the Company finding that, in the good faith opinion of the Company, the Employee is guilty of acts or omissions constituting "Cause".

The term termination "without Cause" shall mean the termination of the Employee's employment for any reason other than (i) death, (ii) disability (as determined by the Company) or (iii) those reasons expressly set forth in the definition "for Cause" above, or no reason at all, and shall also mean the Employee's decision to terminate Employee's employment with the Company by reason of any act, decision or omission by the Company or the Board that (a) materially reduces Employee's salary or the Employee's authority, functions or duties, (b) changes his reporting to an officer below the level of President or Chief Executive Officer or (c) relocates the Employee without his consent from the Company's offices located at 18872 MacArthur Boulevard, Irvine, California, 92612-1400 to any other location in excess of fifty (50) miles beyond the geographic limits of Irvine, California (each a "Good Reason").

"Benefits" shall mean participation, including eligible dependents, in any Company medical, dental or other health plans.

Subsidiaries of Autobytel Inc.

Autobytel Services Corporation, a Delaware corporation

Auto-By-Tel Acceptance Corporation, a Delaware corporation

Auto-By-Tel Insurance Services, Inc., a Delaware corporation

e~autosdirect.com inc., a Delaware corporation, doing business as "autobyteldirect.com"

Autoweb.com, Inc., a Delaware corporation

A.I.N. Corporation, a California corporation, doing business as "CarSmart.com"

Autobytel I Corp., a Delaware corporation

Car.com, Inc., a Delaware corporation

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in Registration Statements on Form S-8 (No. 333-135076, No. 333-116930, No. 333-107525, No. 333-90045, No. 333-77943, No. 333-33038, No. 333-39396, No. 333-67692, No. 333-70334 and No. 333-145280) of Autobytel Inc. and subsidiaries (the Company) of our reports dated March 17, 2008 related to our audit of the consolidated financial statements, financial statement schedule and internal control over financial reporting, which appear in this Annual Report on Form 10-K of the Company for the year ended December 31, 2007.

Our report, dated March 17, 2008, on the effectiveness of internal control over financial reporting as of December 31, 2007, expressed an opinion that the Company had maintained effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

/s/ MCGLADREY & PULLEN, LLP

Irvine, California
March 17, 2008

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-116930, 333-107525, 333-90045, 333-77943, 333-33038, 333-39396, 333-67692, 333-70334, 333-135076 and 333-145280) of Autobytel Inc. of our report dated March 16, 2006 relating to the consolidated financial statements and financial statement schedule, which appears in this Form 10-K.

/s/   P RICEWATERHOUSE C OOPERS LLP
PricewaterhouseCoopers LLP

Irvine, CA
March 12, 2008

## CERTIFICATION

I, James E. Riesenbach, certify that:

1. I have reviewed this annual report on Form 10-K of Autobytel Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 17, 2008

/s/ JAMES E. RIESENBACH
James E. Riesenbach,
*President and Chief Executive Officer*

## CERTIFICATION

I, Monty A. Houdeshell, certify that:

1. I have reviewed this annual report on Form 10-K of Autobytel Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 17, 2008

/s/ Monty A. Houdeshell
Monty A. Houdeshell,
*Executive Vice President and*
*Chief Financial Officer*

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Autobytel Inc. (the " *Company* ") on Form 10-K for the period ended December 31, 2007 (the " *Report* "), we, James E. Riesenbach, Chief Executive Officer of the Company, and Monty A. Houdeshell, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that:

1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ J AMES E. R IESENBACH
James E. Riesenbach
*Chief Executive Officer*
March 17, 2008

/s/ M ONTY A. H OUDESHELL
Monty A. Houdeshell
*Executive Vice President and*
*Chief Financial Officer*
March 17, 2008

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signatures that appear in typed form within the electronic version of this written statement required by Section 906, has been provided to Autobytel Inc. and will be retained by Autobytel Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

# Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FILED-CLERK
U.S. DISTRICT COURT

04 SEP 24 PM 4: 17

TX EASTERN-MARSHALL

BY_____

AUTOBYTEL INC.,

                  Plaintiff,

vs.

DEALIX CORPORATION,

                  Defendant.

CASE NO.   2 - 0 4 C V - 3 3 8  *LD*

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, by and through its designated attorneys, complains and alleges as follows:

### THE PARTIES

1.      Plaintiff Autobytel Inc. (hereinafter "Autobytel") is a corporation organized and existing under the laws of the State of Delaware, and has its principal place of business at 18872 MacArthur Boulevard, Irvine, California 92612.

2.      On information and belief, Defendant Dealix Corporation (hereinafter "Dealix") is a corporation organized and existing under the laws of the State of California and has a principal place of business at 720 Bay Road, Suite 200, Redwood City, California 94063-2469 and/or 445 Cambridge Avenue, Suite D, Palo Alto, California 94306.

### JURISDICTION AND VENUE

3.      This lawsuit is an action for patent infringement. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. 1338(a), and has jurisdiction over the parties in that Plaintiff is informed and believes, and thereon alleges, that

Defendant has transacted and is transacting business and has regularly solicited and is soliciting business in Texas and specifically in this District and has purposefully availed itself of the jurisdiction of this court.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b), because a substantial part of the events giving rise to the claim occurred in this District. Defendant has committed, and will continue to commit, acts of infringement throughout the United States, including Texas and specifically in this District.

5.     Venue is also proper in this district under 28 U.S.C. § 1391(c) and 28 U.S.C. § 1400(b), because Defendant's contacts with this District are sufficient to render Defendant amenable to personal jurisdiction in this District and Defendant therefore resides in this District. Defendant's general contacts with this judicial district include (1) advertising and offering for sale products and services related to the distribution of automobile purchase requests to automobile dealers and (2) transacting business and soliciting business in Texas and specifically in this District.  Defendant has purposefully availed itself of the jurisdiction of this Court, and therefore resides in this District under 28 U.S.C. § 1391(c).

## THE PATENT-IN-SUIT

6.     On August 28, 2001, United States Letters Patent No. 6,282,517 entitled "Real Time Communication of Purchase Requests" (hereinafter "the '517 Patent") were duly and legally issued to assignee autobytel.com inc.  The named inventors on the '517 Patent are Don P. Wolfe, Douglas S. Nottage, Kevin J. Wagoner and Tim E. Nelson.  Plaintiff is the current assignee of the '517 Patent.[1]  A true and correct copy of the '517 Patent is attached hereto as Exhibit 1.

---

[1] Plaintiff's name at the time the inventors' assignments were executed, April 1999, was "autobytel.com inc."  On August 14, 2001, Plaintiff's name was changed to its current form, "Autobytel Inc."

## FIRST CLAIM

## (Infringement of U.S. Patent No. 6,282,517)

7.      Plaintiff hereby incorporates by reference paragraphs 1 through 6 as though set forth herein in their entirety.

8.      Upon information and belief, Defendant has infringed one or more claims of the '517 Patent in violation of 35 U.S.C. § 271 by, without authority, (1) making, using, offering to sell and selling systems and/or methods that embody the invention claimed in the '517 Patent, and/or (2) actively inducing and/or contributing to others' infringement of the '517 Patent.

9.      Upon information and belief, Defendant's acts of infringement will continue after service of this complaint.

10.     As a result of Defendant's infringement, Plaintiff has suffered and will suffer damages in the form of lost profits, or at a minimum, will be entitled to recover a reasonable royalty.

11.     Unless Defendant is enjoined by this Court from continuing its infringement of the '517 Patent, Plaintiff will suffer additional irreparable damages and impairment of the value of its patent rights.  Thus, Plaintiff is entitled to an injunction against further infringement.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered by this Court in its favor and against Defendant, providing the following relief:

A.      The entry of judgment declaring that the '517 Patent is valid, enforceable, and that Defendant has infringed the '517 Patent;

B.      An order that Defendant be permanently enjoined and restrained from infringing the '517 Patent;

C.      An order that Defendant be required to account for any and all damages caused by Defendant's complained of activities;

D.      An award of damages that Plaintiff has sustained by reason of Defendant's patent infringement;

E.      An award of costs incurred in connection with this suit;

F.      An award of interest, including pre-judgment interest, at the legal rate; and

G.      An award of such further and other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury as to all issues so triable.

By: _____
Sam Baxter, Attorney-in-Charge
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
P.O. Box O
505 E. Travis, Suite 105
Marshall, Texas 75670
Telephone: (903) 927-2111
Telecopier: (903) 927-2622

Robert M. Manley
Texas State Bar No. 00787955
rmanley@mckoolsmith.com
300 Crescent Court
Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

**ATTORNEYS FOR PLAINTIFF
AUTOBYTEL INC.**

4

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| AUTOBYTEL INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.2:07-cv-524-TJW |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| INSWEB CORPORATION, | ) | |
| LEADPOINT, INC., | ) | |
| INTERNET BRANDS, INC., and | ) | |
| AUTO INTERNET MARKETING, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Autobytel Inc. ("Autobytel") complains of defendants, InsWeb Corporation ("InsWeb"), LeadPoint, Inc. ("LeadPoint"), Internet Brands, Inc. ("Internet Brands"), and Auto Internet Marketing, Inc. ("Auto Internet Marketing") as follows:

## NATURE OF ACTION

1.  This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, including 35 U.S.C. §§ 271 and 281.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1338(a).

3.  The defendants are subject to personal jurisdiction in this judicial district because, upon information and belief, each defendant has transacted and is transacting business and has regularly solicited and is soliciting business in Texas and specifically in this district.

4.  The defendants are also subject to personal jurisdiction in this judicial district because, upon information and belief, each defendant has committed and is committing acts of infringement in this judicial district, at least by advertising and making available their infringing systems and/or methods through the Internet in such a way as to reach customers in this judicial district.

5.  Venue is proper under 28 U.S.C. § 1391(b) and (c) and 1400(b), as each defendant is subject to personal jurisdiction, does business, and has committed acts of infringement in this judicial district.


## AUTOBYTEL AND THE PATENT-IN-SUIT

6.  The patent-in-suit is United States Patent No. 6,282,517 ("the '517 patent"), entitled "Real Time Communication of Purchase Requests" (Exhibit A).  The '517 patent was filed on January 14, 1999 and issued on August 28, 2001.

7.  Autobytel is a corporation organized and existing under the laws of the State of Delaware, and has its principal place of business at 18872 MacArthur Boulevard, Irvine, California 92612.

8.  Autobytel owns all rights, title and interest in and has standing to sue for infringement of the '517 patent.

9.  Autobytel has complied with the requirements of 35 U.S.C. §287.

## PRIOR ENFORCEMENT OF THE '517 PATENT IN THIS DISTRICT

10.  On September 24, 2004, Autobytel asserted the '517 patent against Dealix Corporation in Civil Action No. 2:04-cv-00338 in this judicial district.  After extended proceedings, the parties reached a settlement of their dispute.  As a result, the suit was dismissed on March 26, 2007.

## INSWEB

11.  Upon information and belief, InsWeb is a Delaware corporation and has its principal offices at 11290 Pyrites Way, Suite 200, Gold River, CA 95670.

12. InsWeb operates at least two websites (http://www.insweb.com and http://www.agentinsider.com).

13.  Upon information and belief, InsWeb has infringed one or more claims of the '571 patent in violation of 35 U.S.C. § 271 by, without authority, (1) making, using, offering to sell and selling systems and/or methods that embody the invention claimed in the '517 patent; and/or (2) actively inducing and/or contributing to others' infringement of the invention claimed in the '517 patent.  InsWeb's infringing activities have occurred at least through the operation of the websites identified in paragraph 12.

14.  InsWeb's acts of infringement have injured Autobytel.  Accordingly, Autobytel is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

15.  InsWeb's acts of infringement will continue to injure Autobytel, unless and until this Court enters an injunction prohibiting further infringement of the '517 patent.

## LEADPOINT

16.  Upon information and belief, LeadPoint is a Delaware corporation and has its principal offices at 11661 San Vicente Boulevard, Suite 800, Los Angeles, CA 90049.

17.  LeadPoint operates at least the website, http://www.leadpoint.com.

18.  Upon information and belief, LeadPoint has infringed one or more claims of the '571 patent in violation of 35 U.S.C. § 271 by, without authority, (1) making, using, offering to sell and selling systems and/or methods that embody the invention claimed in the '517 patent; and/or (2) actively inducing and/or contributing to others' infringement of the invention claimed in the '517 patent.  LeadPoint's infringing activities have occurred at least through the operation of the website identified in paragraph 17.

19.  LeadPoint's acts of infringement have injured Autobytel.  Accordingly, Autobytel is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

20.  LeadPoint's acts of infringement will continue to injure Autobytel, unless and until this Court enters an injunction prohibiting further infringement of the '517 patent.

## INTERNET BRANDS

21.  Upon information and belief, Internet Brands is a Delaware corporation and has its principal offices at 909 North Sepulveda Boulevard, 11th Floor, El Segundo, CA 90245.

22. Internet Brands operates numerous websites, including but not limited to http://www.carsdirect.com, http://connect.carsdirect.com, http://www.autos.com, http://dealers.autos.com, and http://www.loanapp.com.

23. Upon information and belief, Internet Brands has infringed one or more claims of the '571 patent in violation of 35 U.S.C. § 271 by, without authority, (1) making, using, offering to sell and selling systems and/or methods that embody the invention claimed in the '517 patent; and/or (2) actively inducing and/or contributing to others' infringement of the invention claimed in the '517 patent. Internet Brands' infringing activities have occurred at least through the operation of the website identified in paragraph 22.

24. Internet Brands' acts of infringement have injured Autobytel. Accordingly, Autobytel is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

25. Internet Brands' acts of infringement will continue to injure Autobytel, unless and until this Court enters an injunction prohibiting further infringement of the '517 patent.

## AUTO INTERNET MARKETING

26. Upon information and belief, Auto Internet Marketing is a corporation with its principal offices at 2495 Enterprise Road, Suite 201, Clearwater, Florida 33763.

27. Auto Internet Marketing operates at least the website, http://autointernetmarketing.com.

28.  Upon information and belief, Auto Internet Marketing has infringed one or more claims of the '571 patent in violation of 35 U.S.C. § 271 by, without authority, (1) making, using, offering to sell and selling systems and/or methods that embody the invention claimed in the '517 patent; and/or (2) actively inducing and/or contributing to others' infringement of the invention claimed in the '517 patent.  Auto Internet Marketing's infringing activities have occurred at least through the operation of the website identified in paragraph 27.

29.  Auto Internet Marketing's acts of infringement have injured Autobytel. Accordingly, Autobytel is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

30.  Auto Internet Marketing's acts of infringement will continue to injure Autobytel, unless and until this Court enters an injunction prohibiting further infringement of the '517 patent.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, Autobytel, respectfully requests this Court enter judgment against InsWeb, LeadPoint, Internet Brands, and Auto Internet Marketing individually and separately, and against their subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with them, granting the following relief:

A.    The entry of judgment in favor of Autobytel and against each defendant;

B.    An award of damages adequate to compensate Autobytel for the

infringement that has occurred (together with prejudgment interest from the date the infringement began), but in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284;

C.    A finding that this case is exceptional and an award to Autobytel of its attorneys' fees and costs as provided by 35 U.S.C. § 285;

D.    A permanent injunction prohibiting further infringement, inducement of infringement and/or contributory infringement of the '517 patent; and,

E.    Such other relief that Autobytel is entitled to under law and any other relief that this Court or a jury may deem just and proper.

## **JURY DEMAND**

Autobytel demands a trial by jury on all issues presented in this Complaint.

Respectfully submitted,

/s/ Sam Baxter
Samuel F. Baxter
Lead Attorney
State Bar No. 01938000
McKool Smith P.C.
104 East Houston, Suite 300
Marshall, TX 75670
(903) 923-9000 - Telephone
(903) 923-9033 - Facsimile
sbaxter@mckoolsmith.com

Robert M. Manley
State Bar No. 00787955
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4226 – Telephone
(214) 978-4044 – Facsimile
rmanley@mckoolsmith.com

Of Counsel:

Raymond P. Niro
Timothy J. Haller
Christopher J. Lee
Tahiti Arsulowicz
Niro, Scavone, Haller & Niro
181 West Madison Street, Suite 4600
Chicago, IL 60602
(312) 236-0722 - Telephone
(312) 236-3137 – Facsimile
rniro@nshn.com
haller@nshn.com
clee@nshn.com
arsulowicz@nshn.com

**Counsel for Plaintiff Autobytel Inc.**

(12) **United States Patent**
Wolfe et al.

(10) Patent No.:     **US 6,282,517 B1**
(45) Date of Patent:     **Aug. 28, 2001**

(54) **REAL TIME COMMUNICATION OF PURCHASE REQUESTS**

(75) Inventors: **Don P. Wolfe; Douglas S. Nottage**, both of Irvine; **Kevin J. Waggoner**, Rialto; **Tim E. Nelson**, Pomona, all of CA (US)

(73) Assignee: **autobytel.com, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/231,409**

(22) Filed: **Jan. 14, 1999**

(51) Int. Cl.[7] .................................................. **G06F 17/60**

(52) U.S. Cl. ................................ **705/26**; 705/27; 705/28; 705/36

(58) Field of Search .................................. 705/26, 37, 27, 705/28

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,283,731 | 2/1994 | Lalonde et al. . |
| 5,592,375 | 1/1997 | Salmon et al. . |
| 5,671,279 | 9/1997 | Elgamal . |
| 5,710,887 | 1/1998 | Chelliah et al. . |
| 5,842,178 | 11/1998 | Giovannoli . |
| 5,937,391 * | 8/1999 | Ikeda et al. ............................ 705/14 |

OTHER PUBLICATIONS

Henry, Ed; The virtual Car Buyer; Kiplinger's Personal Finance Magazine; p145–150, Sep. 1995.*
Conhaim, Wallys W.; Buying cars online; Link–Up; v15; n5, Sep. 1, 1998.*
Electronic Marketplace Report, Automotive Sites Missing Web Ad Opportunities; v10; n22, Nov. 19, 1996.*
Interactive Marketing News; Auto–by–Tel Wins Educated Customers and Low Prices; v31; n28, Oct. 18, 1996.*

M2Presswire; What Car? TV limited: What car? Online and What Car? Text boost manufacturer and dealer sales leads, Aug. 31, 1998.*
PR Newswire Page; Autoweb.com's New Risk–Free Pricing Structure Revolutionizes Online Car Buying Industry, Feb. 9, 1998.*
Nauman, Matt; The Virtual Showroom Car Shopping on the Web; San Jose Mercury News, Section: Drive; p12, Feb. 7, 1997.*
PR Newswire; Navidec Inc. Announces Third Quarter Results, Nov. 6, 1997.*

(List continued on next page.)

*Primary Examiner*—V. Millin
*Assistant Examiner*—Pedro R. Kanof
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

A method and apparatus for formulating and submitting a purchase request over a computer network and making said purchase request available to a dealer immediately. A Data Center system has a system database, a buyer interface, and a dealer interface. The system database includes an exclusive database region for each participating dealer. A potential buyer submits a purchase request over a computer network to the Data Center system. The purchase request includes a product identification data and a buyer location information. The Data Center system further contains dealer information, product information, and the like. The Data Center system determines at least one appropriate dealer to receive the purchase request. The Data Center creates a purchase request record from the data and information provided in the purchase request. The Data Center then communicates the purchase request to the appropriate dealer by immediately storing the purchase request record into the appropriate dealer's exclusive database region. Thus, the purchase request record becomes immediately available to the appropriate dealer.

**33 Claims, 17 Drawing Sheets**



## US 6,282,517 B1

Page 2

### OTHER PUBLICATIONS

PR Newswire; Navidec Announces "Wheels" Launch Progress Ahead of Schedule, Oct. 27, 1997.*

Naughton, Keith; Revolution in the Showroom: Finally, consumers are in the driver's seat–and pushy dealers look like dinosaurs; Business Week; n3463; p70, Feb. 19, 1996.*

Business Wire; Lycos and AdOne's ClassifiedWarehouse.com Create Online Alliance . . . ; p1093, Dec. 2, 1998.*

Hickford, Michele;Autoweb.com: Industry Leader Autoweb.com Revolutionizes Online Car . . . , Jan. 31, 1998.*

Washington, Frank S.; Autoweb Plans Major Ad Effort; Automotive News; v71; n5726; p1–6, Aug. 11, 1997.*

Akasie, Jacy; Want to buy a new car?; Forbes; v162; n13; p144–148, Sep. 1995.*

* cited by examiner

Case 1:08-cv-00149-SLR    Document 15-2    Filed 07/14/2008    Page 148 of 174



*FIG. 1*



*FIG. 2*

DEALER RECORD

| DEALER IDENTIFICATION NUMBER | DEALER INFORMATION | ACCESS LIST | PRODUCT LIST | NEW VEHICLE PURCHASE REQUESTS | USED VEHICLE PURCHASE REQUESTS |

302    304    306    308    310    312

*FIG. 3*



*FIG. 4*



USED VEHICLE RECORD

| DEALER IDENTIFICATION NUMBER | DEALER STOCK NUMBER | VEHICLE MAKE | VEHICLE MODEL | VEHICLE INFORMATION | VEHICLE PHOTO |
|---|---|---|---|---|---|
| 302 | 502 | 504 | 506 | 508 | 510 |

*FIG. 5*



*FIG. 6*



*FIG. 7*



USED VEHICLE PURCHASE REQUEST RECORD

802 — USED VEHICLE PURCHASE REQUEST IDENTIFICATION NUMBER
804 — SUBMIT TIME STAMP
806 — DEALER IDENTIFICATION NUMBER
808 — DEALER STOCK NUMBER
810 — VEHICLE MAKE
812 — VEHICLE MODEL
814 — VEHICLE MODEL YEAR
816 — PURCHASE TIME FRAME

818 — BUYER INFORMATION
820 — PAYMENT INFORMATION
822 — PRIORITY
824 — PRIVACY
826 — STATUS

FIG. 8



*FIG. 9*



*FIG. 10*



*FIG. 11*

DEALER RECORD

| DEALER IDENTIFICATION NUMBER | DEALER INFORMATION | ACCESS LIST | PRODUCT LIST | NEW VEHICLE PURCHASE REQUESTS | USED VEHICLE PURCHASE REQUESTS |
|---|---|---|---|---|---|
| 100001 | BOC OF IRVINE 123 ANY STREET IRVINE, CA. 92612 | BUICK GM, OLDS GM, CADILAC GM, SALESPERSON 1 . . . SALESPERSON 2 | BUICK CENTRY, BUICK RIVIERA, OLDSMOBILE CUTLASS, CADILAC SEVILLE, | NEW VEHICLE PURCHASE REQUEST 1 NEW VEHICLE PURCHASE REQUEST 2 . . . NEW VEHICLE PURCHASE REQUEST n | USED VEHICLE PURCHASE REQUEST 1 USED VEHICLE PURCHASE REQUEST 2 . . . USED VEHICLE PURCHASE REQUEST n |

FIG. 12



*FIG. 13*

*FIG. 14*



*FIG. 15*



*FIG. 16*



*FIG. 17*

US 6,282,517 B1

1

# REAL TIME COMMUNICATION OF PURCHASE REQUESTS

## RELATED APPLICATIONS

The present application is related to the co-pending and commonly owned U.S. Patent applications having the following titles and attorney docket numbers, each of which was filed on even date herewith:

1. COMPUTER IMPLEMENTED PURCHASING SYSTEM WITH AVAILABLE INVENTORY MANAGEMENT FUNCTIONS, attorney docket number AUTOB.052A
2. SYSTEM AND METHOD FOR SELECTIVELY RETRIEVING INFORMATION ITEMS, attorney docket number AUTOB.050A
3. COMPUTER IMPLEMENTED PURCHASING SYSTEM WITH AFTERMARKET PRODUCT INVENTORY DISPLAY, attorney docket number AUTOB.047A
4. COMPUTER IMPLEMENTED PURCHASING SYSTEM WITH USER ACCESSIBLE PURCHASE REQUEST STATUS, attorney docket number AUTOB.046A
5. REAL TIME VEHICLE PURCHASE REQUEST MANAGEMENT METHOD AND SYSTEM, attorney docket number AUTOB.043A

Each of the above referenced patent applications are incorporated by reference herein in their entireties.

## BACKGROUND

### 1. Field

The present invention is related to systems and methods for conducting transactions using networked computers. Furthermore, this invention relates to communicating a potential customer's purchase request to a seller.

### 2. Description of the Related Art

The global economy has made the business of selling more competitive than ever. Businesses that do not maximize customer satisfaction and profitability may not survive in today's markets. Businesses are therefore demanding tools and methods to provide a competitive edge.

In a conventional vehicle sales scenario, a potential automobile purchaser initiates a purchasing process by visiting a dealership. The customer may make several preliminary visits before making his or her purchasing intent known to the dealer. Until the purchasing intent is revealed, the dealer acts inefficiently in attempting to consummate a customer purchase.

For example, the dealer maintains potentially unnecessary resources to handle the preliminary visits. Not knowing whether the potential customer intends to make a purchase, a large number of salespersons stand ready to confront all visitors to the dealership. However, many visits are preliminary and do not require the assistance of a salesperson. Accordingly, inefficiency is often experienced in such a conventional vehicle dealership setting.

Moreover, in the conventional vehicle dealership, the salesperson works on a commission basis. Because the salesperson's income is directly related to a vehicle's sales price, the salesperson will attempt to sell a vehicle for the highest price possible while still gulling a customer into thinking the customer is getting a great deal. Haggling over the vehicle's price enables the salesperson to achieve this goal.

Haggling over the vehicle's price is an unpleasant process for the customer. Both the customer and dealer invest

2

significant resources in time and energy in this type of negotiation process. Additionally, the dread and intimidation associated with the haggling process often makes it stressful and frustrating for the customer. The customer may decide not to make a purchase as a result of the unpleasant haggling process. Thus, the haggling process introduces additional inefficiency in the vehicle sales process in the form of excess negotiation effort and potential lost sales.

## SUMMARY

The present invention is related to systems and methods for conducting transactions utilizing networked computers. More particularly, this invention relates to communicating a potential customer's vehicle purchase request to a seller.

In conducting a commercial transaction such as the sale of a vehicle, a Data Center system facilitates the creation and submission of a purchase request. The Dalta Center system provides at least a first user web page accessible by a potential buyer. The potential buyer accesses this web page and provides the necessary information needed to create a purchase request.

The buyer provided information is then used to create a new vehicle purchase request record or a used vehicle purchase request record. Both purchase request records contain multiple fields. Each field may additionally contain multiple sub-fields or may even point to other fields or records. The purchase request record contains buyer and product information such as buyer contact information, product description, and payment information.

The purchase request record is stored in a Data Center system database. In one embodiment, the Data Center system database may be partitioned into exclusive database regions. Each participating seller may be assigned an exclusive database region. In another embodiment, a seller record may advantageously exist for each, seller, and the seller record contains information associated with the particular seller. For example, the seller record can contain or point to the seller's purchase request: records. Here, the collection of all records associated with the seller advantageously comprises a virtual exclusive database region in the Data Center system database. The Data Center system database further contains information regarding, for example, sellers, exclusive seller regions, and available products.

When a potential buyer submits either a new vehicle purchase request or a used vehicle purchase request, the Data Center system invokes program modules such as, by way of example, a buyer access module, to create an appropriate purchase request record. Moreover, the Data Center system identifies and notifies an appropriate seller of the purchase request. In one embodiment, the purchase request record is stored in the appropriate seller's exclusive database region. In another embodiment, the seller record may advantageously point to the purchase request record. Thus, the seller immediately becomes aware of the purchase request upon the creation of the purchase request record. In an alternative embodiment, the Data Center system may identify and notify one or a plurality of sellers of the purchase request. Here, the purchase request record may be stored in each identified seller's exclusive database region.

For a new vehicle purchase request, the appropriate seller is advantageously determined by exclusive seller regions based on vehicle make and zip code. For a used vehicle purchase request, the vehicle description generally determines the appropriate seller or sellers.

In one embodiment of the invention, the potential buyer accesses the Data Center system user web pages to submit

3

the purchase request. The Data Center system may assist the buyer in formulating the purchase request. For example, the Data Center system may prompt the buyer to provide the information necessary to create the purchase request.

The Data Center receives the purchase request information from the buyer and determines an appropriate seller to receive the purchase request. The Data Center then proceeds to create and store the appropriate purchase request record in the database; region exclusively assigned to the seller. In one embodiment, the newly created purchase request record may be virtually stored in the seller's exclusive database region by associating or linking the purchase request record to the appropriate seller record.

The present invention facilitates a real time communication of a purchase request to a seller. The real time communication is accomplished by creating the purchase request record in the seller's exclusive database region. As aforementioned, the exclusive database region may either be physically created or virtually created. The real time communication of the purchase request to the seller occurs upon the creation of the purchase request record in its exclusive database region. The seller becomes aware of the newly created purchase request immediately upon the creation of the purchase request record.

In one example, a seller A may be accessing its exclusive database region via a network. Concurrently, a potential buyer may submit a purchase request to the Dalia Center. The Data Center system may determine seller A as the seller to receive the purchase request and accordingly, create a purchase request record in seller A's exclusive database region. This is analogous to the buyer submitting the purchase request by directly writing into the seller=3 s exclusive database region. Immediately upon the purchase request record's creation, seller A becomes aware of the newly created purchase request because the seller has direct access to its exclusive database region. In one embodiment, Seller A's computer screen may be immediately refreshed to reflect the newly created purchase request. In another embodiment, Seller A may be notified via communication mechanisms such as e-mail, page, telephone message, or the like.

Thus, in contrast to conventional systems, the seller is made aware of a new purchase request without significant processing delay. Moreover, the seller may 5 efficiently and advantageously act upon the purchase request in real time.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects, advantages, and novel features of the invention will become apparent upon reading the following detailed description and upon reference to accompanying drawings in which:

FIG. 1 is a system block diagram illustrating an embodiment of the overall network architecture of the invention;

FIG. 2 is a representation of one embodiment of an exclusive dealer regions record of the invention;

FIG. 3 is a representation of one embodiment of a dealer record of the invention;

FIG. 4 is a representation of one embodiment of a new vehicle record of the invention;

FIG. 5 is a representation of one embodiment of a used vehicle record of the invention;

FIG. 6 is a high level block diagram illustrating one embodiment of a Data Center server system architecture of the invention;

FIG. 7 is a representation of one embodiment of a new vehicle purchase request record of the invention;

4

FIG. 8 is a representation of one embodiment of a used vehicle purchase request record of the invention;

FIG. 9 is a block diagram illustrating one embodiment of a communication between a buyer, a seller, and components of a Data Center system;

FIG. 10 is a flow chart illustrating a real time new vehicle purchase request submission and delivery process in accordance with one embodiment of the invention;

FIG. 11 is a flow chart illustrating a real time used vehicle purchase request submission and delivery process in accordance with one embodiment of the invention;

FIG. 12 is a representation of one embodiment of a dealer record showing the contents of the record fields;

FIG. 13 is a representation of one embodiment of a dealer record showing certain of the fields implemented as pointers;

FIG. 14 is a representation of one embodiment of a web page containing a hypertext link;

FIG. 15 is a representation of another embodiment of a web page containing a hypertext link;

FIG. 16 is a representation of one embodiment of a web page suitable for use in the new vehicle purchase request creation and submission process; and

FIG. 17 is a representation of one embodiment of an HTML page illustrating a scrollable list of purchase requests implemented as links.

## DETAILED DESCRIPTION

In one embodiment of the invention, a computerized purchase request communication system is provided which facilitates a real time communication of a purchase request to a system determined seller. The system includes a plurality of HTML pages accessible over a network. A potential buyer accesses a first HTML web page over a network such as the World Wide Web (www) using a standard web browser. A participating seller accesses a second HTML page over a network advantageously utilizing a standard web browser and by providing a URL to identify the system. The system further comprises a web server and other program modules which enable direct and immediate access into a system database. As used herein, "immnediately" is understood to mean occurring without loss or interval of time other than the nominal delay necessarily caused by computing components such as microprocessors, memory devices, software and firmware program execution times, and the like.

A participating seller is a seller of goods which has entered into an agreement to participate in the computerized purchase request communication system of the invention. The seller is identified by a unique seller record stored in the system database. The seller is further assigned an exclusive database region in the system database. The seller directly accesses its exclusive database region over the network utilizing the system's HTML pages.

The system creates exclusive sales regions based on geographic zip code and product type. Each participating seller is then assigned one or a plurality of exclusive sales regions depending on the agreement entered into by the seller. As an example, a seller X may be assigned the exclusive sales region encompassing the zip code 12345 for product A. Then, all purchase requests for product A identified as originating in zip code 12345 will be communicated to seller X. In an alternative embodiment, one or a plurality of sellers may be assigned to a single sales region. Thus, a purchase request may be sent to the plurality of sellers.

5

A potential buyer utilizes the plurality of buyer web pages comprising the system to create a purchase request. The system determines an appropriate seller to receive a purchase request based upon certain information supplied by the buyer. Having determined an appropriate seller, the system immediately stores the purchase request in the appropriate seller's exclusive database region. It is as if the potential buyer directly created the purchase request in the seller's exclusive database region.

The participating seller utilizes the plurality of HTML pages comprising the system to directly access the seller's exclusive database region. The system facilitates direct, concurrent access of the exclusive database region through both the buyer web pages and the seller HTML pages. As an example, the system may store the purchase request into a seller's exclusive database region immediately upon the creation and submission of the purchase request irrespective of whether the seller is concurrently accessing its exclusive database region. If the seller is accessing its exclusive database region, the seller is immediately made aware of the newly created purchase request. If the seller is not currently accessing the system, by immediately storing the just created purchase request in the seller's exclusive database region, and because the seller may directly access its database region, the system communicated the purchase request in real time.

Even though the invention is suitable for communicating a purchase request for any product, the invention will be further disclosed in the context of communicating a purchase request for a vehicle in a vehicle sales environment. Throughout the drawings, components which correspond to components shown in previous figures are indicated using the same reference numbers.

In one embodiment of the invention, a Data Center system facilitates the sales process by informing a vehicle dealer, in real-time, of a potential buyer. The Data Center system utilizes a database to store dealer information, buyer information, and program logic, for example, to associate the potential buyer to a specific dealer. Additionally, the Data Center system may include program logic facilitating access between the Data Center system and sources external to the Data Center system over a computer network.

Computer networks suitable for use with the present invention include local area networks (LAN), wide area networks (WAN), Internet, or other connection services and network variations such as the world wide web, the public internet, a private internet, a private computer network, a secure internet, a private network, a public network, a value-added network, and the like. The computers connected to the network may be any microprocessor controlled device that permits access to the network, including terminal devices, such as personal computers, workstations, servers, mini computers, main-frame computers, laptop computers, mobile computers, palm top computers, hand held computers, set top box for a TV, or a combination thereof. The computers may further possess input devices such as a keyboard or a mouse, and output devices such as a computer screen or a speaker. The computer network may include one or more LANs, WANs, Internets, and computers. The computers may serve as servers, clients, or a combination thereof.

One network architecture which may be used with one embodiment of the invention is indicated generally by a system 10 in FIG. 1. The system 10 may include a network 102, which represents a computer network as previously described, providing access to and from the Data Center system.

6

In one embodiment of the invention, the Data Center programs and Data Center databases comprising the Data Center system preferably reside on one or more Data Center servers 104 and one or more Data Center storage mediums 106. The Data Center servers 104 and Data Center storage mediums 106 may be interconnected by a LAN 108 and a gateway 110 to the network 102. The gateway 110 facilitates access to the Data Center system from the network 102.

One example of the LAN 108 may be a corporate computing network, including possible access to the Internet, to which computers and computing devices comprising the Data Center system are connected. In one embodiment, the LAN 108 conforms to the Transmission Control Protocol/Internet Protocol (TCP/IP) industry standard. In alternative embodiments, the LAN 108 may conform to other network standards, including, but not limited to, the International Standards Organization's Open Systems Interconnection, IBM's SNAG®, Novell's Netware®, and Banyon VINES®.

Those of ordinary skill in the art will recognize that the Data Center programs, the Data Center databases, and gateway functionality may advantageously be implemented on one or more computers. These computers may be uniprocessor or multiprocessor machines. Additionally, these computers include an addressable storage medium such as random access memory and may further include a non-volatile storage medium such as a magnetic or an optical disk.

In accordance with one embodiment of the invention, the Data Center server 104 is connected to the Internet and utilizes at least a first user web page remotely accessible by a potential buyer. This user web page permits the potential buyer to enter the necessary buyer and product information into the Data Center system. In another embodiment, the Data Center server 104 utilizes a second HTML page accessible by an authorized dealer. The authorized dealer utilizes this web page to access the Data Center system and features as further detailed herein. Those of ordinary skill in the art will recognize that a single web page may be used to provide both remote buyer and dealer access to the Data Center system. Further, access for a remote buyer could be through an entirely different network than that used for access by the dealer.

In one embodiment, the Data Center storage medium 106 may be configured as a database from which information can be both stored, updated, and retrieved. For example, the database may conform to the SQL standard. In an alternative embodiment, the database may conform to any database standard, or may even conform to a non-standard, private specification. The Data Center programs may provide access to the information stored on the Data Center storage medium 106. The Data Center storage medium 106 may be accessed by devices such as clients, servers, workstations, personal computers, and the like, connected to the network 102 or the LAN 108.

In one embodiment, the Data Center storage medium 106 comprises exclusive database regions. The Data Center assigns each participating dealer an exclusive database region. In another embodiment, the exclusive database regions may be created by segmenting the storage media into distinct areas, with each area assigned to a dealer. These areas or regions could be dynamically allocated by the computer depending on the amount of data to be stored as the data is entered. In another embodiment, the collection of information associated with a dealer advantageously comprises the exclusive database region for the dealer. The exclusive database region may only be accessed by the assigned dealer and the Data Center system programs.

7

8

In another embodiment, the Data Center programs may transfer the information stored on the Data Center storage medium 106 to sources external to the Data Center system. For example, vehicle inventory information may advantageously be transferred to other third-party computers connected to the network 102. A potential buyer can then access the third-party computer to view vehicle data. In yet another embodiment, the potential buyer may also submit a vehicle purchase request from the third-party computer.

Various other devices may be connected to the LAN 108. For example, a workstation 112 and a personal computer 114 may be connected to the LAN 108 to provide access to the Data Center programs and Data Center databases. In one embodiment, a printer 117 may also be connected to the LAN 108 providing local and remote printing capabilities.

The network 102 may connect devices, such as a user computer 116 or a user laptop 118, for example, by use of a modem or by use of a network interface card. As illustrated, potential buyers, may utilize such devices to remotely access the Data Center system via the network 102. The device used to provide access to the Data Center server may be referred to herein as a buyer terminal. This term is intended to include any device useful for providing access to the Data Center. The Data Center stores the purchase request directly into a dealer's database region.

A plurality of dealer computers 120 may also be connected to the network 102 through a modem or other network connection device. A vehicle dealer may advantageously use the dealer computer 120 to remotely access the Data Center system. The device used to provide access to the Data Center server may be referred to herein as a dealer terminal. This term is intended to include any device useful for providing access to the Data Center. The dealer obtains entry into the Data Center by logging in through the second HTML page of the Data Center server 104. Upon logging in, the dealer attains direct access to its exclusive database region and the contents thereof. Moreover, because a purchase request is directly stored in a dealer's database region, the dealer is immediately made aware of any newly created purchase request.

Although particular computer systems and network components are shown, those of ordinary skill in the art will appreciate that the present invention also works with a variety of other networks and components.

In one embodiment, for new vehicle sales, each zip code is an exclusive territory for a given make of vehicle. Thus, a particular dealer is advantageously assigned an exclusive sales region based upon a vehicle make and a zip code. If a new vehicle purchase request is submitted, for example, for a vehicle make A in zip code 99999, then the dealer assigned to zip code 99999 for the vehicle make A will be notified of the new vehicle purchase request. In one embodiment, a particular dealer may be assigned multiple vehicle makes as well as multiple zip codes. In another embodiment, sales regions need not be based upon zip codes. Other factors such as, by way of example, telephone area codes, cities, and counties, may advantageously provide the basis for determining sales regions.

In an alternative embodiment, one or a plurality of dealers may be assigned to a single sales region. Here, if a new vehicle purchase request is submitted, for example, for a vehicle make B in a zip code 88888, then the plurality of dealers assigned to zip code 88888 for vehicle make B will all be notified of the new vehicle purchase request.

For used vehicles, the territories are advantageously not exclusive. The dealer and buyer may separately specify a search radius. For example, each dealer may specify a search radius indicating that the dealer's used vehicles are to be offered for sale to potential buyer's within the specified geographic radius from the dealer location. This could be done, for example, by utilizing zip codes to represent the area from which the dealer would accept buyers. Similarly, the buyer may specify a search radius indicating the desire to purchase a used vehicle from a dealer within the specified geographic radius from the buyer location. Thus, both the buyer's and the dealer's search radius must overlap before a potential vehicle match is considered.

The dealer and the buyer may simply specify large geographic regions, such as states, counties, or zip codes, and only those dealers and buyers within the geographic region specified by both are considered to determine a potential vehicle match. Thus, if a dealer specifies New York and New Jersey as its sales region and a buyer accesses the Data Center from Pennsylvania, then the dealer's used vehicles would not be considered for a potential sale. Likewise, if a buyer specifies an intent to purchase from New York, a Texas dealer will not be considered.

FIG. 2 illustrates an example of a record of exclusive dealer regions suitable for use with one embodiment of the invention. Advantageously, the record of exclusive dealer regions may be implemented as a matrix. The matrix may be stored in the Data Center Storage medium 106. Along the horizontal axis may be listed all the regions according to zip codes. Along the vertical axis may be listed all the available vehicle makes. Each matrix cell 202 may contain a dealer identification number uniquely identifying a dealer. In this manner, each region, and each vehicle make for that region, may be assigned to a unique dealer. In an alternative embodiment, each matrix cell 202 may contain one or a plurality of dealer identification numbers.

FIG. 3 illustrates an example of a dealer record according to one embodiment of the invention. Each dealer eligible to sell through the Data Center system is assigned a dealer record. The dealer record may be stored in the dealer's exclusive database region in the Data Center storage medium 106. By way of example, six fields are illustrated comprising the dealer identification number 302, dealer information 304, access list 306, product list 308, new vehicle purchase requests 310, and used vehicle purchase requests 312. One of ordinary skill in the art will realize that any number of the fields may be broken down into additional sub-fields and that additional fields could be added.

In one embodiment, the dealer information 302 may be comprised of additional fields such as, for example, a dealer name, dealer address, dealer group, and the like. FIG. 12 generally illustrates an example of a dealer record showing the contents of the record fields suitable for use with one embodiment of the invention. Furthermore, any of the dealer record fields may be implemented as pointers to other fields or other data records. For example, the product list may point to a list of new vehicle model records indicating the new vehicle models offered for sale by the dealer. FIG. 13 generally illustrates an example of a dealer record depicting certain of the fields implemented as pointers.

In one embodiment, each new vehicle model record may in turn point to a list of aftermarket product records. The aftermarket product records identify additional products offered for sale, by the dealer, for the specific new vehicle model. The aftermarket product record may be comprised of the name of an aftermarket product, a retail price for the product, a discounted price for the product, and possibly a photo showing the product.

US 6,282,517 B1

**9**

In yet another embodiment, each new vehicle model record may further point to a vehicle model specifics record and a vehicle model accessories record. The vehicle model specifics record may identify the vehicle model specifics such as available transmission type, available number of doors, and the like. The vehicle model accessories record may identify the accessories such as leather seats, power windows, and the like, available for the vehicle model. In an alternative embodiment, the vehicle model specifics record contents and the vehicle model accessories record contents may be appropriately displayed in a web page. The buyer may then specify the desired vehicle specifics and the desired vehicle accessories.

In one embodiment, a new vehicle database may be comprised of a list of new vehicle records which may be stored in the Data Center storage medium **106**. Each new vehicle model available for purchase through the Data Center system is associated with a new vehicle record. FIG. **4** illustrates a new vehicle record suitable for use with the invention. Seven fields are illustrated comprising a vehicle make **402**, vehicle model **404**, vehicle year **406**, vehicle type **408**, vehicle estimated price **410**, vehicle features **412**, and vehicle photo **414**. It should be understood that appropriate fields may be added and a field may contain additional sub-fields. For example, the vehicle features field **412** may advantageously be comprised of a standard features field and an optional features field. In one embodiment, the vehicle type field **408** may specify whether the vehicle is a passenger car, a luxury car, a sports car, or the like.

In another embodiment, the new vehicle record fields may be implemented as pointers to other fields or other records. For example, the vehicle photo field **414** may be implemented as a pointer pointing to a representative photo of the new vehicle. Thus, the representative photo may advantageously be stored in a different region in the Data Center storage medium **106**. In yet another embodiment, the vehicle year field **406** may be implemented as a pointer pointing to one or a plurality of records, each record containing, for example, a year field, a type field, an estimated price field, a features field, a photo field, and the like.

A used vehicle record identifies a used vehicle, and is created for each used vehicle offered for sale through the Data Center system. The collection of used vehicle records comprise a used vehicle inventory. The used vehicle records may be stored in the Data Center storage medium **106**. For example, the used vehicle inventory may be comprised of a linked list of used vehicle records.

FIG. **5** illustrates an example of a used vehicle record suitable for use with one embodiment of the invention. Six fields are illustrated comprising the dealer identification number **302**, a dealer stock number **502**, vehicle make **504**, vehicle model **506**, vehicle information **508**, and vehicle photo **510**. One of ordinary skill in the art will realize that appropriate fields may be added and any number of the fields may be broken down into additional sub-fields. Furthermore, any of the fields may be implemented as pointers to other fields or other data records. For example, the vehicle photo field **510** may advantageously point to an image of the vehicle stored elsewhere in the Data Center database.

FIG. **6** illustrates in more detail selected components of the Data Center server **104** of FIG. 1 suitable to implement one embodiment of the present invention. The Data Center server **104** includes a buyer access module **602** connected along a virtual communications path **606** to a process purchase request module **604**. Also connected to the virtual communications path **606** is a database access module **608**,

**10**

a buyer-dealer association module **610**, a dealer access module **612**, and a network access module **614**.

The buyer access module **602** provides a buyer an interface into the Data Center system. In one embodiment, a purchase request entry system comprises the buyer access module **602** and may facilitate a data entry environment for a buyer to enter a purchase request for a requested vehicle into the Data Center system. The buyer access module **602** may be comprised of a generate new vehicle purchase request module **616** and a generate used vehicle purchase request module **618**. The generate new vehicle purchase request module **616** and the generate used vehicle purchase request module **618** may advantageously be implemented as a plurality of web pages.

In one embodiment, the web pages may advantageously be implemented in hypertext or hypermedia. Thus, the web pages may contain one or a plurality of selectable items or links. The links may provide access to other web pages contained in the Data Center system. The plurality of linked web pages guides the user in entering the necessary data to create and submit either a new vehicle purchase request or a used vehicle purchase request. In one example, FIG. **14** generally illustrates an example of a used vehicle search request for an Acura 3.5RL. Clicking on a hypertext link **1402** using a pointing device such as a mouse, or the like, may advantageously display another web page as generally illustrated by FIG. **15**. Generally depicted at **1502** is the contents of the web page pointed to by the hypertext link **1402**.

In another embodiment, the links may provide access to any location in the World Wide Web. For example, a link may exist to third-party web sites which advantageously provide additional product information.

The generate new vehicle purchase request module **616** facilitates a new vehicle purchase request creation and submission process. A potential buyer remotely utilizes over a network, such as the World Wide Web, at least a first web page in the generate new vehicle purchase request module **616** and provides information from which the process purchase request module **604** creates a new vehicle purchase request. Likewise, the generate used vehicle purchase request module **618** facilitates a used vehicle purchase request creation and submission process through its web pages. There may be a one-to-one correlation between a purchase request and a purchase request record.

In one embodiment, a processing system comprises the process purchase request module **604** and may facilitate the creation of a purchase request record. The process purchase request module **604** may create either a new vehicle purchase request record or a used vehicle purchase request record. The new vehicle purchase request record may be created from the information supplied through the plurality of web pages utilized during the new vehicle purchase request creation and submission process. In one embodiment, the buyer information gathered through the plurality of web pages comprising the generate new vehicle purchase request module **616** is input to the process purchase request module **604**. The process purchase request module **604** creates a new vehicle purchase request record from this information. The used vehicle purchase request record may likewise be created from the information supplied through the plurality of web pages utilized during the used vehicle purchase request creation and submission process. In another embodiment, the purchase request information may also be obtained from web pages external to the Data Center system.

US 6,282,517 B1

11                                                                    12

As one example, FIG. **16** generally illustrates one web page which may be used in the new vehicle purchase request creation and submission process. The buyer information specified in the desired vehicle model **1602** may advantageously be input to an appropriate vehicle model field **710** in an new vehicle purchase request record illustrated in FIG. **7**. The new vehicle purchase request record will be further discussed below.

FIG. **7** illustrates a set of information fields comprising a new vehicle purchase request record according to one embodiment of the invention. Fifteen fields are illustrated comprising new vehicle purchase request identification number **702**, submit time stamp **704**, dealer identification number **706**, vehicle make **708**, vehicle model **710**, vehicle model year **712**, purchase time frame **714**, vehicle specifies **716**, requested accessories **718**, requested aftermarket products **720**, buyer information **722**, privacy **724**, payment information **726**, priority **728**, and status **730**. It should be understood that some of these fields include several sub-fields. Thus, for example, the buyer information field may include sub-fields for name, address, zip code, e-mail address, phone numbers, and contact preference. The new vehicle purchase request record may advantageously be stored in the Data Center storage medium **106**.

In one embodiment, the information fields may be implemented as pointers to other fields or other records containing the information. For example, the buyer information may be implemented as a pointer. The pointer may point to a record comprised of, for example, the name, address, zip code, e-mail address, phone numbers, and contact preference. Those of ordinary skill in the art will realize that any combination of the information fields may be implemented as pointers.

In another embodiment, certain information fields may be implemented as encoded fields. For example, the requested accessories field may be implemented as a binary encoded field. Each bit position may coincide with a vehicle accessory such as an AM/FM radio, power windows, tilt wheel, overhead console, and the like. For example, a "1" in the first bit position may indicate the selection of an AM/FM Radio accessory.

FIG. **8** illustrates a used vehicle purchase request record suitable for use with one embodiment of the invention. Thirteen fields are illustrated comprising used vehicle purchase request identification number **802**, submit time stamp **804**, dealer identification number **806**, dealer stock number **808**, vehicle make **810**, vehicle model **812**, vehicle model year **814**, purchase time frame **816**, buyer information **818**, payment information **820**, priority **822**, privacy **824**, and status **826**. One of ordinary skill in the art will realize that any number of the fields may be broken down into additional sub-fields. Furthermore, similar to the new vehicle purchase request record, any of the fields may be implemented as pointers, encoded fields, and the like. The used vehicle purchase request record may advantageously be stored in the Data Center storage medium **106**.

In one embodiment, the process purchase request module **604** (FIG. **6**) may associate the information entered by the buyer through either the generate new vehicle purchase request module **616** or the generate used vehicle purchase request module **618** with their appropriate fields in the respective purchase request record. The process purchase request module **604** may utilize the database access module **608** in storing the purchase request record in the Data Center storage medium **106** (FIG. **1**). The database access module **608** will be further discussed below.

In one embodiment, the purchase request record may be completed before being stored in the Data Center storage medium **106**. In another embodiment, the purchase request record fields may be stored in the Data Center storage medium **106** as the appropriate information is provided by the buyer.

In another embodiment of the invention, certain fields comprising the purchase request record may be determined by modules other than the process purchase request module **604** (FIG. **6**). For example, the process purchase request module **604** may request the buyer-dealer association module **610** to identify an appropriate dealer to receive the purchase request. Accordingly, the process purchase request module **604** may advantageously pass certain purchase request information to the buyer-dealer association module **610** via the virtual communications path **606**.

In one example, for a new vehicle purchase request, the buyer-dealer association module **610** may utilize the exclusive dealer regions record to determine a dealer identification number for the purchase request record. In one embodiment, as previously stated, the vehicle make and the buyer zip code may be used to determine the appropriate dealer to receive the new vehicle purchase request. The virtual communications path **606** and the buyer-dealer association module **610** will be further discussed below. In another embodiment, the dealer identification number may be passed to the process purchase request module **604** for inclusion into the dealer identification number field in the new vehicle purchase request record.

In an alternative embodiment, the exclusive dealer regions record may identify one or a plurality of dealer identification numbers. The buyer-dealer association module **610** may then create the necessary number of purchase request records, one for each of the plurality of dealer identification numbers. The dealer identification numbers may be passed to the process purchase request module **610**, which may then create the necessary number of purchase request records. Thus, one or a plurality of dealers may be identified to receive a purchase request.

In one embodiment, the buyer-dealer association module **610** may advantageously determine a dealer of a used vehicle. For example, given the vehicle make, the vehicle model, and the vehicle information, the buyer-dealer association module **610** may search the used vehicle inventory to locate a vehicle matching the buyer's requirements. The used vehicle records in the used vehicle inventory may be searched to determine, for example, the dealer identification number and the dealer stock number for inclusion into the used vehicle purchase request record.

In another embodiment, the used vehicle record may also include a unique identification number. The identification number may be created by the Data Center system to identify each vehicle in the Data Center system. This identification number may advantageously be independent of the dealer stock number. This is because the stock number used by one dealer for one vehicle may be identical or very similar to a stock number selected by another dealer for another vehicle. In one embodiment, a record may associate the unique identification number to a dealer offering the vehicle for sale. The buyer-dealer association module **610** may determine the necessary information to identify the dealer, as well as the vehicle, from the identification number.

In yet another embodiment, the dealer identification number and the dealer stock number may be included into the used vehicle purchase request record by the process purchase request module **604**. For example, the dealer identi-

US 6,282,517 B1

13

fication number and the dealer stock number may be accessed by the process purchase request module 604 at the time the buyer requests the vehicle, or soon thereafter. The process purchase request module 604 may at that time, or soon thereafter, search the used vehicle records stored in the Data Center storage medium 106 to obtain the necessary vehicle information.

In an alternative embodiment, the buyer may specify one or a plurality of dealers to receive the purchase request. For example, the buyer may simply specify one or a plurality of dealers to receive the purchase request. In another embodiment, the buyer may specify a geographic region and a vehicle description. The Data Center system may then identify the dealers offering for sale vehicles potentially matching the specified vehicle description in the specified geographic region. Then, every identified dealer may receive the purchase request.

According to one embodiment of the present invention, the process purchase request module 604 may further associate the purchase request record with the appropriate dealer record. For example, a new vehicle purchase request record mall, upon creation, or soon thereafter, be logically connected to the dealer record new vehicle purchase requests field 310. The logical connection may be in the form of, for example, a direct entry of the new vehicle purchase request record into the new vehicle purchase requests field, or an entry into a list of new vehicle purchase request records pointed to by the new vehicle purchase requests field. The same association may be made between a used vehicle purchase request record and the dealer record used vehicle purchase requests field 312.

FIG. 9 is a block diagram illustrating one embodiment of a communication between a buyer 902, a dealer 904, and components of the Data Center system. More particularly, a communication between the buyer 902, the dealer 904, a Data Center server 104, and a Data Center storage medium 106 is illustrated. The buyer 902 may access the Data Center server 104, through the network 102 and the gateway 110, to create and submit a purchase request in the Data Center system. The Data Center server 104 creates and stores the purchase request, as a purchase request record, in the Data Center storage medium 106. The purchase request is stored such that the dealer 904 may identify the purchase request at the time the purchase request record is created, or soon after.

In one embodiment, the buyer 902 utilizes the components of the Data Center server 104 to create and store a purchase request record in the dealer's exclusive database region in the Data Center storage medium 106. The purchase request record is stored immediately upon the completion of the purchase request creation and submission process. The dealer 904 may access its database region to obtain a listing of its purchase requests. FIG. 17 generally illustrates a HTML page suitable for use in an embodiment of the invention. A scrollable list of purchase requests, advantageously implemented as links, is displayed generally at 1702. Immediately upon the creation of the purchase request record in the dealer 904 exclusive database region, the list of purchase requests is updated to show the just created purchase request.

The dealer 904 may access the Data Center system through the network 102 and the gateway 110. The dealer 904 remotely accesses the Data Center system over the network 102 by providing a URL to identify the Data Center system. Dealers advantageously access the Data Center by providing a URL and preferably not over the world wide web. Thus, access to the Data Center system may advanta-

14

geously be restricted to those who know the URL and is not as readily reachable by web search engines. Thus, the URL for the buyer to access the system is advantageously HTTP://www.autobytel.com and the URL for the Dealer site, called Dealer RealTime (or DRT), may advantageously be HTTP://drt.autobytel.com.

The dealer 904 may access its dealer record and, more particularly, its purchase request records, through the Data Center Server 104. In one embodiment, the appropriate dealer record field contains information from which the purchase request records may be identified and accessed. Alternatively, the purchase request records may contain information identifying the dealer 904. Thus, the purchase request is delivered and communicated to the dealer in real time, upon the creation of the purchase request record, or soon after.

In one embodiment, a dealer may be notified of a newly created purchase request record upon accessing the Data Center system. In another embodiment, the dealer may be notified of a purchase request created while the dealer is concurrently accessing the Data Center system. For example, the dealer may be viewing a screen displaying a list of purchase requests as illustrated in FIG. 17. The appropriate field in the dealer record may be updated to identify the newly created purchase request while the dealer is accessing the Data Center system through a computer 120. Then, the screen may advantageously be refreshed to display a list containing the newly created purchase request immediately upon the creation of the purchase request record, thereby communicating to the dealer the purchase request. In yet another embodiment, the dealer may immediately be notified of a new purchase request via communication mechanisms such as e-mail, page, telephone message, or the like, which are triggered in response to the receipt of the purchase request in the dealer record.

Conventional purchase request delivery systems utilize some degree of batch processing before a purchase request notification is generated. In conventional systems, the delivery is generally by fax, phone call, or e-mail, and the notification occurs at a time significantly after the submission of the purchase request. In contrast, this invention advantageously provides for a real time delivery of a purchase request to the appropriate dealer. The purchase request delivery and notification occur when the purchase request record is created, or soon after. Moreover, unlike conventional notification systems, the buyer need not specify a recipient dealer. This contemplate, however, that the system may permit the buyer to select a recipient dealer or dealers.

The virtual communications path 606 (FIG. 6) facilitates communication amongst the modules comprising the Data Center server 104 (FIG. 1). The virtual communications path 606 may be implemented as a procedure or a function call interface. In an alternative embodiment, the virtual communications path 606 may be implemented as an interprocess communication method. For example, the modules comprising the Data Center server 104 may be implemented as one or a plurality of software processes. The various software processes may then communicate with one another by means of interprocess communication. Those of ordinary skill in the art will realize that the modules comprising the Data Center server 104 may be distributed amongst a plurality of Data Center servers 104 utilizing well known distributed technology techniques.

The database access module 608 provides an interface to the information stored on the Data Center storage medium 106. The database access module 608 thus enables the Data

US 6,282,517 B1

15

Center server **104** modules to be implemented independent of the Data Center storage medium **106** specifics. This enables the Data Center storage medium **106** specification to be altered without impacting the various modules, other than the data base access module **608**, comprising the Data Center server **104**.

In one embodiment, as previously mentioned, the Data Center storage medium **106** may be configured as a SQL database. The database access module **608** implements the specifics of the SQL commands to interact with the Data Center storage medium **106**. Thus, other modules comprising the Data Center server **104** may be developed independent of the SQL specifics. For example, if the Data Center storage medium **106** is re-developed as a DB2 database, only the database access module **608** needs to be updated. The other modules comprising the Data Center server **104** need not be re-developed.

The buyer-dealer association module **610** associates a purchase request and an appropriate dealer. In one embodiment, the buyer-dealer association module **610** may receive purchase request information from the process purchase request module **604** via the virtual communications path **606**. The buyer-dealer association module **610** may then access the Data Center storage medium **106**, utilizing the database access module **608** and the network access module **614**, to determine the appropriate dealer for the purchase request. In one embodiment, as previously stated, the buyer-dealer association module **610** may advantageously determine an appropriate dealer to receive the purchase request from the vehicle make and the buyer zip code.

FIG. **10** is a flow chart generally illustrating a real time new vehicle purchase request submission and communication process according to one embodiment of the present invention. In particular, at a step **1002**, the new vehicle purchase request information is submitted by the buyer. The buyer may utilize the generate new vehicle purchase request module **614** to submit the information pertaining to the new vehicle purchase request. In one embodiment, the buyer information may be passed to the process purchase request module **604** as the buyer information is entered through each web page, or soon thereafter. In another embodiment, the buyer-dealer association module **610** determines the appropriate dealer from the record of exclusive dealer regions once the buyer enters a requested vehicle model and a buyer zip code, or soon thereafter.

Once the buyer information is entered, the Data Center system moves to a step **1004** wherein a check is performed to determine if the buyer has previously submitted a new vehicle purchase request within the previous 48 hours. In one embodiment, a list of new vehicle purchase request records may be searched to determine if the buyer has previously submitted a new vehicle purchase request. In another embodiment, the list of new vehicle purchase request records may be sorted based on the submit time stamp. Thus, only the new vehicle purchase request records submitted within 48 hours need to be searched. In yet another embodiment, the list of new vehicle purchase request records may further be sorted according to dealer identification number, thus requiring a search of even a smaller number of new vehicle purchase request records.

In one embodiment, in step **1004**, a buyer address may be used as the criteria for determining if the buyer previously submitted a new vehicle purchase request within the past 48 hours. If the buyer previously submitted a new vehicle purchase request, then the Data Center system moves to step

16

**1006** and rejects the present new vehicle purchase request. Also, the buyer may be presented with an error message indicating the rejection of the newly submitted purchase request.

If the buyer has not submitted a new vehicle purchase request within the prior 48 hours, the Data Center system moves to a step **1008** wherein a new vehicle purchase request record is created by the process purchase request module **604** and is stored in the appropriate dealer's exclusive database region in the Data Center storage medium **106**. In one embodiment, the process purchase request module **604** may generate a unique number to identify the new vehicle purchase request record. Thus unique number may be associated with the new vehicle purchase request identification number field **702** illustrated in FIG. **7**. The Data Center system then moves to step **1010** wherein a confirmation is sent to the buyer. For example, the confirmation may be a web page displaying the purchase request number.

At a step **1012**, the new vehicle purchase request record is added to the appropriate dealer record new vehicle purchase requests field **310**. In one embodiment, as generally illustrated in FIG. **13**, the new vehicle purchase requests field **310** may point to a list of new vehicle purchase request records. The current new vehicle purchase request record may be added to the existing list of new vehicle purchase request records. The current new vehicle purchase request record is immediately displayed in the list of purchase requests as generally illustrated at **1702** in FIG. **17**. In another embodiment, the dealer record new vehicle purchase requests field may additionally comprise a status flag indicating the new arrival of a newer vehicle purchase request.

In another embodiment, the dealer record advantageously comprises one or a plurality of beeper numbers to be called upon the delivery of a new vehicle purchase request. The process purchase request module **604** may result in the creation of an e-mail message including, for example, beeper number or numbers for the e-mail paging service to call, and address to an e-mail to pager service. The e-mail message may then be submitted to the e-mail paging service. The e-mail paging service may then perform the paging, or dialing, function. As is well known in the art, suitable e-mail message paging services are available from companies such as Pagenet, Skytel, and MCI.

FIG. **11** is a flow chart generally illustrating a real time used vehicle purchase request submission and delivery process according to one embodiment of the invention. In particular, at a step **1102**, the buyer may submit information generally describing a vehicle. To do this, the buyer uses the generate used vehicle purchase request module **616**. In one embodiment, the buyer may specify information such as a vehicle make, a vehicle model, and the like.

Once the buyer submits his or her search criteria, which generally describes the vehicle, the Data Center system moves to step **1103** and conducts a search, based on the submitted search criteria, of the used vehicle records comprising the used vehicle inventory in the Data Center storage medium **106**. In one embodiment, the generate used vehicle purchase request module **618** may utilize the database access module **608** to perform the search. If the search is unsuccessful at step **1104**, the Data Center system moves to a step **1105** wherein the buyer is prompted to alter the search criteria. The Data Center system then moves to step **1102** and functions as described above.

In one embodiment, if it is determined in step **1104** that the search was successful, the Data Center system moves to step **1106** wherein the results of the search are displayed to

17

the buyer. In this step, the buyer may also view a more detailed description of one or more vehicles found in the search. Having decided on an appropriate vehicle, the buyer may create a purchase request for that vehicle which is submitted to the Data Center system at a step 1108.

At a step 1110, the process purchase request module 604 creates a used vehicle purchase request record in the appropriate dealer's exclusive database region in the Data Center storage medium 106. In this step, the buyer-dealer association module 610 may determine the dealer offering the used vehicle for sale. In one embodiment the process purchase request module 604 may generate a unique number to identify the used vehicle purchase request record. This unique number may be associated with the used vehicle purchase request identification number field 802 illustrated in FIG. 8.

In one embodiment, a confirmation is sent to the buyer at a step 1112. Fir example, the confirmation sent may be a web page displaying the purchase request number. At a step 1012, the used vehicle purchase request record is stored and identified in a manner similar to a new vehicle purchase request record. Thus, the purchase request is communicated to the dealer in real time. Consequently, the dealer may appropriately act on the purchase request upon its submission, or shortly after.

The network access module 614 (FIG. 6) provides the modules of the Data Center Server 104 (FIG. 1) a uniform interface to the LAN 108. In one embodiment, the network access module 614 may be implemented as an application program interface. The network access module 614 enables the Data Center server 104 modules to be implemented independent of the underlying network specifics. Thus, the underlying network specifics may be altered without impacting the various modules, other than the network access module 614, comprising the Data Center server 104.

The dealer access module 612 provides a dealer an interface into the Data Center system. In one embodiment, a dealer management system comprises the dealer access module 612 and may facilitate the dealer's managing its purchase requests. More particularly, a dealer may directly access its exclusive database region, and the information contained therein, by logging into the Data Center system through the dealer access module 612. In one embodiment, the dealer access module 612 may be implemented as a plurality of HTML pages providing the dealer a mechanism to access its exclusive database region. The Data Center system may advantageously communicate to the dealer its purchase requests through one or a plurality of the HTML pages. An example of one such HTML page is illustrated in FIG. 17. The dealer may also advantageously perform real time operations such as, purchase request management, inventory management, and the like, through the plurality of HTML pages.

This invention may be embodied in other specific forms without departing from the essential characteristics as described herein. The embodiments described above are to be considered in all respects as illustrative only and not restrictive in any manner. The scope of the invention is indicated by the following claims rather than by the foregoing description.

What is claimed is:

1. A method of communicating a purchase request to a dealer in a Data Center system having a system database, a buyer interface, and a dealer interface, wherein said buyer interface and dealer interface provide a remote interface to said Data Center, said buyer interface and dealer interface provide immediate access to said system database, said method comprising the acts of:

creating an exclusive database region for each of a plurality of participating dealers in said system database;

providing each of said plurality of dealers direct access to said exclusive database region over a computer network, wherein said access is through said dealer interface;

receiving said purchase request over a computer network from a potential buyer, said purchase request including product identification data and buyer location information;

comparing said product identification data and said buyer location information with at least one of a plurality of records that are associated with at least one of said plurality of dealers;

identifying in response to said step of comparing at least one of said plurality of dealers to notify;

creating a purchase request record for said purchase request; and

communicating said purchase request to said identified dealer, said communicating includes storing said purchase request record into said exclusive database region for said identified dealer immediately upon creation of said purchase request record, and wherein said purchase request is accessed by the identified dealer via at least one web page that is provided by a server that is remote to the identified dealer.

2. The method as defined in claim 1 wherein said act of receiving said purchase request comprises receipt of a request that is transmitted through a plurality of web pages.

3. The method as defined in claim 1, wherein said product identification data includes a vehicle make and a vehicle model.

4. The method as defined in claim 1, wherein said purchase request records is either a new vehicle purchase request record or a used vehicle purchase request record.

5. The method as defined in claim 1, wherein said dealer identification is based on a vehicle make specified in said product identification data and a zip code specified in said buyer location information.

6. The method as defined in claim 1, wherein said dealer identification is based on a search of a used vehicle inventory for a vehicle specified in said product identification data.

7. The method as described in claim 6, wherein said search is further based on both a buyer search radius and a dealer search radius.

8. The method as defined in claim 1, wherein said dealer identification is based on an identification number.

9. The method as defined in claim 1, wherein said act of communicating includes the act of adding a new vehicle purchase request record to a new vehicle purchase requests field in a dealer record associated with said identified dealer.

10. The method as defined in claim 1, wherein said act of communicating includes the act of adding a used vehicle purchase request record to a used vehicle purchase requests field in a dealer record associated with said identified dealer.

11. The method as defined in claim 1, wherein said act of communicating includes the act of adding a new vehicle purchase request record to a list of new vehicle purchase request records.

12. The method as defined in claim 1, wherein said act of communicating includes the act of adding a used vehicle purchase request record to a list of used vehicle purchase request records.

**19**

13. The method as defined in claim **1**, wherein said act of communicating includes the act of setting a dealer identification number field to a dealer identification number for said identified dealer.

14. The method as defined in claim **1**, wherein said act of communicating includes the acts of:

displaying a list of purchase requests to said identified dealer; and

refreshing said list to include a new purchase request immediately upon the creation of said new purchase request.

15. The method as defined in claim **1**, wherein said act of communicate includes sending an e-mail message to an e-mail message paging service.

16. The method as defined in claim **1**, wherein said act of communicating includes logically connecting a new purchase request record to a dealer record.

17. The method as described in claim **1**, further comprising the act of receiving only one new vehicle purchase request from said buyer within a 48 hour period.

18. A purchase request communication system, wherein said purchase request is remotely entered by a potential buyer over a computer network, said purchase request communication system comprising:

a system database which provides an exclusive database region for each of a plurality of dealers;

an entry system which creates said purchase request, and which provides at least a first web page to said buyer;

a dealer management system which provides said plurality of dealers remote access into said exclusive database region via using at least a second web page; and

a processing system which creates a purchase request record for said purchase request, said processing system identifying which of a plurality of dealers based on said purchase request, said processing system immediately storing said purchase request record in said exclusive database region for said identified dealer.

19. The purchase request communication system as defined in claim **18**, wherein said purchase request record is either a new vehicle purchase request record or a used vehicle purchase request record.

20. The purchase request communication system as defined in claim **18**, wherein said dealer identification is based on a vehicle make and a zip code specified in said purchase request.

21. The purchase request communication system as defined in claim **18**, wherein said dealer identification is determined in response to a search of a used vehicle inventory for a vehicle specified in said purchase request.

22. The method as described in claim **21**, wherein said search is further based on both a buyer search radius and a dealer search radius.

23. The purchase request communication system as defined in claim **18**, wherein said dealer identification is determined in response to an evaluation of an identification number.

24. The purchase request communication system as defined in claim **18**, wherein said communication system communicates said purchase request to said dealer by adding a new vehicle purchase request record to a new vehicle purchase requests field in a dealer record associated with said dealer.

25. The purchase request communication system as defined in claim **18**, wherein said communication system communicates said purchase request to said dealer by adding

**20**

a used vehicle purchase request record to a used vehicle purchase requests field in a dealer record associated with said dealer.

26. The purchase request communication system as defined in claim **18**, wherein said communication system communicates said purchase request to said dealer by adding a new vehicle purchase request record to a list of new vehicle purchase request records.

27. The purchase request communication system as defined in claim **18**, wherein said communication system communicates said purchase request to said dealer by adding a used vehicle purchase request record to a list of used vehicle purchase request records.

28. The purchase request communication system as defined in claim **18**, wherein said communication system communicates said purchase request to said dealer by setting a dealer identification number field to a dealer identification number for said identified dealer.

29. The purchase request communication system as defined in claim **18**, wherein said communication system communicates said purchase request to said dealer by sending an e-mail message to an e-mail message paging service.

30. A purchase request communication system for communicating to at least one of a plurality of dealers a purchase request submitted by a potential buyer, said communication system having a system database, a buyer interface, and a dealer interface, said system database including an exclusive database region for each of said plurality of dealers, said communication system comprising:

means for receiving a purchase request over a computer network from a potential buyer, said purchase request including at least a product identification data and a buyer location information;

means for comparing said product identification data and said buyer location information with at least one of a plurality of records that are associated with at least one of said plurality of dealers;

means for identifying in response to said comparing means at least one of said dealers to notify;

means for creating a purchase request record for said purchase request; and

means for communicating said purchase request to said identified dealer, said communicating includes storing said purchase request record into said exclusive database region for said identified dealer immediately upon said formulating said purchase request record, and wherein said purchase request is accessed by the identified dealer via at least one web page that is provided by a server that is remote to the identified dealer.

31. The communication system as defined in claim **30**, additionally comprising:

means for displaying a list of purchase requests to said identified dealer; and

means for refreshing said list to include a new purchase request immediately upon tie creation of said new purchase request.

32. The communication system as defined in claim **30**, additionally comprising means for sending an e-mail message to an e-mail message paging service.

33. The communication system as defined in claim **30**, wherein said dealer identification is based on both a buyer provided search radius and a dealer provided search radius.

* * * * *